**Nos. 25-1169, 25-1170**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

O. DOE; BRAZILIAN WORKER CENTER; LA COLABORATIVA,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; US DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State; US SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in their official capacity as Acting Commissioner of Social Security,

*Defendants-Appellants.*

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; DANA NESSEL, Attorney General for the People of the State of Michigan; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN; CITY AND COUNTY OF SAN FRANCISCO,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; US DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State; US DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of Homeland Security; US DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of Health and Human Services; US SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in their official capacity as Acting Commissioner of Social Security; UNITED STATES,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Massachusetts

**JOINT APPENDIX**
**VOLUME 1 OF 2 (*Doe v. Trump*)**

**COUNSEL LISTED ON INSIDE COVER**

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7230*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*

# TABLE OF CONTENTS

**Volume 1:** *Doe v. Trump*, **No. 1:25-cv-10135-LTS (D. Mass.)**

District Court Docket Report ........................................................................JA1

Complaint (Dkt. 1) (Jan. 20, 2025) ..............................................................JA10

Declarations in Support of Motion for Preliminary Injunction (Jan. 23, 2025)

 Declaration of O. Doe (Dkt. 11-1) ....................................................JA32

 Declaration of Gladys Vega (Dkt. 11-2) ...........................................JA35

 Declaration of Brazilian Worker's Center (Dkt. 11-3) ....................JA40

 Declaration of Leon Rodriguez (Dkt. 11-4) .....................................JA44

 Declaration of Fiona S. Danaher, M.D., M.P.H. (Dkt. 11-5) .........JA49

 Declaration of Rose L. Molina, M.D., M.P.H. (Dkt. 11-6)............JA55

 Declaration of Carol Galletly (Dkt. 11-7) ........................................JA60

 Declaration of Daniel Kanstroom (Dkt. 11-8) .................................JA63

 Declaration of Katherine Culliton-González (Dkt. 11-9)...............JA69

 Declaration of Armen H. Merjian (Dkt. 11-10) ...............................JA72

Transcript of February 7, 2025 Consolidated Motion Hearing (Dkt. 44) ...............JA77

Notice of Appeal (Dkt. 48) (Feb. 19, 2025) ...............................................JA155


**Volume 2:** *New Jersey v. Trump*, **No. 1:25-cv-10139-LTS (D. Mass.)**

District Court Docket Report ....................................................................JA158

Complaint (Dkt. 1) (Jan. 21, 2025) ............................................................JA189

*Volume 2 Table of Contents (cont'd)*

Exhibits in Support of Motion for a Preliminary Injunction (Jan. 21, 2025)

  Table of Exhibits (Dkt. 5-1) ....................................................................JA239

  Declaration of Sarah Adelman (Dkt. 5-2)..............................................JA242

  Declaration of Kathy Ehling (Dkt. 5-3) ................................................JA252

  Declaration of Kaitlan Baston (Dkt. 5-4) ..............................................JA259

  Declaration of Laura Jamet (Dkt. 5-5) ..................................................JA267

  Declaration of Sharon C. Boyle (Dkt. 5-6) ............................................JA276

  Declaration of Shelley Lapkoff (Dkt. 5-7) .............................................JA284

  Declaration of Michael F. Rice, Ph.D. (Dkt. 5-8) ..................................JA317

  Declaration of Kelly Sesti (Dkt. 5-9) .....................................................JA323

  Declaration of Jeffrey Duncan (Dkt. 5-10)............................................JA331

  Declaration of Meghan Groen (Dkt. 5-11)............................................JA338

  Declaration of Lindy Harrington (Dkt. 5-12).........................................JA349

  Declaration of Rachel A. Heenan (Dkt. 5-13)........................................JA362

  Declaration of Rita Nguyen, M.D. (Dkt. 5-14) .....................................JA369

  Declaration of Elizabeth Villamil-Cummings (Dkt. 5-15)......................JA378

  Declaration of Gabrielle Armenia (Dkt. 5-16) .......................................JA400

  Declaration of Jonathan Fanning (Dkt. 5-17) ........................................JA410

  Declaration of Jennifer Avenia (Dkt. 5-18) ...........................................JA415

  Declaration of Peter Hadler (Dkt. 5-19) ...............................................JA425

  Declaration of Yvette Gauthier (Dkt. 5-20) ..........................................JA440

  Declaration of Tom Wong (Dkt. 5-21) ..................................................JA446

  State Department's Foreign Affairs Manual (Dkt. 5-22) ........................JA466

  Declaration of Peri Weisberg (Dkt. 5-23)..............................................JA476

  Executive Order, "Protecting the Meaning and Value of American
  Citizenship," (Jan. 20, 2025) (Dkt. 5-24)...............................................JA483

  1860 Webster's Dictionary Excerpt (Dkt. 5-25) ....................................JA489

  Blackstone's Commentaries Excerpt (Dkt. 5-26) ...................................JA493

  Excerpts of Cong. Globe, 39th Cong., 1st Sess. (Dkt. 5-27)....................JA496

*Volume 2 Table of Contents (cont'd)*

Exhibits to Reply in Support of Preliminary Injunction (Feb. 4, 2025)

      1860 Webster's Dictionary Excerpt (Dkt. 123-1) ...........................................JA510

      Hearings on H.R. 6127 (Dkt. 123-2) ...............................................................JA514

*Transcript of February 7, 2025 Consolidated Motion Hearing (Dkt. 142) included in* Doe
      v. Trump *record materials at JA77.*

Notice of Appeal (Dkt. 154) (Feb. 19, 2025) ...............................................................JA522

Order on Motion to Stay Preliminary Injunction Pending Appeal (Dkt. 165)
      (Feb. 26, 2025).......................................................................................................JA525

APPEAL

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:25–cv–10135–LTS

Doe et al v. Trump et al
Assigned to: District Judge Leo T. Sorokin
 related Case:  1:25–cv–10139–LTS
 Case in other court:  USCA – First Circuit, 25–01169
Cause: 05:551 Administrative Procedure Act

Date Filed: 01/20/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**O. Doe**                                      represented by    **Mirian Albert**
                                                                  Lawyers for Civil Rights
                                                                  61 Batterymarch Street
                                                                  Boston, MA 02110
                                                                  617–500–3438
                                                                  Email: malbert@lawyersforcivilrights.org
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Oren M. Sellstrom**
                                                                  Lawyers' Committee for Civil Rights and
                                                                  Economic Justic
                                                                  61 Batterymarch Street, 5th Flr.
                                                                  Boston, MA 02110
                                                                  617–988–0608
                                                                  Email: osellstrom@lawyerscom.org
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Ivan Espinoza–Madrigal**
                                                                  Lawyers for Civil Rights
                                                                  61 Batterymarch Street
                                                                  Boston, MA 02110
                                                                  617–988–0624
                                                                  Email: iespinoza@lawyersforcivilrights.org
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Jacob M. Love**
                                                                  Lawyers for Civil Rights
                                                                  61 Batterymarch Street
                                                                  Boston, MA 02110
                                                                  857–264–0416
                                                                  Email: jlove@lawyersforcivilrights.org
                                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brazilian Worker Center**                     represented by    **Mirian Albert**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Oren M. Sellstrom**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Ivan Espinoza–Madrigal**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

**Jacob M. Love**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

La Colaborativa                    represented by    **Mirian Albert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Oren M. Sellstrom**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ivan Espinoza−Madrigal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob M. Love**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

Donald J. Trump                    represented by    **Brad P. Rosenberg**
*In his official capacity as President of the*        1100 L Street, NW
*United States*                                       Washington, DC 20005
202−514−3374
Email: brad.rosenberg@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Hamilton**
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
202−514−3301
Email: eric.hamilton@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael P. Sady**
United States Attorney's Office
1 Courthouse Way
Suite 9200
Boston, MA 02210
617−748−3362
Fax: 617−748−3971
Email: michael.sady@usdoj.gov
*TERMINATED: 02/20/2025*
*ATTORNEY TO BE NOTICED*

**Robert Charles Merritt**
DOJ−Civ
1100 L St. NW
Washington, DC 20005
202−616−8098
Email: robert.c.merritt@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Yuri Fuchs**

JA2

DOJ–Civ
1100 L St NW
Washington, DC 20005
202–598–3869
Email: yuri.s.fuchs@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**US Department of State**                represented by   **Brad P. Rosenberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Hamilton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael P. Sady**
(See above for address)
*TERMINATED: 02/20/2025*
*ATTORNEY TO BE NOTICED*

**Robert Charles Merritt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yuri Fuchs**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Marco Rubio**                represented by   **Brad P. Rosenberg**
*In his official capacity as Secretary of*                (See above for address)
*State*                *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Hamilton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael P. Sady**
(See above for address)
*TERMINATED: 02/20/2025*
*ATTORNEY TO BE NOTICED*

**Robert Charles Merritt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yuri Fuchs**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**US Social Security Administration**                represented by   **Brad P. Rosenberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Hamilton**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael P. Sady**
(See above for address)
*TERMINATED: 02/20/2025*
*ATTORNEY TO BE NOTICED*

**Robert Charles Merritt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yuri Fuchs**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michelle King**                                represented by   **Brad P. Rosenberg**
*In her official capacity as Acting*                             (See above for address)
*Commissioner of U.S. Social Security*                           *LEAD ATTORNEY*
*Administration*                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Eric Hamilton**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Michael P. Sady**
                                                                 (See above for address)
                                                                 *TERMINATED: 02/20/2025*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Robert Charles Merritt**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Yuri Fuchs**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Amicus**

**Immigration Reform Law Institute**            represented by   **Matthew James O'Brien**
                                                                 Immigration Reform Law Institute
                                                                 25 Massachusetts Avenue NW
                                                                 Suite 335
                                                                 Washington, DC 20001
                                                                 571–236–8146
                                                                 Email: mobrien@irli.org
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**Amicus**

**State of Tennessee**                          represented by   **Andrew C. Coulam**
                                                                 Tennessee Attorney General's Office
                                                                 P.O. Box 20207
                                                                 Nashville, TN 27202–0207
                                                                 615–741–1868
                                                                 Email: andrew.coulam@ag.tn.gov
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **James Matthew Rice**
                                                                 Tennessee Attorney General's Office
                                                                 P.O. Box 20207

Nashville, TN 37202–0207
615–532–6026
Email: matt.rice@ag.tn.gov
*ATTORNEY TO BE NOTICED*

**Whitney D. Hermandorfer**
Tennessee Attorney General's Office
P.O. Box 20207
Nashville, TN 37202
615–741–7403
Email: whitney.hermandorfer@ag.tn.gov
*ATTORNEY TO BE NOTICED*

**Amicus**

**Edwin L Meese, III**                    represented by    **Frank L. McNamara , Jr.**
McNamara & Associates
53 Wilder Road
Bolton, MA 01740
978–333–9608
Email: franklmcnamara@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan P. McLane**
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
413–789–7771
Email: ryan@mclanelaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/20/2025 | 1 | COMPLAINT *Against ALL DEFENDANTS* against Filing fee: $ 405, receipt number AMADC–10795962 (Fee Status: Filing Fee paid), filed by O. Doe, Brazilian Worker Center, La Colaborativa. (Attachments: # 1 Exhibit (Executive Order), # 2 Civil Cover Sheet, # 3 Category Form)(Espinoza–Madrigal, Ivan) M (Entered: 01/21/2025) |
| 01/21/2025 | 2 | MOTION to Proceed Pseudonymously by O. Doe, Brazilian Worker Center, La Colaborativa.(Albert, Mirian) (Entered: 01/21/2025) |
| 01/21/2025 | 3 | NOTICE of Appearance by Mirian Albert on behalf of O. Doe, Brazilian Worker Center, La Colaborativa (Albert, Mirian) (Entered: 01/21/2025) |
| 01/21/2025 | 4 | ELECTRONIC NOTICE of Case Assignment. District Judge Leo T. Sorokin assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (NMC) (Entered: 01/21/2025) |
| 01/21/2025 | 5 | NOTICE of Appearance by Jacob M. Love on behalf of O. Doe, Brazilian Worker Center, La Colaborativa (Love, Jacob) (Entered: 01/21/2025) |
| 01/21/2025 | 6 | NOTICE of Appearance by Oren M. Sellstrom on behalf of O. Doe, Brazilian Worker Center, La Colaborativa (Sellstrom, Oren) (Entered: 01/21/2025) |
| 01/21/2025 | 7 | Summons Issued as to Michelle King, Marco Rubio, Donald J. Trump, President of the United States, US Department of State, US Social Security Administration. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (LBO) (Entered: 01/21/2025) |
| 01/22/2025 | 8 | NOTICE of Appearance by Oren M. Sellstrom on behalf of O. Doe, Brazilian Worker Center, La Colaborativa (Sellstrom, Oren) (Entered: 01/22/2025) |

| 01/23/2025 | 9 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered: re 2 MOTION to Proceed Pseudonymously.<br><br>The motion of the individual plaintiff to proceed pseudonymously (Doc. No. 2) is ALLOWED. This ruling is subject to de novo review if the defendants oppose the request within seven days of their appearance. (SED) (Entered: 01/23/2025) |
| 01/23/2025 | 10 | MOTION for Preliminary Injunction by O. Doe, Brazilian Worker Center, La Colaborativa.(Love, Jacob) (Entered: 01/23/2025) |
| 01/23/2025 | 11 | MEMORANDUM in Support re 10 MOTION for Preliminary Injunction filed by O. Doe, Brazilian Worker Center, La Colaborativa. (Attachments: # 1 Doe Declaration, # 2 Vega Declaration, # 3 Reason Declaration, # 4 Rodriguez Declaration, # 5 Danaher Declaration, # 6 Molina Declaration, # 7 Galletly Declaration, # 8 Kanstroom Declaration, # 9 Culliton−Gonzalez Declaration, # 10 Merjian Declaration)(Love, Jacob) (Entered: 01/24/2025) |
| 01/24/2025 | 12 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered.<br><br>The defendants' opposition to the plaintiffs' motion for preliminary injunction (Doc. No. 10 ) is due on **January 31, 2025**. The plaintiffs may file a reply brief, limited to five pages in length, by **February 4, 2025**. The Court will hold an in−person hearing on the motion **at 10 AM on Friday, February 7, 2025**. Counsel for the plaintiffs shall provide a copy of this Order, along with copies of the motion papers, to the following by 5 PM today: Brad P. Rosenberg, Special Counsel, Federal Programs Branch, Civil Division, U.S. Department of Justice; Leah Foley, U.S. Attorney for the District of Massachusetts; and the Chief of the Civil Division of the U.S. Attorneys Office for the District of Massachusetts. Electronic service suffices. Motion Hearing set for 2/7/2025 10:00 AM in Courtroom 13 (In person only) before District Judge Leo T. Sorokin.)(SED) (Entered: 01/24/2025) |
| 01/24/2025 | 13 | NOTICE of Appearance by Brad P. Rosenberg on behalf of Donald J. Trump, US Department of State, Marco Rubio, US Social Security Administration, Michelle King (Rosenberg, Brad) (Entered: 01/24/2025) |
| 01/24/2025 | 14 | CERTIFICATE OF COMPLIANCE by O. Doe, Brazilian Worker Center, La Colaborativa re 12 Order (Albert, Mirian) (Main Document 14 replaced on 1/24/2025 with corrected PDF) (FGD). (Entered: 01/24/2025) |
| 01/24/2025 | 15 | NOTICE of Appearance by Robert Charles Merritt on behalf of Donald J. Trump, US Department of State, Marco Rubio, US Social Security Administration, Michelle King (Merritt, Robert) (Entered: 01/24/2025) |
| 01/27/2025 | 16 | NOTICE of Appearance by Yuri Fuchs on behalf of Donald J. Trump, US Department of State, Marco Rubio, US Social Security Administration, Michelle King (Fuchs, Yuri) (Entered: 01/27/2025) |
| 01/28/2025 | 17 | Assented to MOTION for Leave to File Excess Pages by O. Doe, Brazilian Worker Center, La Colaborativa.(Sellstrom, Oren) (Entered: 01/28/2025) |
| 01/28/2025 | 18 | District Judge Leo T. Sorokin: ORDER entered. New Civil Cases General Procedural ORDER. (FGD) (Entered: 01/28/2025) |
| 01/29/2025 | 19 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered re: 17 Assented to MOTION for Leave to File Excess Pages.<br><br>ALLOWED. Defendants' consolidated opposition brief, due January 31, 2025, is limited to 40 pages in length. The plaintiffs in this case may file a 10−page reply brief by February 4, 2025; the plaintiffs in the related case may file a separate 10−page reply brief by the same date.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include − Leave to file granted on (date of order)− in the caption of the document. (FGD) (Entered: 01/29/2025) |
| 01/29/2025 | 20 | Copy re 19 Order on Motion for Leave to File Excess Pages, emailed to All Attorneys on related case 25−cv−10139−LTS on 1/29/2025. (FGD) (Entered: 01/29/2025) |

| 01/31/2025 | 21 | RESPONSE to Motion re 2 MOTION to Proceed Pseudonymously filed by Donald J. Trump, US Department of State, Marco Rubio, US Social Security Administration, Michelle King. (Fuchs, Yuri) (Entered: 01/31/2025) |
|---|---|---|
| 01/31/2025 | 22 | Opposition re 10 MOTION for Preliminary Injunction filed by Donald J. Trump, US Department of State, Marco Rubio, US Social Security Administration, Michelle King. (Merritt, Robert) (Entered: 01/31/2025) |
| 02/03/2025 | 23 | NOTICE of Appearance by Matthew James O'Brien on behalf of Immigration Reform Law Institute (O'Brien, Matthew) (Entered: 02/03/2025) |
| 02/03/2025 | 24 | MOTION for Leave to File *Amicus Brief* by State of Tennessee. (Attachments: # 1 Exhibit Proposed Amicus Brief of the State of Tennessee)(Coulam, Andrew) (Entered: 02/03/2025) |
| 02/03/2025 | 25 | MOTION for Leave to Appear Pro Hac Vice for admission of James Matthew Rice and Whitney D. Hermandorfer Filing fee: $ 250, receipt number AMADC–10821099 by State of Tennessee. (Attachments: # 1 Exhibit Certificate of JMR, # 2 Exhibit Certificate of WDH)(Coulam, Andrew) (Entered: 02/03/2025) |
| 02/03/2025 | 26 | Consent MOTION for Leave to File *Amicus Brief* by Immigration Reform Law Institute. (Attachments: # 1 IRLI Amicus Brief)(O'Brien, Matthew) (Entered: 02/03/2025) |
| 02/03/2025 | 27 | NOTICE of Appearance by Andrew C. Coulam on behalf of State of Tennessee (Coulam, Andrew) (Entered: 02/03/2025) |
| 02/04/2025 | 28 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 25 Motion for Leave to Appear Pro Hac Vice Added James Matthew Rice, and Whitney D. Hermandorfer.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register–account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen–pro–hac–vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 02/04/2025) |
| 02/04/2025 | 29 | NOTICE of Appearance by Whitney D. Hermandorfer on behalf of State of Tennessee (Hermandorfer, Whitney) (Entered: 02/04/2025) |
| 02/04/2025 | 30 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered:<br><br>The Motions for Leave to submit amicus briefs filed by Tennessee (# 24 ) and Immigration Reform Law Institute (# 26 ) are ALLOWED. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (FGD) (Entered: 02/04/2025) |
| 02/04/2025 | 31 | NOTICE of Appearance by James Matthew Rice on behalf of State of Tennessee (Rice, James) (Entered: 02/04/2025) |
| 02/04/2025 | 32 | AMICUS BRIEF filed by Immigration Reform Law Institute . (O'Brien, Matthew) (Entered: 02/04/2025) |
| 02/04/2025 | 33 | REPLY to Response to 10 MOTION for Preliminary Injunction filed by O. Doe, Brazilian Worker Center, La Colaborativa. (Albert, Mirian) (Entered: 02/04/2025) |
| 02/04/2025 | 34 | MOTION for Leave to File *Amicus Brief* in Opposition to Plaintiff's 10 MOTION for Preliminary Injunction filed by Edwin L Meese, III. (Attachments: # 1 Exhibit Amicus |

| | | |
|---|---|---|
| | | Brief)(McNamara, Frank) Modified docket text and docketing event on 2/5/2025, to properly reflect document filed. (FGD) (Entered: 02/04/2025) |
| 02/04/2025 | 35 | **Duplicate entry filed in error. Please see entry 34 .** (Entered: 02/04/2025) |
| 02/04/2025 | 36 | Amicus Curiae APPEARANCE entered by Frank L. McNamara, Jr on behalf of Edwin L Meese, III. (McNamara, Frank) (Entered: 02/04/2025) |
| 02/05/2025 | 37 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered re: 34 MOTION for Leave to File Amicus Brief in Opposition to Plaintiff's 10 MOTION for Preliminary Injunction. <br><br> ALLOWED. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (FGD) (Entered: 02/05/2025) |
| 02/05/2025 | 38 | AMICUS BRIEF filed by State of Tennessee . (Coulam, Andrew) (Entered: 02/05/2025) |
| 02/05/2025 | 39 | NOTICE of Appearance by Ryan P. McLane on behalf of Edwin L Meese, III (McLane, Ryan) (Entered: 02/05/2025) |
| 02/05/2025 | 40 | AMICUS BRIEF filed by Edwin L Meese, III . (McLane, Ryan) (Main Document 40 replaced on 2/6/2025, with corrected PDF). (FGD) (Entered: 02/05/2025) |
| 02/06/2025 | 41 | NOTICE of Appearance by Eric Hamilton on behalf of Donald J. Trump, US Department of State, Marco Rubio, US Social Security Administration, Michelle King (Hamilton, Eric) (Entered: 02/06/2025) |
| 02/06/2025 | 42 | SUMMONS Returned Executed as to US Attorney by La Colaborativa, Brazilian Worker Center, O. Doe. All Defendants. (Attachments: # 1 Affidavit of Service on the United States and All Defendants)(Love, Jacob) (Entered: 02/06/2025) |
| 02/07/2025 | 43 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin: <br><br> Motion Hearing held on 2/7/2025 re ( 10 in 1:25−cv−10135−LTS) MOTION for Preliminary Injunction and ( 3 in 1:25−cv−10139−LTS) MOTION for Preliminary Injunction. The court hears arguments on both motions for preliminary injunction. The motions are taken under advisement. <br><br> (Court Reporter: Rachel Lopez at raeufp@gmail.com.)(Attorneys present: Mirian Albert, Oren M. Sellstrom, and Jacob M. Love for plaintiffs in case 25cv10135−LTS, Shankar Duraiswamy, Gerard J. Cedrone, Jared B. Cohen, and Irina Trasovan for plaintiffs in case 25cv10139−LTS, Brad P. Rosenberg, and Eric Hamilton for the defendants.) <br><br> Associated Cases: 1:25−cv−10135−LTS, 1:25−cv−10139−LTS(SED) (Entered: 02/07/2025) |
| 02/13/2025 | 44 | Transcript of Motion Hearing held on February 7, 2025, before Judge Leo T. Sorokin. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Rachel Lopez at raeufp@gmail.com. Redaction Request due 3/6/2025. Redacted Transcript Deadline set for 3/17/2025. Release of Transcript Restriction set for 5/14/2025. Associated Cases: 1:25−cv−10135−LTS, 1:25−cv−10139−LTS(DRK) (Main Document 44 replaced on 3/14/2025) (DRK). (Entered: 02/13/2025) |
| 02/13/2025 | 45 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25−cv−10135−LTS, 1:25−cv−10139−LTS(DRK) (Entered: 02/13/2025) |
| 02/13/2025 | 46 | District Judge Leo T. Sorokin: ORDER entered. MEMORANDUM OF DECISION ON MOTIONS FOR PRELIMINARY INJUNCTION. |

| | | Associated Cases: 1:25–cv–10139–LTS, 1:25–cv–10135–LTS(FGD) (Entered: 02/13/2025) |
|---|---|---|
| 02/13/2025 | 47 | District Judge Leo T. Sorokin: ORDER entered. <u>PRELIMINARY INJUNCTION.</u> (FGD) (Entered: 02/13/2025) |
| 02/19/2025 | 48 | NOTICE OF INTERLOCUTORY APPEAL as to <u>46</u> Memorandum & ORDER, Terminate Motions, <u>47</u> Preliminary Injunction by Donald J. Trump, US Department of State, Marco Rubio, US Social Security Administration, Michelle King. ( (Fee Status: US Government)) NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at <u>http://www.ca1.uscourts.gov</u> MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at <u>http://pacer.psc.uscourts.gov/cmecf</u>. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at <u>http://www.ca1.uscourts.gov/efiling.htm</u>. US District Court Clerk to deliver official record to Court of Appeals by 3/11/2025. (Fuchs, Yuri) (Entered: 02/19/2025)** |
| 02/19/2025 | 49 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re <u>48</u> Notice of Interlocutory Appeal. (MAP) (Entered: 02/19/2025) |
| 02/19/2025 | 50 | USCA Case Number 25–1169 for <u>48</u> Notice of Interlocutory Appeal, filed by US Social Security Administration, US Department of State, Michelle King, Marco Rubio, Donald J. Trump. (MAP) (Entered: 02/19/2025) |
| 02/19/2025 | 51 | NOTICE of Appearance by Michael P. Sady on behalf of Donald J. Trump, US Department of State, Marco Rubio, US Social Security Administration, Michelle King (Sady, Michael) (Entered: 02/19/2025) |
| 02/20/2025 | 52 | NOTICE of Withdrawal of Appearance by Michael P. Sady (Sady, Michael) (Entered: 02/20/2025) |
| 03/19/2025 | 53 | Assented to MOTION for Extension of Time to May 12, 2025 to File Answer re <u>1</u> Complaint, by Donald J. Trump, US Department of State, Marco Rubio, US Social Security Administration, Michelle King. (Attachments: # <u>1</u> Exhibit Proposed Order)(Fuchs, Yuri) (Entered: 03/19/2025) |
| 03/20/2025 | 54 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered re: <u>53</u> Assented to Motion for Extension of Time to Answer re <u>1</u> Complaint.<br><br>ALLOWED. Michelle King answer due 5/12/2025; Marco Rubio answer due 5/12/2025; Donald J. Trump answer due 5/12/2025; US Department of State answer due 5/12/2025; US Social Security Administration answer due 5/12/2025. (FGD) (Entered: 03/20/2025) |

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

O. DOE; BRAZILIAN WORKER CENTER, INC.;
LA COLABORATIVA,

                       Plaintiffs,

               v.

DONALD J. TRUMP, in his official capacity as
President of the United States; U.S. DEPARTMENT
OF STATE; U.S. SOCIAL SECURITY
ADMINISTRATION; MARCO RUBIO, in his
official capacity as Secretary of State; MICHELLE
KING, in her official capacity as Acting
Commissioner of U.S. Social Security
Administration,

                       Defendants.

Civil Action No.

# COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.     On January 20, 2025, within hours of his inauguration as President, Defendant

Donald Trump issued an Executive Order purporting to overturn the longstanding protections of

birthright citizenship (the "EO," attached hereto as Exhibit A). The EO declares that a person born

in the United States whose mother is "unlawfully present" or whose presence is "lawful but

temporary" and whose father is not a citizen or lawful permanent resident will no longer be granted

birthright citizenship. It also directs federal agencies, including the Department of State and Social

Security Administration, not to recognize such individuals as U.S. citizens via the issuance of

passports, social security numbers, federal benefits, or otherwise.

2.      This unprecedented attempt to strip citizenship from millions of Americans with the stroke of a pen is flagrantly illegal.  The President does not have the power to decide who becomes a citizen at birth. That right is conveyed by the first clause of the Fourteenth Amendment to the U.S. Constitution (the "Citizenship Clause"), which states that "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States…." U.S. Const. amend. XIV.

3.      The Citizenship Clause's straightforward text and its history, affirmed by over a century of U.S. Supreme Court precedent, establish that it bestows citizenship upon *all persons* born in the United States—subject only to highly technical and rare exceptions such as the children of foreign diplomats. This constitutional grant of birthright citizenship, enshrined in the very fabric of our country, is also codified by federal statute and has been consistently followed and applied by the federal government since the ratification of the Fourteenth Amendment.

4.      It settled beyond all doubt that the President simply does not have the power to unilaterally revoke a person's birthright citizenship.

5.      These principals expose the EO for what it is: an unconstitutional abuse of power that punishes a group of U.S. citizens based only on their parents' immigration status.

6.      The group that the EO singles out, people born on U.S. soil to a mother who is "unlawfully present" or whose presence is "lawful but temporary" and a father who is not a citizen or lawful permanent resident ("targeted citizens"), are indisputably American citizens under the Citizenship Clause. Targeted citizens include the children of undocumented parents, immigrants whom the federal government has paroled into the country, and those holding various other immigration statuses. In declaring by fiat that all these people are not citizens and instructing

2

federal agencies not to treat, dignify, or honor them as such, the EO purports to divest the targeted citizens of citizenship and its privileges in the public consciousness and in practice.

7.      The harms flowing from de-Americanization are immense. As the U.S. Supreme Court has explained, depriving someone of their citizenship amounts to "the total destruction of the individual's status in organized society" and "is a form of punishment more primitive than torture." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). Those victimized in this way by the EO would be shorn of their national identity, stigmatized in the eyes of those who should be their fellow citizens, and forced to live with the shame, uncertainty, and fear that comes with potential banishment from their native country. Many would be rendered immediately stateless.

8.      The practical impact of the EO would be overwhelming and devastating. The Supreme Court has repeatedly observed that U.S. citizenship carries with it such "priceless benefits" that "it would be difficult to exaggerate its value and importance." *Schneiderman v. United States*, 320 U.S. 118, 122 (1943). If the EO is allowed to go into effect, American citizens would be denied passports, leaving them unable to travel outside the country for fear of never being allowed re-entry; denied Social Security numbers and cards, hampering their ability to work without government permission; and prevented from exercising countless federal rights, protections, benefits, and entitlements that derive from U.S. citizenship.

9.      By purporting to unilaterally strip the targeted citizens of their right to citizenship, the EO violates the Fourteenth Amendment and corresponding statutory protections. And because the EO treats the targeted citizens as a subordinate caste of native-born Americans, entitled to fewer rights, benefits, and entitlements than other Americans due to their parents' alienage, it also violates their right to equal protection under the Due Process Clause of the Fifth Amendment.

10.     Plaintiff O. Doe is an expectant mother who is due in March 2025 and whose child, when born, will be one of the targeted citizens. Plaintiffs Brazilian Worker Center and La Colaborativa (together "Organizational Plaintiffs") are membership organizations that each have numerous members who are either currently pregnant or planning to grow their families in the future, and whose children will be among the targeted citizens. Plaintiffs bring this action for declaratory and injunctive relief preventing the Defendants from implementing the EO.

## JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction over the claims stated herein under 28 U.S.C. §§ 1331 and 1343, and 28 U.S.C. § 2201.

12.     Venue is proper in this Court under 28 U.S.C. § 1391 because Plaintiff D. Doe resides in this District, Brazilian Worker Center and La Colaborativa are based in this District; and the District is a site of the injuries at issue.

## PARTIES

### Plaintiffs

13.     Plaintiff O. Doe is an expectant mother, whose baby is due in March 2025. She lives in Massachusetts and plans to be in the United States when her baby is born. She is lawfully in the country through Temporary Protected Status. The baby's father is not a U.S. citizen or a lawful permanent resident. She brings this action on behalf of herself and her unborn child.

14.     The Brazilian Worker Center ("BWC") is a non-profit corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business at 14 Harvard Avenue, Allston, MA 02134. It is a membership organization with a mission to empower immigrants and promote economic and social justice. It does so by, among other things, providing trainings on workplace rights, sharing information about the U.S. immigration system, and offering

community support services. Those services include assistance with rent support applications, school identification and registration, and communication with federal agencies. Among the organization's members are numerous people who are undocumented or in the United States on temporary statuses and who are either pregnant or plan to grow their families in the future. Those members will experience severe and immediate harm if the EO is allowed to take effect.

15.    La Colaborativa is a non-profit corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business at 318 Broadway, Chelsea, MA 02150. La Colaborativa is a membership organization with a mission to enhance the social, environmental, and economic health of the Chelsea community and its people. La Colaborativa represents a community largely composed on Latinx immigrants, including undocumented individuals and members of mixed-status families. For decades, the organization has championed the rights of immigrant families—both those with and without legal status—who are integral to sustaining urban economies like Chelsea's. Among the organization's members are numerous people who are undocumented or in the United States on temporary statuses and who are either pregnant or plan to grow their families in the future. These members will experience severe and immediate harm if the EO is allowed to take effect.

## **Defendants**

16.    Defendant Donald J. Trump is the President of the United States of America. As the head of the Executive Branch of the United States Government, Defendant Trump signed and issued the EO challenged by this action. He is sued in his official capacity only.

17.    Defendant U.S. Department of State ("DOS") is a department of the Executive Branch of the United States Government. DOS is responsible for, *inter alia*, reviewing passport

applications and issuing passports to United States citizens and will be responsible for implementing the dictates of the EO.

18.     Defendant Social Security Administration ("SSA") is an independent agency within the Executive Branch of the United States Government. SSA is responsible for, *inter alia*, assigning Social Security numbers and issuing Social Security cards to American citizens and will be responsible for implementing the dictates of the EO.

19.     Defendant Marco Rubio is the Secretary of DOS. In that role, Defendant Rubio is responsible for overseeing all DOS operations, including reviewing passport applications, making eligibility determinations thereon, and issuing passports to Americans with birthright citizenship. As head of DOS, Defendant Rubio is responsible for implementation of the dictates of the EO at DOS.  Defendant Rubio is sued in his official capacity only.

20.     Defendant Michelle King is the Acting Commissioner of SSA. In that role, Defendant King is responsible for overseeing all SSA operations, including the assignment of Social Security numbers and the issuance of Social Security cards to American citizens. As head of SSA, Defendant King is responsible for implementation of the dictates of the EO at SSA. Defendant King is sued in her official capacity only.

## FACTS

### Historical and Legal Framework

#### *Citizenship Before the Fourteenth Amendment*

21.     Prior to the Fourteenth Amendment's ratification in 1868, the U.S. Constitution repeatedly used the term "citizen" without defining it.[1]

---

[1] *Slaughter-House Cases*, 83 U.S. 36, 72 (1872); *see* Bernadette Meyler, Note, *The Gestation of Birthright Citizenship, 1868-1898 States' Rights, the Law of Nations, and Mutual Consent*, 15 GEO. IMMIGR. L.J. 519, 526 (2001).

6

22.     Early American courts relied on English common law conventions to clarify the ambiguities this created and, in doing so, broadly embraced the common law idea of "jus soli," *i.e.*, that citizenship is acquired by birth within the sovereign's territory.[2]

23.     Supreme Court Justice Joseph Story discussed this concept in 1830, for example, writing that "[n]othing is better settled at the common law than the doctrine *that the children even of aliens born in a country*, while the parents are resident there under the protection of the government, and owing a temporary allegiance thereto, *are subjects by birth*." *Inglis v. Trs. of Sailor's Snug Harbor*, 28 U.S. 99, 164 (1830) (Story, J.) (emphasis added).

24.     Justice Story also outlined that there are few exceptions to the common law rule of citizenship by birth within the territory, which include the children of ambassadors and invading soldiers who are not "subject[s]" of the state when within the territory. *Id.* at 155-156.

25.     As the Supreme Court later detailed, this understanding of citizenship was "in force in all the English colonies upon this continent … down to the time of the Declaration of Independence … and continued to prevail under the constitution as originally established." *United States v. Wong Kim Ark*, 169 U.S. 649, 658 (1898).

26.     However, in its infamous decision in *Dred Scott v. Sandford*, 60 U.S. 393 (1857), the Supreme Court abandoned this idea of territorial birthright citizenship. The Court's explicitly racist opinion held that only those descended from people considered "citizens" by the framers were entitled to citizenship at birth, and that this excluded the descendants of slaves who had been "subjugated by the dominant race" and considered "subordinate." 60 U.S. at 404.

---

[2] *See United States v. Wong Kim Ark* 169 U.S. 649-664 (1898) (citing cases); Jonathan C. Drimmer, *The Newphews of Uncle Sam: The History, Evolution, and Application of Birthright Citizenship in the United States*, 9 GEO. IMMIGR. L.J. 667, 683-685 (1999) (citing cases); James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 GREEN BAG 2d 367, 369, 369 n.12 (2006) (citing cases).

7

27.    This decision helped spark the Civil War and was harshly criticized even contemporaneously. In an 1862 advisory letter to the Treasury Secretary, Attorney General Edward Bates forcefully disagreed with the *Dred Scott* decision, noting that "every person born in the country is, at the moment of birth, prima facie a citizen …."[3]

28.    Following the Union's victory over the Confederacy, Congress quickly acted to overturn the *Dred Scott* decision through a constitutional amendment.

### *The Fourteenth Amendment's Passage and Purpose*

29.    Congress passed the Fourteenth Amendment in 1866, and the states formally ratified it into the Constitution in 1868.

30.    One of Congress's primary goals in designing and enacting the Fourteenth Amendment, as demonstrated by both its plain text and its legislative history, "was the establishment of equality in the enjoyment of basic civil and political rights" among all Americans. *Shelley v. Kraemer*, 334 U.S. 1, 23 (1948).

31.    The first and fourth clauses of Section 1 of that Amendment, respectively known as the Citizenship Clause and the Equal Protection Clause, are the most relevant here. With those two clauses shown in bold, Section 1 reads, in full:

> "**All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside**. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; **nor deny to any person within its jurisdiction the equal protection of the laws**."

---

[3] Garrett Epps, *The Citizenship Clause: A "Legislative History*," 60 Am. U. L. Rev. 331, 380 (2010) (quoting from Attorney General Bates' letter more extensively).

8

32.    The Supreme Court has repeatedly explained the purpose of the Equal Protection Clause. Congress designed it "to work nothing less than the abolition of all caste-based and invidious class-based legislation." *Plyler v. Doe*, 457 U.S. 202, 213 (1982).

33.    As scholars have pointed out, when used in reference to a country, the term "jurisdiction" is ordinarily defined as the country's lawmaking power.[4]

34.    And according to the common law convention in use before *Dred Scott*, everyone within the country was "subject" to the country's laws, with only narrow exceptions for people with recognized legal immunity like foreign diplomats and their families.

35.    Chief Justice John Marshall discussed this principle at length in 1812. He explained that "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute" except as applied to foreign "sovereign[s]", "ministers", and "troops" who have some degree of immunity from local laws. *The Schooner Exchange v. McFaddon*, 11 U.S. 116, 137-140 (1812).

36.    The plain meaning of the Citizenship Clause is thus that everyone born in the country, with narrow exceptions for the children of those immune to its laws, is a birthright citizen.

### The Supreme Court Interprets the Citizenship Clause Broadly

37.    In 1898, in *United States v. Wong Kim Ark*, the Supreme Court explicitly endorsed this expansive interpretation. 169 U.S. at 673-674.

38.    The Plaintiff in that case, Wong Kim Ark, was born in San Francisco to non-citizen parents from China who were living and working in the United States. In 1894, as an adult, he left the United States for a temporary visit to China. When he returned, Customs denied him entry into

---

[4] Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L. J. 405, 437-440 (2020) (discussing 19th century definition of "jurisdiction"); Ho, *supra* note 2 at 368, n.8 (discussing modern definition and usage of "jurisdiction").

9

the country under the Chinese Exclusion Acts, which "prohibit[ed] persons of the Chinese race, and especially Chinese laborers, from coming into the United States…." *Id.* at 653.

39.     Wong filed an action in federal court arguing that his exclusion was illegal. As the parties agreed that the Chinese Exclusion Acts could not apply to Wong if he was a citizen, the case turned on whether he was a citizen by virtue of his birth in the United States. *Id.*

40.     When the case reached the Supreme Court, it held Wong to be a United States citizen. The Court started by tracing the long common law history of birthright citizenship, starting in England as early as the 1600s, which established that anyone born within the country was considered a "natural-born subject" unless the child of a diplomat or of an invading enemy.[5] The Court went on to determine that this same law applied during American colonial times and in the early days of the United States.[6] The Court then reviewed the *Dred Scott* decision and the adoption of the Fourteenth Amendment to overturn it.[7]

---

[5] *See Wong Kim Ark*, 169 U.S. at 675 ("It thus clearly appears that by the law of England for the last three centuries, beginning before the settlement of this country, and continuing to the present day, aliens, while residing in the dominions possessed by the crown of England, were within the allegiance, the obedience, the faith or loyalty, the protection, the power, and the jurisdiction of the English sovereign; and therefore every child born in England of alien parents was a natural-born subject, unless the child of an ambassador or other diplomatic agent of a foreign state, or of an alien enemy in hostile occupation of the place where the child was born.").

[6] *See id.* ("The same rule was in force in all the English colonies upon this continent down to the time of the Declaration of Independence, and in the United States afterwards, and continued to prevail under the constitution as originally established.").

[7] *See id.* (explaining that the Fourteenth Amendment "is declaratory in form, and enabling and extending in effect. Its main purpose doubtless was, as has been often recognized by this court, to establish the citizenship of free negroes, which had been denied in the opinion delivered by Chief Justice Taney in Scott v. Sandford (1857) 19 How. 393; and to put it beyond doubt that all blacks, as well as whites, born or naturalized within the jurisdiction of the United States, are citizens of the United States.").

10

41.    Emphasizing the Citizenship Clause's broad applicability, the Supreme Court found that it "includes the children born within the territory of the United States of all other persons, of whatever race or color, domiciled within the United States" and that "[e]very citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States." *Id.* at 474.

42.    In a later case, *Afroyim v. Rusk*, the Supreme Court stated that the Citizenship Clause provides each citizen with "a constitutional right to remain a citizen in a free country unless [they] voluntarily relinquish[] that citizenship." 387 U.S. 253, 268 (1967).

43.    The Plaintiff in that case, a naturalized citizen, filed suit against the Secretary of State after his passport renewal application was denied under a federal law that said a citizen "shall lose" their citizenship if they vote in foreign election. *Id.* at 254 n.1.

44.    He argued that this law violated his Fifth Amendment Due Process rights as well as his right to be a citizen under the Citizenship Clause. The Court agreed, outlining the above right to citizenship and writing that "once acquired, this Fourteenth Amendment citizenship [is] not to be shifted, canceled, or diluted at the will of the Federal Government." *Id.* at 262.

### *The Citizenship Clause Is Codified And Consistently Followed By Federal Agencies*

45.    The Citizenship Clause's broad grant of birthright citizenship is also now a statutory right. In 1952, with *Wong Kim Ark* the settled law of the land, Congress passed the collection of immigration laws known as the Immigration and Nationality Act (INA). Among the INA's provisions is 8 U.S.C. § 1401, which codifies the language of the Citizenship Clause. 8 U.S.C. § 1401 ("The following shall be nationals and citizens of the United States at birth: a) a person born in the United States, and subject to the jurisdiction thereof ….").

11

46.     Pursuant to their statutory and constitutional duties, federal agencies have consistently followed the broad conception of territorial birthright citizenship as directed by both this plain language and the Supreme Court's holding in *Wong Kim Ark*.

47.     For example, SSA has long accepted U.S. birth certificates as sufficient proof of U.S. citizenship for issuance of a Social Security number and card.[8]

48.     Through a formalized program known as Enumeration at Birth, the SSA works cooperatively with hospitals, which electronically send birth registration information to SSA.[9] SSA then assigns a Social Security number and issues a card.

49.     Similarly, other federal agencies like Defendant DOS have long considered state birth certificates to be proof of U.S. citizenship.[10]

## The Executive Order is Facially Illegal

50.     The EO is unlawful on its face. First, it purports to unilaterally deny citizenship rights to a swath of American citizens in violation of both the Citizenship Clause of the Fourteenth Amendment and 8 U.S.C. § 1401. Second, it explicitly targets certain citizens for disparate treatment in violation of the equal protection component of the Fifth Amendment. Third, it violates the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq*.

---

[8] *See* 20 C.F.R. § 422.107 (stating that an applicant for a social security card "may prove that he or she is a U.S. citizen by birth by submitting a birth certificate…."

[9] *See generally* SSA, STATE PROCESSING GUIDELINES FOR ENUMERATION AT BIRTH (2024), https://www.ssa.gov/dataexchange/documents/Updated%20State%20Processing%20Guidelines%20for%20EAB.pdf.

[10] *See* 22 C.F.R. § 51.42(a) (stating that "person born in the United States generally must submit a birth certificate" to sufficiently prove their citizenship on a passport application).

12

### *The EO Violates the Citizenship Clause and Its Statutory Counterpart*

51.    Birthright citizenship is a right defined and guaranteed by the Fourteenth Amendment. The President lacks the power to revoke it.

52.    Pursuant to the Supreme Court's broad interpretation of the Citizenship Clause in *Wong Kim Ark*, citizens targeted by the EO are *ipso facto* American citizens.

53.    Their citizenship rights are entitled to the respect and recognition of the federal government just as much as those rights belonging to the children of tenth-generation Americans. Indeed, in acting to overturn *Dred Scott*, Congress disavowed a construction of birthright citizenship that was in any way racial, hereditary, or dependent on the status of one's parents.

54.    The EO nevertheless instructs federal agencies not to recognize the citizenship of people born in the United States whose mother is "unlawfully present" or whose presence is "lawful but temporary" and whose father is not a citizen or lawful permanent resident.

55.    Not only will this result in federal agencies denying citizenship benefits to many thousands of American citizens, but it also veers the country dangerously back to the reprehensible conception of hereditary birthright citizenship espoused in *Dred Scott*.

56.    Because the EO violates the Citizenship Clause, it also violates the parallel statutory protections of 8 USC § 1401.

### *The EO Violates the Equal Protection Component of the Fifth Amendment*

57.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be … deprived of life, liberty, or property, without due process of law …."

58.    The Supreme Court has determined that the Due Process Clause of the Fifth Amendment contains an "equal protection guarantee" that is "coextensive with that of the Fourteenth [Amendment] …." *U.S. v. Paradise*, 480 U.S. 149, 166 n.16 (1987).

59.     "The Equal Protection Clause was intended to work nothing less than the abolition of all caste-based and invidious class-based legislation." *Plyler*, 457 U.S. at 214.

60.     And yet that is precisely what the EO does. It resurrects the notion of a caste-based system, repudiated by our Nation following the Civil War, and singles the targeted citizens out for disparate treatment based on the alienage of their parents.

61.     In practice, it consigns the targeted citizens to a lower caste of native-born Americans who—although equal citizens according to the Fourteenth Amendment—are viewed and treated as something lesser by the federal government.

62.     The Executive Branch has declared through the EO that the targeted citizens, unlike other birthright citizens, are not real citizens under the law and will not be treated or respected as citizens. This inflicts public indignity and shame on the targeted citizens.

63.     Additionally, it ensures that the targeted citizens will receive fewer rights and benefits than those deemed "true" citizens by Defendants, including by, among other things, being automatically ineligible for passports, social security numbers, and certain government programs. Put simply, it imposes upon them a separate but unequal status.

64.     In these respects, the EO seeks to return to the world of *Dred Scott* in which it is acceptable for government action to subordinate one class of Americans to another. But the Fifth and Fourteenth Amendments outlaw such action.

### *The EO Violates the Administrative Procedure Act*

65.     The Administrative Procedure Act (APA) provides that a court shall "compel agency action unlawfully withheld" and "hold unlawful and set aside" agency action that is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706.

14

66.     The EO requires Defendant agencies to act in a manner that is in violation of the Fourteenth Amendment, the Fifth Amendment, and 8 U.S.C. § 1401 and therefore on its face violates the APA.

### The EO Will Cause the Plaintiffs Profound Injury

67.     American citizenship carries with it priceless privileges that are unavailable to noncitizens. Those include, among countless others, the right to vote in federal elections, the right to run for and be appointed to certain high elective offices, and the right to serve on federal and state juries.[11]

68.     Citizenship also provides an individual with "membership in a nation," *Minor v. Happerset*, 88 U.S. 162, 166 (1874), thereby admitting them into a community and promoting social cohesion and integration.

69.     If the government takes away or refuses to recognize a person's American citizenship, it strips them of these rights and privileges that are exclusive to citizens, as well as their identity as part of a greater community.

70.     It also makes the person, unlike someone with recognized citizenship status, subject at any time to the possibility of banishment in the form of deportation.

71.     Due to the extreme consequences of stripping someone of their citizenship, the Supreme Court has held that it would be cruel and unusual in violation of the Eighth Amendment to impose such a sanction as a criminal penalty. *Trop*, 356 U.S. at 101.

72.     Punishing someone in this way is unacceptable because it "subjects the individual to a fate of ever-increasing fear and distress. He knows not … what proscriptions may be directed

---

[11] *See* Vinineath Nuon Gopal, *From Judicial to Administrative Denaturalization: For Better or For Worse?*, 72 U. Colo. L. Rev. 779, 780 (2001) (listing these and other benefits available to citizens of the United. States, but not noncitizens).

15

against him, and when and for what cause his existence in his native land may be terminated. He may be subject to banishment, a fate universally decried by civilized people." *Id.* at 102.

73.　　As Justice Warren explained in his dissent in *Perez v. Brownell*—later overturned by *Afroyim*—"[c]itizenship is man's basic right for it is nothing less than the right to have rights. Remove this priceless possession and there remains a stateless person, *disgraced* and *degraded* in the eyes of his countrymen." 356 U.S. 44, 64 (1958) (Warren, J., dissenting) (emphasis added).

74.　　The EO, therefore, inflicts irreparable and undeniable injury upon the targeted citizens and on the Organizational Plaintiffs and their members.

75.　　By its terms, it declares that the targeted citizens are not citizens in the eyes of the federal government and instructs federal agencies to treat them accordingly. This denies them their rightful status as American citizens in both form and substance.

76.　　In announcing publicly and wrongfully that the targeted citizens are not citizens—and imposing upon them a governmentally sanctioned lesser status than other rightful citizens—the EO stigmatizes them, injures their reputations, and impugns their dignity.

77.　　It also wrenches from them membership in the larger citizenship community and, with it, a sense of identity, social acceptance, and pride.

78.　　Without recognized citizenship status from federal agencies, including those that enforce immigration laws, the targeted citizens will have to live with constant fear, anxiety, and uncertainty that accompanies marginalization and the risk of deportation. At any moment, their government may choose to exile them from their country of birth.

79.　　The idea of losing one's citizenship—de-Americanization—is so noxious to our nation that it is considered cruel and unusual to enforce it as punishment for a crime. And yet the EO purports to impose that very sanction on a broad range of innocent American citizens.

80.     The psychological harm from all of this is, and will continue to be, traumatizing and destabilizing for the targeted citizens.

81.     The loss of citizenship the EO inflicts on the targeted citizens also carries with it a loss of value that is unconscionable and immeasurable in its scope and scale.

82.     If federal agencies uniformly refuse to recognize their citizenship status as the EO directs, including Defendant federal agencies, they will in practice lose access to the exclusive rights and benefits that come with citizenship status, which the Supreme Court has described as "priceless." *Schneiderman*, 320 U.S. at 122.

83.     Not only will the targeted citizens lose access to crucial documents like passports and social security cards—which would serve to identify them as citizens and provide countless other everyday benefits—but also, they will become ineligible for numerous federal benefits programs that require applicants to have citizenship or other qualifying immigration status.

84.     The federal government's declaration that the targeted citizens are not citizens will have a significant chilling effect on their exercise of citizenship rights and access to citizenship benefits. Targeted citizens will inevitably avoid things like voting and applying for benefits for fear of persecution and prosecution.

## CLAIMS FOR RELIEF

## COUNT I

### Fourteenth Amendment to the U.S. Constitution—Citizenship Clause

85.     Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

86.     The Citizenship Clause of the Fourteenth Amendment to the U.S. Constitution states that "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States…."

87.     The Supreme Court has held that "the protection afforded to the citizen by the Citizenship Clause … is a limitation on the powers of the National Government as well as the States." *Saenz v. Roe*, 526 U.S. 489, 507-508 (1999).

88.      Plaintiff O. Doe and similarly-situated members of the Organizational Plaintiffs who are pregnant or will grow their families in the future will have children who are United States citizens under the Fourteenth Amendment—born in the United States and, at the time of their birth, subject to its laws.

89.     Yet the EO declares that these people will not be citizens and instructs federal agencies like Defendants DOS and SSA to refuse to recognize them as such, including by denying them passports and Social Security numbers and cards, stripping them of their U.S. citizenship on paper, in the public consciousness, and in practice, and depriving them of the bundle of rights and benefits attendant to that citizenship, including access to passports and social security numbers.

90.     Defendants' conduct causes Plaintiffs direct and proximate harm as described herein.

## COUNT II

### Fifth Amendment to the U.S. Constitution—Equal Protection

91.     Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

92.     The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be … deprived of life, liberty, or property, without due process of law …."

18

93.    The Supreme Court has determined that the Due Process Clause of the Fifth Amendment contains an "equal protection guarantee" that is "coextensive with that of the Fourteenth [Amendment] …" *U.S. v. Paradise*, 480 U.S. 149, 166 n.16 (1987).

94.    The EO intentionally and invidiously singles out the targeted citizens for disparate treatment relative to similarly situated U.S. citizens on the sole basis of the alienage of the targeted citizens' parents.

95.    Specifically, the EO purports to deny the targeted citizens their rightful status as U.S. citizens and instructs federal agencies, such as Defendants DOS and SSA, not to recognize that citizenship, including through the issuance of passports and social security numbers and cards.

96.    The EO only directs this treatment at U.S. citizens born in the United States whose mother is "unlawfully present" or whose presence is "lawful but temporary" and whose father is not a citizen or lawful permanent resident. It does not purport to change the status of, or otherwise impact, U.S. citizens born in the United States to citizens or LPRs.

97.    The disparate treatment the EO inflicts on the targeted citizens causes Plaintiffs direct and proximate harm as described herein.

## COUNT III

### 8 U.S.C. § 1401—Statutory Protection of Birthright Citizenship

98.    Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

99.    8 U.S.C. § 1401 provides that "The following shall be nationals and citizens of the United States at birth: a) a person born in the United States, and subject to the jurisdiction thereof …."

19

100.   By purporting to deny citizenship to targeted citizens, the EO violates this command and concomitant statutory protections.

101.   It causes the Plaintiffs direct and proximate harm as described herein.

<u>**COUNT IV**</u>

**5 U.S.C. § 551, et seq.—Administrative Procedure Act**

**(Against all Defendants except Defendant Trump)**

102.   Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

103.   The Administrative Procedure Act ("APA"), 5 U.S.C. § 551, et seq., ensures that federal agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action."  5 U.S.C. § 702.  Judicial review extends to "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.

104.   Among other things, the APA empowers the federal courts to "compel agency action unlawfully withheld" and "hold unlawful and set aside agency actions, finding, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(1), (2)(A).

105.   The Administration's actions, as described above constitute arbitrary and capricious acts contrary to the U.S. Constitution and federal law through denying the privileges of citizenship to U.S. citizens as described above.

20

## COUNT V

### 28 U.S.C. §§ 2201, 2202—Declaratory Judgment

106.    Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein

107.    For the reasons stated above, Defendants have violated the rights of Plaintiffs under the Citizenship Clause of the Fourteenth Amendment and the equal protection guarantee of the Due Process Clause of the Fifth Amendment. Defendants have also, as pleaded above, committed violations of 8 U.S.C. § 1401 and the APA.

108.    Plaintiffs seek a declaration to that effect.

109.    Defendants' illegal actions have injured, and will continue to injure, Plaintiffs in numerous ways as described herein.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request the following relief:

A.      A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that the Executive Order is:

unconstitutional because it violates the Fourteenth Amendment's Citizenship Clause and the Fifth

Amendment's Equal Protection guarantee; and illegal because it violates the provisions of 8 U.S.C.

§ 1401, and the Administrative Procedure Act;

B.      A preliminary and permanent injunction enjoining Defendants, their officials,

agents, employees, assigns, and all persons acting in concert or participating with them from

enforcing the Executive Order or carrying out its directive;

C.      An order awarding Plaintiffs attorneys' fees, costs, and expenses; and

D.      Such other and additional relief as the Court deems equitable, just, and proper.

Dated:  January 20, 2025                          Respectfully submitted,

*/s/  Oren Sellstrom*
Oren Sellstrom (BBO #569045)
Iván Espinoza-Madrigal (BBO # 708080)
Jacob Love (BBO #699613)

Mirian Albert (BBO #710093)

Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 482-1145
osellstrom@lawyersforcivilrights.org
iespinoza@lawyersforcivilrights.org
jlove@lawyersforcivilrights.org
malbert@lawyersforcivilrights.org
Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

O. DOE; BRAZILIAN WORKER CENTER, INC.;
LA COLABORATIVA,

               Plaintiffs,

        v.

DONALD J. TRUMP, in his official capacity as
President of the United States; U.S. DEPARTMENT
OF STATE; U.S. SOCIAL SECURITY
ADMINISTRATION; MARCO RUBIO, in his
official capacity as Secretary of State; MICHELLE
KING, in her official capacity as Acting
Commissioner of U.S. Social Security
Administration,

               Defendants.

Civil Action No. 25-10136-LTS

_____    C    C    C

# DECLARATION OF O. DOE

I, O. Doe, make the following declaration based on my personal knowledge and declare under the penalty of perjury that the following is true and correct:

1. I am originally from Haiti, and I am 7 months pregnant with my second daughter. I am due on or around March 23, 2025.
2. My husband and I have Temporary Protected Status (TPS) and pending asylum applications, which we have because of the collapse of Haiti.
3. My first daughter was born in the United States and is seven years old.
4. My family and I cannot safely return to Haiti, especially after the assassination of the Haitian President and serious political instability, including coups d'état.
5. The hardships include the social and economic collapse of the country, which makes it dangerous and life-threatening to return for myself and my family, including my soon-to-be-born child.
6. That's why we now live in the United States, for our own safety and the safety of my children, including the baby I am now carrying.
7. I now understand that my child will be born in a stateless condition due to the new Executive Order, "Protecting the Meaning and Value of American Citizenship," on birthright citizenship.
8. On Monday, after learning about the Executive Order, I was overwhelmed with anxiety. Deeply concerned about how this might affect my baby, I reached out to a health center for support and connected with a therapist. They were able to schedule me for future appointments.
9. I feel utterly helpless knowing that my baby's citizenship could be at risk solely because of my husband's and my immigration status.

10. Despite both my children being born on U.S. soil, my youngest will be unable to exercise the rights of U.S. citizenship. She will be treated as a second-class citizen and will have less access to resources.

11. This is extremely demoralizing and frightening, and I am very scared for the safety of my child. How can I keep my child safe from being deported to a collapsed Haiti?

12. This is a country made of immigrants. It does not belong to one racial group. I pray that the Executive Order is stopped by the courts, as this is something that has been established in this country for over a century.

13. As a person who has fled turmoil and upheaval, I know firsthand that my child needs the full protection of U.S. citizenship. This is essential. It's indispensable.

Signed under pains and penalty of perjury, this 23 day of January 2025.

2

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

O. DOE; BRAZILIAN WORKER CENTER, INC.;
LA COLABORATIVA,

               Plaintiffs,

         v.

DONALD J. TRUMP, in his official capacity as
President of the United States; U.S. DEPARTMENT
OF STATE; U.S. SOCIAL SECURITY
ADMINISTRATION; MARCO RUBIO, in his
official capacity as Secretary of State; MICHELLE
KING, in her official capacity as Acting
Commissioner of U.S. Social Security
Administration,

               Defendants.

Civil Action No. 25-10135-LTS

## DECLARATION OF GLADYS VEGA

I, Gladys Vega, am the President & CEO of La Colaborativa, and I make this declaration
based on my personal knowledge and information provided by our members. I declare under
penalty of perjury that the following is true and correct:

1. La Colaborativa is a non-profit corporation organized under the laws of the
   Commonwealth of Massachusetts with a principal place of business at 318 Broadway,
   Chelsea, MA 02150.

2. La Colaborativa is a membership organization with a mission to enhance the social,
   environmental, and economic health of the Chelsea community and its people.

3. La Colaborativa represents a community largely composed of Latinx immigrants,
   including many undocumented individuals and members of mixed-status families. For
   decades, the organization has championed the rights of immigrant families—both those

with and without legal status—who are integral to sustaining urban economies like Chelsea's. Many served as essential workers at the height of the COVID pandemic.

4. Our organization serves hundreds of immigrant mothers and expecting mothers, many of whom are Temporary Protected Status (TPS) recipients, Deferred Action for Childhood Arrivals (DACA) recipients, asylum applicants, or have other immigration statuses such as parole. Many of these mothers have children born in the United States and are citizens by birth.

5. The Trump Administration's Executive Order, "Protecting the Meaning and Value of American Citizenship," to eliminate birthright citizenship would inflict profound harm on our members and their families, particularly on the health, legal stability, and well-being of children born to immigrant parents.

6. Many of our members rely on hospitals to assist with critical documentation, such as obtaining Social Security numbers and birth certificates for their newborns. This Executive Order would interfere with those processes, delaying access to essential services.

7. Any interruption in these longstanding processes would create additional and significant burdens on our organization and staff, who will have to intervene to help our members in the absence of other support. This will entail diverting resources from our current programming and priorities to address the unfolding crisis in our membership.

8. Just today, our staff has started responding to dozens of member inquiries and concerns, especially surrounding birthright citizenship.

9. For example, one of our members, "Daisy," a 31-year-old Chelsea resident originally

from Honduras, is eight months pregnant. Both she and her husband are asylum seekers. Daisy worries that without U.S. citizenship, her child would be ineligible for medical insurance or public assistance, leaving the family to face overwhelming medical bills they cannot afford. This would place an even greater strain on a family already struggling financially, potentially causing long-term hardships for both Daisy and her baby

10. Another member, "Angela," a 32-year-old Chelsea resident originally from El Salvador, has lived in the U.S. for 10 years and is currently eight months pregnant. Both Angela and her husband are undocumented. Angela is deeply concerned about the Executive Order, fearing that her baby might lack proper documentation, which could limit their opportunities and jeopardize their future. The stress of these uncertainties, coupled with her advanced pregnancy, has heightened both the emotional and financial pressures on her family during an already challenging time.

11. The panic and stress at the community level make sense because citizenship status is often a prerequisite for accessing many benefits and federally funded healthcare programs. Without citizenship, our member's newborns may face restricted access to preventive care, vaccinations, and other critical health services, exacerbating health disparities.

12. Our members who are undocumented may delay or avoid seeking medical care altogether due to confusion, fear of deportation, or stigma, putting their children at heightened risk for untreated conditions and developmental delays.

13. Our members are deeply concerned about the emotional toll this policy would take on their children, who may grow up feeling stigmatized, excluded, and alienated in the

only country they know as home.

14. The prospect of raising children deemed "stateless" or lacking full citizenship rights would cause immense stress and anxiety, undermining the mental health and stability of entire families.

15. The Executive Order has already created a chilling effect, deterring immigrant families from seeking critical services, such as health care, out of fear that doing so could jeopardize their children's status or attract unwanted scrutiny.

16. This climate of fear forces many families to withdraw from essential public programs and avoid engaging with institutions, which undermines community trust and exacerbates health and economic disparities among immigrant populations.

17. As an organization, we are already experiencing the surge in demand for assistance, including navigating complex legal systems, advocating for children's rights, and addressing the fallout of delayed or denied services. These resources could otherwise be directed toward empowering families and advancing systemic change.

18. We strongly oppose any policy that would strip children of their birthright citizenship, as it undermines fundamental principles of fairness, equality, and human dignity. Such a policy would not only harm individual families but also erode the social fabric and foundational values of our nation.

Signed under pains and penalty of perjury, this 23 day of January 2025.

Gladys Vega

President & CEO

La Colaborativa

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| O. DOE; BRAZILIAN WORKER CENTER, INC.; LA COLABORATIVA, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; U.S. SOCIAL SECURITY ADMINISTRATION; MARCO RUBIO, in his official capacity as Secretary of State; MICHELLE KING, in her official capacity as Acting Commissioner of U.S. Social Security Administration, <br><br> Defendants. | Civil Action No. 25-10136-LTS |

**DECLARATION OF THE BRAZILIAN WORKER'S CENTER**

I, Lenita Reason, am the Executive Director of the Brazilian Worker Center, and I make this declaration based on personal knowledge and information provided by our members. I declare under penalty of perjury that the following is true and correct:

1. The Brazilian Worker Center (BWC) is a women-led non-profit organization dedicated to supporting immigrants in defending and advancing their labor and immigrant rights, particularly those of domestic workers. The BWC's principal place of business is 14 Harvard Avenue in Boston.

2. The BWC represents a community largely comprised of Latinx immigrants, with a focus on the Brazilian population. Since 1995, the organization has provided support to families, both those with and without legal status, as they navigate life in the United States through various programs and initiatives designed to address their specific challenges and enhance their well-being.

3. The BWC is a membership organization dedicated to empowering immigrants and advocating for economic and social justice within the Greater Boston region. Members pay an annual fee of $50. However, this fee can be waived if the potential member is low-income and is unable to pay. The process is streamlined for individuals or families experiencing trauma or crisis, such as domestic violence or homelessness, to make membership accessible for vulnerable members.

4. The BWC organization offers comprehensive training programs on workplace rights and provides holistic community support services. These services include but are not limited to assistance with rent support applications, school enrollment, English as a Second Language (ESL) classes, and communication with federal agencies, such as the U.S. Citizenship and Immigration Services.

5. The BWC is also currently engaged with the State of Massachusetts to provide support to newly arrived immigrants in the U.S. As a part of this initiative, the BWC has been designated as a Welcome Center for these immigrant families.

6. The Welcome Center is dedicated to serving as a central point of entry for these families, connecting them with essential resources, such as emergency housing, services, and transportation to ensure a safe and secure transition.

7. Our members have expressed deep concern regarding the Trump Administration's Executive Order, "Protecting the Meaning and Value of American Citizenship," to eliminate birthright citizenship.

8. Many of our immigrant mothers already have so much fear about reaching out for help, even when it is for life-saving resources. Several expecting mothers have arrived at our Welcome Center seeking stable housing and other resources, but they are already saying

that they are hesitant to seek help because of the Executive Order. They are afraid to expose their newborn children to additional scrutiny, stigma, or discrimination.

9. Take, for instance, "Catarina," a 36-year-old Brazilian immigrant and member, who is eight months pregnant. Her arrival in the U.S. has interrupted her access to regular prenatal care, relying instead on services provided by the BWC. Both Catarina and her husband are undocumented. She has expressed intense fear and anxiety upon learning about the Executive Order and the potential consequences it may have for her child.

10. Like Catarina, many of our members, including other undocumented women who are pregnant or planning to grow their families in the future, have approached us with confusion and panic. They are uncertain about how the Executive Order will be enforced, who it affects, and whether their future children will be able to obtain a passport or other federal documents recognizing their child's citizenship.

11. Many of the BWC's members are navigating unique challenges as part of mixed-status families, balancing the need to care for their U.S.-born children while managing their own precarious immigration statuses. Many families are also in lengthy and prolonged immigration proceedings, such as asylum and other types of relief that may take multiple years to come to a final decision or adjudication.

12. The Executive Order would force the BWC to stretch its resources further, addressing a surge in demand for assistance with federal documentation and legal challenges that would disproportionately impact already vulnerable families.

13. The threat of eliminating birthright citizenship is already creating a climate of mistrust, making it harder for organizations like the BWC to connect immigrant families with the resources they need to thrive, such as education, healthcare, and housing support.

14. The BWC is particularly concerned about the long-term consequences for children of immigrant parents, who may grow up in an environment where their legal status and rights are constantly questioned and challenged.

15. By serving as a central resource hub for immigrant families, the BWC has seen firsthand how policies targeting immigrants create ripple effects, leading to economic instability and social isolation within communities.

16. The BWC's work is rooted in the belief that all families deserve dignity, stability, and a chance to build a better future, values that are directly threatened by the Executive Order.

17. Eliminating birthright citizenship would add an unnecessary layer of bureaucracy, disproportionately affecting low-income and marginalized families who already face systemic barriers to accessing vital services.

18. The BWC stands committed to protecting the rights of all immigrant families, recognizing that the strength of its community depends on the inclusion and support of every individual, regardless of their citizenship or immigration status.

Signed under pains and penalty of perjury, this 23 day of January 2025.

*Lenita Reason*
Lenita Reason

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| O. DOE; BRAZILIAN WORKER CENTER, INC.; LA COLABORATIVA, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; U.S. SOCIAL SECURITY ADMINISTRATION; MARCO RUBIO, in his official capacity as Secretary of State; MICHELLE KING, in her official capacity as Acting Commissioner of U.S. Social Security Administration, <br><br> Defendants. | Civil Action No. 25-CV-10135 |

**DECLARATION OF LEON RODRIGUEZ**

I, Leon Rodriguez, declare and state as follows:

1. Throughout my career, I have gained personal knowledge of how birthright citizenship is critical to many different facets of American life. The experience from which I draw for this declaration includes my work as a federal prosecutor; my service as the County Attorney for Montgomery County, Maryland; and my experience as the Director of the United States Citizenship and Immigration Services.

**Background**

2. I am an attorney licensed to practice law in the District of Columbia, Maryland, and New York. I began my career as a prosecutor, first in Brooklyn, New York (1988-1994); then

JA44

at the U.S. Department of Justice in Washington, D.C. (1994-1997); and then as an Assistant U.S. Attorney in Pennsylvania (1997-2001). One of my main focus areas in my work as a prosecutor was healthcare. I later worked as the Chief of Staff, Deputy Assistant Attorney in the Civil Rights Division of the Department of Justice (January 2010-September 2011) and as the Director of the U.S. Department of Health and Human Services, Office for Civil Rights (2011-2014).

3. From 2014 to 2017, I served as the Director of the United States Citizenship and Immigration Services (USCIS).

4. I am currently a partner at Seyfarth Shaw LLP, where I am a founding member of the firm's Immigration and Compliance specialt

## Eliminating Birthright Citizenship On February 19, 2025 Would Result In Chaos

5. I am aware that on January, 20, 2025, President Trump issued an Executive Order entitled " Protecting the Meaning and Value of Am things, the EO states that it shall be the policy of the United States that no federal agency shall issue documents recognizing U.S. citizenship to certain categories of people who heretofore have been recognized as citizens by virtue of their birth in the United States. This includes a person born in the United States "wh whose presence is "lawful but temporary" a permanent resident.

6. The EO states that it shall apply to people born within the United States after 30 days from the date of the order (February 19, 2025).

7. If the EO were allowed to go into effect on that date, it would immediately cause significant disruption and chaos throughout many different facets of American life. That

2

JA45

is because we as a nation have built up numerous different systems that are designed on the foundational premise that a birth certificate reflecting birth within the United States constitutes proof of U.S. citizenship. Birthright citizenship underpins our daily life in ways that most people scarcely think about, because it has been taken as a given for generations. Removing that fundamental premise on February 19, 2025 would wreak havoc in many different ways.

8. Starting at the most basic level, there is currently no other immigration status for the babies whose citizenship would no longer be recognized under the EO. Babies who are born after February 19, 2025 and fall into the categories listed in the EO would therefore have no immigration status at all. We simply do not have any legal structures in place in the United States to recognize such babies as anything other than U.S. citizens.

9. The resulting disruption would be immediate and severe. All of the babies who fall into the categories listed in the EO—a number that would grow daily—would become instantly deportable by virtue of having no recognized immigration status in the United States. Many would be rendered stateless, because they would also have no ties to any other country.

10. M o r e o v e r ,   p a r e n t s   w o u l d   h a v e   n o   w a y   o f   a d j Because our entire immigration system has developed over the last century (and more) on the foundational premise that such children are U.S. citizens, there is no mechanism for adjustment of their status. This would cause immense problems, not just for children but for parents put in a position of trying to navigate their family through this void.

11. Although the chaos and disruption would fall most heavily on the families of children specifically listed in the EO, it would extend across all of American society. For example,

3

there is currently a relatively seamless cooperation between hospitals (where births are recorded) and federal agencies that recognize immigration status. Through the Enumeration At Birth (EAB) program, parents who have just had a baby can sign a simple form while still in the hospital, authorizing the hospital to report that information to the Social Security Administration (SSA) for issuance of a Social Security number and card.[1] SSA reports that approximately 99% of all new parents do this.

12. The EO would change all that—not just for undocumented individuals but for everyone. Even in the case of a baby born to two U.S. citizen parents, a birth certificate reflecting a birth within the United States would no lo parents would have to prove their own status first. Even if it were deemed acceptable for citizen-parents to do so by producing their own birth certificates (which would appear illogical, if that does not serve as proof for individuals born after February 19, 2025), that would be an extraordinarily cumbersome process compared to what exists today.

13. Moreover, it is not clear to whom they would produce those documents: to the hospitals where their ch (which have no training or ability to manage such a process)? To the local jurisdiction where their child was born? To the one where they reside? The state? To a federal agency? There does not currently exist in the United States a centralized database of U.S. citizens. Even if one could be created, and a process for determining who goes into it, that most certainly could not be accomplished within 30 days. Thousands of people would be required to hire immigration attorneys to help with this process, at immense burden and cost.

---

[1] *See* Bureau of Vital Statistics, State Processing Guidelines for Enumeration at Birth (Social Security Administration Nov. 2024), available at
https://www.ssa.gov/dataexchange/documents/Updated%20State%20Processing%20Guidelines%20for%20EAB.pdf

14. That is just one example of the chaos and disruption that would occur if the EO were
allowed to go into effect on February 19, 2025. Many other facets of American life are
similarly built upon the foundational premise that a birth certificate reflecting birth in the
United States serves as proof of U.S. citizenship. Passports, employment authorization,
drivers licenses, public benefit programs: the processes for accessing all of these benefits
and entitlements have been designed and operated over the last century based on the
premise that a birth certificate reflecting birth in the United States is proof of citizenship.
If that premise is removed, then those systems will become instantly unmanageable and
unworkable. And there is nothing in place to replace them. This harms not just the
children directly affected, but whole families: if a child loses access to healthcare
benefits, for example, parents will be put in the position of trying to secure alternative
care—or managing the problematic health outcomes that result for their child if
alternative care cannot be secured.

15. In the United States, birthright citizenship has been in place for generations and has been
relied upon by federal, state, and local agencies in creating systems that underpin many
facets of our daily lives. Whether or not such entrenched systems could ever be replaced
by ones that do not rely on birthright citizenship, this most certainly cannot be done by
February 19, 2025. Allowing the EO to go into effect on that date would therefore cause
significant disruption and harm in numerous different ways.

I declare under penalty of perjury that the foregoing is true and correct to the best of my
knowledge. Executed this 23rd day of January 2025 in Washington, D.C.

*/s/ Leon Rodriguez*

5

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| O. DOE; BRAZILIAN WORKER CENTER, INC.; LA COLABORATIVA, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; U.S. SOCIAL SECURITY ADMINISTRATION; MARCO RUBIO, in his official capacity as Secretary of State; MICHELLE KING, in her official capacity as Acting Commissioner of U.S. Social Security Administration, <br><br> Defendants. | Civil Action No. 25-10136-LTS |

**DECLARATION OF FIONA S. DANAHER, M.D., M.P.H.**

I, Fiona S. Danaher, M.D., M.P.H., make the follow declaration based on my personal knowledge and declare under the penalty of perjury that the follow is true and correct:

1. I am a pediatrician with over 12 years of experience working with children and families. I graduated from Mount Sinai School of Medicine in New York with M.D. and M.P.H. degrees in 2012. I completed my pediatric residency at Massachusetts General Hospital for Children in 2015. My residency training included extensive experience interviewing and conducting physical exams of children and adolescents to treat both medical and psychiatric conditions.

2. I have been board certified and fully licensed as a pediatrician in the state of Massachusetts since 2015. Since then I have been working as a primary care pediatrician at MGH Chelsea Pediatrics, where a substantial proportion of my work

focuses on the care of children in immigrant families. I also worked for 7 years as a child abuse pediatrician for Massachusetts General Hospital.

3. Since 2020, I have directed the MGH Center for Immigrant Health, which serves as a hub to foster excellence in clinical care, education, advocacy and research to improve the health and wellbeing of immigrants.

## Health Outcomes Tied to Citizenship

4. A growing body of scientific literature demonstrates that policies of exclusion based on immigration status harm children in immigrant families by directly and indirectly diminishing access to public benefits such as healthcare, nutrition, and educational opportunities, while promoting bullying, fear, and chronic stress.[1,2]

5. Decreased access to healthcare is one of the best studied impacts. Income-eligible children whose immigration status bars eligibility for public health insurance programs are uninsured at more than seven times the rate of comparable children with U.S. citizenship.[3] Lack of insurance renders healthcare cost-prohibitive, leading to lower preventive healthcare utilization and delays in needed medical

---

[1] Crookes DM, Stanhope KK, Kim YJ, Lummus E, Suglia SF. Federal, State, and Local Immigrant-Related Policies and Child Health Outcomes: a Systematic Review. J Racial Ethn Health Disparities. 2022 Apr;9(2):478-488. doi: 10.1007/s40615-021-00978-w. Epub 2021 Feb 8. PMID: 33559110; PMCID: PMC7870024.
[2] Perreira KM, Pedroza JM. Policies of Exclusion: Implications for the Health of Immigrants and Their Children. Annu Rev Public Health. 2019 Apr 1;40:147-166. doi: 10.1146/annurev-publhealth-040218-044115. Epub 2019 Jan 2. PMID: 30601722; PMCID: PMC6494096.
[3] Lacarte V. 2022. Immigrant Children's Medicaid and CHIP Access and Participation: A Data Profile. Washington, DC: Migration Policy Institute. https://www.migrationpolicy.org/sites/default/files/publications/mpi_chip-immigrants-brief_final.pdf

and dental care for non-citizen children, with particular disparities noted in states

that have not extended public insurance eligibility to undocumented children.[4,5,6,7]

6.  Multiple studies have found that the upfront costs of public insurance programs

for children are recouped in adulthood through decreased emergency room

utilization and hospitalizations, lower mortality, increased educational attainment

and increased wage income leading to higher tax contributions.[8,9,10] The American

Academy of Pediatrics thus recommends that Medicaid and CHIP eligibility be

extended to all children, regardless of immigration status.[11]

## **Effects of Executive Order Eliminating Birthright Citizenship**

7.  Eliminating birthright citizenship would not only expand the population of

undocumented children with reduced access to healthcare in the U.S.; it would

create a new, more vulnerable subpopulation of stateless children with no

domestic or foreign government charged to protect their rights and wellbeing. As

---

[4] Pillai D, Artiga S, Hamel L, et al. Health and health care experiences of immigrants: The 2023 KFF/LA Times survey of immigrants. KFF. Published September 17, 2023. https://www.kff.org/racial-equity-and-health-policy/issue-brief/health-and-health-care-experiences-of-immigrants-the-2023-kff-la-times-survey-of-immigrants/
[5] Blewett LA, Johnson PJ, Mach AL. Immigrant children's access to health care: differences by global region of birth. J Health Care Poor Underserved. 2010 May;21(2 Suppl):13-31. doi: 10.1353/hpu.0.0315. PMID: 20453374; PMCID: PMC3174684.
[6] Rosenberg J, Shabanova V, McCollum S, Sharifi M. Insurance and Health Care Outcomes in Regions Where Undocumented Children Are Medicaid-Eligible. Pediatrics. August 2022; 150 (3): e2022057034. 10.1542/peds.2022-057034
[7] Jewers M, Ku L. Noncitizen Children Face Higher Health Harms Compared With Their Siblings Who Have US Citizen Status. *Health Affairs*. 2021;40(7):1084-1089. doi:https://doi.org/10.1377/hlthaff.2021.00065
[8] Brown DW, Kowalski AE, Lurie IZ. Long-Term Impacts of Childhood Medicaid Expansions on Outcomes in Adulthood. *The Review of Economic Studies*. 2019;87(2):792-821. doi:https://doi.org/10.1093/restud/rdz039
[9] Wherry LR, Miller S, Kaestner R, Meyer BD. Childhood Medicaid Coverage and Later-Life Health Care Utilization. *Rev Econ Stat*. 2018 May;100(2):287-302. doi: 10.1162/REST_a_00677. Epub 2018 May 4. PMID: 31057184; PMCID: PMC6497159.
[10] Goodman-Bacon A. The Long-Run Effects of Childhood Insurance Coverage: Medicaid Implementation, Adult Health, and Labor Market Outcomes. *American Economic Review*. 2021;111(8):2550-2593. doi:https://doi.org/10.1257/aer.20171671
[11] Kusma JD, Raphael JL, Perrin JM, Hudak ML. Medicaid and the Children's Health Insurance Program: Optimization to Promote Equity in Child and Young Adult Health. *Pediatrics*. 2023;152(5). doi:https://doi.org/10.1542/peds.2023-064088

described by the U.S. Department of State, people who are stateless "have no legal protection and no right to vote, and… often lack access to: education; employment; health care; registration of birth, marriage, or death and property rights. Stateless people may also encounter travel restrictions, social exclusion, and heightened vulnerability to sexual and physical violence, exploitation, trafficking in persons, forced displacement, and other abuses."[12] The estimated 10 million stateless individuals living worldwide tend to experience worse health outcomes and shorter lifespans, prompting the U.S. to join the Global Alliance to End Statelessness and pledge at the UNHCR- convened 2019 High-Level Segment on Statelessness to "engage in strong U.S. diplomacy to advocate for the prevention and reduction of statelessness and to provide U.S. humanitarian assistance to help protect stateless persons."[13] The U.S. Department of State has called on other nations to eliminate "discrimination in nationality laws and practice" and to strengthen political will to address "gaps in national laws that are causing statelessness."[14]

8. Statelessness eliminates not just "social citizenship" but also "medical citizenship,"[15] and the harmful effects of eliminating birthright citizenship would extend beyond the stateless children to U.S. citizens. In "mixed-status" immigrant families, for example, U.S. citizen children with non-citizen siblings are less likely to have health insurance or a usual source of care, are more likely to utilize

---

[12] Statelessness - United States Department of State. United States Department of State. Published January 16, 2025. Accessed January 20, 2025. https://www.state.gov/statelessness
[13] Ibid.
[14] Ibid.
[15] Kingston LN, Cohen EF, Morley CP. Debate: Limitations on universality: the "right to health" and the necessity of legal nationality. *BMC International Health and Human Rights*. 2010;10(1). doi:https://doi.org/10.1186/1472-698x-10-11

emergency departments for care, and are less likely to receive the routine schedule of preventive care measures recommended by the American Academy of Pediatrics and American Academy of Pediatric Dentistry.[16] Children who do have public or private insurance are less likely to have a usual source of care if they have an uninsured sibling.[17]

9. The chilling effects of restrictive anti-immigrant policies extend beyond directly affected families, with declines in public health insurance enrollment noted even in immigrant families where all children are U.S. citizens.[18] Such chilling effects can also decrease utilization of other important public benefits with no immigration status requirements, such as the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC).[19] Unmet basic needs have been shown to drive up emergency room, urgent care, and mental health visits among children.[20]

10. Data from the National Health Interview Survey demonstrate that children from marginalized/minoritized racial backgrounds, who are heavily represented among both children enrolled in public health insurance programs and children in immigrant families, already experience more limited access to healthcare and are

---

[16] Hudson JL, Abdus S. Coverage And Care Consequences For Families In Which Children Have Mixed Eligibility For Public Insurance. *Health Affairs*. 2015;34(8):1340-1348. doi:https://doi.org/10.1377/hlthaff.2015.0128

[17] Percheski C, Bzostek S. Health insurance coverage within sibships: Prevalence of mixed coverage and associations with health care utilization. *Soc Sci Med*. 2013;90:1-10. doi:https://doi.org/10.1016/j.socscimed.2013.04.021

[18] Twersky SE. Do state laws reduce uptake of Medicaid/CHIP by U.S. citizen children in immigrant families: evaluating evidence for a chilling effect. *Int J Equity Health*. 2022;21(50):1-14. doi:https://doi.org/10.1186/s12939-022-01651-2

[19] Vargas ED, Pirog MA. Mixed-Status Families and WIC Uptake: The Effects of Risk of Deportation on Program Use. *Social Science Quarterly*. 2016;97(3):555-572. doi:https://doi.org/10.1111/ssqu.12286

[20] Black LI, Ng AE, Zablotsky B. Stressful life events and healthcare utilization among U.S. children aged 2–17 years. National Health Statistics Reports; no 190. Hyattsville, MD: National Center for Health Statistics. 2023. DOI: https://dx.doi.org/10.15620/cdc:130311.

less likely to report excellent or very good health compared to white, non-Hispanic children.[21] The health burdens of statelessness would further exacerbate existing racial inequities in pediatric health outcomes, not only among directly affected children, but among U.S. citizen children as well.

Signed under pains and penalty of perjury, this 20th day of January 2025.

_____

Fiona S. Danaher, M.D., M.P.H., F.A.A.P.

---

[21] Brooks T, Gardner A. *Snapshot of Children with Medicaid by Race and Ethnicity, 2018*. Georgetown University McCourt School of Public Policy Center For Children and Families; 2020. Accessed January 20, 2025. https://ccf.georgetown.edu/wp-content/uploads/2020/07/Snapshot-Medicaid-kids-race-ethnicity-v4.pdf

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| O. DOE; BRAZILIAN WORKER CENTER, INC.; LA COLABORATIVA,<br><br>        Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; U.S. SOCIAL SECURITY ADMINISTRATION; MARCO RUBIO, in his official capacity as Secretary of State; MICHELLE KING, in her official capacity as Acting Commissioner of U.S. Social Security Administration,<br><br>        Defendants. | Civil Action No. 25-10136-LTS |

**DECLARATION OF ROSE L. MOLINA, M.D., M.P.H.**

        I, Rose L. Molina, M.D., M.P.H. make the following declaration based on my personal knowledge and declare under the penalty of perjury that the following is true and correct:

**Background**

1.   I am a board-certified obstetrician-gynecologist at The Dimock Center (a federally qualified community health center) and Beth Israel Deaconess Medical Center.

2.   I am an Associate Professor of Obstetrics, Gynecology, and Reproductive Biology at Harvard Medical School. I am the Faculty Director of the Health Equity Theme and the Medical Language Program at Harvard Medical School.

3.   I completed the Global Women's Health Fellowship at Brigham and Women's Hospital and obtained a Master of Public Health in Clinical Effectiveness from Harvard T.H. Chan

School of Public Health.

**Processing of Social Security Applications in Hospitals**

4. As an obstetrician-gynecologist and as a mother, I am familiar with the process by which families obtain Social Security numbers/cards for their newborns. The process is very straightforward because a hospital's certification that a child was born in the United States has traditionally been all that is needed for the federal government to issue a child a Social Security card as a U.S. citizen

5. The Enumeration at Birth (EAB) program is a collaborative initiative between hospitals, state agencies, and the Social Security Administration (SSA). This program allows parents to obtain a Social Security number for their newborns during the birth registration process at hospitals.

6. The EAB eliminates the need to gather documents and visit a Social Security office, as the hospital transmits the necessary birth information electronically to the SSA. The EAB program is voluntary. However, SSA reports that nearly all parents—approximately 99%—utilize EAB to obtain a Social Security number for their child.[1] This is consistent with the high rates of usage that I have seen in my practice.

7. Through the EAB, the hospital provides parents with a very simple form to fill out (Form SSA-2853).[2] After the hospital submits the birth registration information, the SSA mails the child's Social Security card with a Social Security number to the parents within a few

---

[1] *See* Social Security Administration, *Bureau of Vital Statistics: Updated State Processing Guidelines for the Enumeration at Birth Program, at 4* (Nov. 2024), https://www.ssa.gov/dataexchange/documents/Updated%20State%20Processing%20Guidelines%20for%20EAB.pdf.
[2] *Id.* at 5.

weeks. In Massachusetts, SSA currently estimates that parents should receive the card in approximately two weeks.[3]

8. This streamlined process ensures that families receive their child's Social Security card efficiently, facilitating tasks such as adding the child to health insurance policies, claiming tax benefits, or opening a savings account.

## Health Outcomes Associated With Citizenship

9. A child's citizenship status significantly impacts their access to healthcare and health outcomes. U.S. citizenship ensures eligibility for vital programs like Medicaid and the Children's Health Insurance Program (CHIP), providing preventive care, immunizations, and treatment that support healthy development. While some states have programs to provide medical services to non-citizen children, there remain gaps between health access for citizen and non-citizen children.

10. Infants are among the most vulnerable populations, requiring frequent healthcare visits in their early months to ensure healthy development. Limited access to healthcare significantly increases their risk of adverse outcomes, including low birth weight complications and a higher likelihood of infant mortality.[4]

11. Infants with citizenship are more likely to access routine care without barriers, leading to better management of chronic conditions, early detection of issues, and overall improved health. By contrast, infants without citizenship often face restricted access, delays in care,

---

[3] Social Security Administration, *How Long Does It Take to Get My Child's Social Security Number?*, https://www.ssa.gov/faqs/en/questions/KA-01969.html (last visited Jan. 17, 2025).
[4] *See* Institute of Medicine, Committee on the Consequences of Uninsurance, *Health Insurance is a Family Matter*, 6 (2002), https://www.ncbi.nlm.nih.gov/books/NBK221019/.

and greater exposure to health disparities. These obstacles can result in untreated conditions, undermining their well-being.[5]

**Effects of Executive Order Eliminating or Eroding Birthright Citizenship:**

12. Allowing the elimination or erosion of birthright citizenship through an Executive Order would significantly disrupt the efficient relationship between hospitals, state agencies and the federal government. It would also create immediate and long-term harm to children. Even in states like Massachusetts, where basic care may be accessible, non-citizen infants may face delays, limited coverage, and difficulties navigating employer-based insurance, harming medical outcomes.

13. Allowing the elimination or erosion of birthright citizenship through an Executive Order would disrupt the timely issuance of essential documentation for children at birth, as facilitated by the EAB program. This would happen not only for children of undocumented parents, but for all children. Children born to citizen parents would need to find some way to establish the citizenship of their parents. Currently, that is not necessary because being born in the United States establishes citizenship.

14. Allowing the elimination or erosion of birthright citizenship through an Executive Order would restrict access to vital healthcare services for infants, a particularly vulnerable population, as social science research shows they are more susceptible to health risks and complications. Any bureaucratic barriers that impede access to healthcare can become highly problematic very quickly.

15. Allowing the elimination or erosion of birthright citizenship through an Executive Order

---

[5] *Id.*

would also add to the chilling effect of immigrant families being discouraged to seek out necessary medical attention, leading to missed preventive services and untreated conditions. Even where families are entitled to receive care, where there is confusion and uncertainty, we see families foregoing needed care.

Signed under pains and penalty of perjury, this 19th day of January 2025.

Rose L. Molina, M.D., M.P.H.

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| O. DOE; BRAZILIAN WORKER CENTER, INC.; LA COLABORATIVA, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; U.S. SOCIAL SECURITY ADMINISTRATION; MARCO RUBIO, in his official capacity as Secretary of State; MICHELLE KING, in her official capacity as Acting Commissioner of U.S. Social Security Administration, <br><br> Defendants. | Civil Action No. 25-10136-LTS |

## DECLARATION OF CAROL GALLETLY

I, Carol Galletly, make the following declaration based on my personal knowledge and declare under the penalty of perjury that the following is true and correct:

### Background

1. I am an Associate Professor at a private medical school, pharmacy school, and graduate school of sciences. I hold a PhD in Health Education, as well as a JD, from the Ohio State University.

2. My research applies empirical methods to guide the development of sound law and policy on critical issues at the intersection of individual behavior and public health. My research addresses topics including sexual health, HIV seropositive status disclosure, stigma, and the assessment of structural-level HIV prevention interventions.

3. Among other areas of study, my work focuses on the interaction between public

health and immigration law.

## The Interaction Between Public Health and Immigration Status

4. Persons whose immigration status is undocumented may be afraid of being identified and thus may avoid interacting with public health representatives. Their legal fears may prompt them to go "underground," out of the reach of public health. Concerns about confidentiality, collaborations between public health officials and immigration enforcement, and running afoul of immigration-related laws and regulations can prompt them to avoid traditional public health epidemic response measures—disease testing, prompt treatment, vaccination, and contact tracing. This can increase morbidity and mortality within the population as a whole.

5. Undocumented immigrants' fear of being identified may make them reluctant to provide the information necessary for public health contact. Yet contact with individuals is critical to reduce transmission and prevent morbidity and mortality. Immigrants' concerns about being identified can extend to undocumented family members, co-workers, and others. They may be afraid lest undocumented others are identified. These others who may have been exposed but not contacted are denied the benefit of disease testing and of transmission information and may unknowingly risk the forward infection of a disease that public health officials are attempting to contain.

## Effects of Executive Order Eliminating Birthright Citizenship

6. If, based on an Executive Order, Social Security stopped issuing social security numbers or cards to people with a US birth certificate because this document was no longer sufficient to establish citizenship, public health would be compromised. The

number of undocumented residents in the US would be greatly expanded. Public health

disease control efforts could be undermined as undocumented immigrants seek to

avoid detection. Further, undocumented persons face barriers to healthcare and safe

employment, contributing to the spread of disease.

Signed under pains and penalty of perjury, this 20th day of January 2025.

*/s/ Carol Galletly JD, PhD*

Carol Galletly

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| O. DOE; BRAZILIAN WORKER CENTER, INC.; LA COLABORATIVA,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; U.S. SOCIAL SECURITY ADMINISTRATION; MARCO RUBIO, in his official capacity as Secretary of State; MICHELLE KING, in her official capacity as Acting Commissioner of U.S. Social Security Administration,<br><br>Defendants. | Civil Action No. 25-10136-LTS |

## DECLARATION OF DANIEL KANSTROOM

I, Daniel Kanstroom, make the following declaration based on my personal knowledge. I declare under the penalty of perjury that the following is true and correct:

**Background and Experience**

1. I am Professor of Law with tenure, Faculty Director of the Rappaport Center for Law & Public Policy, and Dean's Distinguished Scholar at Boston College Law School. My areas of academic expertise include Human Rights, Refugee Law, Immigration Law, and Administrative Law.

2. In addition to my academic work, I founded the Boston College Immigration and Asylum Clinic. I served for more than a decade as Co-Director of the Boston College Center for Human Rights and International Justice. I created the Post-Deportation Human Rights

1

Project to conceptualize and develop a new field of law, while representing U.S. deportees abroad and undertaking empirical studies of the effects of deportation on families and communities.

3. Together with my students, I have litigated many immigration and asylum cases and provided counsel for hundreds of clients over more than 40 years of practice as a lawyer. I have also organized innumerable public presentations in schools, churches, community centers, courts and prisons, and advised community groups. I have trained federal and state judges, prosecutors and defense attorneys in the intricacies of US immigration law.

4. I have published widely in the fields of U.S. immigration law, criminal law, and European citizenship and asylum law. I am the author of Aftermath: Deportation Law and the New American Diaspora (Oxford University Press) and Deportation Nation: Outsiders in American History (Harvard University Press). I am a co-editor of The New Deportations Delirium (NYU Press) and Constructing "Illegality": Immigrant Experiences, Critiques, and Resistance (Cambridge University Press). I have also published dozens of law review articles, book reviews, and essays.

## The Meaning and Importance of U.S. Citizenship

5. Citizenship is a universal politico-legal aspect of the modern world of nation states. Every state has a unique set of criteria for citizenship and for various statuses of noncitizens. In general terms, citizenship everywhere confers what one well-known scholar referred to in 1950 as "full membership of a community." T.H. Marshall, *Citizenship and Social Class and Other Essays* (1950) p. 8.

6. In all states, the specific legal aspects of citizenship vary. U.S. citizenship confers a unique bundle of privileges and benefits. These include the right to reside in the United States, the right not to face deportation under any circumstances, the right to vote in federal elections, the right to hold certain political offices and government positions, the ability to

leave and to re-enter the United States freely unencumbered by immigration criteria and processes, and eligibility for various public benefits.

7. Although many U.S. constitutional rights do not depend upon citizenship status (e.g. the right to due process of law and the rights of those charged with crimes), it is clear that U.S. citizenship is an essential element of American identity and a foundational element of American social cohesion. It facilitates social, community, and economic integration through tangible and intangible characteristics. Thus, although it is something of an overstatement to say, as Justice Earl Warren once did, that citizenship is "the right to have rights," there are many arenas of U.S. law and politics in which this is clearly true. Perez v. Brownell, 356 US 44, 46 (1958).

## The Consequences of an Executive Order Challenging Birthright Citizenship

8. Citizenship, as noted, is both an abstract, theoretical politico-legal concept and a forensic question of proof. Unlike many other states, the U.S. does not have a centralized, national database of U.S. citizens. Most U.S. citizens demonstrate their citizenship with a state-issued birth certificate showing they were born in the U.S. As a matter of longstanding precedent under the Common Law and, most specifically, the Fourteenth Amendment of the U.S. Constitution, birth on U.S. soil *definitively* and *conclusively* proves one's citizenship, with only a very few, highly technical, rare exceptions. This system is simple and basic and was designed as such for important reasons of inclusion, equal protection, and avoidance of the development of a caste of multi-generational noncitizens.

9. As the U.S. Supreme Court noted, in the seminal 1898 case that first definitively interpreted the scope of the Fourteenth Amendment:

> "The Amendment, in clear words and in manifest intent, *includes the children born within the territory of the United States, of all other persons*, of whatever race or color, domiciled within the United States. Every citizen or subject of another country, while domiciled here, is within the allegiance

and the protection, and consequently subject to the jurisdiction, of the United States…" United States v. Wong Kim Ark, 169 U.S. 649, (1898) (emphasis added)

10. U.S. immigration law, by contrast, is exceedingly complex, as many courts have recognized over many decades. Assessment of the legal status of a particular person often involves highly technical legal and factual analyses that, as one court famously noted, would "cross the eyes of a Talmudic scholar." Cervantes v. Perryman, 954 F. Supp. 1257, 1260 (1997) Birthright citizenship is one of the very few "bright lines" in immigration law and, of course, one of the most consequential. Its elimination by Executive Order would portend an immense amount of legal chaos and inevitable, irremediable harm. This is true whether the elimination or complexification of birthright citizenship is attempted as a substantive matter of law or, more subtly, as an impediment to the sorts of simple bureaucratic practices that have marked the field for centuries.

11. As the Supreme Court noted more than a half century ago, citizenship is "no light trifle to be jeopardized at any moment…" Afroyim v. Rusk, 387 U.S. at 257 (1967). This would be so even if it were the Congress that had tried to do so under one of its general or implied grants of power." *Id.* This is even more true in regard to an Executive Order. As the Court noted in *Afroyim*,

> "The very nature of our free government makes it completely incongruous to have a rule of law under which a group of citizens temporarily in office can deprive another group of citizens of their citizenship." *Id.* at 262.

12. The consequences of even a short-lived Executive Order of this type would involve intolerable legal chaos and potentially irremediable harm to individuals, families, and communities.

13. For one thing, it would predictably lead to wrongful, illegal arrests of people thought to be "aliens." Wrongful deportations not only cause tremendous emotional distress; but they

4

are physically dangerous and extremely difficult to rectify once a U.S. citizen is sent to a foreign country. Moreover, thousands of people apply for federal government documents every day, many of which depend upon proof of U.S. citizenship. Families of newborn children routinely apply for passports sometimes for emergency reasons to visit and help to care for sick relatives or to attend funerals with their young U.S.-born children. Many parents also apply for Social Security cards for their children at birth to facilitate eligibility for a wide array of public benefits. Thousands of older workers, in turn, apply for Social Security benefits. As the website of the Social Security Administration intones:

> "If you were not born in the U.S., proof of U.S. citizenship or lawful alien status. We must see the original document(s), or copies certified by the agency that issued them. We cannot accept documents if they have expired. We cannot accept photocopies or notarized copies."
> https://www.ssa.gov/benefits/retirement/planner/applying5.html

14. All of these processes and many more rely on broad, unquestioning acceptance of the norm of Fourteenth Amendment U.S. citizenship, regardless of the legal status of one's parents (except for diplomats and, perhaps, "enemy aliens" in a time of armed conflict.) A U.S. birth certificate conclusively answers the issue of one's citizenship and has done so efficiently and effectively for more than 150 years.

15. If all of this were changed—or even called into question by an Executive Order, there would be significant legal chaos and disruption. Any clerk at any level of any municipal, state or federal system might decline to issue a birth certificate or decline to recognize its legal validity as proof of citizenship. Immigration enforcement agents and those with whom they collaborate would be confused and would inevitably err. No one would know how to demonstrate citizenship. Would one have to prove the "legality" of one's parents' status? An Executive Order of this type thus implicates an enormously complicated set of legal and factual issues for which there is no training or guidance that could remotely be deemed sufficient as a matter of due process or equal protection of the laws to avoid terrible harms in practice.

5

16. Indeed, the chaos would extend far beyond the children of undocumented parents. Unless there were equally intolerable invidious discrimination based on race, national origin, linguistic ability, etc. [which is also foreseeable under such circumstances] *everyone* would have to demonstrate their citizenship with reference to the legal status of their parents. It is completely foreseeable that many thousands would suffer harms or at the very least, live for long periods of time in a bureaucratic morass of legal uncertainly and precarity.

17. Even if the Executive Order were eventually overturned by the U.S. Supreme Court, the disruptions and harms in the meantime would be immense. Many children born in the U.S. would lack legal status for indeterminate periods of time. Many would be stateless, and thus without the protection of any government at all. They would be unable to attain legal status or naturalize for many years, if ever. Children born in the U.S. would essentially be relegated to a subordinate caste of native-born Americans. *This was precisely the situation that the Fourteenth Amendment was designed to eliminate.* Indeed, it is well-established by Supreme Court precedent and scholarly research that a primary jurisprudential aim of the Fourteenth Amendment was to remove not only the specific holding—but *all vestiges* of the explicitly racist and exclusionary reasoning of the infamous case of Dred Scott v. Sandford, 60 U.S. (19 How.) 393 (1857). In contrast, an Executive Order that questions birthright citizenship threatens to take us back to pre-Civil War harms that we had long thought were historical relics.

Signed under the pain and penalties of perjury this 20 day of January 2025.

Daniel Kanstroom

6

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

O. DOE; BRAZILIAN WORKER CENTER, INC.;
LA COLABORATIVA,

                Plaintiffs,

        v.

DONALD J. TRUMP, in his official capacity as
President of the United States; U.S. DEPARTMENT
OF STATE; U.S. SOCIAL SECURITY
ADMINISTRATION; MARCO RUBIO, in his
official capacity as Secretary of State; MICHELLE
KING, in her official capacity as Acting
Commissioner of U.S. Social Security
Administration,

                Defendants.

Civil Action No. 25-10136-LTS

## DECLARATION OF KATHERINE CULLITON-GONZÁLEZ

       I, Katherine Culliton-González, make the following declaration based on my personal knowledge and declare under the penalty of perjury that the following is true and correct:

**Background**

1. From Jan. 2021-Sept. 2022, I was a Presidential Appointee serving as Officer for Civil Rights and Civil Liberties (CRCL) at the Department of Homeland Security (DHS). In this statutory role, I supported the mission of the Department to secure the Nation while preserving our values, including liberty, fairness, and equality under the law.

2. Prior to and after my time at DHS, I have served in a variety of roles in the federal government and in the non-profit sector and national bar associations, and developed significant expertise in civil rights and citizenship, including through peer-reviewed research. I am an attorney and graduated as valedictorian of American University law school in May 1993. I am providing this declaration in my personal capacity.

**The Importance of Birthright Citizenship to American Democracy**

3. As I documented in my 2012 *Harvard Human Rights Law Journal* article, *Born in the Americas: Birthright Citizenship and Human Rights*, limiting birthright citizenship would be antithetical to American democracy, as it is clearly unconstitutional and would upend 157 years of American constitutional norms put in place through the Reconstruction Amendments that were enacted to replace the odious and discriminatory ideas of the *Dred Scott* and previous decisions limiting equal access to citizenship based on race.

4. Limiting birthright citizenship would also undermine the promises of the Civil Rights Act of 1964 and the Immigration and Nationality Act of 1965, which eliminated basing access to citizenship on race or national origin. The great majority of the millions of families and children targeted are people of color, with the majority being Latino.

5. Contrary to popular belief, the United States is not exceptional in providing birthright citizenship. As I documented in 2012, every nation in the Americas except for the Dominican Republic provides birthright citizenship as part of their constitutional promise of equality and democracy. The promise of freedom in the Americas contrasts with the former European monarchies that tried to colonize the people of this hemisphere, including Black and Indigenous peoples provided birthright citizenship as a fundamental promise of constitutional democracy. The U.S. followed suit with the Fourteenth Amendment and the subsequent 1898 Supreme Court decision in *Won Kim Ark*.

**Effects of Executive Order Eliminating Birthright Citizenship**

6. The executive order has clear discriminatory impacts and is disruptive to many aspects of American life including the safety and security of millions of American families and communities. There is no comprehensive list of U.S. citizens, making it impossible to implement without massive mistakes likely resulting in deportation of U.S. citizens and

misusing resources meant for national security, public safety, health and education.

7. It can be extremely difficult and costly to access a social security card or a passport, and the fear and confusion introduced by this executive order will make access to these documents even more difficult for every child and especially for children of color, who are the majority of the next generation of Americans, across our nation.

8. Foreign policy and economic implications include that Latin American nations may no longer reciprocate by providing citizenship documents for the children of American citizens living abroad, such as the 1.6 million U.S. citizens living in Mexico, disrupting their access to education, health care, ability to work, and property rights.

Signed under pains and penalty of perjury, this 20th day of January 2025.

*Katherine Culliton-Gonzalez*

Katherine Culliton-González

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

O. DOE; BRAZILIAN WORKER CENTER, INC.;
LA COLABORATIVA,

                    Plaintiffs,

               v.

DONALD J. TRUMP, in his official capacity as
President of the United States; U.S. DEPARTMENT
OF STATE; U.S. SOCIAL SECURITY
ADMINISTRATION; MARCO RUBIO, in his
official capacity as Secretary of State; MICHELLE
KING, in her official capacity as Acting
Commissioner of U.S. Social Security
Administration,

                    Defendants.

Civil Action No. 25-10136-LTS

## DECLARATION OF ARMEN H. MERJIAN

## DECLARATION OF ARMEN H. MERJIAN

I, Armen H. Merjian, make the following declaration based on my personal knowledge and declare under the penalty of perjury that the following is true and correct:

### Background

1.    I am a graduate of Yale University (*magna cum laude* 1986) and Columbia Law School (Harlan Fiske Stone Scholar 1990), and I am licensed to practice law in Connecticut, New York, and several federal courts.

2.    Currently, I am the Senior Staff Attorney at Housing Works, Inc. (Housing Works) in New York, a position that I have held for the last 27 years. Housing Works is a nonprofit organization dedicated to ending the twin crises of homelessness and HIV.

3.    The Housing Works Legal Department assists clients in two areas of practice: (a) individual client services, which assists indigent clients with their civil legal needs, including, chiefly, housing issues and public benefits, and (b) impact litigation on matters of importance to the community, including public benefits and housing discrimination. In my capacity as Senior Staff Attorney, I supervise the individual client services and lead the impact litigation. I also regularly speak in city, state, and national fora, and publish in law review articles, books, and other media on issues that include public benefits and housing issues.

### Housing Outcomes Associated with Citizenship

4.    In both public and private housing markets, United States citizens tend to fare better than non-citizens, particularly those who are undocumented. For example, undocumented individuals are ineligible for most housing assistance programs, such as Section 8 and myriad state and local housing voucher and subsidy programs. In addition, public housing and project-based rental assistance all restrict eligibility for citizens and documented immigrants. If,

however, at least one member of the household is eligible, the entire household may live in the unit, though the rent is prorated. What this means is that citizenship confers upon families the ability to secure subsidized or public housing. This is critical to the health, safety, and lives of these immigrant families, for stable housing is the wellspring to education, employment, health, wealth accumulation, and prosperity. At Housing Works, we say that "housing is healthcare," for without stable housing, it is impossible to store medication and fresh food, regularly attend medical appointments, and to maintain a strict medical regimen.

5.     To take another example, the FEMA Individuals and Households program is available only to individuals with eligible immigration status or households with at least one eligible adult or child. For those facing emergencies, and for those who have often lost everything, the presence of an eligible child can mean the difference between homelessness and stable housing.

6.     Here in New York City, families with at least one documented family member are eligible to receive housing from the New York City Housing Authority and Section 8. Undocumented family members are responsible for paying their portion of the rent. Hence, in a family with one citizen child and two undocumented parents, the family is provided with 33% of the subsidy allotted for a family of three. This can make all the difference in providing the family with a chance to thrive, and to ensure the proper development of the child.

7.     Similarly, citizenship renders children eligible for all of the programs provided to citizens, including Medicaid, the Supplemental Nutrition Assistance Program (SNAP), child care, and numerous additional federal, state, and local programs. Such programs, combined with safe and secure housing, can make all the difference in the lives of children of the undocumented, and of their families.

8.     Each of these affects the other: most immigrants are renters, and throughout the United States, low-income individuals pay a disproportionately high percentage of their income toward rent. The provision of benefits and services, such as Medicaid and SNAP, helps to ensure that families are not rendered unable to meet their rental obligations as a result of the high cost of childcare, child medical care, and food, to take three examples.

9.     For those excluded from public housing and thus forced into the private rental market, the situation is dire. Lack of legal status renders families of the undocumented disproportionately impecunious, and as a result, such families are often forced to live in overcrowded, unsafe, unsanitary, and unstable conditions. Such families are also more vulnerable to exploitation and to unscrupulous practices by landlords.

10.     For example, in New York, many families with undocumented family members find themselves unwittingly renting unsafe and illegal apartments, such as illegal basement apartments. Among other things, these apartments are vulnerable to devastating flooding, and it is my understanding that undocumented individuals have even died as a result of such flooding. These families, together with their children, find it difficult or impossible to assert their housing rights, and to secure, for example, critical repairs to unsafe, unsanitary, and often uninhabitable conditions.

**Effects of Executive Order Eliminating Birthright Citizenship**

11.     Over five million U.S. citizen children live with an undocumented family member. If, based upon an executive order, the Social Security administration stopped issuing Social Security numbers and cards to those with a United States birth certificate, and/or if birth certificates were no longer sufficient to establish citizenship, the ability of households with

undocumented individuals, including myriad children, would be severely compromised and restricted.

12. Anything that increases bureaucratic barriers decreases access to housing. Given that, as noted, safe and secure housing is a wellspring to health, education, employment, and childhood development, for example, this poses the very real risk of plunging huge numbers into a downward spiral, in which the inability to access housing leads to homelessness, job loss, lack of childcare, lack of medical coverage, lack of food assistance, lack of educational opportunity, and a host of related maladies. It would cause endless pain and suffering to countless individuals and their families and only exacerbate a homelessness crisis that has reached staggering proportions in municipalities throughout the United States.

Signed under pains and penalty of perjury, this 21st day of January 2025.

Armen H. Merjian

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2

 3   _____

 4   O. DOE, et al.,

 5        Plaintiffs,                   Civil Action No.
                                        1:25-cv-10135-LTS
 6      v.

 7   DONALD J. TRUMP, in his official
     capacity as President of the United
 8   States, et al. ,

 9        Defendants.

10   and

11   STATE OF NEW JERSEY, et al.,

12        Plaintiffs,                   Civil Action No.
                                        1:25-cv-10139-LTS
13      v.

14   DONALD J. TRUMP, in his official
     capacity as President of the United
15   States, et al.

16        Defendants.

17   _____

18      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

19                   MOTION HEARING

20              Friday, February 7, 2025
                     9:58 a.m.
21
     John J. Moakley United States Courthouse
22   Courtroom No. 13
     One Courthouse Way
23   Boston, Massachusetts

24   Rachel M. Lopez, CRR
     Official Court Reporter
25   raeufp@gmail.com
```

2

```
1                    A P P E A R A N C E S

2
    On behalf of the 10135 Plaintiffs Doe, Brazilian Worker
3   Center, and La Colaborativa:

4        LAWYERS FOR CIVIL RIGHTS
         BY:  OREN M. SELLSTROM, MIRIAN ALBERT,
5        AND JACOB LOVE
         61 Batterymarch Street
6        Boston, Massachusetts  02110
         (617) 988-0608
7        osellstrom@lawyerscom.org
         malbert@lawyersforcivilrights.org
8        jlove@lawyersforcivilrights.org

9

10  On behalf of the 10139 Plaintiffs State of New Jersey,
    Commonwealth of Massachusetts, and State of California:
11
         MASSACHUSETTS ATTORNEY GENERAL'S OFFICE
12       BY:  GERARD J. CEDRONE AND JARED B. COHEN
         One Ashburton Place
13       20th Floor
         Boston, Massachusetts  02108
14       (617) 963-2282
         gerard.cedrone@mass.gov
15       jared.b.cohen@mass.gov

16

17       NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
         BY:  SHANKAR DURAISWAMY
18       33 Washington Street
         Newark, New Jersey  07102
19       (908) 507-2949
         shankar@duraiswamy@njoag.gov
20

21
         OFFICE OF THE ATTORNEY GENERAL
22       BY:  IRINA TRASOVAN
         300 S. Spring Street
23       Suite 1702
         Los Angeles, California  90013
24       (213) 269-6261
         irina.trasovan@doj.ca.gov
25
```

1              **A P P E A R A N C E S, Cont.**

2

   On behalf of the Defendants:

3

       US DEPARTMENT OF JUSTICE
4      BY:  ERIC HAMILTON
       950 Pennsylvania Avenue, NW
5      Washington, D.C.,  20530
       (202) 514-3301
6      eric.hamilton@usdoj.gov

7

8      DEPARTMENT OF JUSTICE - CIVIL DIVISION
       BY:  BRAD P. ROSENBERG
9      1100 L Street, NW
       Washington, D.C., 20005
10     (202) 514-3374
       brad.rosenberg@usdoj.gov

11

12

       UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
13     BY:  MICHAEL FITZGERALD
       John Joseph Moakley Courthouse
14     One Courthouse Way, Suite 9200
       Boston, Massachusetts  02210
15     (617) 748-3266
       michael.fitzgerald2@usdoj.gov

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2          (In open court.)

 3          THE DEPUTY CLERK:  The United States District Court

 4  for the District of Massachusetts is now in session, the

 5  Honorable Leo T. Sorokin presiding.

 6          THE COURT:  Please be seated.

 7          THE COURTROOM CLERK:  Today is Friday, February 7,

 8  2025, and we are on the record in Civil Case Number

 9  25-cv-10135, O. Doe, et al., versus Donald J. Trump, et al.,

10  and 25-cv-10139, The State of New Jersey, et al., versus

11  Donald J. Trump, et al.

12          Will counsel please state your name for the record.

13          THE COURT:  Hold on one second.  Give me one moment

14  just to get set up, and I want to make a note of one thing.

15          Okay.  Go ahead.

16          MR. SELLSTROM:  Good morning, Your Honor.  Oren

17  Sellstrom from Lawyers for Civil Rights on behalf of

18  Plaintiffs O. Doe, La Colaborativa, and Brazilian Workers

19  Center.

20          THE COURT:  Good morning.

21          MR. CEDRONE:  Good morning, Your Honor.  Gerard

22  Cedrone from the Massachusetts Attorney General's Office, on

23  behalf of the Commonwealth.

24          I'll let my colleagues at counsel table introduce

25  themselves, but note that we have co-counsel from several
```

```
 1   other jurisdictions in the courtroom today, as well.

 2              THE COURT:  Okay.

 3              MR. DURAISWAMY:  Good morning, Your Honor.  Shankar

 4   Duraiswamy from the State of New Jersey here on behalf of the

 5   plaintiffs in the 10139 action.

 6              THE COURT:  Good morning.

 7              MS. ALBERT:  Good morning, Your Honor, Mirian

 8   Albert on behalf of the Doe plaintiffs, La Colaborative, and

 9   Brazilian Workers Center.

10              THE COURT:  Good morning.

11              MR. LOVE:  Good morning, Your Honor.  Jacob Love

12   from Lawyers for Civil Rights on behalf of the Doe

13   plaintiffs.

14              THE COURT:  Good morning.

15              MS. TRASOVAN:  Good morning, Your Honor.  Irina

16   Trasovan on behalf of The State of California.

17              MR. COHEN:  Good morning, Your Honor.  Jared Cohen

18   on behalf of The Commonwealth of Massachusetts.

19              THE COURT:  Just say it again.  I didn't catch your

20   name.

21              MR. COHEN:  Jared Cohen on behalf of The

22   Commonwealth of Massachusetts.  Good morning.

23              THE COURT:  Good morning.

24              MR. HAMILTON:  Good morning, Your Honor.  Eric

25   Hamilton, deputy assistant attorney general in the Civil
```

1   Division of the US Department of Justice for defendants.

2           THE COURT:  Good morning.

3           MR. ROSENBERG:  Good morning, Your Honor.  Brad

4   Rosenberg, special counsel with the Federal Programs Branch

5   in the Department of Justice's Civil Division, on behalf of

6   the federal defendants.

7           THE COURT:  Good morning.  Okay.

8           All right.  So I have read all the papers that

9   you've all submitted and all the amicus briefs that I've

10  authorized that I've allowed to file.

11          Who's arguing on -- for the plaintiffs?

12          MR. SELLSTROM:  Your Honor, with the Court's

13  permission, we've spoken with the state's counsel, as well,

14  and we would propose to consolidate the arguments.  From the

15  plaintiffs' side in the two cases, I would go first on behalf

16  of the Doe plaintiffs.  The state's counsel can then pick up

17  from there on some of the shared arguments, as well as some

18  that are unique to the State.

19          THE COURT:  Okay.

20          MR. SELLSTROM:  We'd also like some rebuttal time

21  after the government's argument, as well.

22          THE COURT:  All right.  And just one person from

23  the states?

24          MR. CEDRONE:  So I think you'll be hearing from two

25  of us, with the Court's leave.  I'll be addressing the

1    standing and threshold questions, and Mr. Duraiswamy will

2    address the PI factors, so the merits in the case.

3             THE COURT:  I see.  So just the two of you?

4             MR. CEDRONE:  Correct.

5             THE COURT:  Okay.  All right.  And then one or both

6    of you on the defense side?

7             MR. HAMILTON:  Yes, Your Honor.

8             THE COURT:  Who's with you at the table, who you

9    didn't introduce?

10             MR. FITZGERALD:  Oh.  Good morning, Your Honor,

11    Michael Fitzgerald from the US Attorney's Office for the

12    defendants.

13             THE COURT:  Okay.  Good morning.  Sorry, I couldn't

14    see you right there behind them.  Washington looms large over

15    the US Attorney's Office, I guess.

16             Okay.  That's fine.  I'm not going to set time

17    limits.  I'll hear from you; then I'll hear from the

18    government.  I'll hear something more in response from you,

19    and then we might be done, or maybe depending whether you

20    want to say anything else.  But you don't -- just as sort of

21    a guide post, you don't need to say everything in your

22    briefs.  If you walked out right now, you will have waived

23    nothing.  Okay?  If you say, "I waive," everything that

24    follows is gone.  Right?  But if you don't use those words,

25    right, you have whatever is in your briefs.  So if you walked

1  out and you hadn't said part two of your brief, or what have

2  you, it's not gone.  I have it; I've read it.  I'm going to

3  think about it.  I'll consider it; I'll address it.  So in

4  that sense, you know, I don't -- just keep that in mind in

5  terms of the -- what you have to say.  Okay?

6           Go ahead.

7           MR. SELLSTROM:  Thank you, Your Honor, and we will

8  try and hit the highlights.

9           As the Supreme Court has said, it would be

10  difficult to exaggerate the value and importance of American

11  citizenship.  Citizenship carries with it a full array of

12  rights and privileges and makes one a full member of the

13  United States community.

14           Given that importance, the Supreme Court has also

15  said that stripping someone of citizenship amounts to, quote,

16  "A total destruction of the individual status in organized

17  society."

18           The declarations that we have submitted show

19  clearly how that harm would be visited upon children and

20  families if the executive order were to go into effect.  That

21  momentous act of denaturalization cannot be done by the

22  stroke of a pen, and that is because the concept of

23  birthright citizenship that anyone born on American soil is

24  an American citizen is so fundamental to the fabric of our

25  nation that it's expressly written into the Constitution.

1    That, of course, is through the 14th Amendment, passed as a

2    means to mend a broken nation and make clear in the

3    citizenship clause that the government never again can decide

4    who among disfavored classes is entitled to citizenship.

5    That is why the citizenship clause was enacted, and it makes

6    clear that all who are born here, subject only to very rare

7    exceptions, like the children of diplomats, are automatically

8    American citizens.  That basic concept has been definitively

9    endorsed and upheld by the Supreme Court, by the First

10   Circuit, and by courts around this country for generations.

11   It permeates federal agency and state agency practice and has

12   for 150 years and more.  It cannot be changed with the stroke

13   of a pen.

14          In many ways, the Court's inquiry this morning need

15   go no further than that.  The defendants may wish that the

16   Supreme Court revisit this issue.  But at this point in time,

17   First Circuit and Supreme Court jurisprudence is clear and

18   unequivocal, the citizenship clause does not turn on the

19   immigration status of one's parents, and, therefore, the

20   executive order is unconstitutional.

21          The seminal case, of course, is *Wong Kim Ark*,

22   decided by the Supreme Court at the turn of the century,

23   which outlines a long line of English history and common law

24   to arrive at its conclusion.

25          THE COURT:  Turning back, sorry, just to one thing

1   from earlier, the -- from the papers that you've submitted

2   with respect to the associations, I draw the conclusion or

3   it's established that the associations have members in

4   Massachusetts.

5           MR. SELLSTROM:  That's correct.

6           THE COURT:  But do they have members in --

7   elsewhere?

8           MR. SELLSTROM:  The members are primarily in

9   Massachusetts, Your Honor.

10          THE COURT:  And what about -- is it -- should I

11  view them as just having members in Massachusetts?  Or should

12  I view them as having members beyond Massachusetts?

13          MR. SELLSTROM:  I think viewing them as having

14  members in Massachusetts is what's supported by the

15  affidavits that we submitted.

16          THE COURT:  Okay.

17          MR. SELLSTROM:  And is fully sufficient for

18  granting the relief that we are asking for.

19          THE COURT:  All right.  Okay.

20          MR. SELLSTROM:  Which I'm happy to address, if it's

21  something that Your Honor would like to probe deeper.

22          THE COURT:  Well, one -- certainly you can address

23  that.  I intend to address all of the issues that are put to

24  me in this case, the way I would in any case.  And so one of

25  the issues, it's just, as you know, a series of steps, but

1    one of the issues, if I get there, is what, if any, form of

2    relief should be granted, and what's the scope of that

3    relief.  So if you want to talk -- you've talked about it in

4    your papers, but you can talk about it.

5         MR. SELLSTROM:  Yes, absolutely.  Let me get to it,

6    Your Honor.  As you said, the Doe plaintiffs are an

7    individual, an expectant mother whose unborn child would be

8    subject to the executive order, and two membership

9    organizations, each of whom have members, as the declarations

10   attest, who are essentially similarly situated to Ms. Doe.

11   That, as Your Honor alluded to, gives them membership,

12   associational standing, something that is quite clear from

13   Supreme Court First Circuit jurisprudence, the *Hunt vs.*

14   *Washington State Apple* case, and many others that say,

15   essentially, membership organizations can bring the action on

16   behalf of individual members.

17        THE COURT:  I wasn't really asking about standing.

18   I was asking about what other members there were, in terms of

19   thinking about scope of relief.

20        MR. SELLSTROM:  That gets, then, to the question of

21   relief, Your Honor.  And I raise that because -- and we went

22   into a little bit of detail about this in our -- at the end

23   of our reply brief, citing in particular the Supreme Court's

24   decision in the *Trump vs. IRAP* case, because it is so similar

25   to the issue before Your Honor today in terms of those

1     issues.  In that case, that was also brought, the Fourth

2     Circuit case that was later consolidated with the Ninth

3     Circuit case, was brought on behalf of individuals and

4     membership organizations who were affected by the travel ban.

5     And the Supreme Court there upheld a nationwide injunction.

6     It did so by refusing a stay request from the government, but

7     it made clear that it was endorsing the nationwide relief

8     that had been granted in that case, and it did so on a number

9     of different grounds.  One, probably the most important, is

10    because it involved issues of immigration, which the Court

11    said, and the lower courts in both the Fourth and Ninth

12    Circuit also said is, you know, needs to be uniform

13    throughout the country.  That's, you know, a part of the

14    Constitution and the naturalization clause saying it has to

15    be a uniform system of naturalization.  And everyone thinks

16    of it that way, that the immigration laws, in particular, the

17    same rules need to apply to everyone.  And so for that

18    reason, there's a necessity of granting nationwide relief on

19    a facial challenge like this, that is -- that is challenging,

20    again, the analogy is clear -- an executive order that is, on

21    its face, unconstitutional.

22            There are other grounds for that same relief.

23    Again, this is in our reply brief.  We are running out of

24    room a little bit, so it's in a footnote, but the

25    Administrative Procedure Act also makes clear that nationwide

1    relief is the appropriate relief under that act, that the

2    statute says that if an enactment or an agency action is

3    found unconstitutional, the remedy is to set it aside, and

4    that, by its nature, has nationwide impact.  And that's

5    something that has -- you know, there are a number of cases

6    that we've cited that, in the regulatory context, that's the

7    case, an individual challenges something like a regulation is

8    facially unconstitutional, the result under the APA is that

9    it is set aside and nationwide relief is granted.

10            So for all of those reasons, should Your Honor find

11   in our favor, that, we believe, is the appropriate relief.

12            THE COURT:  Okay.

13            MR. SELLSTROM:  I do want to also address the

14   merits of the issue, as well, to make sure that that is laid

15   out.  And again, my brother counsel will pick up on that.

16   But the main case, going back to *Wong Kim Ark*, is cited so

17   much, because it is so decisive and so authoritative.  As

18   Your Honor knows, it is a very lengthy opinion that really

19   traverses a lot of territory, from English common law to, you

20   know, the enactments after the Revolution.  But it's

21   important not only for background, but also because it shows

22   just how wrong defendants are in their interpretation today.

23            The idea of birthright citizenship goes back to the

24   English common law, the idea that anyone born within the

25   king's dominion is automatically subject to his protection

1    and is owed allegiance to him.  And the important thing about

2    those two concepts, protection and allegiance, is that they

3    are not, in any way, subjective.  They're automatic.  It's

4    not as if the king is deciding, you know, who should I bring

5    under my protection.  It automatically adheres, at birth, to

6    anyone who is born in the king's dominion.  And on the other

7    side, the allegiance that is talked about in those cases is

8    not something that is subjective, like we think of, you know,

9    today, the Pledge of Allegiance, where somebody stands up and

10   makes that allegiance.  It's really much more fundamental

11   than that.  It is talked about in terms of the duty that is

12   owed to the king, to be subject to the king, and that is what

13   makes it automatic, that that happens whenever, you know,

14   someone is born on the country's soil.  And that is the basic

15   framework of birthright citizenship that came over to the

16   United States in the colonies, and then through the

17   constitution after the revolution.  And that's what the Court

18   in *Wong Kim Ark* makes so clear, and then takes those

19   principles and applies them to the facts of that particular

20   case.

21           Wong Kim Ark was born here in the United States, in

22   San Francisco, to parents who were Chinese citizens.  And

23   he -- then the question before the Court was he a citizen,

24   when he left the country, and then was trying to reenter.

25   And that's where the Court went into the whole concept of

1  birthright citizenship and held that, yes, because he is born

2  on American soil, he is subject to the jurisdiction of the

3  United States, under the citizenship clause.

4         The Court then illustrated that by the exceptions.

5  There are very few exceptions to that, but the Court went

6  into detail about those exceptions to essentially prove the

7  rule, to show why that rule existed.  And so, for example,

8  the Court talked about children of foreign diplomates, you

9  know, what we know today as diplomatic immunity that has long

10 existed both in England and here, the idea that those

11 individuals are not subject to the country's laws, because

12 they have that diplomatic immunity.

13        The other example given is the children of invading

14 armies during hostile occupations, who are clearly not,

15 again, subject to the country's laws.

16        The other exception that the Court raised in *Wong*

17 *Kim Ark* was something that was unique to the United States,

18 not something that existed in England, which is the case of

19 what was then referred to as Indian tribes.  The idea -- and

20 this is drawing on the earlier case, the *Elk vs. Wilkins*

21 case, authored by the same justice, by the way, who came

22 along later in *Wong Kim Ark* to then explain that in more

23 detail, that because at the time, Indian tribes, Native

24 Americans were viewed as quote/unquote, "alien nations," that

25 was essentially the same as the children of foreign

1    diplomats; that the idea, there again, is it's the exception

2    that shows the basic rule that if you are born in the United

3    States, you are subject to the United States laws.  You are a

4    citizen.  That's what the 14th Amendment was about.  That's

5    exactly what the citizenship clause was enacted to ensure,

6    and that is what *Wong Kim Ark* held.

7         That's not the only case, certainly.  It's cited to

8    so much, because it's authoritative, but there's a long line

9    of Supreme Court First Circuit cases and other cases since

10   then that make that exact same point and cite back to *Wong*

11   *Kim Ark*.  So that is the basic framework that says that you

12   cannot -- a President cannot, with the stroke of a pen, add

13   additional qualifications to that.  It's written in the

14   Constitution, and the President cannot overturn that through

15   executive order.

16         THE COURT:  Okay.  Thank you.

17         MR. SELLSTROM:  I do want to make sure that my

18   colleagues from the State have time to argue.  I did want to

19   touch, just briefly, on the equities.  Your Honor, we think

20   that on the merits, there's a high likelihood of success, and

21   that the balance of equities tips sharply in plaintiffs'

22   favor.  The declarations that we set forth go into detail

23   about that, about babies being born stateless, subject to

24   immediate deportation, all of the other consequences that

25   flow from stripping someone of citizenship, whether it's

1    health ramifications and others.  This is serious, serious

2    business to strip someone of citizenship in that way.  And

3    the Supreme Court comes back to not only that, but what the

4    Supreme Court talks about as a dignitary harm, the idea that

5    taking away someone's national identity is a grave and

6    irreparable threat.  And that's what this executive order

7    does, and that's why the balance of equities tips sharply in

8    plaintiffs' favor.

9            THE COURT:  Thank you.

10            Mr. Cedrone?

11            MR. CEDRONE:  Good morning, Your Honor, Gerard

12    Cedrone for the Commonwealth of Massachusetts and the

13    plaintiff States.  As I mentioned at the outset, I'll address

14    standing and the federal government's threshhold arguments,

15    and then Mr. Duraiswamy will address any additional points on

16    the merits and the equities of the PI.

17            THE COURT:  Just to clarify one thing, you're not

18    asserting *parens patriae* standing?

19            MR. CEDRONE:  We are not asserting that as a basis

20    here.

21            THE COURT:  I thought so, but I just wanted to be

22    sure.

23            Go ahead.

24            MR. CEDRONE:  And there are obviously weighty

25    interests here, but I'll take a moment in my portion to

1    explain why we are obviously the right plaintiffs or why we

2    obviously are proper plaintiffs to vindicate those interests.

3    Mindful of Your Honor's request that we keep it short, I'll

4    try to keep it concise, because in our view, this is not a

5    close case on standing, both on the facts before the court,

6    in the record, and on settled law in the First Circuit and

7    Supreme Court.  We are clearly proper plaintiffs.  I'm here

8    on behalf of 18 states, the District of Columbia, and the

9    City and County of San Francisco, who will all suffer

10    immediate, direct, and predictable injury if this executive

11    order goes into effect.

12          So let me maybe take a moment to address the facts

13    that are before the Court, and then a moment to explain why,

14    under settled precedent, we clearly have standing.  We've put

15    in front of Your Honor declarations explaining the harms that

16    the jurisdictions will suffer if this order goes into effect.

17    I'll focus on the financial harms, because economic harm is

18    in the heartland of an Article III injury, and we've put

19    forward declarations showing the types of federal funding

20    that the plaintiff jurisdictions receive today, that they

21    will no longer receive if this order goes into effect.

22          And I think it's helpful to think about it in that

23    but-for way, to consider what federal funding are we

24    receiving now, what federal funding will the plaintiffs'

25    jurisdictions not receive if this order goes into effect.

1   And Your Honor has declaration after declaration explaining

2   those injuries.

3          Just speaking for the Commonwealth, millions of

4   dollars in Medicaid funding, thousands of dollars from the

5   Social Security Administration for processing Social Security

6   applications will be lost if a whole class of children are

7   considered undocumented or without lawful status.  That's

8   just what the Commonwealth has put forward.  Our colleagues

9   in other states have addressed Title IV-E funding,

10  school-based health services, really vital programs that are

11  assisted by federal dollars to help some of our most

12  vulnerable citizens, where the states will receive less

13  funding if this order goes into effect.

14         I don't take the federal defendants to dispute that

15  that federal funding will be lost.  They simply dispute

16  whether this rises to the level of an Article III injury, and

17  whether we have standing.  For the reasons we said in our

18  papers, we clearly do.  The two points that I'll just

19  reiterate today are that, essentially, every objection to

20  standing that the federal defendants make is resolved by the

21  *Biden vs. Nebraska* case in the Supreme Court, and the

22  *Massachusetts vs. HHS* case in the First Circuit.  In the

23  first case, the Biden case was a state-led challenge to then

24  President Biden's plan to forgive student loans.  The

25  argument for standing there was that this quasi-governmental

1    entity of the state --

2        THE COURT:  You view yourselves as in similar shows

3    to the Missouri entity.

4        MR. CEDRONE:  That's exactly right.  I think we're

5    actually in a stronger position.  In that case there was a

6    question of whether that quasi-governmental entity, MOHELA,

7    was really an arm of the state, such that injuries to MOHELA

8    counted as injuries to Missouri.  Here we don't even have

9    that question.  The money that we're talking about comes

10   directly to the Treasury of the Commonwealth and the

11   plaintiff jurisdictions, and will be lost otherwise.

12       So I don't think there's a way to find no standing

13   in this case, without -- without directly conflicting with

14   that case and with the *Massachusetts vs. HHS* case in the

15   First Circuit.

16       And I will note that just yesterday a judge in the

17   Western District of Washington agreed on this exact standing

18   question on exactly those grounds.

19       I think the only other point that I would like to

20   emphasize --

21       THE COURT:  Am I right that there are certain state

22   laws that turn on citizenship?

23       MR. CEDRONE:  That's right, Your Honor.  There are

24   a number of state laws about participation in civic life that

25   turn on state citizenship.  There are --

```
 1              THE COURT:  On US citizenship?

 2              MR. CEDRONE:  That's right.  For jury service, for

 3    example.  And also in these joint federal state programs that

 4    we've talked about, things like Medicaid, there's obviously

 5    federal law that implements Medicaid, and state law that

 6    implements Medicaid that tracks federal law or has to comply

 7    with federal law.  But that's correct.

 8              So we think this is a straightforward case on

 9    standing.  I'll just mention briefly, the government -- the

10    federal government's argument that we lack a proper cause of

11    action.  Our argument on that, I think, is addressed by the

12    papers.  I'll just mention two things that are new since we

13    submitted our reply brief.  One is that, again, a judge in

14    the Western District of Washington found that --

15              THE COURT:  I read his decision.

16              MR. CEDRONE:  Exactly.  And the only other thing

17    I'll mention is that the government -- the federal government

18    is talking a little bit out of both sides of its mouth on

19    this.  The government just filed a complaint yesterday in the

20    Northern District of Illinois, the case is 25-cv-1285, the

21    United States vs. Illinois, and it challenges so-called

22    sanctuary policies seeking to enjoin state and city officers

23    in Illinois and Chicago and Cook County from implementing

24    those policies.  As I read that complaint, it relies on the

25    exact same ultra vires cause of action that we bring in
```

1    Count 1 and 2 of our complaint.  So I would submit that even

2    the federal government, by its actions in other cases,

3    recognizes that this cause of action to enjoin

4    unconstitutional actions by executive office holders clearly

5    exists and is recognized.

6              Unless Your Honor has further questions, I'll --

7              THE COURT:  No.  Thank you.

8              MR. DURAISWAMY:  Good morning, Your Honor.  On

9    behalf of the 18 plaintiff states, the District of Columbia,

10   and the City of San Francisco, we ask for a nationwide

11   injunction to remedy the profoundly harmful effects of the

12   President's executive order, not only the effect on millions

13   of children who will now be born without any legal status,

14   but the immense disruption to the operation of plaintiffs,

15   child health and welfare programs, and the loss of millions

16   and millions of dollars in federal funding to support those

17   programs.

18              I want to touch on the merits, Your Honor, briefly.

19   But before I get to that, with respect to the Court's earlier

20   question about the scope of relief, I want to be clear that

21   in order to remedy the harms to the plaintiffs that

22   Mr. Cedrone identified, nationwide relief is absolutely

23   essential, for the simple reason that those harms will not be

24   remedied if children living in states outside of the

25   plaintiffs' jurisdiction are denied birthright citizenship,

1    because those families can move into plaintiffs'

2    jurisdictions, and, in fact, there may be families who live,

3    for example, in Massachusetts, who, for whatever reason, give

4    birth in New Hampshire.  So for that fundamental reason that

5    people are mobile, the harms cannot be remedied without full,

6    nationwide relief.

7         Let me start with the merits.  And I don't intend

8    to repeat everything that Mr. Sellstrom said, but with the

9    Court's indulgence, I do think it's critical to reiterate the

10   historical context for this executive order.

11        150 years ago, in the wake of the civil war, the

12   framers of the 14th Amendment enshrined the right to

13   birthright citizenship in the Constitution as a reaction to

14   the *Dred Scott* decision, which itself was an aberration from

15   the well-recognized common law rule that a person born on

16   American soil was an American citizen.  Moreover, the reason

17   the framers chose to enshrine birthright citizenship as a

18   constitutional right was to ensure that it would never again

19   be subject to the vicissitudes of fleeting political

20   considerations.  In the years since, as Mr. Sellstrom has

21   explained, the Supreme Court has made explicit that

22   birthright citizenship is subject only to certain very narrow

23   and precisely defined exceptions, exceptions that were

24   articulated in *Wong Kim Ark*.  And it has also been explicit

25   that these exceptions do not include the children of

1    undocumented immigrants or those who are here on a temporary

2    basis.

3           And for the more than 100 years, the executive

4    branch has acted in accordance with this bedrock

5    constitutional principle, recognizing citizenship for all

6    children born here without regard to the lawfulness or

7    duration of their parents' presence in the United States.  In

8    the face of this century-plus of unbroken precedent and

9    practice, the President issued an executive order summarily

10   declaring that these children are not, in fact, entitled to

11   birthright citizenship, and directing every federal agency to

12   execute his order by stripping them of that right.

13          The order is flatly unconstitutional and *ultra*

14   *vires*.  Not only does it directly conflict with the

15   longstanding understanding of the scope of the citizenship

16   clause, it conflicts with a congressionally enacted statute

17   that codified that understanding into law.  And although

18   defendants attempt to justify the executive order by

19   resorting to purported policy concerns, those must be

20   addressed through lawful means, not by disregarding the

21   Constitution and statutory limits.  And indeed, the very

22   purpose of the citizenship clause was, as the office of legal

23   counsel said, 30 years ago, to remove the right of

24   citizenship by birth from transitory political pressures.

25          Mr. Sellstrom discussed *Wong Kim Ark* in depth, so I

1    won't repeat that, but I do want to focus on defendants'

2    argument that *Wong Kim Ark* is not controlling because it

3    involved the child of permanent residents, not undocumented

4    immigrants or individuals here on a temporary basis.  And

5    they premised this argument on the distinction between

6    whether parents are domiciled here long-term or they're not.

7         This argument is flawed for multiple reasons,

8    Your Honor, but first start with Supreme Court case law.

9    *Plyler v. Doe* held that undocumented immigrants fell within

10   the jurisdiction of the United States for the purposes of the

11   14th Amendment because they were subject to the full range of

12   obligations imposed by the State's civil and criminal laws.

13   The Court further explained that there was no distinction in

14   that regard between those who resided here lawfully and those

15   who resided here unlawfully.  And in several cases, the Court

16   has specifically recognized the citizenship of children born

17   to undocumented immigrants, as well as those here

18   temporarily.

19        In 1957, in *Hintopoulos vs. Shaughnessy*, the Court

20   considered a case involving two crew members of a foreign

21   ship who had been granted temporary permission into the

22   United States and who overstayed.  They gave birth to a

23   child, and the Court explained that, quote, "Of course, the

24   child is an American citizen by birth."

25        In *INS v. Rios-Pineda*, which also involved a

1    petition for suspension of deportation proceedings, the

2    Supreme Court stated plainly that the undocumented immigrant

3    in that case had given birth to a child who, quote, "Born in

4    the United States, was a citizen of this country."

5         In *Hamdi v. Rumsfeld,* the Supreme Court considered

6    the legality of the government's detention of a person born

7    in the United States on the ground that he was an enemy

8    combatant.  An amicus brief argued that the individual in

9    question was not actually a citizen because his parents were

10   on temporary visas in the country when he was born.  The

11   Court did not adopt that view, and they proceeded to analyze

12   his due process rights as a, quote/unquote, "citizen

13   detainee."

14        The First Circuit has also recognized this.  In

15   2011, in *Mariko v. Holder* -- Your Honor, I identified this

16   case after the close of briefing, so I'll give the cite.

17   It's 632 F.3d 1.  The Court considered the case of a child

18   born in the United States to parents who had entered

19   unlawfully and had removal proceedings initiated against them

20   and noted that the child simply, quote, "is a United States

21   citizen."

22        So defendants' domicile theory is squarely at odds

23   with binding Supreme Court case law.

24        Second, it's at odds with the plain language of

25   *Wong Kim Ark*.  And I won't repeat all of these quotations,

1    because we discussed them at length in our reply brief.  But

2    the Court there made clear that whether one is subject to the

3    jurisdiction is independent of their intention to continue

4    such residence or domiciliation; that one is subject to the

5    jurisdiction even if they are, quote/unquote, "merely

6    temporarily sojourning"; that one is subject to the

7    jurisdiction even if they are here, quote/unquote, "for

8    business or pleasure."

9          And for that proposition, they point to Chief

10    Justice Marshall's explication of jurisdiction in the seminal

11    case *The Schooner Exchange,* where he explained that even a

12    merchant vessel that is here for purposes of trade is subject

13    to the jurisdiction of the United States, because if they

14    were not, it would subject the nation's laws to continual

15    infraction.

16          No one, Your Honor, least of all the federal

17    defendants, would suggest that individuals who are here

18    undocumented or are here on a temporary bases are free to

19    disregard the full range of civil and criminal laws of the

20    United States simply because of their status.

21          Although there are parts of *Wong Kim Ark* that refer

22    to the fact that the parents of Wong Kim Ark were here as

23    permanent residents, that discussion is applying the holding

24    of the case to the facts before the Court.  In no way did it

25    qualify the court holding and the precisely defined

1    exceptions that Mr. Sellstrom identified.

2         Finally, Your Honor, if you unpack the reasoning of

3    defendants' domicile argument, it falls apart pretty quickly.

4    It hinges on references in both *Wong Kim Ark* and

5    *Elk v. Wilkins* to owing allegiance, and they never explain

6    what that means.  They never explain what they think it means

7    to owe allegiance or why one has to be domiciled here to owe

8    allegiance.  By contrast, *Wong Kim Ark* makes very clear what

9    they mean -- what allegiance means and what it means simply

10   is a duty to obey the law.

11        Finally, Your Honor, if domicile were a proxy for

12   allegiance as defendants posit, that would not explain why

13   Native Americans were found not to be subject to the

14   jurisdiction.  They are, after all, domiciled long term

15   within the territorial boundaries of the United States.

16        One more point on defendants' arguments,

17   Your Honor, with respect to this issue.  The notion of

18   consent.  They attempt to rely on *Elk's* comment that no one

19   can become a citizen of the nation without its consent.  That

20   statement is taken out of context clearly.  Because *Elk*

21   involved a situation where someone who -- a Native American

22   who had been born within the jurisdiction of a tribal nation,

23   subsequently attempted, through his own volition, to subject

24   himself to the jurisdiction of the United States.  And the

25   Court treated that, essentially, as a naturalization

1    question.  And their point was that you cannot naturalize

2    yourself, only the nation can consent to your naturalization.

3         At bottom, Your Honor, defendants are not really

4    litigating the scope of Supreme Court precedents.  They're

5    seeking to relitigate those precedents directly.  That's

6    clear from the recitation of historical sources that were

7    largely cited in the dissent in *Wong Kim Ark* that were known

8    to and considered by the majority, and that were rejected in

9    the majority's holding.  It's clear from the defendants'

10   attempt to rely on the language of the 1866 Civil Rights Act,

11   which *Wong Kim Ark* expressly discussed and explained the

12   language of which was no different than the meaning of

13   subject to jurisdiction as they articulated it in that

14   opinion.  And it's clear from the policy argument that

15   defendants advance that dual citizenship is problematic, that

16   the government must have tools to address unlawful entry, and

17   the like.

18        To be clear, Your Honor, the executive branch does

19   have some discretion when it comes to the enforcement of

20   immigration laws with respect to the entry, admission, and

21   removal of noncitizens.  But this is not a case about the

22   entry, admission, or removal of noncitizens.  This is a case

23   about children who are born in the United States.  And the

24   executive branch has no more power to take away their

25   constitutional rights to birthright citizenship because they

1   believe it will disincentivize unlawful entry than they have

2   the power to take away their First Amendment rights, their

3   due process rights, or their equal protection rights because

4   they believe it may disincentivize illegal reentry.

5           Finally, Your Honor, even if the Court believed

6   that *Wong Kim Ark* was wrongly decided and even if it had the

7   power to overturn that precedent, plaintiffs would still

8   prevail on their *ultra vires* claims based on the Immigration

9   and Nationality Act, because Congress, at the time of

10  enacting that statute, codified the then existing

11  understanding of what it meant to be subject to the

12  jurisdiction, which was articulated in *Wong Kim Ark*.

13          Let me move quickly, Your Honor, to the equities.

14  Mr. Cedrone has already explained the harms to the states.

15  There's no serious argument that they are not irreparable.  I

16  think it's undisputed that many of the harms could not be

17  addressed, many of the fiscal harms could not be remedied

18  through any administrative channel.  And even as to the ones

19  that involve reimbursement programs, like Medicaid,

20  defendants ask the question as to whether they could be

21  recovered through administrative processes, but the fact that

22  they don't answer that question is very telling.  They don't

23  actually identify any administrative process they have where

24  plaintiffs could recover those funds.

25          On the public interest, I think it's quite

1    straightforward, Your Honor.  I think this is really

2    derivative of the merits.  Once the Court answers the merits,

3    the government has no public interest in violating a

4    constitutional principle in order to address policy concerns.

5         So finally, as I mentioned, Your Honor, we are

6    seeking nationwide relief for the reasons I mentioned before.

7    And I would say that the government raises, in their

8    opposition brief, in a footnote or request that the PI

9    proceedings be consolidated on the merits and that the Court

10   proceed to a final judgment, plaintiffs' position is --

11   Your Honor, is that if the Court is inclined to grant relief,

12   then the record is complete in terms of supporting that

13   relief, and we fully support granting a full and final

14   permanent injunction.

15        THE COURT:  So are you saying that you support me

16   consolidating -- that this is the trial on the merits?  You

17   support that?

18        MR. DURAISWAMY:  We do.  Obviously to the extent

19   the Court believes that there's some defect in the record

20   that would not support --

21        THE COURT:  If I think that everything -- if I

22   think I don't need -- there isn't any -- are you asking for

23   the possibility of more?  Are you saying that if I don't

24   think there's anything else needed, I should just proceed to

25   enter final judgment?

```
 1            MR. DURAISWAMY:  I think what we're saying,

 2   Your Honor, is if you're prepared to enter relief, then

 3   certainly we think that that relief can proceed by way of a

 4   permanent injunction.

 5            THE COURT:  I see.  So if you persuade me that a

 6   preliminary injunction is appropriate, then what you're

 7   saying is I should enter a permanent final injunction.

 8            MR. DURAISWAMY:  That's exactly right, Your Honor,

 9   because to reach that conclusion, I think that would -- the

10   record would be sufficient to support a permanent injunction,

11   as well.  And I would also point out that nothing that we've

12   submitted in the factual record has been disputed by the

13   defendants in any way.  So we really are here on legal

14   arguments.

15            THE COURT:  Okay.  Thank you.

16            Is it Mr. Hamilton or Mr. Rosenberg?

17            MR. HAMILTON:  Good morning, Your Honor.  Eric

18   Hamilton again for the defendants.

19            This Court should deny the plaintiffs' motion for a

20   preliminary injunction.  Our brief identifies a number of

21   threshold problems with plaintiffs' claims.  I want to start

22   by highlighting just one.  That is the lack of standing of

23   the New Jersey plaintiffs.  The New Jersey case is a group of

24   18 states, the District of Columbia, and the City and County

25   of San Francisco.  They lack standing under the
```

1    *United States vs. Texas* case of the Supreme Court.  In that

2    case, two states, Texas and Louisiana, challenge a federal

3    immigration policy, and they premised their challenge on

4    incidental economic harms.

5            Now, plaintiffs respond that

6    *United States vs. Texas* dealt with what the Court called an

7    unusual lawsuit seeking the enforcement of federal law, and

8    that's true.  But it is also true that there's language in

9    *Texas* that is specific to issues of state standing.  We

10   highlight Footnote 3 of that opinion, which calls out the

11   problem of states resting theory on incidental economic

12   harms, which we view as an identical problem to that here.

13           If plaintiffs --

14           THE COURT:  Is direct injury, financial injury

15   enough, or not?

16           MR. HAMILTON:  A direct injury would be different.

17   And that distinguishes *Biden vs. Nebraska*, as well as the

18   Department of Commerce case.  In *Biden vs. Nebraska* that's

19   actually --

20           THE COURT:  But why isn't the injury they advance

21   direct?

22           MR. HAMILTON:  Well, it's an incidental one,

23   because it sort of depends on a chain of --

24           THE COURT:  Well, you -- the President determines

25   or directs that person -- Doe's child -- nowhere in your

```
 1    brief challenged Doe's standing, right?
 2              MR. HAMILTON:  That's right.  That's right.
 3              THE COURT:  So actually, the lack of standing is
 4    not a basis to deny the injunction.
 5              MR. HAMILTON:  Well, you're talking about the --
 6              THE COURT:  I can't -- it would be wrong for me to
 7    deny both motions for injunction for lack of standing.  Do
 8    you agree with that?
 9              MR. HAMILTON:  Well, I'm not sure, Your Honor,
10    because we have two separate cases right now --
11              THE COURT:  I asked for both.  So you made a
12    challenge to standing of the state plaintiffs' case, right?
13              MR. HAMILTON:  Exactly.  The argument I'm making
14    right now has nothing to do with the --
15              THE COURT:  So it's not a basis to deny both
16    motions for injunction.
17              MR. HAMILTON:  Right.  Right.
18              THE COURT:  In fact, it would be wrong for me to
19    deny injunctive relief only on standing grounds, if I applied
20    that to both cases.
21              MR. HAMILTON:  For the Doe case, yes.  For the New
22    Jersey case --
23              THE COURT:  Right.
24              MR. HAMILTON:  Yes.  No -- yes, though.
25              THE COURT:  So you agree with me that I would
```

1    commit legal error if I denied both motions for injunctive

2    relief and the only reason I cited was the lack of standing.

3            MR. HAMILTON:  That's right.  That's right.

4            THE COURT:  So the reason the Doe plaintiff, if I

5    understand it correctly, has standing, given the -- her

6    pregnancy and the birth of her child anticipated to occur

7    after the effective date of the executive order, is that that

8    would cause her direct injury.

9            MR. HAMILTON:  Exactly.  Exactly.

10           THE COURT:  All right.  So my question is, since

11   the executive order would -- what follows from the executive

12   order is that Doe's child is not a citizen under the

13   executive order, right?

14           MR. HAMILTON:  Yes.

15           THE COURT:  And so -- and that causes her direct

16   injury sufficient for Article III, right?

17           MR. HAMILTON:  Yes.

18           THE COURT:  So why -- and since what the states

19   point to is various monies they get based on people being

20   citizens, right?

21           MR. HAMILTON:  Yes.

22           THE COURT:  And so the money they would get for

23   Doe's child being a citizen, they're not going to get if the

24   executive order is in place, right?

25           MR. HAMILTON:  Yes.  But there's more steps

1    involved to get there.  And again, it's a problem that

2    *United States vs. Texas* addressed.  States are unique kinds

3    of plaintiffs, and if these incidental economic harms were

4    sufficient to confer standing --

5        THE COURT:  I guess that's my question.  What does

6    it mean to you, or what do you think it meant to the Supreme

7    Court to be incidental?

8        MR. HAMILTON:  Well, I think it means where

9    there's -- there's kind of a leap you have to take, and it's

10    not a direct regulation.  I think, again, the *Nebraska*

11    against *Biden* case is actually unhelpful for plaintiffs,

12    because there there was multiple states that were challenging

13    the policy.  And the Court didn't hold that all the states

14    had standing --

15        THE COURT:  Didn't Justice Roberts say that the

16    standing of one state was sufficient for him to proceed in

17    his opinion to address the merits?

18        MR. HAMILTON:  It is, but the standing that was

19    sufficient there was specific to a very unique state program,

20    where the state --

21        THE COURT:  Well, but wasn't the standing there

22    that the Supreme Court said that the elimination of the

23    program -- the elimination -- the forgiveness, rather, of the

24    loans would mean that the entity, as a downstream effect,

25    would no longer receive fees for managing those loans, right?

 1          MR. HAMILTON:  Yes, but it was unusual that

 2   Missouri --

 3          THE COURT:  But it wasn't that the federal

 4   regulation said anything directly to that entity.  It was

 5   just a consequence of the -- forgiving the loans, right?

 6          MR. HAMILTON:  Yes.  But it had a direct effect on

 7   federal loan servicers, which is the business that the State

 8   of Missouri decided to get into.

 9          THE COURT:  So but why is that a direct -- you

10   concede that's a direct effect in that case.

11          MR. HAMILTON:  Yes.

12          THE COURT:  And so if that's a direct effect, why

13   isn't it a direct effect to say that we will -- the number of

14   people we're going to pay you for processing Social Security

15   numbers, for example, is going to be less, because there's

16   going to be, under this order, less birthright citizens.

17          MR. HAMILTON:  Because the persons directly

18   affected are people like O. Doe, people whose citizenship

19   hinges on the executive order.

20          THE COURT:  Well, no, but they get money for

21   submitting the applications, just the way the servicer got

22   money for servicing the loans.  What's the difference?

23          MR. HAMILTON:  Well, there's still that extra step

24   between the individuals within the states and then the

25   incidental effects that the states --

1          THE COURT:  What's the extra step?

2          MR. HAMILTON:  Well, the extra step is that the

3    states are claiming that they're going to receive certain

4    funds or not --

5          THE COURT:  Well, you haven't disputed that.

6          MR. HAMILTON:  We haven't disputed that.

7          THE COURT:  So that's a fact.  That's a fact that

8    you conceded, essentially.

9          MR. HAMILTON:  Yes.  But there's still --

10          THE COURT:  Yes, you conceded it.

11          MR. HAMILTON:  Yes.  Yes.

12          THE COURT:  Right.  So that is a fact that they

13    will lose that money.

14          MR. HAMILTON:  We're not challenging that on the

15    present record.  But Your Honor --

16          THE COURT:  Or seeking to expand the record.

17          MR. HAMILTON:  Correct.  Correct.

18          THE COURT:  So if they are losing that, why isn't

19    that direct?  I'm just misunderstanding -- I'm just not

20    understanding what is this extra step?  I mean, because what

21    seems like the analogy is you would agree with me that in the

22    *Nebraska* case, the loans that were forgiven were not the --

23    were the loans owed by borrowers, right?

24          MR. HAMILTON:  Right.

25          THE COURT:  And not loans owed by that Missouri

1   entity.

2           MR. HAMILTON:  Yes.  I think, though, that the

3   boundaries and standing are frequently fuzzy, but we have

4   *Biden vs. Nebraska* and *United States vs. Texas*.  Those are

5   two very recent state standing cases in the US Supreme Court.

6   In the end, we think this case is more analogous to the

7   *United States vs. Texas* case.

8           But even aside from state standing, the Court

9   should also deny the motion for preliminary injunction,

10  because none of the plaintiffs have shown --

11          THE COURT:  Can I ask one other question before --

12  you're moving on to something else, right?

13          MR. HAMILTON:  I am.

14          THE COURT:  Just before you go on to that, one

15  other question about standing.

16          You would agree with me, or do you agree with me,

17  is maybe a better way to ask the question, do you agree with

18  me that a person who acquires birthright -- in birthright

19  United States citizenship, under the Section 1 of the 14th

20  Amendment, by virtue of that clause, automatically acquires

21  citizenship in the state in which they reside?

22          MR. HAMILTON:  I do, yes.

23          THE COURT:  Which means that a person who has

24  birthright -- who is born, say, in Massachusetts,

25  Massachusetts -- that person, if they are a person who

1    gets -- you concede there are people who get birthright

2    citizenship, even after the EO, right?

3              MR. HAMILTON:  Yes, of course.

4              THE COURT:  Right.  Of course.  Okay.  So somebody

5    is born, let's just say Massachusetts, and they're born in

6    Massachusetts, and they're a person who acquires birthright

7    citizenship.  Okay?  They -- Massachusetts has to give them,

8    recognize them as citizens of Massachusetts.  As a citizen of

9    Massachusetts, right?

10             MR. HAMILTON:  It does.

11             THE COURT:  And so why doesn't that fact that -- so

12   in that sense, that clause operates directly on the states.

13   Right?

14             MR. HAMILTON:  It does.  And candidly, I think

15   Your Honor has articulated a theory of standing that is

16   stronger than anything the plaintiffs have suggested.  They

17   did not make that argument.  Arguments in favor of standing

18   are forfeited.  But even then, I would still question the

19   state standing, because the 14th Amendment would just set a

20   floor for state citizenship.  It isn't necessarily the case

21   that the --

22             THE COURT:  But it severs the unitary connection.

23   The 14th Amendment established this unification between

24   citizenship of the United States and a state.

25             MR. HAMILTON:  It did.

```
 1            THE COURT:  And your interpretation severs that, to
 2   some degree, because it, first of all, narrows it, right?
 3            MR. HAMILTON:  Yes.
 4            THE COURT:  It puts it in a narrower interpretation
 5   than theirs.
 6            MR. HAMILTON:  It would affect who becomes a
 7   citizen of the State, but, again, this is a forfeited
 8   argument by the state and plaintiffs.
 9            Turning, though, to the likelihood of success on
10   the merits --
11            THE COURT:  Well, I just -- okay.  I understand.
12   Go ahead.
13            MR. HAMILTON:  Plaintiffs -- none of the plaintiffs
14   show a likelihood of success on the merits, which, of course,
15   is also a requirement for a preliminary injunction.  That's
16   because all of the plaintiffs arguments rest on a misreading
17   of the 14th Amendment of the Constitution.  The 14th
18   Amendment was enacted to repudiate the US Supreme Court's
19   shameful decision in *Dred Scott vs. Sanford*, and ensure it
20   would never again be the law of this country that an
21   African-American might be denied American citizenship based
22   on his or her race.  But the framers of that amendment did
23   not intend to, and did not, in fact, create a loophole to be
24   exploited by temporary visitors to the country and illegal
25   aliens.  The 14th Amendment says that all persons --
```

 1          THE COURT:  So just to stop you there.  So your

 2  position is that the definition of who is and who is not a

 3  birthright citizen, articulated in the EO is what the 14th

 4  Amendment always meant?

 5          MR. HAMILTON:  Yes.

 6          THE COURT:  And so to the extent it's been

 7  construed, understood, or applied differently, those are, as

 8  you put it, misimpressions or misreadings?

 9          MR. HAMILTON:  Yes.

10          THE COURT:  And am I correct that prior to -- well,

11  even up to today, people who the EO says don't -- are not

12  birthright citizens have been recognized by the United States

13  government as birthright citizens?

14          MR. HAMILTON:  Yes.  This would be a change in

15  policy.

16          THE COURT:  And so those people, under this Trump

17  administration, have been recognized as birthright citizens,

18  right?

19          MR. HAMILTON:  Yes, the policy was not slated to

20  take effect until the future.

21          THE COURT:  Right.  So even before -- putting aside

22  the injunctions issued by the other judges, the -- this

23  administration has been recognizing people who fall into

24  the -- who otherwise, executive order applied to, they have

25  been recognized as US citizens, right?

```
 1              MR. HAMILTON:  Correct.  Nothing has changed in
 2    executive practice.
 3              THE COURT:  I'm not asking about change.  I'm
 4    asking about --
 5              MR. HAMILTON:  Yeah.
 6              THE COURT:  The federal government has been
 7    recognizing them as citizens, right?
 8              MR. HAMILTON:  Yes.
 9              THE COURT:  And that was true under the Biden
10    administration, right?
11              MR. HAMILTON:  Yes.
12              THE COURT:  And that was true under the first Trump
13    administration, right?
14              MR. HAMILTON:  Yes.
15              THE COURT:  And that was true at least back to
16    World War II, if not earlier.
17              MR. HAMILTON:  Yes.
18              THE COURT:  And so my question then is -- and your
19    interpretation is that -- or your view is that all of
20    those -- those are wrong.  Correct?
21              MR. HAMILTON:  Yes.
22              THE COURT:  So that, in fact, in law, really, the
23    people who were born -- who were born in the United States --
24    forgetting about the injunctions, but prior to February 19th,
25    okay, who are children of -- who would fall within the two
```

1   categories of executive orders, they are not -- the proper

2   reading of the clause one of the 14th Amendment, they are not

3   birthright citizens.

4          MR. HAMILTON:  That's right.

5          THE COURT:  So if that's true, then how do they

6   have citizenship?

7          MR. HAMILTON:  Well, this --

8          THE COURT:  And how do you lawfully -- like you

9   have just told me, essentially, that people that the federal

10  government is now recognizing as US citizens, even putting

11  before -- putting aside the injunctions, before the

12  injunctions were into place, whatever it was the other day,

13  that they were not -- they were -- you were recognizing

14  people as citizens who are not birthright citizens under the

15  United States Constitution, right?

16         MR. HAMILTON:  Right.  So the executive order is

17  forward looking only, and that is consistent with how the US

18  Supreme Court has handled the misapplication of

19  constitutional law in the immigration context previously.

20  The *Sessions vs. Morales-Santana* case corrected a -- a -- it

21  corrected a constitutional rule of law, and at the end of

22  that opinion, the Court announces that it is applying its

23  rule prospectively only, and so the path that this executive

24  order takes is consistent with that.

25         And I'd also note --

```
 1            THE COURT:  So you're suggesting that when you

 2   identify -- when -- the President's not the Supreme Court,

 3   right?  They're different.

 4            MR. HAMILTON:  Of course.

 5            THE COURT:  Right.  So you're suggesting that that

 6   principle, then, that you're articulating on behalf of the

 7   executive branch, is that the executive branch identifies an

 8   error in the application of constitutional law, that's what

 9   we're talking about, that's the executive branch's position,

10   right?

11            MR. HAMILTON:  Yes.

12            THE COURT:  And that then the executive branch can

13   choose or must apply it prospectively?

14            MR. HAMILTON:  Yeah, I don't know that we've taken

15   a position on that, but in this case, it was the President's

16   judgment that a forward-looking policy was --

17            THE COURT:  I'm asking what the law is.

18            MR. HAMILTON:  We haven't taken a position on that.

19            THE COURT:  So -- as you stand here now, you don't

20   know whether or not the executive branch has the authority to

21   make it not prospective or -- I'm sorry.  That's a bad

22   question.

23            Is it -- you don't know whether that you must make

24   it, under the law, prospective?

25            MR. HAMILTON:  Yeah, it's not something that we've
```

1    taken a position on, but the executive order's path is

2    consistent with the line that the US Supreme Court drew in

3    that *Sessions* case in recent turns.

4              THE COURT:  So you're not taking a position, either

5    way, as to whether or not it would be either required to say

6    to people who prior -- who are born prior to February 19th

7    that they don't have citizenship.  You're not taking a

8    position whether or not it's required for you to do that,

9    assuming you prevail on your view.

10             MR. HAMILTON:  Well, that is certainly not the

11   policy of the executive order.

12             THE COURT:  I understand.  Right.  The executive

13   order doesn't say that.  But my question is whether the

14   law -- you're not taking a position on whether the law, if

15   you're correct on the meaning of the Constitution, would

16   require to apply it to people before February 19th.

17             MR. HAMILTON:  Oh, no.  That is not something that

18   we're arguing.  We do not think of that as a requirement

19   under the *Sessions* case.

20             THE COURT:  You don't think the law requires you to

21   do that.

22             MR. HAMILTON:  Exactly.

23             THE COURT:  Okay.

24             MR. HAMILTON:  Apologies if I misunderstood

25   Your Honor's questions.

```
 1              THE COURT:  No problem.

 2              So -- and whether you have discretion to do that is

 3     something that you're not taking a position on now.

 4              MR. HAMILTON:  That's right.

 5              THE COURT:  Okay.  So your view is -- I don't want

 6     to put words in your mouth, I just want to make sure I

 7     understand.  You're not required -- your view is the law does

 8     not require, when you're correcting a constitutional

 9     interpretation, to apply it to all people who would be

10     subject to it.  You can apply it instead prospectively.

11              MR. HAMILTON:  That's right.

12              THE COURT:  So the law doesn't require that and

13     you're not taking a -- that is, you're not saying you do have

14     discretion to apply it retroactively -- or not retroactively.

15     You're saying you do -- you're not -- you're taking no

16     position as to whether or not you -- the executive branch has

17     the discretion to say to someone born before February 19th,

18     you're not a United States citizen, because you're not under

19     the proper interpretation of the clause.

20              MR. HAMILTON:  Correct, but it definitely is not a

21     requirement to do that.  The executive orders forward-looking

22     policy is consistent with law.

23              And I'd also note, because Your Honor referenced

24     that recent executive practice has been something different.

25     That recent Supreme Court decisions have -- have not been
```

1    afraid to chart a different course, despite recent practice.

2    For example, in the *Chadha* case, the legislative veto was on

3    the books --

4         THE COURT:  So your position is that -- well,

5    that's for the Supreme Court, right?  It's not for me to

6    chart a different course under constitutional law than the

7    Supreme Court has chartered, right?

8         MR. HAMILTON:  Supreme Court precedent is, of

9    course, binding, but we think that the language that

10    plaintiffs are leaning into is *dicta*.

11         THE COURT:  Right.  So your position is that the --

12    I can deny the injunction because this case is not controlled

13    by the Supreme Court precedent?

14         MR. HAMILTON:  Exactly.

15         THE COURT:  Okay.  I got it.  Go ahead.

16         MR. HAMILTON:  So I'll return to the 14th Amendment

17    citizenship clause, and specifically that subject to the

18    jurisdiction thereof clause, because that is what is at

19    issue --

20         THE COURT:  By the way, one of your arguments for

21    the subject, too, is that -- that it's premised on mutual

22    consent between the person and the polity, right?

23         MR. HAMILTON:  Yes.

24         THE COURT:  Okay.  That's that the polity, that's

25    that the government, right, consents to the person's

1    citizenship, right?

2              MR. HAMILTON:  Right.

3              THE COURT:  And that the person consents to being a

4    citizen, right?

5              MR. HAMILTON:  Yes.

6              THE COURT:  And you agree that the 14th Amendment,

7    that when it became -- the moment it became part of the

8    Constitution, the moment it was enacted and became law, that

9    the children born to enslaved people in the United States, at

10   that moment, they became citizens.  The US born, natural

11   born, born in the United States children of enslaved peoples,

12   they became citizens at that moment.

13             MR. HAMILTON:  Yes.

14             THE COURT:  But their parents, you agree, came to

15   the United States or many of them, in chains.

16             MR. HAMILTON:  (Nods head.)

17             THE COURT:  Yes?

18             MR. HAMILTON:  Yes.

19             THE COURT:  And they did not consent to come to the

20   United States, those people who came in chains.

21             MR. HAMILTON:  No.

22             THE COURT:  Any hesitation?

23             MR. HAMILTON:  Well --

24             THE COURT:  As to whether they consented to come to

25   the United States?

```
 1              MR. HAMILTON:  No, they certainly did not.

 2              THE COURT:  And they didn't consent to become part

 3    of this polity, correct?

 4              MR. HAMILTON:  No.

 5              THE COURT:  So -- okay.  Well, that's just what I

 6    wanted to understand the theory.  Go ahead.

 7              MR. HAMILTON:  Yeah, I mean, obviously --

 8              THE COURT:  But they did -- but their children

 9    became citizens of the United States, if they were born in

10    the United States.

11              MR. HAMILTON:  Yes.  Yes.

12              THE COURT:  And that was one of the points of the

13    14th Amendment.

14              MR. HAMILTON:  Absolutely.  Absolutely.

15    Repudiating *Dred Scott vs. Stanford* was the central purpose

16    of the citizenship clause.

17              THE COURT:  But those people didn't consent.

18              MR. HAMILTON:  That's -- that's right, but it

19    was -- I mean, slavery --

20              THE COURT:  That is right, isn't it?

21              MR. HAMILTON:  Yes.  Yes.  *Elk vs. Wilkins* and *Wong*

22    *Kim Ark*.

23              THE COURT:  So consent wasn't a part of the meaning

24    of the 14th Amendment.

25              MR. HAMILTON:  Well, I don't think it's the sole
```

1      meaning of the subject to the jurisdiction thereof.  I'd

2      start with --

3              THE COURT:  But you've advanced that as an argument

4      that if you didn't -- if they didn't have those consents, you

5      were outside the scope of the 14th Amendment, but you just

6      agreed with me that there's a whole swath of people they had

7      in mind, who, in law, became citizens and that was their

8      intent.  That was the purpose of those words, and they didn't

9      consent.

10             MR. HAMILTON:  Right.  I think consent is

11     frequently relevant, but, perhaps, not with every

12     application.

13             Being born into the allegiance of the country is

14     the concept that *Elk vs. Wilkins* and *Wong Kim Ark* both

15     identify as -- as --

16             THE COURT:  Were those children, when they were

17     born in the United States, and they were enslaved, were they

18     born into allegiance to the United States?

19             MR. HAMILTON:  I'm sorry, I missed the first part.

20             THE COURT:  Were the children who were born in the

21     United States, who became citizens under the 14th Amendment,

22     when they were born, the relevant time is birth, right?

23             MR. HAMILTON:  Yes.

24             THE COURT:  When they were born, were they born

25     into allegiance to the United States?

1          MR. HAMILTON:  I think it would have to be

2     understood that way to reconcile that with *Wong Kim Ark* and

3     *Elk vs. Wilkins*.

4          I'd also want to highlight the Civil Rights Act of

5     1866, which is important because it was drafted by the

6     Congress at, basically, the same time that the 14th Amendment

7     was drafted by Congress, both were passed in the first half

8     of 1866.  And that act uses slightly different language.  It

9     says that all persons born in the US and not subject to any

10    foreign power, excluding Indians not taxed, are hereby

11    declared to be citizens.  And it was just a few months later

12    that the 14th Amendment was passed by the Congress and sent

13    out for ratification.

14          I know Your Honor has read our briefs.  I do want

15    to highlight one piece of legislative history in our briefs,

16    it's from Senator Lyman Trumbull who was one of the principle

17    authors of the 14th Amendment.  He said during the

18    congressional debates, what do we mean by subject to the

19    jurisdiction of the United States not owing allegiance to

20    anybody else.  That is what it means.  And that understanding

21    of subject to the jurisdiction thereof is --

22          THE COURT:  Owing no allegiance to anyone else.

23    That's your position, right?

24          MR. HAMILTON:  Right.

25          THE COURT:  Complete, with no allegiance to anyone

1     else, to another country.

2           MR. HAMILTON:  And that's what *Elk vs. Wilkins*

3     says.  It talks about direct and immediate allegiance and

4     that's language that reappears --

5           THE COURT:  So how can the -- you agree with me

6     that lawful permanent residents are obviously not citizens of

7     the United States, right?

8           MR. HAMILTON:  That's right.

9           THE COURT:  And they are, in most, if not all

10    cases, citizens of another country, right?

11          MR. HAMILTON:  Yes.

12          THE COURT:  And they owe allegiance, in some form,

13    to those other countries.

14          MR. HAMILTON:  Yes.  Yes.

15          THE COURT:  And yet their children -- you agree

16    that their children, if born in the United States, are

17    birthright citizens?

18          MR. HAMILTON:  Yes.  Because the common law

19    recognizes that --

20          THE COURT:  But they owe allegiance to other

21    people, their parents owe allegiance to another country.

22          MR. HAMILTON:  Right.

23          THE COURT:  But even if you owe allegiance to

24    another country, your child can be a birthright citizen.

25          MR. HAMILTON:  That's right.  The allegiance.

1      THE COURT:  So why is it complete.

2      MR. HAMILTON:  The allegiance inquiry doesn't turn

3  on whether there exists another allegiance based on some

4  foreign body of law, it turns on whether there's an

5  allegiance to the United States or not, under controlling

6  American law.  And the common law recognized that individuals

7  owe an allegiance to the country where their domicile is.

8  And so lawful permanent residents do have a domicile in the

9  United States, and so they have that allegiance to the United

10 States, as well.

11     I also want to say a few words about plaintiffs'

12 theory of the clause, because it makes subject to the --

13     THE COURT:  So if lawful permanent residents were

14 here and they -- the -- one of them was -- the mother was

15 pregnant, and then they went overseas, like, what is the

16 child's domicile -- you're saying it's the domicile of the

17 parents?

18     MR. HAMILTON:  Yes.  Well, if the parents went

19 overseas, then the child would not be born in the United

20 States.

21     THE COURT:  (Nods head.)

22     MR. HAMILTON:  But I do want to address plaintiffs'

23 theory.  The Doe plaintiffs say that subject to the

24 jurisdiction thereof means anyone --

25     THE COURT:  I'm sorry, wait.  So Canadians who

```
1   cross the border to give birth in an American hospital,
2   they're not birthright US citizens?
3            MR. HAMILTON:  Well, it would depend on whether
4   they were a citizen or lawful permanent resident.
5            THE COURT:  No, they're Canadian citizens, like in
6   some places, Canadians, the border is close.  They live --
7   many Canadians live close to the border.  If they happen to
8   either be in the United States for the day, for shopping, or
9   whatever, and went into labor, and went to a US hospital, or
10  maybe the closest medical facility is a US medical facility,
11  but for whatever reason -- a Canadian citizen who -- not
12  lawful permanent resident, just Canadian citizens, came over
13  to the hospital, gave birth there, then they wouldn't be
14  birthright citizens.
15           MR. HAMILTON:  That's right.  Temporary visitors to
16  the United States do not have a domicile in the United
17  States.  They do not owe an allegiance to the United States.
18           THE COURT:  So the allegiance comes from the
19  domicile of the parents.
20           MR. HAMILTON:  It does.  It does, as well as the
21  citizenship.
22           THE COURT:  Okay.  Go ahead.
23           MR. HAMILTON:  Again, the Doe plaintiffs say that
24  this clause applies to anyone to whom United States law
25  applies.  The states say that it means being subject to US
```

JA131

1    authority.  That would render subject to the jurisdiction

2    thereof redundant, because anyone who is in the United States

3    that would be true for.

4            Plaintiffs' theory also does not explain the

5    categories of individuals that *Elk* and *Wong Kim Ark* say are

6    not subject to the jurisdiction thereof.  *Elk* holds that

7    Indians are not subject to the jurisdiction thereof, but the

8    US can regulate Indian commercial activities, property, and

9    adoptions, can also punish Indians for crimes.  Foreign

10   diplomats are also subject to US law.  It's true that they do

11   have a limited immunity, but foreign diplomats can still be

12   sued in civil courts and that immunity is subject to

13   abrogation.  Surely it isn't the case that the citizenship

14   clause turns on Congress's expansion and contraction of

15   diplomatic immunity.

16           I also want to address the Plyler against --

17           THE COURT:  So that's not really the immunity that

18   they're talking about, right?

19           MR. HAMILTON:  I understood them to --

20           THE COURT:  I mean, police officers have qualified

21   immunity, right?

22           MR. HAMILTON:  Yes.

23           THE COURT:  Nobody is suggesting that because a

24   police officer has qualified immunity that if he has a

25   child -- the plaintiffs aren't suggesting that if he has a

1    child, that that's the kind of immunity that they're talking

2    about with respect to subject to the jurisdiction, assuming

3    the police officer is a citizen and has a child born in the

4    United States.  That's not the kind of immunity they're

5    talking about.  They're talking about --

6              MR. HAMILTON:  I agree.  They're talking about

7    diplomatic immunity, but that is still something that

8    Congress has the authority to alter.

9              THE COURT:  Yes.  But they were talking about its

10   understanding of what they were -- what they meant by those

11   words then, not whether there was any possibility of that

12   shifting.  I mean, in fairness, like their argument, you're

13   transforming their argument into a regulatory argument that

14   anybody to whom US law has any sort of application to.

15   That's not what their interpretation of what the subject to

16   means.

17             MR. HAMILTON:  I respectfully disagree.  I'll just

18   read from page 10 of the State's briefs.  They say that

19   subject to the jurisdiction thereof means, quote, "subject to

20   US authority."  And I think that's very difficult to square

21   at least with the *Elk vs. Wilkins* case, holding with respect

22   to Indians.

23             THE COURT:  If you interpret authority to mean the

24   application of any civil law to the person.

25             MR. HAMILTON:  Well, but also criminal.  There are

```
 1    statutes.

 2              THE COURT:  Well, civil or criminal.

 3              MR. HAMILTON:  Yes.  Also, I'll say a few words on

 4    scope of relief issues, since Your Honor asked my friends on

 5    the other side about that.

 6              THE COURT:  Yes, of course.

 7              Before you get to that, I have one other, just,

 8    question.

 9              So this -- under the EO, citizenship turns -- you

10    agree with me that, before the EO, whether right or wrong,

11    misimpression, misreading or not, the way citizenship,

12    birthright citizen was applied was you just looked at where

13    the person was born, correct?  At least for within the United

14    States -- the 50 states.

15              MR. HAMILTON:  Well, no, because you do have

16    Elk vs. Wilkins and then the categories of individuals in

17    Wong Kim Ark that are recognized as not being subject to the

18    jurisdiction thereof.

19              THE COURT:  So there's a few people -- so in that

20    sense, you're saying even before the EO, or -- and the way

21    it's been done, a birth certificate alone -- determining the

22    fact that you were born here did not necessarily completely

23    resolve the question of whether you were a birthright

24    citizen.

25              MR. HAMILTON:  Yes.  And let me add one point to
```

1    the answer.  There is a statute, 8 USC 1401, that expands

2    citizenship --

3            THE COURT:  Sure.

4            MR. HAMILTON:  -- beyond the citizenship clause.

5    That is the reason that Indians have birthright citizens in

6    the United States.

7            THE COURT:  So but my -- under the EO, there is

8    a -- you are expanding the number of people who fall into the

9    category, who, merely looking at their birth certificate

10   doesn't establish their citizenship.

11           MR. HAMILTON:  That's right.  The EO mandates the

12   change of --

13           THE COURT:  So you would have to have -- in order

14   to have -- to determine whether someone is a citizen going

15   forward, not just on February 25th, but as this goes --

16   because the intent is to have this be -- this is the

17   proper -- the intent of the executive branch is that this is

18   how it should be forever, because that is how it was

19   established in 1868, right?

20           MR. HAMILTON:  Exactly.  The executive order wants

21   to align executive practice with what the law requires.

22           THE COURT:  Well, what the clause says.

23           MR. HAMILTON:  Yes, which is what the law and 8 USC

24   1401 requires.  Both are relevant authorities in determining

25   citizenship.

```
 1              THE COURT:  So to then determine who's a citizen,

 2    you have to look into who the parents are going forward,

 3    right?

 4              MR. HAMILTON:  Yes.

 5              THE COURT:  In almost every case, more so -- more

 6    and more as time goes forward?

 7              MR. HAMILTON:  Yes.  Yes.

 8              THE COURT:  And so -- well, one, doesn't that make

 9    citizenship more like bloodline citizenship as a general

10    proposition?

11              MR. HAMILTON:  I don't think so.  The rule that

12    we're proposing is both citizenship and domicile and --

13              THE COURT:  And to sort of, just as a practical

14    matter, to effectuate that, aren't you going to need a list

15    of people?

16              MR. HAMILTON:  I -- so the executive order directs

17    federal agencies to work through implementation issues during

18    the 30-day period.  That has not happened because of the

19    temporary restraining order.

20              THE COURT:  Well, presumably they started that

21    before.  Those orders only went into effect 48 hours ago.

22              MR. HAMILTON:  Oh, Your Honor, a federal judge in

23    Seattle entered --

24              THE COURT:  Oh, the TRO.  Right.  I forget about

25    that.  I'm sorry.  Yes, I forgot.
```

1          MR. HAMILTON:  So I'm not able to answer questions

2     about implementation.  That's something that the executive

3     order excepted.

4          THE COURT:  So you have no idea, for example,

5     whether or not this would require the federal government or

6     whether the -- what comes out of this is the federal

7     government would require every person -- keep a list of every

8     person, whether they were citizen or not, so that it could be

9     determined when the State Department was issuing passports or

10     whether there was any other question that they would need to

11     reference that list.  You have no idea whether or not that

12     that's what's contemplated?

13          MR. HAMILTON:  Correct.  It's Section 3 of the EO

14     that directs agencies to work on guidance and work through

15     the implementation issues.  That work was not allowed to go

16     forward under the TRO issued in Seattle just days after the

17     EO was signed.

18          THE COURT:  It doesn't prevent -- the TRO or the

19     PIs don't prevent thinking about that issue, right?

20          MR. HAMILTON:  I don't know that we've taken a

21     position on that, but it did -- it did enjoin Section 3, as

22     well as other portions of the executive order --

23          (Counsel confers.)

24          MR. HAMILTON:  And we've interpreted it as a

25     pencils down executive order -- or sorry.  A pencils down

1    temporary restraining order.

2              THE COURT:  I see.  Okay.  Go ahead.

3              MR. HAMILTON:  On the scope of relief, so the state

4    standing issue that I began with is important because the --

5              THE COURT:  So just turning back to that, it may be

6    or it may be not, but it may be that it would require

7    everybody to register, or maybe not.  You just don't know and

8    haven't addressed it.

9              MR. HAMILTON:  I can't --

10             THE COURT:  You can't answer.

11             MR. HAMILTON:  I can't answer any implementation

12   questions.

13             THE COURT:  Okay.  Go ahead.

14             MR. HAMILTON:  To the extent the Court is inclined

15   to enter injunctive relief, there should not be a nationwide

16   injunction.  The plaintiff states lack standing, and the

17   associational plaintiffs have acknowledged that their members

18   are limited to Massachusetts.  And so there's no

19   justification for a nationwide injunction, which also is

20   inconsistent with Article III authority, which is limited to

21   resolving cases and controversies not to setting nationwide

22   rules of policy applicable to parties not before the Court.

23             THE COURT:  When just circling -- I'm sorry.  Do

24   you have something else?

25             MR. HAMILTON:  No, Your Honor.

```
1              THE COURT:  Okay.  One last question about

2      forfeiting.  Does that principle come into play in the PI

3      when there hasn't been an answer, there hasn't been a motion

4      to dismiss?

5              MR. HAMILTON:  I think so.  I don't know how we

6      could --

7              THE COURT:  When did -- so at what point do people

8      forfeit standing arguments?

9              MR. HAMILTON:  Well, standing arguments are --

10             THE COURT:  There's a different question -- I'm

11     sorry to interrupt.  Let me just divide it.  I understand it

12     to say hey, they didn't address it, Judge, I didn't get a

13     chance to respond to it.  That's not a forfeit argument.

14     That's just an argument that it's not fair, either you

15     shouldn't consider it, or I should get a chance to respond,

16     but a forfeit argument is it's gone from the case.  That's

17     what you mean by forfeit.

18             MR. HAMILTON:  Right.  Right.

19             THE COURT:  And so my question is then do you

20     forfeit it if you don't articulate it in the complaint, or

21     like if they had -- when -- when are you locating it under

22     the federal rules that they forfeited it.

23             MR. HAMILTON:  For purposes of deciding this

24     motion, it is forfeited because it doesn't appear anywhere in

25     the papers, but I suppose Your Honor would have to anticipate
```

JA139

1    that the states would have a different standing theory in the

2    future that they haven't taken yet.  But again, even if that

3    happened, we don't think that theory of standing is

4    sufficient, because the citizenship clause is just setting a

5    floor for citizenship.  We don't see anything in there that

6    would prevent states.

7                 THE COURT:  Well, doesn't it affect, for example,

8    if you lower the floor, that's essentially what you're doing.

9    You're saying you're lowering the floor back to what it

10   should be.  But you certainly -- however you characterize it,

11   you're lowering it, but it's a narrower floor, or a lower

12   floor than what they've articulated or what was previously

13   was misimpressed or --

14                MR. HAMILTON:  Yes.  Yes.

15                THE COURT:  So that effects states in terms of the

16   number of citizens in the state, right?

17                MR. HAMILTON:  In a sense.  But at bottom.

18                THE COURT:  Well, not in a sense.  I mean, the

19   Doe's child born here, without the executive order, would

20   have been treated as a birthright citizen, right?

21                MR. HAMILTON:  Yes.

22                THE COURT:  And so with the executive order, if

23   it's enforced, she would not be treated as a citizen, Doe's

24   child.

25                MR. HAMILTON:  That's right.  That's right.

```
 1          THE COURT:  And so that -- actually, not in a
 2   sense, that actually reduces by one the number of US citizens
 3   in Massachusetts, right?
 4          MR. HAMILTON:  Yes.  But, again, we're talking
 5   about a theory of standing that plaintiffs have not argued.
 6          THE COURT:  Right, but then you were explaining to
 7   me why it didn't work as a theory.  That's what I'm wondering
 8   about.
 9          MR. HAMILTON:  Right.  Right.  And it also doesn't
10   work because the states would be able to still extend
11   citizenship to --
12          THE COURT:  But not United States citizenship --
13          MR. HAMILTON:  That's right.
14          THE COURT:  -- which would matter for various
15   things -- for example, apportionment -- aren't
16   representative's apportionment based on the population,
17   right?
18          MR. HAMILTON:  Yes.
19          THE COURT:  Or just population.  But aren't there
20   provisions in the Constitution, I think, that relate to the
21   number of citizens?
22          MR. HAMILTON:  There are provisions in the
23   constitution that relate to the number of citizens.  I'm not
24   prepared to spell them out all here.
25          THE COURT:  Right.  Okay.  Thank you.
```

```
1            MR. HAMILTON:  Thank you, Your Honor.

2            THE COURT:  Anything you want to say in response?

3            MR. SELLSTROM:  Thank you, Your Honor, and I'll be

4   brief, just a couple of points to respond to.  I think, in

5   particular, the colloquy between the Court and defense

6   counsel about the retroactive nature of the executive order

7   really highlights what the defendants are asking to do and

8   wanting to do, which is to take the place of what the Supreme

9   Court does.  The whole idea that there is an effective date

10  to the executive order and the particular categories that are

11  called out really shows that this is something that is not

12  executing laws and Constitution that exists now by asking to

13  change that.  The similar -- very similar in the arguments

14  that defense counsel was making about the Wong Kim Ark case

15  and domicile and subject to the jurisdiction of, all of those

16  arguments are specifically addressed by the Wong Kim Ark case

17  that domicile is not the controlling factor there, and that

18  the consent is not what is at issue here.  These are issues

19  that are addressed to the Supreme Court and are not

20  controlling law that exists today.  And that's from Wong Kim

21  Ark, along to the Hintopoulos case that we cited in note 11,

22  and all of the other cases that have since -- come since

23  then.

24            Finally, I just wanted to go to the point where the

25  state had said that they would consent to converting the
```

1   preliminary injunction hearing into a permanent injunction.

2   The Doe plaintiffs also agree with that, that on the record

3   that Your Honor has, should the Court be inclined to issue a

4   preliminary injunction, we believe a permanent injunction

5   would also be appropriate.

6           THE COURT:  Okay.

7           Anything else you want to add?

8           MR. CEDRONE:  Two brief points on standing,

9   Your Honor.  First on the question of whether we've forfeited

10  standing on the basis of the sovereign harms to the

11  plaintiffs, we don't think we have, for the reason that your

12  question highlighted.  This is a preliminary posture, there

13  hasn't been an answer, there hasn't been a motion to dismiss.

14  We put forward in our PI papers what we think was the

15  clearest and most straightforward path to finding standing in

16  this case, with the limited space we had to do so.  I don't

17  think we forfeited other arguments.

18          Your Honor has heard fulsome argument on it here

19  today, and to the extent you were -- had questions about the

20  basis for standing that we included in the papers, but

21  thought that there was another more straightforward path, we

22  could also put in supplemental briefing on that issue.

23          I don't -- that brings me to my second point, which

24  is I don't think the Court needs to go down that path,

25  because the grounds for standing in the briefing make this a

1    very straightforward case.  The federal defendants rely on

2    *United States vs. Texas* to try to make this seem like a muddy

3    or fuzzy, in their words, issue.  This is not that case.

4    That case, the opinion of the Supreme Court was infused with

5    the fact that the plaintiff states in that case had a really

6    *sui generis* request.  They were asking federal courts to

7    issue a mandatory injunction to the federal government to

8    arrest more people.  And the Court's opinion made clear that

9    that was such an unprecedented request that it bore on the

10   state's standing.  Even assuming there's some kind of fuzzy

11   line between what's direct and what's indirect, this case is

12   clearly on the direct side of the line.

13          Your Honor can take everything that Mr. Hamilton

14   said about why the government views this case as not direct

15   and apply it to the situation in *Biden vs. Nebraska*, and

16   apply it to the situation in *Massachusetts vs. HHS*.  You're

17   familiar with the facts in *Biden vs. Nebraska*.  There were

18   student loans.  The President had a policy to forgive them.

19   That policy was obviously immediately directed at the student

20   loan holders, but it had a direct financial impact on MOHELA,

21   that state entity.

22          We're in the same position here.  We have a

23   contract with the federal government, for example, to process

24   Social Security numbers, and the federal government doesn't

25   dispute the factual premise that that contract, other

1  arrangements with the federal government, will result in a

2  direct financial harm -- or result in a financial harm to the

3  plaintiffs, and that is clearly direct within the meaning of

4  both *Biden vs. Nebraska*, and *Mass. vs. HHS* in the First

5  Circuit.

6          THE COURT:  Thank you.

7          MR. CEDRONE:  Thank you.

8          MR. DURAISWAMY:  Just one point, Your Honor, on

9  this issue of allegiance and owing allegiance to a foreign

10 power.  So again, I think it's unclear what the government

11 thinks allegiance means.  They don't -- what it means to owe

12 allegiance, they don't really say that.  To the extent that

13 it just means having a tie of some sort to another foreign

14 power, then that would apply equally to people who are lawful

15 permanent residents, and it would convert the citizenship

16 clause into something that absolute -- that prohibits dual

17 citizenship or dual nationality, which we know it does not.

18          What allegiance means, as *Wong Kim Ark* has

19 explained, is a duty to obey, and so owing allegiance to a

20 foreign power is problematic from the standpoint of the

21 citizenship clause only when, while you are in the United

22 States, you have a principal duty to a foreign power that is

23 effectively operating with the express or implied consent of

24 the United States, as Chief Justice Marshall explained in the

25 *Schooner Exchange*, where that foreign power is effectively

1    operating within the territorial boundaries of the United

2    States.

3          So that is the case with respect to tribal nations,

4    which were considered in the 19th Century to be alien powers

5    within the United States.  That is the case when there is a

6    hostile entity that is occupying part of the territory of the

7    United States, and that is the case when you have foreign

8    representatives of a foreign government, who are allowed into

9    the country, and are acknowledged to be essentially operating

10   within the United States as emissaries of their foreign

11   government.  It is not the case with respect to lawful

12   permanent residents, as -- which defendants do not dispute,

13   and there is no reason, if it's not the case with respect to

14   lawful permanent residents that it should be the case with

15   respect to those who are here long term, short term,

16   whatever, but who are not here under the domain and under the

17   auspices, or as representatives of a foreign power.

18          THE COURT:  Thank you.

19          You didn't have anything else, right?

20          MR. HAMILTON:  I'll just make one comment on

21   Rule 65, consolidation of trial on the merits with the PI.

22   We agree with that, with the Doe plaintiffs' concession that

23   their members are only in Massachusetts.

24          Thank you, Your Honor.

25          THE COURT:  That is your position, right?  They're

1   only in Massachusetts?  The members of the associations, for

2   purposes of preliminary and permanent relief.

3           MR. SELLSTROM:  That's right.

4           THE COURT:  Just one last question, Mr. Hamilton.

5           One of the things, just so I understand correctly,

6   that you're urging that I do is conclude that -- on the

7   merits, putting aside standing and cause of action, but on

8   the merits, deny the injunction, because the -- I have the --

9   you think I have the authority to do that within the case law

10  from the Supreme Court?

11          MR. HAMILTON:  Exactly.

12          THE COURT:  And you've read -- I'm not going to get

13  the name of the case right, there's a lot of cases that I've

14  read in the last two weeks, it's a 1985 decision by unanimous

15  Supreme Court, so nine to zero, Justice White, I think, wrote

16  the opinion for the Court *INS v.* -- I think it was *Rios*.  Are

17  you familiar with that case?

18          MR. HAMILTON:  I am not, Your Honor.

19          THE COURT:  Let me explain it to you and then

20  just -- I want to understand the position that you're urging

21  on me.

22          In that case, according to the Supreme Court, the

23  only opinion that they issued, the father and mother paid a

24  professional smuggler to illegally bring them into the United

25  States, and they came into the United States without

1    inspection.  So they would be undocumented, or illegal

2    aliens, or whatever term you want to use, right?  You agree?

3              MR. HAMILTON:  That sounds right.

4              THE COURT:  It seems right.  I'm just telling you

5    what they said as I read it, as I understand it.

6              And they then had a child in the United States,

7    according, again, to the opinion from the Supreme Court.  And

8    they, in immigration proceedings, asserted that to deport

9    them, the parents, was to *de facto* deport their child.  And

10   they lost that claim in the immigration proceedings and they

11   went to the Supreme Court.  And I think the question in the

12   Supreme Court turned on whether they were entitled to have --

13   it was a question of just the scope of the attorney general's

14   discretion to reopen that proceeding, given that was what

15   they were urging, and so that's the context of the case.

16             And you're in all of these cases, right?  Or are

17   you just in the case before me?

18             MR. HAMILTON:  You're asking about my role in the

19   different cases?

20             THE COURT:  Yeah.

21             MR. HAMILTON:  I --

22             THE COURT:  It doesn't matter.  You don't have to

23   tell me, but I would assume that all of you are talking to

24   each other, but you don't have to tell me that, either.

25             So in any event, the Supreme Court called that

1    child a United States citizen, born in the United States and,

2    therefore, was a citizen.  And so I guess my question is, I

3    know one answer you'll give me is the express holding of that

4    case was not -- the question -- I'm sorry, the question

5    presented to the Supreme Court was not was that child a

6    United States citizen, so, therefore, there's not a four

7    corners.  So that's one answer I'm sure you would give me,

8    right?

9              MR. HAMILTON:  Yes.  Yes.

10             THE COURT:  And so my related, follow-up question

11   is you're telling me that in the face of that context of that

12   case, where citizenship -- the underlying claim turned on the

13   citizenship of the child, that -- and the unanimous Supreme

14   Court saying those things, nonetheless, as a district judge,

15   I have the authority to say they're wrong, effectively.

16             MR. HAMILTON:  We read comments like that to be

17   *dicta*.  And *dicta* is something that even *Wong Kim Ark* talks

18   about.  *Wong Kim Ark* cites the *Cohens* case and warns against

19   overreading *dicta*.

20             THE COURT:  So your position is, (a), that

21   statement, assuming I've accurately described it to you, is

22   wrong --

23             MR. HAMILTON:  Yes.

24             THE COURT:  -- that the person was a United States

25   citizen.  The nine justices when they said that, they were

```
 1    wrong.
 2              MR. HAMILTON:  From my understanding of --
 3              THE COURT:  From the way I've described it,
 4    assuming if I've described it fairly.
 5              MR. HAMILTON:  Yes.
 6              THE COURT:  Then they would be wrong.
 7              MR. HAMILTON:  Yes.  And I --
 8              THE COURT:  And then I have -- because it's *dicta*,
 9    in your view, as I've described it, then I have the authority
10    to disregard that?
11              MR. HAMILTON:  Yes.  But if I could add, our brief
12    does cite some post-*Wong Kim Ark* cases of the Supreme Court
13    decided in 1902 and 1920.  This is page 32 of our brief, that
14    include the domicile condition we've identified in stating
15    *Wong Kim Ark's* rule.  So I think there are conflicting --
16              THE COURT:  But the power of the 1985 decision
17    would be more -- since it's more recent since the 1902
18    decision, might have more -- neither -- not necessarily
19    binding.  I don't think it's a binding holding about that
20    question.  I'm only asking you, just a narrow question, and I
21    think your answer is yes, that I -- I think the answer is, A,
22    those nine justices were wrong when they said that, assuming
23    my recitation of the facts is correct.  They were wrong, and
24    B, I'm not bound by that.
25              MR. HAMILTON:  Yes.
```

```
 1                 THE COURT:  And therefore, I would be -- it would
 2      be appropriate for me to not follow that statement.
 3                 MR. HAMILTON:  That's right.
 4                 THE COURT:  Okay.
 5                 MR. HAMILTON:  Thank you, Your Honor.
 6                 THE COURT:  Thank you.
 7                 MR. SELLSTROM:  Your Honor, could I raise one more
 8      point on the issue of the membership?
 9                 THE COURT:  So just to be clear, so I'm only
10      bound -- in the view of the Department of Justice, I am only
11      bound to the four corners of holdings of the United States
12      Supreme Court?
13                 MR. HAMILTON:  Well, I think the rules are also
14      applicable, but I don't think plaintiffs --
15                 THE COURT:  No, no.  I'm just asking, am I bound --
16      I think what you're saying to me is I'm only bound by the
17      holdings?
18                 MR. HAMILTON:  Yes.
19                 THE COURT:  And not anything more.
20                 MR. HAMILTON:  Yes.  Yes.
21                 THE COURT:  And then I'm -- not -- so just the
22      holdings, that's all that binds me, in any case.
23                 MR. HAMILTON:  And *dicta* can be disregarded.
24                 MR. SELLSTROM:  The final point that I wanted to
25      make, Your Honor, on that was just to make sure the record is
```

1   clear, that the membership is primarily Massachusetts

2   residents.  I don't want to represent to the Court all of the

3   membership, but it is certainly primarily --

4             THE COURT:  I think the question -- what

5   Mr. Hamilton meant by that, and you'll correct me,

6   Mr. Hamilton, if I'm not reciting it accurately.  I think

7   what he meant by that is for purposes of this case in

8   deciding all of the issues in play, by the motion, I should

9   decide it as if the members were only from Massachusetts, not

10  that that -- and that assumption would not be binding in any

11  other case involving the association, simply that we would be

12  deciding that that's what this case was deciding.

13            That's -- is that what you were saying,

14  Mr. Hamilton?

15            MR. HAMILTON:  Yes, Your Honor.

16            THE COURT:  That's how I understand.

17            MR. SELLSTROM:  That is correct in terms of

18  primarily membership that is residents of Massachusetts,

19  correct.

20            THE COURT:  So if I proceed to final determination,

21  I should -- I would be assuming and accepting, just for

22  purposes of this case, that the only association members are

23  in Massachusetts.

24            MR. SELLSTROM:  That's correct, Your Honor.

25            THE COURT:  Okay.  And that just to be clear, so,

1    like, that wouldn't bind -- you could come forward in the

2    next case, filed in four minutes or in four years, or

3    whenever, and take the position that members of the

4    association, some, many, lots of them, are elsewhere, and you

5    wouldn't be bound by this assumption or this determination

6    that I made, even if it's necessary to the judgment, right?

7            MR. SELLSTROM:  Yes, Your Honor.

8            THE COURT:  You agree with that, Mr. Hamilton?

9            MR. HAMILTON:  Yes, Your Honor.

10            THE COURT:  Okay.  All right.  So I'll take it

11    under advisement.  I intend to issue a written decision

12    promptly, but I don't think you should expect it today, and I

13    want to think about all the issues.  They're important and

14    serious, and I thank you very much.  You have a good day.

15            (Court in recess at 11:29 a.m.)

16

17

18

19

20

21

22

23

24

25

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4            I, Rachel M. Lopez, Certified Realtime Reporter, in

5    and for the United States District Court for the District of

6    Massachusetts, do hereby certify that pursuant to Section

7    753, Title 28, United States Code, the foregoing pages

8    are a true and correct transcript of the stenographically

9    reported proceedings held in the above-entitled matter and

10   that the transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13                        Dated this 7th day of February, 2025.

14

15

16

17                    /s/ RACHEL M. LOPEZ

18

19

20   _____

21   Rachel M. Lopez, CRR
     Official Court Reporter

22

23

24

25

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

O. DOE, *et al.*,

            *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official
capacity as President of the United States, *et
al.*,

            *Defendants*.

Case No. 1:25-cv-10135-LTS

## <u>NOTICE OF APPEAL OF PRELIMINARY INJUNCTION</u>

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of

Appeals for the First Circuit from the Court's February 13, 2025 Memorandum Opinion (ECF No.

46) and Order (ECF No. 47) granting Plaintiffs' motion for preliminary injunction.

Dated: February 19, 2025

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

LEAH B. FOLEY
United States Attorney

ALEXANDER K. HAAS
Branch Director

BRAD P. ROSENBERG
Special Counsel

*s/ Yuri S. Fuchs*
R. CHARLIE MERRITT
YURI S. FUCHS (CA Bar No. 300379)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW

JA155

Washington, DC 20005
Phone:  202-598-3869
Fax: 202-616-8460
Email: yuri.s.fuchs@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF.

Dated: February 19, 2025

*/s/ Yuri S. Fuchs*
Yuri S. Fuchs