**Nos. 25-1169 & 25-1170**

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

No. 25-1169

O. DOE; BRAZILIAN WORKER CENTER; LA COLABORATIVA,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; US DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State; US SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in their official capacity as Acting Commissioner of Social Security,

*Defendants-Appellants.*

No. 25-1170

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHU-SETTS; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF CO-LUMBIA; STATE OF HAWAII; STATE OF MAINE; STATE OF MAR-YLAND; DANA NESSEL, Attorney General for the People of the State of Michigan; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN; CITY AND COUNTY OF SAN FRAN-CISCO,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; US DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State; US DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of Homeland Security; US DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in their offi-cial capacity as Secretary of Health and Human Services; US SOCIAL

SECURITY ADMINISTRATION; MICHELLE KING, in their official capacity as Acting Commissioner of Social Security; UNITED STATES,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Massachusetts

**CORRECTED AMICUS BRIEF OF THE STATE OF TENNESSEE
IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL**

Jonathan Skrmetti
  *Attorney General & Reporter*

J. Matthew Rice
  *Solicitor General*

OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 741-3491
matt.rice@ag.tn.gov

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ............................................................. 1

INTRODUCTION ..................................................................................... 2

ARGUMENT ............................................................................................ 3

I.    There Is No Clear-Cut Constitutional Case for Plaintiffs' Mere-Presence Position ................................................................................ 4

    A.    The Text Weighs Against Plaintiffs. ............................................ 7

    B.    Contemporaneous History and Practice Weigh Against Plaintiffs ..................................................................................... 11

    C.    Supreme Court Precedent Cuts Against Plaintiffs .................... 15

    D.    Plaintiffs' Reliance on Post-Ratification Practice Is Not Dispositive ................................................................................ 21

II.   Plaintiffs Are Not Entitled to Universal Relief. .............................. 27

CONCLUSION ...................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Albathani v. INS,*
    318 F.3d 365 (1st Cir. 2003) ............................................................20

*Ayotte v. Planned Parenthood of N. New England,*
    546 U.S. 320 (2006) ...................................................................31, 32

*Benny v. O'Brien,*
    32 A. 696 (N.J. 1895) .................................................................17, 18

*Bowsher v. Synar,*
    478 U.S. 714 (1986).........................................................................23

*Brooks v. Martin,*
    69 U.S. 70 (1864)...............................................................................7

*Califano v. Yamasaki,*
    442 U.S. 682 (1979).........................................................................28

*California v. Texas,*
    593 U.S. 659 (2021).........................................................................28

*CASA, Inc. v. Trump,*
    No. 25-1153, 2025 WL 654902 (4th Cir. Feb. 28, 2025)...............29, 30

*Connection Distrib. Co. v. Holder,*
    557 F.3d 321 (6th Cir. 2009)...........................................................31

*DHS v. Thuraissigiam,*
    591 U.S. 103 (2020)...................................................................20, 21

*DHS v. New York,*
    140 S. Ct. 599 (2020).......................................................................29

*Doran v. Salem Inn,*
    422 U.S. 922 (1975).........................................................................29

*Dred Scott v. Sandford,*
   60 U.S. (19 How.) 393 (1857) .................................................. 5

*Elk v. Wilkins,*
   112 U.S. 94 (1884) ..................................................... 16, 17

*Gill v. Whitford,*
   585 U.S. 48 (2018) ........................................................ 28

*INS v. Rios-Pineda,*
   471 U.S. 444 (1985) ...................................................... 24

*Kaplan v. Tod,*
   267 U.S. 228 (1925) ................................................... 19, 20

*Kentucky v. Biden,*
   57 F.4th 545 (6th Cir. 2023) ............................................. 30

*L.W. ex rel. Williams v. Skrmetti,*
   83 F.4th 460 (6th Cir. 2023) ......................................... 28, 30

*Leng May Ma v. Barber,*
   357 U.S. 185 (1958) ...................................................... 20

*Lopez-Sorto v. Garland,*
   103 F.4th 242 (4th Cir. 2024) ............................................ 20

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ...................................................... 27

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
   526 U.S. 172 (1999) ...................................................... 31

*Minor v. Happersett,*
   88 U.S. 162 (1874) ....................................................... 16

*Morrison v. California,*
   291 U.S. 82 (1934) ....................................................... 24

*Nat'l Treasury Emps. Union v. Bush,*
   891 F.2d 99 (5th Cir. 1989) .............................................. 31

*NLRB v. Noel Canning,*
   573 U.S. 513 (2014) ............................................................... 22

*Perez v. Mortg. Bankers Ass'n,*
   575 U.S. 92 (2015) ................................................................. 27

*Peter Pan Bus Lines v. Fed. Motor Carrier Safety Admin.,*
   471 F.3d 1350 (D.C. Cir. 2006) ............................................. 25

*Plyler v. Doe,*
   457 U.S. 202 (1982) ................................................ 18, 19, 24

*Regan v. King,*
   49 F. Supp. 222 (N.D. Cal. 1942) ......................................... 24

*Samia v. United States,*
   599 U.S. 635 (2023) ............................................................... 22

*Seila Law LLC v. CFPB,*
   591 U.S. 197 (2020) ........................................................ 22, 24

*Shaughnessy v. United States ex rel. Mezei,*
   345 U.S. 206 (1953) ............................................................... 20

*Slaughter-House Cases,*
   83 U.S. 36 (1873) .................................................................. 15

*Somerville v. Somerville,*
   31 Eng. Rep. 839 (1801) ....................................................... 10

*Trump v. Hawaii,*
   585 U.S. 667 (2018) ............................................................... 30

*United States v. Ju Toy,*
   198 U.S. 253 (1905) ........................................................ 19, 21

*United States v. Nat'l Treasury Emps. Union,*
   513 U.S. 454 (1995) ............................................................... 29

*United States v. Rahimi,*
   602 U.S. 680 (2024) ...................................................... *passim*

iv

*United States v. Salerno*,
    481 U.S. 739 (1987) ...............................................................31

*United States v. Wong Kim Ark*,
    169 U.S. 649 (1898) .............................................. 17, 18, 19

*Van Buren v. United States*,
    593 U.S. 374 (2021) .................................................................7

*Vidal v. Elster*,
    602 U.S. 286 (2024) ...............................................................25

*Washington v. Trump*,
    858 F.3d 1168 (9th Cir. 2017) ...............................................31

*Whole Woman's Health v. Jackson*,
    595 U.S. 30 (2021) .................................................................28

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ...............................................................19

**Constitutional Provisions**

U.S. Const. Amend. XIV, § 1 ...........................................4, 8, 9

U.S. Const. art. III .................................................... 28, 29, 30

U.S. Const. art. VI ................................................................26

**Statutes & Legislative Materials**

8 U.S.C. § 1401(b) ..................................................................6

Civil Rights Act of 1866 ......................................................4, 9

Cong. Globe, 39th Cong., 1st Sess. (1866) ....................4, 7, 12

**Other Authorities**

*2 A Dictionary of Words and Phrases Used in Ancient and Modern Law*
    (1899) ..................................................................................10

3 John Bassett Moore, LL.D., *A Digest of International Law* § 373 (1906) .............................................................................. 13

Alexander Porter Morse, *A Treatise on Citizenship* (1881) .................. 14

Amy Swearer, *Subject to the (Complete) Jurisdiction Thereof: Salvaging the Original Meaning of the Citizenship Clause*, 24 Tex. Rev. L. & Pol. 135 (2019) ................................................ *passim*

Brandon L. Garrett, *Misplaced Constitutional Rights*, 100 B.U. L. Rev. 2085 (2020) ............................................................ 25

Hannis Taylor, *A Treatise on International Public Law* (1901) ............. 15

Henry Campbell Black, *Handbook of American Constitutional Law* (3d ed. 1910) ................................................................................ 14

James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367 (2006) ...................................................................... 6

Joseph Story, *Commentaries on the Conflict of Laws* (1834) ................ 13

Justin Lollman, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455 (2015) ......................... *passim*

K. Whittington, *Originalism: A Critical Introduction*, 82 Ford. L. Rev. 375, 378 (2013) ........................................................ 26

Legis. Denying Citizenship at Birth to Certain Child. Born in the U.S., 19 Op. O.L.C. 340 (1995) ................................................................ 22

Letter from F.A. Reeve, Acting Solicitor of the Treasury, (in XI Documents of the Assembly of the State of New York, 113th Sess.) ........................................................................................... 13

Letter from Sen. Lyman Trumbull to President Andrew Johnson, (in Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Congress) ........................................................................................ 12

vi

Mark Shawhan, Comment,
*The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351 (2010) ........................................ 11, 14

S. Rapalje & R. Lawrence, *A Dictionary of American and English Law* (1888) .................................................................................... 9, 10, 11

Samuel Freeman Miller, *Lectures on the Constitution of the United States* (J. C. Bancroft Davis ed., 1893) ................................................ 14

The Federalist No. 78 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ................................................................ 27

William Edward Hall, *A Treatise on International Law* (5th ed. 1904) ................................................................................ 14

## INTEREST OF AMICUS CURIAE

Tennessee has an interest in ensuring that courts appropriately exercise their judicial power within the bounds of the law and separation-of-powers principles. That interest is heightened here, where a sweeping preliminary injunction has thwarted the President's effort to address one aspect of a national immigration crisis that has harmed States. Recent years have seen an influx of illegal aliens—over 9 million—overwhelming the national infrastructure. U.S. Customs and Border Protection, *Nationwide Encounters* (Feb. 5, 2024), https://perma.cc/EDU3-98CP. And "many noncitizens proceed to interior States" after crossing the border illegally. *See* DHS, *Explanation of the Decision to Terminate the Migrant Protection Protocols* 26 (Oct. 29, 2021), https://perma.cc/5DNE-B9AE. Tennessee thus faces significant economic, health, and public-safety issues from immigration policies that extend beyond what the Citizenship Clause requires.

## INTRODUCTION

Judicial review of presidential policies should reflect sound legal analysis, not snap judgments with indiscriminate scope. Yet Plaintiffs dismiss any need for a deep dive here, casting their maximalist reading of the Citizenship Clause as too settled to debate. Never mind that a mere-presence rule cannot be right all the time, as Plaintiffs concede. Or that Plaintiffs' position perversely rewards illegal behavior in a manner no drafter or ratifier of the Citizenship Clause endorsed. Because Plaintiffs see their reading as a foregone conclusion, they say any anomalies should not stop entry of relief against the Citizenship Executive Order facially and nationwide.

But they should. Tennessee writes to emphasize two points. One, Plaintiffs' first-principles case for a mere-presence approach to the Citizenship Clause is not only not obvious—it has serious problems under text, history, and Supreme Court precedent. Contemporaneous sources instead support what common sense suggests: Conferring United States citizenship requires a more meaningful connection than mere presence by happenstance or illegality. That connection, evidence repeatedly instructs, was parental domicile. Supreme Court precedent likewise cuts

against a mere-presence rule and for a domicile-based rule. By focusing on residency, the Executive Order does not infringe the Citizenship Clause, let alone facially. Nor can reliance on political-branch practice long post-dating ratification override the original public meaning of the Citizenship Clause. Contra Plaintiffs' contentions, this is not an open-and-shut case.

Two, even if this Court agrees with Plaintiffs on the merits, the sweeping injunctions issued are beyond the judicial power. Injunctive relief, the Supreme Court has stressed, must be no more burdensome than necessary to address a plaintiff's injury. And here, that principle dictates that any relief be limited in two ways: first, it must extend only to the Plaintiffs; and second, it must prohibit only the unconstitutional applications of the challenged Executive Order, if there are any.

## ARGUMENT

Plaintiffs take the maximalist position on the Citizenship Clause. Under it, all that matters for purposes of birthright citizenship is where a child is born; considerations of the parents' legal status or residency are irrelevant. But to prevail against the President's Executive Order, Plaintiffs must show that their mere-presence reading of the Clause is

constitutionally compelled. And on relief, they must justify any injunction as consistent with Article III and the limits on courts' equitable power. Their challenge to the Executive Order flounders on each front.

## I. There Is No Clear-Cut Constitutional Case for Plaintiffs' Mere-Presence Position.

The Citizenship Clause of the Fourteenth Amendment provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. Amend. XIV, § 1. It "verge[d] on frivolous," the district court believed, to suggest that the Clause's text does anything other than enshrine Plaintiffs' mere-presence position. Prelim. Inj. Op., Add.28. That markedly overstates Plaintiffs' interpretive case.

The parties of course dispute the effect of the Clause's language. But before turning to the core of their dispute, it's helpful to start with a few broader points that most accept:

*First*, the Fourteenth Amendment aimed to constitutionally "ingraft" the protections of the Civil Rights Act of 1866. Cong. Globe, 39th Cong., 1st Sess. App. 82 (1867) (statement of Rep. Miller). Relevant here, the 1866 Act directed that "all persons born in the United States *and not subject to any foreign power*, excluding Indians not taxed, are hereby

4

declared to be citizens of the United States," no matter their "race and color" and "without regard to any previous condition of slavery or involuntary servitude." Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27 (emphasis added). Given their close relationship, the Act's history and ordinary public meaning have long been understood to bear on interpretation of the Citizenship Clause. *See* U.S. Br. 20-21.

*Second*, there is "near-universal consensus" that both the Citizenship Clause and the Civil Rights Act of 1866 sought to overturn the Supreme Court's odious holding in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), which treated U.S.-born descendants of African slaves as property rather than persons entitled to U.S. citizenship. Amy Swearer, *Subject to the (Complete) Jurisdiction Thereof: Salvaging the Original Meaning of the Citizenship Clause*, 24 Tex. Rev. L. & Pol. 135, 145 (2019). The provisions also sought to redress the "systematic denial of civil rights to freed slaves" by prohibiting race-based discrimination in the conferral of citizenship or provision of civil rights. *Id.* at 146. But parental race or alienage is *not* parental residency—a distinction the district court failed to grasp. *See* Prelim. Inj. Op., Add.23.

*Third*, while Plaintiffs advocate for a mere-presence rule, they must at the same time agree that their pure *jus soli* approach does not hold in all cases. Specifically, Plaintiffs and their supporters stipulate that presence is not enough for children of (i) Indian tribal members (who obtain citizenship only through statute, *see* 8 U.S.C. § 1401(b)), (ii) foreign diplomats, and (iii) at least some others, like enemy combatants, who are immune from U.S. law. *E.g.*, James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367, 369 (2006). This means that the core question is not, as many commentators cast it, whether all persons born within U.S. borders obtain citizenship—even Plaintiffs agree that's not right. It's whether "born ... in the United States, and subject to the jurisdiction thereof" excludes only some unstated set of limited exceptions based on then-prevailing understandings of immunity (Plaintiffs' view), or provides a generally applicable rule that bars all those without meaningful residence-based ties to the United States (Defendants' view).

*Fourth*, immigration restrictions as we know them did not arise until the early 1880s, after the Citizenship Clause's ratification. There is thus no contemporaneous discussion supporting Plaintiffs' maximalist

position applying the Clause to children whose parents are present in the United States only unlawfully and after evading detection. And if rewarding parental illegality had come up, it would have run afoul of the "deep and firm" legal rule *Ex turpi causâ non oritur actio*, which prohibited enforcing illegal contracts or rewarding illegal acts. *E.g.*, *Brooks v. Martin*, 69 U.S. 70, 75-76 (1864).

To sum up, then, Plaintiffs' first-principles position is that a provision that (i) aimed to confer citizenship on freed slaves and thus (ii) does not address non-residents or those unlawfully present, nonetheless (iii) binds the Executive Branch to automatically confer citizenship in most (but not all) cases (iv) in a manner rewarding those who illegally enter the country. That counterintuitive "fallout" should raise red flags about the "implausibility" of Plaintiffs' interpretation. *Van Buren v. United States*, 593 U.S. 374, 394 (2021). And as it turns out, there are serious textual, historical, and precedential problems with Plaintiffs' mere-presence rule.

## A.    The Text Weighs Against Plaintiffs.

There are two apparent textual problems with Plaintiffs' mere-presence position. At the outset, the Clause directs that covered persons

not only must be "born … in the United States"; they also must be "subject to the jurisdiction thereof"—a limitation that was added later to the originally proposed text. U.S. Const. Amend. XIV, § 1; *see* Swearer, *supra*, at 143. So the text, as revised, must do something different than adopt England's common-law rule of pure *jus soli*, which turns only on the location of a child's birth. Plaintiffs do not dispute as much.

The parties instead debate precisely *how* the Clause departs from a pure *jus soli* approach. Plaintiffs contend that "jurisdiction" is a low bar, referring only to the bare sense of being subject to *some* U.S. control. But as the United States explains, that narrow meaning doesn't work—after all, tribal members and foreign diplomats are "in some way subject to the basic level of sovereign authority the United States government exerts over its geographical territory," even though their "exclusion from birthright citizenship is uncontested." Swearer, *supra*, at 149 & n.35 (collecting examples of U.S. legal authority over diplomats); U.S. Br. 11, 19-22 (same, for diplomats and Indians). Equating "subject to the jurisdiction of" with being within the United States' territory collapses two distinct prongs of the Clause's text.

Plaintiffs' contrary reading further places the Citizenship Clause in collision with the 1866 Act, which allows citizenship only to those "not subject to any foreign power."  Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27.  That phrasing "specifically intended to withhold birthright citizenship from those who did not owe a complete, permanent allegiance to the United States and who were not part of the 'American people.'" Swearer, *supra*, at 157-59 (collecting sources).  Historical evidence indicates that the metric for measuring the requisite connection to U.S. jurisdiction was domicile or lawful permanent residence.  *Infra* pp. 6-8. Temporary presence by a parent who legally resided in a foreign country was not enough (neither, *a fortiori*, was illegal parental presence, *see* U.S. Br. 31).

A second textual feature of the Citizenship Clause points to a domicile-based approach:  The provision's premise is that it applies only to persons who also have a "State *wherein they reside*."  U.S. Const. Amend. XIV, § 1 (emphasis added).  The term "reside," in context, connotes a person's legal residence or domicile.  *See, e.g.*, "Residence," S. Rapalje & R. Lawrence, 2 *A Dictionary of American and English Law* 1114 (1888) (collecting cases treating "residence" as "synonymous with 'domicile'");

9

"Residence, Legal," 2 *A Dictionary of Words and Phrases Used in Ancient and Modern Law* 692 (1899) ("[t]he place where a man has his fixed place of abode, where he can exercise his political rights and is subject to personal taxation"). That's particularly so when viewed against then-prevailing concepts of complete jurisdiction and political allegiance, with which domicile's meaning was closely aligned. U.S. Br. 21-22; *see* Justin Lollman, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455, 488-90 (2015) (collecting authorities); *accord* "Domicile," 1 *Dictionary of American and English Law*, *supra*, at 410 ("The question where a person is domiciled may be important, because it is by the law of that place that his civil status … is regulated.").

The general rule of "domicile of origin" or "natural domicile," moreover, is that a child inherits his parent's domicile at birth and that domicile prevails until "clearly abandoned and another taken" via "fixed and settled habitation." *Somerville v. Somerville* (1801) 31 Eng. Rep. 839, 840, 842; 5 Ves. Jun. 750, 750, 755; *see* U.S. Br. 24-27. "Thus," as an 1888 American and English law dictionary instructed, "if a husband and wife domiciled in England take a voyage to India, and a child is born to them on the voyage, or in India before they acquire a domicile there, its

10

domicile is English."  "Domicile of origin," *Dictionary of American and English Law*, *supra*, at 410.  The Citizenship Clause's reference to "reside" thus appears to align with a domicile-based approach to the Citizenship Clause and exclude persons whose parents lack permanent or lawful residence in the United States.

### B.  Contemporaneous History and Practice Weigh Against Plaintiffs.

When assessing the Citizenship Clause's meaning, the "history that matters most is the history surrounding the ratification of the text." *United States v. Rahimi*, 602 U.S. 680, 737 (2024) (Barrett, J., concurring).  Tennessee does not purport to fully survey the complex historical record here.  Others have, though.  *See* Swearer, *supra*; Lollman, *supra*; Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351, 1352 (2010).  Suffice it to say, a range of contemporaneous sources[1] cast significant doubt on Plaintiffs' mere-presence position.

---

[1] The historical sources quoted throughout this section are collected in Swearer, *supra*, and Lollman, *supra*.

These include debates and commentary surrounding the passage and ratification of the 1866 Act and the Fourteenth Amendment, which pervasively linked eligibility to legal residency:

- Senator Trumbull, the primary drafter of the 1866 Act's citizenship provision, explained that the Act excluded "persons *temporarily resident* in [the United States] whom we would have no right to make citizens." Even though "a sort of allegiance was due to the country from" such persons, they were not those "who owe allegiance to the United States" in the sense the citizenship clause was understood to require. Cong. Globe, 39th Cong., 1st Sess. 572 (1866) (emphasis added).

- Senator George Henry Williams, a member of the Joint Committee on Reconstruction, wrote similarly: "In one sense, all persons born within the geographical limits of the United States are subject to the jurisdiction of the United States, *but they are not subject to the jurisdiction of the United States in every sense.*" Cong. Globe, 39th Cong., 1st Sess. 2897 (1866) (emphasis added).

- Summarizing the Civil Rights Act for President Johnson, Senator Trumbull explained that the Act "declares 'all persons' born of *parents domiciled in the United States* … to be citizens of the United States." Swearer, *supra*, at 158-59 (quoting Letter from Sen. Lyman Trumbull to President Andrew Johnson, *in* Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Congress, Washington, D.C., Doc. No. 28152) (emphasis added).

- In explaining how the Citizenship Clause tracked the Civil Rights Act, Senator Howard emphasized that the Clause "will not, of course, include persons born in the United States *who are foreigners, aliens*, who belong to the families of embassadors or foreign ministers accredited to the Government of the United States." Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) (emphasis added).

Early Executive Branch practice was in accord:

12

- In the 1880s, two different Secretaries of State denied citizenship to persons born in the United States. The reason? Their parents had "remained domiciled" overseas. Swearer, *supra*, at 170. Letters setting out their reasoning confirmed that "[t]he fact of birth" in the United States, "under circumstances implying alien subjection, establishes of itself no right of citizenship." Letter from Mr. Frelinghuysen, Sec'y of State, to Mr. Kasson, Minister to Ger. (Jan. 15, 1885), *in* 3 John Bassett Moore, LL.D., A Digest of International Law § 373, at 279 (1906); Letter from Mr. Bayard, Sec'y of State, to Mr. Winchester, Minister to Switz. (Nov. 28, 1885), *in* 3 John Bassett Moore, LL.D., A Digest of International Law § 373, at 280 (1906); *see* Lolling, *supra*, at 479-80.

- The Secretary of the Treasury applied similar reasoning in an 1890 opinion letter, which denied "citizenship of a child born to a would-be immigrant who had not 'landed' but was awaiting immigration approval." Swearer, *supra*, at 171. The Secretary explained: "I am, therefore, of the opinion that the child in controversy born during the temporary removal of the mother from the importing vessel to a lying-in hospital for her own comfort, pending further examination as to whether she belongs to the prohibited class of immigrants, did not become, by reason of its birth, under such circumstances, an American citizen." Letter from F.A. Reeve, Acting Solicitor of the Treasury (Mar. 4, 1890), *in* XI Documents of the Assembly of the State of New York, 113th Sess., No. 74, 6, 47.

Likewise, 1800s and early 1900s commentary recognized parental domicile as a distinguishing feature between the British and U.S. rules on citizenship:

- Justice Joseph Story, writing in his *Commentaries on the Conflict of Laws*, urged in 1834 that "[a] reasonable qualification o[n] the rule" of *jus soli* "would seem to be, that it should not apply to the children of parents … who were abiding there for temporary purposes." Joseph Story, Commentaries on the Conflict of Laws § 48

(Boston, Little, Brown & Co. 6th ed. 1865) (quoted in Lollman, *supra*).

- Alexander Porter Morse asserted in 1881 that "[t]he words 'subject to the jurisdiction thereof' exclude[d] the children of foreigners transiently within the United States … as … subjects of a foreign nation."  Alexander Porter Morse, A Treatise on Citizenship 248 (Boston, Little, Brown & Co. 1881).

- In an 1891 law review article, former Supreme Court Justice Samuel Miller observed:  "If a stranger or traveller passing through, or temporarily residing in this country, who has not himself been naturalized, and who claims to owe no allegiance to our Government, has a child born here which goes out of the country with its father, such child is not a citizen of the United States, because it was not subject to its jurisdiction."  Samuel Freeman Miller, LL.D., Naturalization and Citizenship, *in* Lectures on the Constitution of the United States 275, 279 (J. C. Bancroft Davis ed., 1893).

- An 1898 comment in *Yale Law Journal* wrote:  "[I]n this country, the alien *must be permanently domiciled*, while in Great Britain birth during a mere temporary sojourn is sufficient to render the child a British subject."  Comment, 7 Yale L.J. 365, 367 (1898) (emphasis added).

- Constitutional scholar Henry Campbell Black distinguished between U.S.-born children of "a stranger or traveler passing through the country, or temporarily residing here," who are not entitled to citizenship, and "children, born within the United States, *of permanently resident aliens*, who are not diplomatic agents or otherwise within the excepted classes," who are entitled to citizenship no matter their race.  *Handbook of American Constitutional Law* 634 (3d ed. 1910) (emphasis added).

- International law treatises reached the same conclusion.  *See, e.g.*, William Edward Hall, M.A., *A Treatise on International Law* 224-25, 227 (5th ed. 1904) ("In the United States it would seem that the children of foreigners in transient residence are not citizens.");

14

Hannis Taylor, LL.D., *A Treatise on International Public Law* 220
(1901) ("It appears, therefore, that children born in the United
States to foreigners here on transient residence are not citizens, be-
cause by the law of nations they were not at the time of their birth
'subject to the jurisdiction.'").

If nothing else, the excerpts above and sources collected by scholars
show that Plaintiffs oversell their mere-presence position as the uniform
historical consensus.

## C.    Supreme Court Precedent Cuts Against Plaintiffs.

Nor does Supreme Court precedent mandate Plaintiffs' maximalist
reading of the Citizenship Clause.  Quite the contrary: Caselaw empha-
sizes the importance of parental domicile to birthright citizenship and
shuns mere-physical-presence rules in the immigration context.

1.    The earliest cases interpreting the Fourteenth Amendment
point towards a domicile-based approach.  In 1872, the Court's decision
in the *Slaughter-House Cases* stated that the Citizenship Clause "was
intended to *exclude* from its operation children of ministers, consuls, and
*citizens or subjects of foreign States born within the United States*."  83
U.S. 36, 73 (emphasis added).  Two years later, the Court observed that
"common-law" principles informed "who shall be natural-born citizens"
and noted "doubts" as to whether children of "aliens or foreigners" born

in the United States constituted "natural-born citizens." *Minor v. Happersett*, 88 U.S. 162, 167-68 (1874). The Court recognized that "it was never doubted that all children born in a country of parents who were its citizens became themselves, upon their birth, citizens also." *Id.* at 167. After observing that "[s]ome authorities go further and include as citizens children born within the jurisdiction without reference to the citizenship of their parents," the Court noted that "[a]s to this class there have been doubts." *Id.* at 168.

*Elk v. Wilkins*, 112 U.S. 94 (1884), also counsels against a mere-presence approach. There, the Court assessed how the Citizenship Clause applied to an Indian born into a tribe who then severed tribal relations. *Id.* at 99. The Court held that "Indians born within the territorial limits of the United States, … although in a geographical sense born in the United States" were not "'born in the United States and subject to the jurisdiction thereof,' within the meaning of the first section of the fourteenth amendment." *Id.* at 102. The Indian must have been "completely subject to [the United States's] political jurisdiction, and owing them direct and immediate allegiance." *Id.* But he was not, just as

16

"the children of subjects of any foreign government born within the domain of that government" would not qualify for citizenship. *Id.*

*Wong Kim Ark*—on which Plaintiffs principally rely—cuts against them too. The Court there decided how the Citizenship Clause applied to a U.S.-born child of Chinese aliens lawfully present and permanently domiciled in the United States. *United States v. Wong Kim Ark*, 169 U.S. 649, 652-53 (1898). So unlawful presence was not at play. Still, the Court emphasized throughout that the alien parents were "resident[s]" and "domiciled within the United States." *Id.* at 652, 653, 693, 696, 705. It reasoned that "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States" for purposes of the Clause. *Id.* at 693 (emphasis added). And it held that "Chinese persons … *so long as they are permitted by the United States to reside here*" enjoy the same birthright protections "as all other aliens residing in the United States." *Id.* at 694 (emphasis added). In so doing, the Court expressly drew from *Benny v. O'Brien*, 32 A. 696 (N.J. 1895), which interpreted the Citizenship Clause to require that parents be "domiciled here," and thus

17

to exclude "those born in this country of foreign parents who are temporarily traveling here." *Id.* at 698.

Wong Kim Ark's emphasis on parental domicile was no accident. It responded directly to the parties' briefing and to the dissent's concern about covering persons "born of aliens whose residence was merely temporary, either in fact or in point of law." *Id.* at 729 (Fuller, C.J., dissenting). Not surprisingly, "[i]n the years immediately following *Wong Kim Ark*, several commentators read the Court's reference to domicile as actually doing work in the opinion." Lollman, *supra*, at 462, 471. So did the Court and the Department of Justice. *See* U.S. Br. 41.

The Supreme Court's much later, 5-4 decision in *Plyler v. Doe* likewise lends little help to Plaintiffs. *Plyler* did not confront or purport to resolve any Citizenship Clause question. Instead, it addressed only whether children's "undocumented status" supported a state law denying them benefits under the Equal Protection Clause. 457 U.S. 202, 220-21 (1982). But entitlement to *some* constitutional protections does not equate to lawful residency or entitlement to *citizenship*, as *Plyler* confirms by noting that children in the country illegally "are subject to deportation." *Id.* at 215, 226. Note, too, that the Court's recited rule from

18

*Wong Kim Ark* again referenced domicile: "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States." *Id.* at 211 n.10 (quoting *Wong Kim Ark*, 169 U.S. at 693 (emphasis added)).

2.    Additional precedent clashes with Plaintiffs' treatment of mere physical presence in the United States as determinative.

The Supreme Court has long recognized that not every alien physically present within U.S. soil, water, or airspace "has *effected an entry* into the United States" for "constitutional purposes." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *see United States v. Ju Toy*, 198 U.S. 253, 263 (1905). *Kaplan v. Tod*, 267 U.S. 228 (1925), is instructive. There, the Court rejected a mere-presence rule when considering whether children obtain citizenship through their parents' naturalization. A mother brought her daughter to Ellis Island to join her father, who legally resided in the country. *Id.* at 229. The daughter was denied admission, but the outbreak of the First World War prevented her deportation. *Id.* After detaining the girl for nearly a year, the government paroled her. *Id.* She then lived with her father in the United States for the better part

of a decade. *Id*. During this time, the girl's father naturalized. *Id*. at 230. And when the government later sought to deport the girl, she argued that she had obtained citizenship because she was "'dwelling in the United States'" when her father naturalized. *Id*.

The Court disagreed. It held that the girl never "lawfully … landed in the United States," and "until she legally landed," she "could not have dwelt within the United States." *Id*. (quotations omitted). Legally, she remained "at the boundary line and had gained no foothold in the United States." *Id*. Absent a permissible "entry," the Court concluded, "an alien can neither 'dwell' nor 'reside' within the United States, as those words are understood in the immigration context." *Lopez-Sorto v. Garland*, 103 F.4th 242, 252 (4th Cir. 2024) (quoting *Kaplan*, 267 U.S. at 229-30).

The Supreme Court has invoked the at-the-border legal fiction time and again. *E.g.*, *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953); *Leng May Ma v. Barber*, 357 U.S. 185, 189 (1958).[2] Under it, an alien may be "physically within our boundaries," but treated under the law "as if he

---

[2] So has this Court. *See, e.g.*, *Albathani v. INS*, 318 F.3d 365, 375 (1st Cir. 2003).

had been stopped at the limit of our jurisdiction, and kept there while his right to enter was under debate." *Ju Toy*, 198 U.S. at 263.  And that rule applies to aliens who "arrive at ports of entry" or are detained "after unlawful entry," for example, even if later "paroled elsewhere in the country" pending removal.  *Thuraissigiam*, 591 U.S. at 139.

The at-the-border legal fiction in the Court's precedents aligns with the historical domicile-based approach to the Citizenship Clause.  It makes no sense to recognize the "legal fiction of extraterritoriality, wherein ambassadors and diplomats, though literally present on United States soil, were considered to be still living in the sending state," Swearer, *supra*, at 143, yet ignore the similarly well-established legal fiction when it comes to aliens paroled into the country.  The clash between Plaintiffs' Citizenship Clause reading and settled immigration-law principles further weighs against their mere-presence position.

### D.    Plaintiffs' Reliance on Post-Ratification Practice Is Not Dispositive.

Plaintiffs at times ground their position in congressional and Executive Branch practice, which they say has supported their position for "more than a century."  N.J. Compl., JA204, ¶ 90.  To be sure, "the longstanding practice of the government can inform our determination of

what the law is." *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (citation and quotations omitted).  And if Supreme Court precedent aligns with practice in a holding about the meaning of a constitutional provision, "*stare decisis*" might "control the outcome." *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring).  But for a few reasons here, Plaintiffs' historical-practice points prove little about the interpretive question.

To begin, Plaintiffs' cited evidence consists only of a 1995 Office of Legal Counsel memo.  N.J. Compl., JA204, ¶ 90 (citing Legis. Denying Citizenship at Birth to Certain Child. Born in the U.S., 19 Op. O.L.C. 340 (1995)).  Plaintiffs' thus have a "timing problem":  Evidence arising more than a century after the Fourteenth Amendment's adoption is "far too late to inform the meaning" of the Citizenship Clause "at the time of" its ratification.  *Samia v. United States*, 599 U.S. 635, 655 (2023) (Barrett, J., concurring in part and concurring in the judgment); *cf. Seila Law LLC v. CFPB*, 591 U.S. 197, 221 (2020) (dismissing cited historical-practice examples as too "recent").

Nor is closer-in-time practice evidence merely "inconclusive." *Samia*, 599 U.S. at 656 (Barrett, J., concurring in part and concurring in the judgment).  As discussed, *see supra* pp. 12-13, administrative actions

"surrounding the ratification" weigh against Plaintiffs by highlighting that Executive Branch officials viewed parental domicile as relevant to the Citizenship Clause's application, *Rahimi*, 602 U.S. at 737 (Barrett, J., concurring).  As far as practice goes, those incidents are rather on point:  As here, they involve executive officials asserting that citizenship does not automatically attach based on a child's place of birth alone, but instead turns on assessing parental connection to the United States. *Compare supra* pp. 12-13, *and* U.S. Br. 30, *with* Executive Order No. 14,160, Add.1-3.  Neither Plaintiffs nor the district court has offered any counters to that "contemporaneous and weighty evidence of the Constitution's meaning." *Bowsher v. Synar*, 478 U.S. 714, 723 (1986) (cleaned up).

Plaintiffs' limited body of earlier 20th-century "practice" is not persuasive on its own terms, either.  Reading Congress's mid-century choice to codify the Clause's language to create "a statutory right," Doe Compl., JA20, ¶ 45, only begs this case's dispute over what phrases like "subject to the jurisdiction of" and "in the United States" are best read to mean. Cases making passing references to broader conceptions of birthright citizenship do not move the needle.  *Cf.* 19 Op. O.L.C. at 346 n.15 (collecting

such cases).  Many arise only late into the 1900s, so likewise suffer timing flaws.[3]  Others either overread *Wong Kim Ark* to conflate alienage and "race" with lawful residency[4] or mention birthright citizenship only in describing the factual background or in other dicta.[5]  No case "directly" addresses the interpretive question here:  Whether the Citizenship Clause requires conferral of citizenship based on a child's mere presence at birth, no matter the temporary, accidental, or unlawful nature of parental presence.  *See* Swearer, *supra*, at 197-201 (discussing more recent Supreme Court cases).

That leaves later Executive Branch practice from the mid-1900s to now, which Plaintiffs assert has generally adopted a mere-presence view. But in a case about the location of a constitutional floor on Fourteenth-Amendment citizenship, it is not determinative that the Executive Branch has been willing to raise the ceiling.  *Cf.* Brandon L. Garrett, *Misplaced Constitutional Rights*, 100 B.U. L. Rev. 2085, 2087 (2020)

---

[3] *See, e.g.*, *Plyler*, 457 U.S. at 211 n.10.

[4] *See, e.g.*, *Morrison v. California*, 291 U.S. 82, 85 (1934) (citing *Wong Kim Ark* for the proposition that a person "of the Japanese race is a citizen of the United States if he was born within the the United States") (cited at Prelim. Inj. Op., Add.23).

[5] *See, e.g.*, *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (cited at 19 Op. O.L.C. at 346 n.15).

24

("[I]n many areas, government actors can choose to provide greater protection than the Constitution demands.").  Outside of the mandatory constitutional limits on the President's power over foreign affairs, the political branches maintain discretion to craft citizenship and naturalization rules in a manner consistent with foreign-policy objectives and exigencies.  *See* U.S. Br. 35-36.

And to the extent the Executive Branch has read *Wong Kim Ark* as governing beyond its holding about parental domicile, *see, e.g.*, 19 Op. O.L.C. at 344-46, its practice is minimally probative, *cf. Peter Pan Bus Lines v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) ("[D]eference to an agency's interpretation of a statute is not appropriate when the agency wrongly believes that interpretation is compelled…." (citation and quotations omitted)).  Carrying forward a plainly flawed reading of a case is not the type of historical practice that should govern.  After all, "evidence of 'tradition' unmoored from original meaning is not binding law." *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring) (quoting *Vidal v. Elster*, 602 U.S. 286, 322-25 (2024) (Barrett, J., concurring in part)).

Along the same lines, even if Plaintiffs are right that some recent federal-government tradition supports their reading, that could not override or alter the meaning of the Clause as ratified. "The first and most important rule in constitutional interpretation is to heed the text—that is, the actual words of the Constitution—and to interpret that text according to its ordinary meaning as originally understood." *Rahimi*, 602 U.S. at 715 (Kavanaugh, J., concurring). That fixation principle is plank one of originalism; the second rule speaks to interpretive constraint— that "the discoverable historical meaning … has legal significance and is authoritative in most circumstances." *Id.* at 737 (Barrett, J., concurring) (quoting K. Whittington, *Originalism: A Critical Introduction*, 82 Ford. L. Rev. 375, 378 (2013)). Tethering meaning to the ratified text reflects that "[t]he text of the Constitution is the 'Law of the Land'" that controls "unless and until it is amended." *Id.* at 715 (Kavanaugh, J., concurring) (quoting U.S. Const., art. VI).

Asked to select among historical sources supporting original public meaning and practice of more recent vintage, this Court should favor the former. To be sure, the "[h]istorical analysis" an original-meaning methodology requires "can be difficult; it sometimes requires resolving

threshold questions, and making nuanced judgments about which evidence to consult." *McDonald v. City of Chicago*, 561 U.S. 742, 803-04 (2010) (Scalia, J., concurring). But such constraints serve a vital purpose in a system governed by a written Constitution with judges empowered to exercise "neither FORCE nor WILL but merely judgment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 120 (2015) (Thomas, J., concurring in the judgment) (quoting The Federalist No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). Among other things, an original-meaning approach helps ensure that courts' constitutional analysis reflects "a body of evidence susceptible of reasoned analysis"—not "vague ethico-political First Principles whose combined conclusion can be found to point in any direction the judges favor." *McDonald*, 561 U.S. at 804 (Scalia, J., concurring).

## II. Plaintiffs Are Not Entitled to Universal Relief.

Even if this Court affirms some issuance of injunctive relief, it should reject Plaintiffs' invitation to employ an across-the-board override of an Executive policy throughout the country. Instead, the Court should tailor any relief in at least two ways.

*First*, any injunctive relief must be limited to the Plaintiffs. As a rule, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added). To that end, an injunction "must … be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 585 U.S. 48, 68 (2018). This limitation follows from "the nature of federal judicial power," as enshrined in Article III itself. *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023), *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (2024) (Mem.). Article III "confines the 'judicial power' to 'Cases' and 'Controversies.'" *Id.* (quoting U.S. Const. art. III, § 2). It does not permit federal courts to "issue advisory opinions" or address legal issues "'in the abstract.'" *Id.* (quoting *California v. Texas*, 593 U.S. 659, 672 (2021)). Courts thus cannot "lawfully enjoin the world at large or purport to enjoin challenged laws themselves." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (cleaned up). They "must operate in a party-specific and injury-focused manner." *L.W.*, 83 F.4th at 490.

So to the extent that the threatened application of the Executive Order to Plaintiffs gives rise to an Article III injury, an injunction preventing application of the order *to Plaintiffs'* contrary citizenship policies would fully redress that injury. It is improper to enter an injunction that also governs "everyone in the nation similarly situated by categorically enjoining the defendants" from any enforcement. *CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 654902, at *3 (4th Cir. Feb. 28, 2025) (Niemeyer, J., dissenting). Such relief as "to those who are strangers to the suit" exceeds "the judicial role of resolving cases and controversies." *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). That is why, in cases involving in personam injunctions of officials' enforcement, "neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Doran v. Salem Inn*, 422 U.S. 922, 931 (1975); *see United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477-78 (1995). And it is also why the government generally remains "free to" enforce challenged provisions—even if enjoined as to specific plaintiffs—against "others" not party to the suit. *See Doran*, 422 U.S. at 931.

That Plaintiffs have raised a facial challenge to the Executive Order changes nothing.  Limits on the scope of "judicial power" apply with full force whether the challenge is facial or as applied.  *L.W.*, 83 F.4th at 490. No matter the substantive theory, "[d]istrict courts 'should not issue relief that extends further than necessary to remedy the plaintiff's injury.'" *Id.* (quoting *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023)).  Relief that goes further and applies to unnamed nonparties across the country necessarily exceeds "the power of Article III courts" and flouts "longstanding limits on equitable relief." *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring); *see L.W.*, 83 F.4th at 490.  It also "implicates unnecessarily potentially conflicting orders or reasoning, claims preclusion, res judicata, and other similar principles that order the work of different courts." *CASA, Inc.*, 2025 WL 654902, at *3 (Niemeyer, J., dissenting).

*Second*, any injunctive relief must be limited to the allegedly unconstitutional applications of the challenged Executive Order.  That is, even if this Court concludes that some applications of the Executive Order are unconstitutional, it does not follow that *all* applications should be enjoined.  Rather, the constitutionality of Executive Orders, like statutes,

should be assessed provision by provision, and courts have an "obligation" to use severance "to maintain as much of the order as is legal." *Washington v. Trump*, 858 F.3d 1168, 1172 (9th Cir. 2017) (Kozinski, J., dissenting); *see Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999) (assuming "the severability standard for statutes also applies to executive orders"). Applied here, that rule restricts any remedy to "enjoin[ing] the unconstitutional *applications* of the [Order] while preserving the other valid applications." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 342 (6th Cir. 2009); *see Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006).

As discussed, evidence supports reading the Citizenship Clause to turn on parental domicile or lawful residency. If that is right, then there are a host of situations in which the Executive Order can be applied with no constitutional problems. That at a minimum means Plaintiffs' *facial* challenge to the Executive Order must fail. *See Nat'l Treasury Emps. Union v. Bush*, 891 F.2d 99, 101 (5th Cir. 1989) (applying "difficult" facial standard from *United States v. Salerno*, 481 U.S. 739 (1987), to an Executive Order). To the extent that there remain situations outside the bounds of constitutional application, injunctive relief should be narrowly

crafted to "enjoin only the unconstitutional applications … while leaving other applications in force."  *Ayotte*, 546 U.S. at 329.

## CONCLUSION

A wide range of sources close in time to the Citizenship Clause's ratification support rejecting Plaintiffs' mere-presence position.  At a minimum, any injunction must be appropriately tailored, not universal.

Dated: May 13, 2025                          Respectfully submitted,

Jonathan Skrmetti
  *Attorney General & Reporter*

*/s/ J. Matthew Rice*
J. Matthew Rice
  *Solicitor General*

OFFICE OF THE TENNESSEE ATTORNEY
GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
matt.rice@ag.tn.gov
(615) 741-3491

*Counsel for the State of Tennessee*

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's type-volume limitations because it contains 6,487 words, excluding portions omitted from the Court's required word count.

This brief complies with the Court's typeface requirements because it has been prepared in Microsoft Word using fourteen-point Century Schoolbook font.

*/s/J. Matthew Rice*
J. Matthew Rice

## CERTIFICATE OF SERVICE

I certify that on May 13, 2025, I filed an electronic copy of this brief with the Clerk of the First Circuit using the Court's electronic-filing system. That system sends a Notice of Docket Activity to all registered attorneys in this case.

I further certify that on May 13, 2025, I mailed copies of this brief to the following non-registered individuals via First Class Mail, postage prepaid:

Mark Marvin
135 Mills Rd
Walden, NY 12586

Leonard W. Houston
148 Deer Ct Dr, Bldg 4
Middletown, NY 10940

Rubin Young
14060 SW 258th St
Homestead, FL 33032

Colleen Connors
1935 Hosler St
Flint, MI 48503

*/s/ J. Matthew Rice*
J. Matthew Rice