**Nos. 25-1169, 25-1170**

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT
———————————

O. DOE; BRAZILIAN WORKER CENTER; LA COLABORATIVA,
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United
States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity
as Secretary of State; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE
KING, in her official capacity as Commissioner of Social Security,
*Defendants-Appellants.*

———————————

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF
CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAIʻI; STATE OF MAINE;
STATE OF MARYLAND; ATTORNEY GENERAL DANA NESSEL, on behalf of the
People of Michigan; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF
NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF
RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN; CITY AND
COUNTY OF SAN FRANCISCO,
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United
States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity
as Secretary of State; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI
NOEM, in her official capacity as Secretary of Homeland Security; U.S.
DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR.,
in his official capacity as Secretary of Health and Human Services; U.S.
SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in her official capacity
as Commissioner of Social Security; UNITED STATES OF AMERICA,
*Defendants-Appellants.*

———————————

Appeal from the U.S. District Court for the District of Massachusetts
———————————

## APPELLEES' BRIEF IN NO. 25-1170
———————————
(*Counsel listed on inside cover*)

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*

Gerard J. Cedrone
  *Deputy State Solicitor*
Jared B. Cohen
  *Assistant Attorney General*
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Counsel for the Commonwealth
  of Massachusetts*


ROB BONTA
  *Attorney General of California*

Christopher D. Hu
  *Deputy Solicitor General*
Michael L. Newman
  *Senior Assistant Atty. Gen.*
Marissa Malouff
Irina Trasovan
  *Supervising Deputy Attys. Gen.*
Denise Levey
Lorraine López
Delbert Tran
Annabelle Wilmott
  *Deputy Attorneys General*
455 Golden Gate Ave., Ste. 11000
San Francisco, CA 94102
(415) 510-3917
christopher.hu@doj.ca.gov

*Counsel for the State of California*

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*

Jeremy M. Feigenbaum
  *Solicitor General*
Shankar Duraiswamy
  *Deputy Solicitor General*
Viviana M. Hanley
Elizabeth R. Walsh
Shefali Saxena
  *Deputy Attorneys General*
25 Market Street
Trenton, NJ 08625
(862) 350-5800
viviana.hanley@njoag.gov

*Counsel for the
  State of New Jersey*

*(Additional counsel listed in signature block)*

# TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................... 1

STATEMENT OF THE ISSUES ................................................. 3

STATEMENT OF THE CASE ..................................................... 4

   I.   Legal Background ....................................................... 4

      A.   The Supreme Court settles the meaning of the
Citizenship Clause over 127 years ago. ................. 4

      B.   Congress codifies, and subsequent decisions reaffirm,
this settled understanding of birthright citizenship. ............ 9

   II.   Factual Background .................................................. 12

      A.   The President signs the Order, which purports to deny
citizenship to children born in the United States. ............... 12

      B.   The Order, if implemented, will cause direct and
immediate injuries to Plaintiffs. ........................... 13

          1.   Plaintiffs will suffer immediate financial injuries. ....... 14

          2.   Plaintiffs will suffer immediate operational
disruptions. ...................................................... 18

          3.   Plaintiffs will suffer immediate sovereign harms. ........ 19

   III.  Procedural Background ............................................. 20

SUMMARY OF THE ARGUMENT ....................................... 23

ARGUMENT .............................................................................. 26

   I.   The district court properly held that Plaintiffs have standing
to challenge the Order. .............................................. 27

      A.   Plaintiffs have Article III standing. ...................... 27

B.   Prudential "third-party standing" limitations do not bar Plaintiffs' challenge ............................................................ 31

II.   The district court did not abuse its discretion in granting a preliminary injunction. .................................................................. 41

A.   The district court correctly held that the Order likely violates the Fourteenth Amendment and the INA. ............ 41

1.   The Order violates the Fourteenth Amendment. .......... 41

2.   The Order violates the INA. ........................................... 58

B.   The district court properly exercised its discretion in determining that the equities support relief. ....................... 61

III.   The district court did not abuse its discretion in granting preliminary relief, including on a nationwide basis. ................. 64

CONCLUSION ........................................................................................ 70

# TABLE OF AUTHORITIES

Page

**Cases:**

*Biden v. Nebraska,*
  600 U.S. 477 (2023)..................................................................28, 29

*Bond v. United States,*
  564 U.S. 211 (2011)..........................................................................35

*Bostock v. Clayton Cnty.,*
  590 U.S. 644 (2020)..................................................................25, 59

*Burnham v. Superior Ct. of Calif., Cnty. of Marin,*
  495 U.S. 604 (1990)..........................................................................53

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018)...........................................................29

*Comcast of Me./N.H.,*
  988 F.3d 607 (1st Cir. 2021) .....................................................62, 66

*Craig v. Boren,*
  429 U.S. 190 (1976)..........................................................................40

*Department of Commerce v. New York,*
  588 U.S. 752 (2019)................................................................. passim

*District of Columbia v. Heller,*
  554 U.S. 570 (2008)..........................................................................57

*DraftKings Inc. v. Hermalyn,*
  118 F.4th 416 (1st Cir. 2024).....................................................64, 66

*eBay Inc. v. MercExchange, LLC,*
  547 U.S. 388 (2006)..........................................................................64

*Elk v. Wilkins,*
   112 U.S. 94 (1884) ............................................................... 8, 45, 46, 48

*Fong Yue Ting v. United States,*
   149 U.S. 698 (1893).......................................................................... 4, 57

*Georgia v. McCollum,*
   505 U.S. 42 (1992) .................................................................................. 33

*Haaland v. Brackeen,*
   599 U.S. 255 (2023) ................................................................................ 31

*Hasan v. Holder,*
   673 F.3d 26 (1st Cir. 2012) ................................................................... 11

*Hirabayashi v. United States,*
   320 U.S. 81 (1943) ................................................................................. 49

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
   110 F.4th 295 (1st Cir. 2024)................................................................ 27

*INS v. Chadha,*
   462 U.S. 919 (1983)................................................................................ 35

*INS v. Errico,*
   385 U.S. 214 (1966)................................................................................ 10

*INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Labor,*
   510 U.S. 1301 (1993)............................................................................. 61

*INS v. Rios-Pineda,*
   471 U.S. 444 (1985)................................................................................ 10

*June Med. Servs. L.L.C. v. Russo,*
   591 U.S. 299 (2020)................................................................................ 36

*Kawakita v. United States,*
   343 U.S. 717 (1952)........................................................................ 48, 55

iv

*Kentucky v. Biden,*
  23 F.4th 585 (6th Cir. 2022) ................................................................ 32

*Kowalski v. Tesmer,*
  543 U.S. 125 (2004) ................................................................... passim

*Kozera v. Spirito,*
  723 F.2d 1003 (1st Cir. 1983) ................................................... 33, 38, 40

*Lamar, Archer & Cofrin, LLP v. Appling,*
  584 U.S. 709 (2018) ............................................................................. 60

*Lynch v. Clark,*
  1 Sand. Ch. 583 (N.Y. Ch. Ct. 1844) .................................................. 52

*Mariko v. Holder,*
  632 F.3d 1 (1st Cir. 2011) ................................................................... 10

*Massachusetts v. Mellon,*
  262 U.S. 447 ......................................................................................... 32

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.,*
  923 F.3d 209 (1st Cir. 2019) ..................................................... 27, 30, 33

*McBreairty v. Miller,*
  93 F.4th 513 (1st Cir. 2024) ............................................................... 27

*Murthy v. Missouri,*
  603 U.S. 43 (2024) .............................................................................. 31

*N.Y. State Rifle & Pistol Ass'n. v. Bruen,*
  597 U.S. 1 (2022) ................................................................................ 41

*Naser Jewelers, Inc. v. City of Concord,*
  538 F.3d 17 (1st Cir. 2008) ................................................................ 66

*New Jersey v. Trump,*
  131 F.4th 27 (1st Cir. 2025) ..................................................... passim

*Nishikawa v. Dulles*,
   356 U.S. 129 (1958)................................................................57

*Philip Morris, Inc. v. Harshbarger*,
   159 F.3d 670 (1st Cir. 1998) ................................................66

*Pierce v. Society of Sisters*,
   268 U.S. 510 (1925)................................................................34

*Plyer v. Doe*,
   457 U.S. 202 (1982)................................................................11

*Powers v. Ohio*,
   499 U.S. 400, 411 (1991)..................................................38, 39

*Schooner Exchange v. McFaddon*,
   11 U.S. 116 (1812) ......................................................43, 51, 52

*Seila Law LLC v. CFPB*,
   591 U.S. 197................................................................................35

*Slaughter-House Cases*,
   83 U.S. (16 Wall.) 36  (1873)................................................48

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966)..........................................................32, 33

*Together Emps. v. Mass. Gen. Brigham Inc.*,
   32 F.4th 82 (1st Cir. 2022)....................................................26

*United States ex rel. Hintopoulos v. Shaughnessy*,
   353 U.S. 72 (1957) ..................................................................10

*United States v. Place*,
   693 F.3d 219 (1st Cir. 2012) ................................................60

*United States v. Texas*,
   599 U.S. 670 (2023)................................................................29

*United States v. Wong Kim Ark,*
  169 U.S. 649 (1898) ..................................................................... passim

*Warth v. Seldin,*
  422 U.S. 490 (1975) ............................................................................ 33

*Winter v. NRDC,*
  555 U.S. 7 (2008) ......................................................................... 26, 67

**Statutes:**

20 U.S.C. § 1400 ..................................................................................... 16

20 U.S.C. § 1412 ..................................................................................... 16

20 U.S.C. § 1433 ..................................................................................... 16

22 U.S.C. § 254a–254e ........................................................................... 11

42 U.S.C. § 1320b-7 ............................................................................... 68

42 U.S.C. § 1320b–7(a) .......................................................................... 65

42 U.S.C. § 1320b-7(a)(1) ...................................................................... 68

42 U.S.C. § 1396a ............................................................................. 18, 37

42 U.S.C. § 1396b(v)(1) .......................................................................... 15

42 U.S.C. § 1396c ............................................................................. 18, 38

42 U.S.C. § 1396d(b) .............................................................................. 14

42 U.S.C. § 1397bb(a)(3) ........................................................................ 68

42 U.S.C. § 1397bb(c)(1) ........................................................................ 68

42 U.S.C. § 1397ff(d)(1) ................................................................ 68

42 U.S.C. § 1983 ........................................................................... 38

42 U.S.C. § 603(a)(1)(B) .............................................................. 16

42 U.S.C. § 671 ............................................................................. 18

42 U.S.C. §§ 670–679c ................................................................. 16

7 U.S.C. § 2025(e) ........................................................................ 68

8 U.S.C. § 1356 ............................................................................. 19

8 U.S.C. § 1401 ............................................................................. 21

8 U.S.C. § 1401(a) ................................................................. passim

8 U.S.C. § 1401(b) ................................................................... 8, 11

8 U.S.C. § 1611(a) ........................................................................ 15

8 U.S.C. § 1611 ............................................................................. 16

Cal. Civ. Proc. Code § 203 ........................................................... 20

Mass. Gen. Laws Ann. ch. 234A, § 4 ........................................... 20

N.J. Stat. Ann. § 2B:20-1(c) ......................................................... 20

**Regulations:**

20 C.F.R. § 422.103(c)(2) ............................................................. 11

20 C.F.R. § 422.107(d) .................................................................. 11

22 C.F.R. § 41.31 .......................................................................... 62

42 C.F.R. § 435.406 ............................................................... 15

42 C.F.R. § 435.910 ............................................................... 69

44 Fed. Reg. 10369, 10371 (Feb. 20, 1979) ............................. 11

7 C.F.R. § 272.4(e)(1) ............................................................ 68

7 C.F.R. § 277.4(b) ................................................................ 16

88 Fed. Reg. 81,090-01 (Nov. 21, 2023) .................................. 14

**Constitutional Provisions:**

Cal. Const. art. 5, § 2 ............................................................ 20

Mass. Const. Amend. art. 3 .................................................... 20

N.J. Const. art. 2, § 1, cl. 3 .................................................... 20

N.J. Const. art. 5, § 1, cl. 2 .................................................... 20

N.Y. Const. art. 4, § 2 ............................................................ 20

U.S. Const. amend. XIV ............................................ 1, 4, 19, 24

U.S. Const. amend. XIV, § 1 ........................................ 30, 34, 41

**Other Authorities:**

Bureau of Vital Statistics,
   *State Processing Guidelines for Enumeration at Birth* (Nov. 2024),
   https://bit.ly/3Gy9CQw ....................................................... 17

Emer de Vattel, *Law of Nations* (6th Am. ed. 1844) ............... 50

Hannis Taylor, *A Treatise on International Public Law* (1901) ............ 55

James C. Ho, *Defining "American": Birthright Citizenship & Original Understanding of the 14th Amendment*
9 Green Bag 2d 367 (2006) .................................................... 5

*Legislation Denying Citizenship at Birth to Certain Children Born in the United States*
19 Op. O.L.C. 340, 1995 WL 1767990 (1995) ........................ 12, 19, 58

Margaret D. Stock, *Is Birthright Citizenship Good for America?*
32 Cato J. 139, 150 (2012) .................................................... 13

Michael Ramsey, *Originalism & Birthright Citizenship*
109 Geo. L.J. 405, 413 (2020) ............................................... 5

Noah Webster, *An American Dictionary of the English Language*
(George & Charles Merriam 1860) ................................... 43, 47

Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney-General* (1910) ........ 54, 55

USCIS, Form G-1055, Fee Schedule (April 15, 2025 ed.)
https://www.uscis.gov/g-1055 ............................................. 19

**INTRODUCTION**

In the wake of the Civil War, our Nation adopted the Fourteenth Amendment's Citizenship Clause to remove the question of American citizenship from changing political winds. The Citizenship Clause confirms that everyone born in the United States and "subject to the jurisdiction thereof" would be citizens of the United States and of the State in which they reside. U.S. Const. amend. XIV. The Clause built on a longstanding tradition from English and American common law, known as *jus soli*, that ensured birthright citizenship to all those born in the sovereign's territory and subject to its legal authority. The Supreme Court held 127 years ago that the Citizenship Clause indeed enshrined birthright citizenship into our constitutional order, *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), and more than a century of judicial opinions, executive practice, and Congressional statutes are in accord. And that command went unchallenged in the years since—until January 20, 2025, when the President sought to eliminate the citizenship of babies born to undocumented parents and those with temporary legal status with the stroke of a pen.

While not every appeal at this Court involves binding and on point Supreme Court precedent, this one does. In *Wong Kim Ark*, the Supreme

Court reviewed the text and history of the Citizenship Clause and held that the decision to limit citizenship to those "subject to the jurisdiction" of the United States mirrored the *jus soli* common-law rule: namely, that individuals subject to a country's regulatory authority would be born as citizens, but that citizenship would not apply to two established classes— "children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign state." *Id.* at 682. *Wong Kim Ark* added that the Clause allowed for only one other exception to birthright citizenship: the children of tribal members. *Id.* at 682, 693. *Wong Kim Ark* made clear that no other exceptions exist. And the children of immigrants, regardless of the either unlawful or temporary status of their parents, would certainly not qualify: these American-born babies are subject to the full legal authority of the United States, and are thus subject to its jurisdiction. Nor does this right come from the Constitution alone—in the years after *Wong Kim Ark*, Congress codified this understanding of birthright citizenship into the U.S. Code. *See* 8 U.S.C. § 1401(a).

Appellants' challenge thus fails. The States have standing to pursue their action, because the Order imposes significant pocketbook injuries and sovereign harms on them, and because the States are free to seek

redress for those injuries based on the argument that the Order violates the Citizenship Clause.  The Order is unconstitutional, violating the Citizenship Clause and the Immigration and Nationality Act (INA).  The equitable factors support the preliminary injunction, which maintains a centuries-old status quo and avoids enormous and unprecedented irreparable harms.  And, as a panel of this Court already concluded at the stay stage, the court below did not abuse its discretion in granting a nationwide remedy to the States—especially as Appellants never raised to the district court the alternative remedies they now press to this Court.  This Court should affirm.

## STATEMENT OF THE ISSUES

The issues presented in No. 25-1170, *New Jersey v. Trump.*, are:

1.     Whether the district court properly determined that Plaintiffs have standing to challenge the Executive Order.

2.     Whether the district court properly determined that the Executive Order likely violates the Fourteenth Amendment and the INA.

3.     Whether the district court abused its discretion in crafting a nationwide preliminary injunction to remedy the States' harms.

## STATEMENT OF THE CASE

### I.    Legal Background

#### A.    The Supreme Court settles the meaning of the Citizenship Clause over 127 years ago.

The Fourteenth Amendment guarantees that "[a]ll persons born …
in the United States, and subject to the jurisdiction thereof, are citizens
of the United States."  U.S. Const. amend. XIV, § 1.  Over a century ago,
in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), the Supreme
Court settled the meaning of "subject to the jurisdiction thereof" in a thorough opinion based on the text and history of the Citizenship Clause and
deeply rooted common-law tradition.  That interpretation has remained
authoritative in the years since.

In *Wong Kim Ark*, the petitioner had been born in San Francisco to
Chinese nationals and was "a laborer by occupation."  *Id.* at 650.  Upon
returning from a visit to China, he was detained at the port of San Francisco on the ground that he was "a Chinese person, and a subject of the
emperor of China."  *Id.* at 650.  Pursuant to the Chinese Exclusion Acts
then in effect, Chinese laborers could not enter the United States, and
those already present could not naturalize.  *See Fong Yue Ting v. United
States*, 149 U.S. 698, 717–26 (1893).  Wong Kim Ark sought a writ of

habeas corpus, countering "that he was a native-born citizen of the United States," and thus entitled to reenter. 169 U.S. at 653.

The Supreme Court agreed. *Id.* at 705. It began its constitutional analysis by looking to English common law, "the principles and history of which were familiarly known to the framers of the constitution." *Id.* at 654. "By the common law of England, every person born within the dominions of the crown, no matter whether of English or of foreign parents, and, in the latter case, whether the parents were settled, or merely temporarily sojourning, in the country, was an English subject." *Id.* at 657. This rule of citizenship by country of birth was referred to as *jus soli. Id.* at 667; James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367, 369 n.15 (2006) (agreeing j*us soli* was "embraced in early American jurisprudence"); Michael Ramsey, *Originalism & Birthright Citizenship*, 109 Geo. L.J. 405, 413 (2020) (same). Pursuant to *jus soli*, citizenship flows from "birth within the allegiance—also called 'ligealty,' 'obedience,' 'faith,' or 'power'—of the king." *Wong Kim Ark*, 169 U.S. at 655. As the Supreme Court explained, allegiance did not require "an oath," and was "distinct from … domicile." *Id.* at 656. It encompassed everyone within

the "power, or as would be said at this day, within the jurisdiction, of the king." *Id.* at 656.

Although nearly everyone born within the sovereign's territory was thus born within the sovereign's "allegiance," that is, within his power or jurisdiction, English common law recognized two exceptions:  (1) children "of an ambassador or other diplomatic agent of a foreign state," and (2) children "of an alien enemy in hostile occupation of the place where the child was born." *Id.* at 657–58.  In both cases, such children were considered not born under the sovereign's jurisdiction, and thus not fully subject to U.S. laws, because they were under the sovereign domain of a foreign nation operating on U.S. soil.

After elucidating the *jus soli* principle as it existed at English common law, the *Wong Kim Ark* Court meticulously examined American common-law practice and tradition, and confirmed that the *jus soli* "rule was in force in all the English colonies upon this continent down to the time of the Declaration of Independence, and in the United States afterwards, and continued to prevail under the constitution as originally established." *Id.* at 658.  As the Court explained, the only change was the substitution of the term "citizen" for the common-law term "subject," and

the transfer of sovereignty "from the man to the collective body of the people," such that "he who before was a 'subject of the king' is now 'a citizen of the state.'" *Id.* at 664 (quotation omitted).

Having determined that the American law on citizenship leading up to Reconstruction followed its English common-law roots, the Court examined whether the Civil Rights Act of 1866 or the Fourteenth Amendment had effected any changes. It determined they had not. Rather, "the fundamental principle of citizenship by birth within the dominion was reaffirmed in the most explicit and comprehensive terms." *Id.* at 675. Carefully examining the text and history of the Fourteenth Amendment, the Court held that the framers' "real object … in qualifying the words 'all persons born in the United States' by the addition 'and subject to the jurisdiction thereof,'" was to mirror the *jus soli* rule, that is, to broadly grant citizenship to everyone "born in the United States," excepting those "two classes of cases" well-established as exceptions under English common law: "children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign state." *Id.* at 682.

The Court acknowledged one "single additional" class, "unknown to the common law," that the Citizenship Clause's qualifier also removed

from the birthright citizenship guarantee: "children of members of the Indian tribes." *Id.* at 682, 693. The Court characterized the tribes' "peculiar relation to the national government" as "anomalous," and acknowledged that it had previously held that the children of tribal members, "although in a geographical sense born in the United States, are no more 'born in the United States, and subject to the jurisdiction thereof,' within the meaning of the … fourteenth amendment, than the children of subjects of any foreign government born within the domain of that government." *Id.* at 681–83 (quoting *Elk v. Wilkins*, 112 U.S. 94, 99–103 (1884)). But the Court was clear that *Elk* had no bearing on the citizenship of "children born in the United States of foreign parents." *Id.* at 682.[1]

From this exhaustive review, the Court concluded that "[t]he fourteenth amendment affirms" *jus soli*, "the ancient and fundamental rule of citizenship by birth within the territory," exempting only those unique classes of individuals who would not be subject to U.S. jurisdiction, though present within its borders: the children of foreign diplomats, the

---

[1] In 1924, Congress extended birthright citizenship to Native American tribal members via statute. *See* Indian Citizenship Act of 1924, ch. 233, 43 Stat. 253; 8 U.S.C. § 1401(b). They retain that right today.

children of alien enemies during a hostile occupation, and the children of Native American tribal members. *Id.* at 693.

As to Wong Kim Ark, the Court held that he fit none of these exceptions. *Id.* at 705. Rather, because his parents were living in San Francisco at the time of his birth, they then "owe[d] allegiance to the United States" and were "subject to the jurisdiction thereof," despite "remaining subjects of the emperor of China." *Id.* at 694. Wong Kim Ark was a birthright citizen—and regardless of "[w]hatever considerations" had led the political branches "to decline to admit persons of the Chinese race to the status of citizens," none could overcome "the peremptory and explicit language of the fourteenth amendment." *Id.* at 694, 705.

## B. Congress codifies, and subsequent decisions reaffirm, this settled understanding of birthright citizenship.

*Wong Kim Ark* has remained the authoritative exposition of the Citizenship Clause since it was decided. Thus, when Congress codified the language of the Citizenship Clause in 1940, *see* Nationality Act of 1940, ch. 876, § 201, 54 Stat. 1137, 1138, it baked into the U.S. Code *Wong Kim Ark*'s longstanding interpretation. That statutory guarantee remains the law today. *See* 8 U.S.C. § 1401(a) (providing that "a person born in the

United States, and subject to the jurisdiction thereof" is a "citizen[] of the United States at birth").

Consistent with *Wong Kim Ark*'s affirmation of *jus soli* and Congress's codification of this principle, the Supreme Court and this Court have both repeatedly agreed that persons born here are citizens regardless of the lawfulness or length of their parents' presence in the United States. *See, e.g.*, *United States ex rel. Hintopoulos v. Shaughness*y, 353 U.S. 72, 73 (1957) (petitioners' child was "of course[] an American citizen by birth" even though parents had been admitted on a temporary basis and overstayed); *INS v. Errico*, 385 U.S. 214, 215–16 (1966) (noting petitioners, who entered U.S. with visas fraudulently obtained, gave birth to children the Court recognized as "United States citizens[] at birth"); *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (child of undocumented parent "was a citizen of this country" by virtue of being "born in the United States"); *Hamdi v. Rumsfeld*, 542 U.S. 507, 510 (2004) (finding detainee entitled to due process as a citizen despite amicus arguing that he was not a citizen because his parents were on temporary visas); *Mariko v. Holder*, 632 F.3d 1, 3, 8 n.4 (1st Cir. 2011) (stating U.S.-born child of parents who "were here illegally" is a citizen, and citing *Wong Kim Ark*);

10

*Hasan v. Holder*, 673 F.3d 26, 28 & n.1 (1st Cir. 2012) (same); *see also*

*Plyer v. Doe*, 457 U.S. 202, 211 n.10 (1982) (undocumented immigrants

are subject to U.S. jurisdiction).

Executive understanding and practice have long been in accord.

*See* JA119 (Defendants' counsel conceding that "at least back to World

War II, if not earlier," Executive Branch recognized citizenship of U.S.-

born children, even if their parents are undocumented or have temporary

status). Federal agencies therefore have long accepted proof of birth in

the United States as proof of citizenship.[2] The Social Security Admin-

istration (SSA), for example, has done so since 1979—when the agency

first promulgated rules for proving identity, age, and citizenship or im-

migration status for the purpose of assigning Social Security numbers

(SSNs). 44 Fed. Reg. 10369, 10371 (Feb. 20, 1979); 20 C.F.R. §

422.107(d); 20 C.F.R. § 422.103(c)(2). And the Department of Justice's

Office of Legal Counsel previously opined that a congressional proposal

---

[2] This evidentiary rule makes sense. Given Native American tribal
members' statutory entitlement to birthright citizenship, *see* 8 U.S.C.
§ 1401(b), and the fact that the U.S. has not experienced a hostile occu-
pation since the War of 1812, the only "live" exception to the default rule
that birth on U.S. soil confers U.S. citizenship is for the U.S.-born chil-
dren of recognized foreign diplomats, *see* 22 U.S.C. §§ 254a–254e, an ex-
ceedingly small class.

to deny American citizenship "to children born in the United States to parents who are not citizens or permanent resident aliens" was "unquestionably unconstitutional." *Legislation Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340, 1995 WL 1767990, at *2 (1995) ("OLC Op.").

## II.    Factual Background

### A.    The President signs the Order, which purports to deny citizenship to children born in the United States.

Hours after his inauguration, President Trump issued Executive Order No. 14,160 (Order). *See* Defendants' Add. 1. Section 1 of the Order declares that birthright citizenship does not extend to a child born in the United States if, at the time of the child's birth, (1) the child's mother was present in the United States "unlawfully" or "lawful[ly] but temporar[ily]," and (2) the child's "father was not a United States citizen or lawful permanent resident" ("Covered Children"). Defendants' Add. 1.

Although Section 1 calls into question the citizenship of every individual born in the United States under such circumstances, the Order does not itself direct any immediate action as to anyone born before February 19, 2025. However, as to children born after February 19, 2025, Section 2 mandates that no federal official "shall issue documents

12

recognizing United States citizenship, or accept documents issued by State, local, or other governments … purporting to recognize United States citizenship," to children in the categories described in Section 1. Defendants' Add. 1.  And Section 3 directs various federal agencies and officials—including Defendants—to "ensure that the regulations and policies of their respective departments and agencies are consistent with this order" and to issue public guidance regarding implementation of the Order within 30 days.  Defendants' Add. 2.

## B.    The Order, if implemented, will cause direct and immediate injuries to Plaintiffs.

The Order will deny a fundamental right—citizenship—to millions of people across the Nation, creating a class of U.S.-born children who are excluded from most federal public benefits, who live under a constant, destabilizing threat of deportation, and who, as they age, will be unable to work lawfully or to participate in American political life as voters or officeholders.  Margaret D. Stock, *Is Birthright Citizenship Good for America?*, 32 Cato J. 139, 150 (2012).  That denial of citizenship, in turn, will have direct and immediate consequences for Plaintiffs—17 states, the District of Columbia, and the City and County of San Francisco

13

("Plaintiffs")—who will suffer irreparable financial injuries, operational disruptions, and sovereign harms if the Order goes into effect.

### 1.　Plaintiffs will suffer immediate financial injuries.

Begin with the significant financial injuries that the Order will cause. Plaintiffs receive substantial federal funding to provide healthcare, educational services, and foster-care services to children—but only if those children are U.S. citizens or have a qualifying immigration status. If the Order goes into effect, Plaintiffs will lose federal funding they would otherwise receive for providing those critical services to Covered Children. In the proceedings below, Plaintiffs introduced undisputed evidence of financial harm to four programs in particular.

*First*, Plaintiffs will lose funding they currently receive through Medicaid and the Children's Health Insurance Program (CHIP). Created by federal law and administered by the States, these programs provide healthcare to low-income individuals and families. The federal government reimburses a substantial portion of the States' costs for running these programs—including 50 to 75 percent of the cost of serving eligible children. *See* 42 U.S.C. § 1396d(b); 88 Fed. Reg. 81,090-01 (Nov. 21, 2023); JA245 (¶15); JA279 (¶8); JA354 (¶19); JA406 (¶23). But these

14

reimbursements are available only for services provided to U.S. citizens or "qualified aliens":  the federal government will not reimburse non-emergency costs for "an alien who is not ... permanently residing in the United States under color of law."  42 U.S.C. § 1396b(v)(1); *see* 8 U.S.C. § 1611(a); 42 C.F.R. § 435.406.  To ensure that all children have access to comprehensive healthcare, several Plaintiffs provide—at their own expense—coverage for undocumented children who otherwise meet Medicaid or CHIP's income thresholds.  *See* JA243–245 (¶¶5–14); JA279–280 (¶¶7, 11); JA353–354 (¶¶16–17).  By deeming certain children non-citizens, the Order will shift numerous children to these state-funded plans from their federally reimbursed counterparts, costing the States tens of millions of dollars per year.  *See* JA248 (¶29); JA280 (¶¶9–11); JA357–358 (¶36); JA406–407 (¶¶23–26); JA436–437 (¶¶26–27).[3]

*Second*, the same loss of Medicaid eligibility will cause Plaintiffs to lose federal funding for services provided to young children with disabilities.  Under the Individuals with Disabilities in Education Act (IDEA),

---

[3]  Public expenditures will rise even in states that do *not* provide this kind of coverage to undocumented children:  the undisputed record shows that the loss of Medicaid and CHIP eligibility will place a financial strain on public hospitals, which will experience greater levels of uncompensated care.  JA346–347 (¶¶16, 19).

states must provide early-intervention and special-education services to certain children, including infants and toddlers. *See* 20 U.S.C. §§ 1400(d)(1)(A), (C)(2); 1412(a)(1)(C); 1433. Defendants then partially reimburse States for providing such services to children enrolled in Medicaid. JA255–256 (¶10); JA264 (¶¶17–18); JA366 (¶12). Because the Order will eliminate Medicaid eligibility for Covered Children—including those with special needs—Plaintiffs will suffer direct financial harms.

*Third*, the Order will deprive state agencies of federal funds that they currently receive under Title IV, part E, of the Social Security Act.[4] *See* 42 U.S.C. §§ 670–679c. This "Title IV-E" funding covers a sizeable portion of States' expenses for foster care, adoption, and guardianship assistance. *See* JA270–272 (¶¶10–16); JA325–327 (¶¶4–7); JA419–420 (¶¶13–19). Because this funding, too, is limited to citizens or "qualified aliens," *see* 8 U.S.C. §§ 1611(a), (c)(1)(B); 1641, States will shoulder the full cost of providing crucial services to any children covered by the Order if it goes into effect. *See* JA271 (¶15); JA327 (¶¶8–9); JA420 (¶18).

---

[4] The Order will similarly deprive San Francisco's welfare agencies of federal funds they currently receive under Temporary Assistance to Needy Families (TANF) and Supplemental Nutrition Assistance Program (SNAP). *See* JA229 (¶199); *see also* 42 U.S.C. § 603(a)(1)(B); 7 C.F.R. § 277.4(b).

*Fourth*, the Order will strip States of federal funding they receive from the Social Security Administration (SSA) through their participation in the Enumeration at Birth (EAB) program. The EAB program allows new parents to obtain an SSN during the birth registration process, eliminating the need for them to gather documents and submit a separate application to the SSA. *See* JA281 (¶15). Participating States transmit SSN applications for newborns to the SSA and, in exchange, receive $4.82 per SSN issued. *See* JA262 (¶¶10–11); JA281–282 (¶18); JA335–336 (¶¶13–15); JA374 (¶23); JA382 (¶16). According to the SSA, 99% of SSNs for newborns are assigned through this program. *See* Bureau of Vital Statistics, *State Processing Guidelines for Enumeration at Birth* at 4 (Nov. 2024), https://bit.ly/3Gy9CQw. If the Order goes into effect, the SSA will issue fewer SSNs to newborns (specifically, those the Order considers not to be citizens), thus costing the States tens of thousands of dollars. *See, e.g.*, JA262–263 (¶¶12–16); JA282 (¶19); JA337 (¶17); JA375 (¶30); JA382 (¶17); JA445 (¶19).

Defendants have never disputed that Plaintiffs will suffer the financial consequences exactly as described above. To the contrary,

Defendants' counsel expressly *conceded* the point during the preliminary injunction hearing below.  JA114 (38:2–17).

### 2.    Plaintiffs will suffer immediate operational disruptions.

The Order directly will impose significant administrative and operational burdens on Plaintiffs.  Consistent with federal law, Plaintiffs maintain systems to verify their residents' eligibility for federally-funded programs such as Medicaid, CHIP, Title IV-E, TANF, and SNAP.  *See, e.g.*, 42 U.S.C. § 1396a(a)(5); 42 U.S.C. § 1396c; 42 U.S.C. § 671(a)(27); *see also* JA249 (¶31); JA280 (¶12); JA328–329 (¶11); JA359 (¶¶42–43).  Right now, these systems are built on the premise that a child's birth in the United States is sufficient proof of the child's U.S. citizenship:  no further documentation is necessary.  *See, e.g.*, JA274 (¶21); JA345 (¶15); *see also supra*, p. 11 n.2.

If the Order goes into effect, however, Plaintiffs will have to overhaul these systems.  They will need to (1) identify the kinds of evidence that would now be sufficient to prove a child's citizenship; (2) modify their eligibility verification systems to incorporate information about the immigration status of a child's parents; (3) implement new measures for processing applications and tracking citizenship status; (4) train staff,

18

partner organizations, and healthcare providers on new policies and procedures; and (5) revise existing guidance and manuals regarding eligibility. JA249–250 (¶¶32–35); JA274–275 (¶¶22–25); JA329–330 (¶¶12–15); JA359–360 (¶¶44–45); JA408–409 (¶¶31–33); JA435–438 (¶¶25–28). The federal government's own practices confirm the substantial cost of these efforts: USCIS currently charges $1,335 *per application* to determine whether a child born outside the United States is entitled to U.S. citizenship. USCIS, Form G-1055, Fee Schedule, at 34–35 (April 15, 2025 ed.) (filing fee for Form N-600), https://www.uscis.gov/g-1055; *see* 8 U.S.C. § 1356(m).

### 3. Plaintiffs will suffer immediate sovereign harms.

Finally, if allowed to take effect, the Order will harm Plaintiff States' sovereign interests. "The Citizenship Clause defines which individuals become birthright citizens not only of the United States, but also of the state in which they reside." Defendants' Add. 15 (Op. 10 n.7); *see* U.S. Const. amend. XIV ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States *and of the State wherein they reside*.") (emphasis added).

19

Moreover, state law also commonly makes U.S. citizenship a pre-requisite for participation in various civic functions like juror service and voting. *See* N.J. Stat. Ann. § 2B:20-1(c); Mass. Gen. Laws Ann. ch. 234A, § 4; Cal. Civ. Proc. Code § 203; N.J. Const. art. 2, § 1, cl. 3; N.J. Const. art. 5, § 1, cl. 2; Mass. Const. Amend. art. 3; Cal. Const. art 2, § 2; Cal. Const. art. 5, § 2; N.Y. Const. art. 4, § 2.

## III. Procedural Background

Plaintiffs filed this lawsuit the day after the Order issued, alleging that it violated the Fourteenth Amendment and the INA and seeking preliminary injunctive relief. After briefing and oral argument, the district court granted that relief.

Preliminarily, the district court held that Plaintiffs "easily" satisfied Article III requirements. Defendants' Add. 13 (Op. 8). The court explained that the Order would cause Plaintiffs to suffer "direct financial harms" and "administrative upheaval," and added that the States likely also had Article III standing based on independent sovereign injuries. *Id.* at 15 (Op. 10 n.7), 30 (Op. 25).

On the merits, the district court concluded that Plaintiffs were "nearly certain to prevail" on their constitutional and statutory claims.

*Id.* at 19 (Op. 14) because "*Wong Kim Ark* leaves no room for the defendants' proposed reading of the Citizenship Clause," *id.* at 21 (Op. 16), and because 8 U.S.C. § 1401 separately codified *Wong Kim Ark*'s interpretation of the Citizenship Clause, *id.* at 24–35 (Op. 19–20). The district court also held that the equities "tip[ped] decisively toward" Plaintiffs, who would face irreparable harms through the loss of federal funds and new costs to overhaul existing administrative systems, while Defendants would suffer no material harm because an injunction would simply "maintain a status quo that has been in place for well over a century." *Id.* at 32 (Op. 27). Finally, the district court found that a nationwide injunction was "necessary to prevent [Plaintiffs] from suffering irreparable harm," *id.* at 34 (Op. 29), because "the record establishe[d] that the harms [Plaintiffs] face [would] arise not only from births within their borders, but also when children born elsewhere return or move to one of the plaintiff jurisdictions," *id.* at 9 (Op. 4).

The district court then denied Defendants' motion for a stay pending appeal, which challenged Plaintiffs' standing and the propriety of issuing a nationwide injunction. JA527. The district court found that "this was not a close case," and emphasized that "[t]he equitable scale did not

tip ever so slightly in the plaintiffs' direction" but instead that "the four factors favor the plaintiffs lopsidedly."  JA526.

Defendants renewed their request for a stay in this Court, which likewise denied Defendants' motion.  Writing for the Court, Chief Judge Barron explained that Defendants' standing objections were likely to fail because Plaintiffs' lawsuit was predicated on the loss of federal funds traceable to the Order, injuries indistinguishable from those the Supreme Court had recently endorsed in *Nebraska* and *New York*.  *New Jersey v. Trump*, 131 F.4th 27, 35–38 (1st Cir. 2025).  The Court also rejected Defendants' argument that prudential third-party standing principles barred Plaintiffs from bringing their claims:  as the Court observed, the Order "directly operat[es]" against Plaintiffs by instructing federal officials to refuse to accept state and local documents recognizing Covered Children as citizens by birth.  *Id.* at 38–40.

Regarding the scope of the injunction, the Court "declin[ed] to consider arguments raised for the first time in this court in support of stay pending appeal" and therefore rejected Defendants' request for a narrower alternative injunction that they had not presented to the district court below.  *Id.* at 41–44.  As for contentions about preparatory steps

Defendants might take, the Court confirmed that "the plain terms" of the injunction did not "enjoin 'internal operations' that are 'preparatory operations that cannot impose any harm' on" Plaintiffs. *Id.* at 44.

## SUMMARY OF THE ARGUMENT

I.  For the reasons this Court already identified at the stay-pending-appeal stage, Plaintiffs have standing to bring their challenge. Plaintiffs will suffer classic pocketbook injuries from the implementation of this Order: they will lose Medicaid, CHIP, TANF, SNAP, and Title IV-E funding; they will lose funds for processing SSNs pursuant to the EAB program; and they will incur operational and administrative costs given the obligation to verify the citizenship of the participants in these federal programs. These are not *parens patriae* claims, in which States sue to redress Article III injuries suffered by their residents, but claims Plaintiffs bring to vindicate their *own* injuries—and Defendants do not cite a single case in which States have been barred under Article III from pursuing such claims. Defendants argue that this case should be the first, relying on the third-party standing doctrine, but that doctrine has no role here: the Citizenship Clause impacts not only individual rights but sovereign interests, as it redefines States' own citizenry. In any event, as

23

this Court already reasoned, Plaintiffs fit easily within an exception to the third-party standing doctrine.

II.    Binding Supreme Court precedent, which properly construes the text and history of the Fourteenth Amendment and was codified at 8 U.S.C. §1401(a), conclusively resolves the merits of this case.

First, the Order is contrary to the Fourteenth Amendment—which the Supreme Court authoritatively construed in *Wong Kim Ark*.  The Citizenship Clause confers citizenship on "[a]ll persons born … in the United States," exempting only those not born "subject to the jurisdiction thereof."  U.S. Const. amend. XIV, § 1.  The Citizenship Clause thus constitutionalized the English common-law rule of *jus soli*, under which everyone born in a sovereign's territory is a subject, with the sole exception of those whose parents were not subject to the sovereign's full authority at birth.  The Clause thus exempts only the classes of individuals excluded under the English *jus soli* rule—that is, "children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign state," *Wong Kim Ark,* 169 U.S. at 682—with the "single additional exception" of children of tribal members, who stood in a unique status vis-à-vis U.S. authority and were unknown to the English common

24

law. *Id.* at 693.  For more than a century, the Supreme Court, this Court, and uniform executive practice have all rested on precisely the same rule. This Court should therefore reject Defendants' effort to "disregard[]" all of *Wong Kim Ark*'s reasoning and cabin that monumental and on-point case to its facts.  JA151.

Second, 8 U.S.C. §1401(a) is likewise dispositive.  Section 1401(a) provides that all individuals born in the United States and subject to its jurisdiction are citizens.  By the time Congress codified the language of the Citizenship Clause into the U.S. Code in 1940, it already had an established meaning—that provided by the Supreme Court in *Wong Kim Ark.*  See JA119.  Because federal laws are interpreted consistent with the "public meaning of the statute's language at the time of the law's adoption," *Bostock v. Clayton Cnty.*, 590 U.S. 644, 659 (2020), the Order is also contrary to Section 1401(a).

III.   The district court properly granted nationwide relief in order to remedy Plaintiffs' injuries.  Plaintiffs established that they will suffer direct and substantial pocketbook injuries not merely from the implementation of the Order as to the children born within their borders, but also as to the thousands of children born outside their borders who later

25

move into their States.  The scope of relief ordered below is thus appropriate to meet Plaintiffs' own harms.  Defendants now say that there are alternative ways to remedy those harms, but as this Court has already explained, those alternatives were never presented to the district court and thus supply no basis to reverse the district court's decision.  Regardless, on their face, these proffered alternatives are not practically or legally workable—as they require a child's citizenship status to vary when she crosses state lines, and they implicate a host of serious administrability questions to which Defendants have provided no answer.

## ARGUMENT

A preliminary injunction is appropriate where the plaintiff "establish[es] that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Together Emps. v. Mass. Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)).  The district court correctly determined that Plaintiffs satisfied all four factors.

I.    **The district court properly held that Plaintiffs have standing to challenge the Order.**

A.    **Plaintiffs have Article III standing.**

To satisfy Article III, a plaintiff must show that it will suffer an "injury in fact" that is "fairly traceable" to the challenged government decision and that "may be redressed by" a judicial order enjoining its implementation. *McBreairty v. Miller*, 93 F.4th 513, 518 (1st Cir. 2024). A state can satisfy these requirements by demonstrating a "substantial risk" that a federal action will cause it to suffer proprietary harms, including fiscal injuries. *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 222 (1st Cir. 2019) ("demonstration of fiscal injury" satisfies Article III); *see also In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 308 (1st Cir. 2024) (financial losses are "a quintessential injury in fact"). Even "small economic loss ... is enough to confer standing." *Massachusetts*, 923 F.3d at 222.

Plaintiffs easily satisfy these requirements. The Order would reverse the citizenship status of Covered Children, eliminating, by direct operation of federal law, Plaintiffs' ability to receive federal funding for serving these children. *See supra*, pp. 14–18. As outlined in detail above, the Plaintiffs introduced uncontested evidence that they will lose millions

of dollars in Medicaid, CHIP, TANF, SNAP, and Title IV-E funding that now supports critical health and child welfare services. *See supra*, pp. 14–17. Still more, Plaintiffs will immediately lose federal funds that they currently receive for processing SSN applications at birth. *See supra*, p. 17. And Plaintiffs will incur substantial costs to create new verification systems to comply with federal eligibility rules. *See supra*, pp. 18–19.

As both this Court and the district court have already held, these are "precisely the same sort of direct financial impacts" that conferred standing in *Biden v. Nebraska*, 600 U.S. 477 (2023), and *Department of Commerce v. New York*, 588 U.S. 752 (2019). Defendants' Add. 13–16 (Op. 8–11); *see New Jersey v. Trump*, 131 F.4th 27, 35-38 (1st Cir. 2025) (confirming "pocketbook injuries" in this case match those in *Nebraska* and *New York*). In *Nebraska*, the challenged federal loan-forgiveness program injured Missouri by causing its instrumentality to receive fewer fees for administering student loans, *see* 600 U.S. at 490–491, just as this Order directly causes Plaintiffs to lose federal funding (such as EAB payments) and incur administrative costs. Those injuries are not "speculative," as Defendants now suggest (Br. 50)—to the contrary, Defendants

28

have conceded they will occur, *see* JA113-114 (37:20–38:17), and the record shows this conclusively.

Defendants fail to meaningfully distinguish *Nebraska* or *New York*; instead, they continue to rely (Br. 49–50) on a footnote from *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). But as the district court and this Court recognized, *Texas* is on a wholly different footing. There, the Supreme Court held that Article III precludes "challenges to the Executive Branch's exercise of enforcement discretion over whether to arrest or prosecute," *id.* at 677, such as the lawsuit in that case, and that Texas's specific "theories of standing" failed to "overcome[] th[at] fundamental Article III problem," *id.* at 680 n.3. Because Plaintiffs here do not challenge a lack of enforcement in any way, *Texas* is inapposite.

Nor can Plaintiffs' injuries fairly be characterized as "self-inflicted." Defendants' Br. 52. As multiple circuits have observed, "[c]ourts regularly entertain actions brought by states and municipalities that face economic injury, even though those governmental entities theoretically could avoid injury by enacting new legislation." *California v. Azar*, 911 F.3d 558, 574 (9th Cir. 2018). Indeed, this Court recognized in *Massachusetts* that the Commonwealth had standing to challenge federal

29

policies that would directly cause more women to take advantage of state-funded contraceptive care. 923 F.3d at 225–27. "[A] state's ability to change its laws to evade injury [does not] preclud[e] standing," *New Jersey v. EPA*, 989 F.3d 1038, 1046 (D.C. Cir. 2021), especially as "nothing here indicates that" Plaintiffs administer Medicaid or other critical programs "in order to manufacture standing," *id.* at 1047.

Finally, Plaintiffs suffer a sovereign injury beyond their pocketbook injuries. The Order upends the century-old definition of the States' citizenry, for "[t]he Citizenship Clause defines which individuals become birthright citizens not only of the United States, but also of the state in which they reside." Appellants' Add. 15 (Op. 10 n.7); U.S. Const. amend. XIV, § 1 ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."). The Order—by redefining the Fourteenth Amendment for the first time in over a century—thus redefines who falls within the sovereign States' own citizenry too, directly impinging on Plaintiffs' sovereign interests.

That sovereign injury is exacerbated by the fact that "state laws commonly define civic obligations such as jury service using eligibility

30

criteria that include U.S. citizenship." Defendants' Add. 15 (Op. 10) n.7; *see supra*, p. 20. The Order thus directly shrinks the pool of individuals eligible to participate in such core sovereign functions. Defendants' response (Br. 48-49 n.5) assumes that these functions and federal citizenship can be easily separated, ignoring that Plaintiffs would have to amend their statutes or constitutional provisions to avoid this harm to these civic activities.

## B. Prudential "third-party standing" limitations do not bar Plaintiffs' challenge.

Defendants' principal response—that prudential third-party standing principles bar Plaintiffs from obtaining relief for their *own* Article III injuries (Br. 44–-48)—is unavailing.

The cases Defendants cite each found a lack of standing because the States did not allege any Article III injuries that *they*, as opposed to their residents, suffered from the federal action. *See Haaland v. Brackeen*, 599 U.S. 255, 294-96 (2023) (Texas lacked standing where "not injured by the placement preferences" challenged); *Murthy v. Missouri*, 603 U.S. 43, 75-76 (2024) (Missouri lacked standing where not injured by content moderation activities); *Massachusetts v. Mellon*, 262 U.S. 447, 479-80, 482

31

(1923) (Massachusetts lacked standing where legislation did not "require the states to do or to yield anything" and imposed no "burden" on them).[5]

Those cases have no applicability here because, as both the district court and this Court already found, *see* Defendants' Add. 15 (Op. 10) n.7; *New Jersey*, 131 F.4th at 40, Plaintiffs are suing to obtain redress for their own direct injuries from the Order. *See supra*, pp. 13–20; *Kentucky v. Biden*, 23 F.4th 585, 594, 596 (6th Cir. 2022) (States have standing when they "assert[] some injury to their *own* interests separate and apart from their citizens' interests"). Plaintiffs therefore have standing to remedy their own harms, and Defendants do not cite a single case in which a State that had established Article III standing was nonetheless barred from seeking relief.

Defendants nevertheless argue—based on a misunderstanding of the third-party standing doctrine—that this Court should issue an unprecedented ruling barring States from suing to vindicate their own

---

[5] *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), is even further afield. *Katzenbach* concerned South Carolina's challenge to provisions of the Voting Rights Act of 1965 that determined whether a State was subject to the Act's remedies designed to redress voting discrimination. *Id.* at 307, 315-16. The Court dismissed South Carolina's due process claim for the simple reason that States lack due process rights, *id.* at 323.

injuries, but the Court should reject the invitation. Defendants rest on the argument that constitutional claims should only "be brought by the person 'at whom the constitutional protection is aimed,' that is, 'the party with the right,'" Br. 44–45 (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004), and further citing *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). But courts have repeatedly allowed States to litigate claims that federal action violates constitutional rights where the State establishes its own Article III injury. *See, e.g.*, *Massachusetts*, 923 F.3d at 222 (Massachusetts had standing to challenge federal regulations based on pocketbook injuries, and among its claims were that the regulations violated equal protection, *see* 301 F. Supp. 3d 248, 250 (D. Mass. 2018)); *Kozera v. Spirito*, 723 F.2d 1003, 1005-06 (1st Cir. 1983) (Massachusetts had standing to challenge constitutionality of federal regulations that "would deprive the state of funds to which it would" otherwise "have been entitled … diminish[ing] Massachusetts' ability to provide welfare assistance to families of its needy children"); *Georgia v. McCollum*, 505 U.S. 42, 56 (1992) (Georgia had standing to litigate equal protection rights of jurors because "a State suffers … injury when the fairness and integrity of its own judicial process is undermined"); *cf. Pierce v. Society of Sisters*, 268

U.S. 510, 573 (1925) (private schools had standing to challenge compulsory public education law as violating parental rights because schools' "business and property" interests were "threatened" by the law).

And here, Defendants' third-party standing argument is particularly weak for two independent reasons: first, the Citizenship Clause impacts sovereign interests directly, and second, as this Court held in denying Defendants' request for a stay pending appeal, a well-established exception to the third-party standing doctrine also applies here. 131 F.4th at 38–40.

First, Plaintiffs are not relying on a "constitutional protection" that "is aimed" only at another—the premise of Defendants' third-party standing argument. *Kowalski*, 543 U.S. at 129. To the contrary, the Citizenship Clause defines members of the States' citizenry. The post-Civil War Framers of the Fourteenth Amendment made this point explicitly, guaranteeing that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States *and of the State wherein they reside.*" U.S. Const. amend. XIV, § 1 (emphasis added). It is thus passing strange for the United States to argue that States cannot get redress for their *own* Article III harms flowing from a

34

violation of the Citizenship Clause—a constitutional provision that discusses the States explicitly, that defines their citizenry.  On that basis alone, Defendants' prudential argument cannot pass muster.

Nor is there anything unusual about both individuals and governments being able to assert their own rights under the same constitutional provision—so long as they are suffering their own Article III injuries, as both individuals and the States are in this case.  Indeed, in *Bond v. United States*, the Supreme Court recognized that individuals and the States alike could assert claims under the Tenth Amendment—as it impacted both sovereign authorities and individual rights.  564 U.S. 211, 221–26 (2011); *see also Seila Law LLC v. CFPB*, 591 U.S. 197, 210–213 (2020) (violation of President's removal authority may be challenged, not only via contested removal, but also by corporation suffering Article III injury); *INS v. Chadha*, 462 U.S. 919, 935–36 (1983) (constitutionality of legislative veto may be challenged not only by Executive Branch whose power is infringed, but also by individual suffering Article III injury).  Defendants make no effort to square their argument that individuals alone can vindicate rights under the Citizenship Clause with the

precedents establishing that individuals and governments could have distinct interests they can each vindicate.

Second, even if the third-party standing doctrine could bar the Plaintiffs' claims under the Citizenship Clause in some other case, this Court has already correctly held that a well-established exception applies in this circumstance. *See New Jersey*, 131 F.4th at 38–40. Even in that doctrine's most muscular form, a party may protect its own Article III interests based on third-parties' rights if "enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130 (citations omitted); *see also June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 318–19 (2020) (recognizing that condition as "generally permit[ing] plaintiffs to assert third-party rights in [such] cases"); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682–84 (1977) (seller had standing to challenge sale restrictions on ground that they violated purchasers' constitutional rights); *Craig*, 429 U.S. at 193–97 (1976) (same).

As this Court has already explained, that is the case here: Plaintiffs are among the intermediaries against whom the Order's limits on birthright citizenship "directly operat[es]." *New Jersey*, 131 F.4th at 39. The

Order operates directly on the States by prohibiting federal agencies from "accept[ing] documents issued by State, local, or other governments or authorities"—*i.e.*, issued by Plaintiffs here—"purporting to recognize [the] United States citizenship" of the Covered Children. Defendants' Add. 1-2 (Order § 2). This prohibition on federal recognition of Plaintiffs' submissions as proof of citizenship requires them to incur significant administrative costs to revamp federal eligibility verification systems, and denies them millions of dollars in federal reimbursements they would otherwise have received. *See supra*, pp. 14–18. That this further "has the indirect effect of preventing the individuals from obtaining federally funded services based on their U.S. citizenship," *New Jersey*, 131 F.4th at 39, does not bar Plaintiffs' claims.

Defendants' argument that the Order's requirements are not sufficiently enforced against the States misapprehends federal law. Preexisting federal law obligates the *States* to confirm, in managing the federal benefits programs they administer, that the participants are citizens or have some other qualifying lawful status. *See, e.g.*, 42 U.S.C. § 1396a(a)(5) (noting a state plan for Medicaid must include provisions that ensure it is verifying participants' eligibility). The Order thus puts

the Plaintiffs in an untenable position: if Plaintiffs continue to verify citizenship based on the language of the Fourteenth Amendment and contrary to the provisions of the Order, they put their Medicaid funds at risk, *see* 42 U.S.C. § 1396c (stating noncompliance with Section 1396a leads to termination of payments); but if they adhere to the Order, they will be violating citizens' rights under the Fourteenth Amendment and would thus be exposed to liability under 42 U.S.C. § 1983. *Cf. Kozera*, 723 F.2d at 1005–06 (Massachusetts had standing given similar "squeeze" whereby it could either comply with the Constitution or with federal regulatory requirements, but not both). Given that Plaintiffs suffer their own Article III injuries, that the Citizenship Clause directly governs their sovereign interests, and that a decision barring Plaintiffs from suing would leave them trapped in the same "squeeze",[6] this Court was

---

[6] Finally, another exception applies here too: *Kowalski* also recognizes that prudential limits on standing do not apply where "the party asserting the right has a 'close' relationship with the person who possesses the right," and where "there is 'hindrance' to the possessor's ability to protect his own interests." 543 U.S. at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). Plaintiffs here have a close relationship with Covered Children as a provider of medical, educational, and child welfare services for which federal funding depends on the children's citizenship status. And there is an obvious hindrance: to forestall the Order's deprivation of their rights—in some cases, with consequences for their ability to access

right at the stay-pending-appeal stage to hold that Plaintiffs likely have standing, and it should confirm their standing now. *See New Jersey*, 131 F.4th at 38–39.

In the end, it should come as no surprise that Defendants' third-party standing arguments are unavailing: the concerns that animate the third-party standing doctrine have no applicability here. This prudential limitation reflects concerns that a plaintiff other than the rightsholder may lack "the appropriate incentive to challenge" the action "with the necessary zeal and appropriate presentation," *Kowalski*, 543 U.S. at 129 (citation omitted), or that such claims may require courts "to decide abstract questions … even though judicial intervention may be unnecessary to protect individual rights," *id.* (quotation omitted). But Plaintiffs have every "incentive to challenge" the Order with the same "zeal and appropriate presentation" as the Covered Children themselves, given the significant injuries Plaintiffs face if the Order takes effect. *Id.*; *see supra*, pp. 13–20. And there is nothing abstract about the question at issue here;

---

key services like health insurance—each of the hundreds of Covered Children born each day, or their families, would have to bring suit immediately upon their birth. This "practical" limitation on "the likelihood and ability of the third parties … to assert their own rights," *Powers*, 499 U.S. at 414, further supports this suit.

it is undisputed that the Order will broadly deny citizenship to hundreds of thousands of children in the first year alone and will impose concomitant financial costs and other injuries on Plaintiffs. *See supra*, pp. 13-20.

In these ways, this suit is no different from *Kozera*, where this Court held that prudential considerations did not bar the Commonwealth of Massachusetts from challenging a federal rule as violating the constitutional rights of children to whom it provided financial assistance. *See* 723 F.2d at 1006. Because the Commonwealth's interests were consistent with those of the children whose rights were violated, and the suit did "not entail 'unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative,'" the Commonwealth was permitted to litigate its claim. *Id.* (quoting *Craig v. Boren*, 429 U.S. 190, 193 (1976)). That is the same result that should obtain here—especially as the Citizenship Clause so directly governs the Plaintiffs' sovereign interests.

**II.   The district court did not abuse its discretion in granting a preliminary injunction.**

    **A.   The district court correctly held that the Order likely violates the Fourteenth Amendment and the INA.**

As the district court concluded, "[P]laintiffs are exceedingly likely to prevail on the merits of their constitutional and statutory claims." Defendants' Add. 29 (Op. 24). Indeed, the Order contravenes 127 years of Supreme Court precedent, over a century of executive practice, and Congress's decision to codify both into the INA.

          **1.   The Order violates the Fourteenth Amendment**.

The Citizenship Clause provides, "in plain and simple terms," Defendants' Add. 19 (Op. 14), that "[a]ll persons born … in the United States, and subject to the jurisdiction thereof, are citizens of the United States." U.S. Const. amend. XIV, § 1. Because the children of immigrants who are undocumented or have temporary lawful status are "subject to the jurisdiction" of the United States as that phrase was interpreted in *Wong Kim Ark*—an interpretation consistent with the phrase's "'normal and ordinary' meaning," and "confirmed by the historical background" of the Fourteenth Amendment, *N.Y. State Rifle & Pistol Ass'n. v. Bruen*, 597 U.S. 1, 20 (2022) (cleaned up)—they are constitutionally entitled to citizenship. The Order is thus facially unconstitutional.

41

1. A straightforward application of *Wong Kim Ark,* 169 U.S. 649, disposes of this appeal.  As detailed above, *see supra*, pp. 4–9, *Wong Kim Ark* exhaustively reviewed the history of citizenship rules under the English common law and in the United States, and examined the history and intent of the Citizenship Clause itself.  Based on this comprehensive analysis, the Court concluded that the Citizenship Clause reflects the *jus soli* rule from English common law—that is, it grants citizenship to everyone "born in the United States," excepting only those unique classes of individuals who would not be "subject to the jurisdiction" of the United States, though present within its borders:  the children of foreign diplomats, of alien enemies during a hostile occupation, and of Native American tribal members.  *Wong Kim Ark*, 169 U.S. at 693–94.  The children of immigrants who are undocumented or have temporary lawful status do not fit any of these limited exceptions, nor their underlying reasoning and logic.  Indeed, both the Supreme Court and this Court repeatedly have recognized the citizenship of such children.  *See supra* pp. 10–11.

*Wong Kim Ark* binds this Court, but regardless, it properly construed the text and history of the Citizenship Clause.  At the time of the Fourteenth Amendment's ratification, the public meaning of a nation's

"jurisdiction" was its "[p]ower of governing or legislating" or "right of exercising authority." Noah Webster, *An American Dictionary of the English Language* 635 (George & Charles Merriam 1860) (JA492). The common-law exceptions to birthright citizenship that *Wong Kim Ark* recognized rested, the Court explained, on well-founded principles that this "jurisdiction" is subject only to narrow limitations where an individual is not subject to the United States' exclusive sovereign authority. *See* 169 U.S. at 684–85 (noting United States is "understood to waive the exercise of a part of [its] complete exclusive territorial jurisdiction" when permitting foreign sovereigns and their representatives to enter U.S. territory); *id.* at 683 (recognizing that when foreign power occupies portion of United States, the "sovereignty of the United States over the territory" is "of course, suspended, and the laws of the United States could no longer be rightfully enforced there").

The children of immigrants, regardless of the immigration status of their parents, are subject to this country's sovereign authority. As *Wong Kim Ark* explained, building upon Chief Justice Marshall's recognition of the same point in *Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812), foreign nationals who enter the United States even temporarily, for

43

"business or caprice," are not "exempt[] 'from the jurisdiction of the country in which they are found'" because "it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction" if such individuals "were not amenable to the jurisdiction." 169 U.S. at 685–86. The same is true for the children covered by this Order and their parents. The nation has not waived its sovereign authority to enforce the laws against them. Indeed, the very fact that the United States enforces its immigration laws against those without lawful status— which Defendants would hardly deny—is proof positive that the population is subject to United States jurisdiction in the first place. Ho, *Defining "American"*, 9 The Green Bag at 368–69 (arguing undocumented immigrants "are such *because* they are subject to U.S. law").

Defendants are wrong to charge (Br. 15–18, 37) that this conception of "jurisdiction" does not cohere with the established exceptions to the rule that birth on U.S. soil confers U.S. citizenship. To the contrary, each exception applies in one of the few circumstances in which the United States has ceded some part of its sovereign authority to a foreign government. As laid out just above, that perfectly describes the two common-law exceptions to *jus soli*:  children of foreign diplomats and hostile

44

occupants are considered born under the sovereign power of another nation—either because the United States has consented to this fiction, as in the case of the foreign diplomat, or because the United States' authority has been overcome by force, as in the case of the hostile enemy occupant—and therefore are not subject to the full exercise of the United States' sovereign power. *Wong Kim Ark*, 169 U.S. at 684–86. But as *Wong Kim Ark* explained (contra Defendants' arguments), children born to tribal members are analogous to "children of subjects of a[] foreign government born within the domain of that government." *Id.* at 681–83 (quoting *Elk*, 112 U.S. at 99–103). That is, tribal children are considered born within the sovereign power of an "alien nation" operating within the boundaries of the United States. *Id.* at 681. That logic, however, has no application here: children born in the United States to immigrants are not born under the sovereign authority of another nation operating within our borders. They are born "subject to the jurisdiction"—the complete authority—of the United States.

2. Defendants' contrary claims that birthright citizenship instead is based on a nebulous "allegiance" analysis or the parent's domicile are directly contrary to *Wong Kim Ark*. Nor is there any basis in the text of

the Citizenship Clause, precedent, or logic for their position.

a. Defendants' claim (Br. 15, 18), that the Citizenship Clause excludes the Covered Children because their parents do not owe the United States "primary allegiance," is irreconcilable with *Wong Kim Ark*.  Indeed, though once residents in the United States, Wong Kim Ark's parents were not U.S. citizens but were "subjects of the emperor of China." 169 U.S. at 652-53, 705.  Although the dissent viewed this fact as precluding Wong Kim Ark's family from being "subject to the jurisdiction" of the United States, *see id.* at 725 & n.2 (Fuller, C.J., dissenting) (claiming Chinese law and custom prohibited renouncing allegiance to Chinese emperor, and thus Chinese children were never born subject to U.S. jurisdiction), the majority disagreed.  It resoundingly rejected the argument that foreigners are not "subject to the jurisdiction" of the United States on account of being subjects of another nation. *Id.* at 683-86.

Defendants rest their mistaken theory of "jurisdiction" on the references to "allegiance" in *Elk* and *Wong Kim Ark*, implying that a newborn's parents must have some principal loyalty to the United States for the child to be entitled to citizenship.  But this misreads the meaning of "allegiance," as used in 19th-century discussions of citizenship.  As *Wong*

*Kim Ark* makes clear, "allegiance" in this context means "nothing more than the tie or duty of obedience" to the sovereign's laws—that is, precisely the same thing as being subject to the county's legal jurisdiction. 169 U.S. at 659 (citation omitted); Noah Webster, *An American Dictionary of the English Language* 35 (George & Charles Merriam 1860) (Plaintiffs' Add. 11) (defining "allegiance" as "[t]he tie or obligation of a subject to his prince or government; the duty of fidelity to a king, government, or state," and noting "[e]very native or citizen owes *allegiance* to the government under which he is born"). Indeed, *Wong Kim Ark* expressly rejected the notion that any "oath" or affirmative pledge of loyalty was necessary to render someone "within the allegiance" and thus "subject to the jurisdiction" of the United States.  169 U.S. at 655, 693–94.  Unlike the limited classes excluded from birthright citizenship, the Covered Children are not exempt in any way from the nation's laws and are therefore born "within the allegiance" of the United States.

Defendants also rely (Br. 15-16) on language from prior cases that *Wong Kim Ark* expressly rejected as a reason to consider subjects of foreign nations, while present in the United States, not subject to U.S. jurisdiction.  Defendants invoke a quote from the *Slaughter-House Cases*,

47

83 U.S. (16 Wall.) 36, 73 (1873), but as *Wong Kim Ark* explains, this was "unsupported" dicta, and inconsistent with later statements by the same justice and the general *jus soli* tradition.  169 U.S. at 678–79.[7]  Similarly, although Defendants lean heavily on *Elk v. Wilkins*, 112 U.S. 94, *Wong Kim Ark* explains that *Elk* "concerned only members of the Indian tribes" and had no bearing on the citizenship of "children born in the United States of foreign parents."  169 U.S. at 682.

Further, Defendants' argument is incompatible with the Supreme Court's affirmation of dual citizenship, whereby "a person may have and exercise rights of nationality in two countries and be subject to the responsibilities of both."  *Kawakita v. United States*, 343 U.S. 717, 723 (1952).  In *Kawakita*, the Court recognized that an individual "born in this country" to Japanese parents was "a citizen of the United States by birth," *id.* at 720, even though "all Japanese nationals … are duty bound to Japanese allegiance," *id.* at 724.  The Court recognized that this is so even "[a]t a time of threatened Japanese attack upon this country."

---

[7] Defendants' citation to a treatise by Alexander P. Morse (Br. 28), can be disregarded because Morse relies solely on the language from the *Slaughter-House Cases* that the Supreme Court in *Wong Kim Ark* rejected.  *Compare* Alexander P. Morse, *A Treatise on Citizenship* 248 & n.4 (1881) (Plaintiffs' Add. 2), *with Wong Kim Ark*, 169 U.S. at 678-79.

*Hirabayashi v. United States*, 320 U.S. 81, 96 (1943).  Simply put, parental ties to another nation do not defeat a child's birthright citizenship.

The different citizenship language of the Civil Rights Act of 1866 provides no reason to depart from *Wong Kim Ark*.  Defendants emphasize (Br. 20–22) that the 1866 Act which preceded the Fourteenth Amendment conferred citizenship upon "all persons born in the United States *and not subject to any foreign power*, excluding Indians not taxed."  But *Wong Kim Ark* already rejected this argument.  169 U.S. at 688.  As the Court explained, given our country's entrenched tradition of *jus soli*, the 1866 Act could not reasonably be interpreted to deny citizenship, "for the first time in our history," to U.S.-born children of foreign parents other than those "in the diplomatic service of their own country," or "in hostile occupation of part of our territory."  *Id.*  And "any possible doubt in this regard was removed when the negative words of the civil rights act, 'not subject to any foreign power,' gave way … to the [Citizenship Clause's] affirmative words, 'subject to the jurisdiction of the United States.'"  *Id.*

Finally, Defendants' invocation of international law principles, including those expounded by the Swiss writer Emer de Vattel (Br. 22–23), also provides no basis to depart from *Wong Kim Ark*.  *Wong Kim Ark*

expressly rejected Vattel's view "that, in order to be of the country, it is necessary that a person be born of a father who is a citizen." Vattel, *Law of Nations* (6th Am. ed. 1844), § 212, at 101 (Plaintiffs' Add. 4–5). Vattel's view reflects "the rule of the Roman law," *jus sanguinis*, "by which the citizenship of the child followed that of the parent," which was recognized in many civil law countries and by international law scholars. 169 U.S. at 666. But *Wong Kim Ark* made clear that this international law concept had not "superseded" the common-law *jus soli* rule in America. *Id.* at 666–67; *compare id.* at 708–09 (dissent, citing Vattel and arguing for the *jus sanguinis* rule over the *jus soli* rule). The Court explained that "[t]he later modifications of the rule in Europe rest upon the constitutions, laws, or ordinances" of those countries and have "no important bearing upon the interpretation and effect of the constitution of the United States." *Id.* at 667. Indeed, Vattel himself recognized that in "England … the single circumstance of being born in the country, naturalizes the children of a foreigner." *Law of Nations* § 214, at 101 (Plaintiffs' Add. 5).

b. Defendants' domicile argument likewise fails. Defendants argue (Br. 18–20) that foreigners only have the requisite "allegiance" to be subject to U.S. jurisdiction if they are domiciled here. But apart from

misconstruing the concept of "allegiance," *see supra*, pp. 46-49, this purported domicile requirement appears nowhere on the face of the Citizenship Clause and is inconsistent with the plain text of the Fourteenth Amendment and the preexisting *jus soli* rule that it constitutionalized.

Most importantly, it is not possible to read into the constitutional phrase "subject to the jurisdiction" an intention to restrict birthright citizenship to the children of domiciliaries. Just the opposite: the phrase already had a far broader meaning than "domiciled in" the United States: As Chief Justice Marshall stated in *The Schooner Exchange*, even those briefly traveling through the country are not "exempt[] from the *jurisdiction of the country* in which they are found" because they "owe temporary and local allegiance" that requires them to comply with U.S. laws. *Wong Kim Ark*, 169 U.S. at 685–86 (emphasis added).

The centuries old *jus soli* rule that the Fourteenth Amendment adopted is also incompatible with a domicile test. As *Wong Kim Ark* explained, under the *jus soli* rule, "temporary and local allegiance" is "strong enough to make a natural subject" of the children of any foreigner born in the sovereign's territory. *Id.* at 693 (quoting Calvin's Case). Indeed, the *Wong Kim Ark* majority and dissent both agreed that "[b]y the

common law of England, every person born within the dominions of the crown, no matter … whether the parents were settled, or merely temporarily sojourning, in the country, was an English subject." *Id.* at 657; *see id.* at 706 (Fuller, C.J., dissenting) (same); *e.g.*, *Lynch v. Clark*, 1 Sand. Ch. 583 (N.Y. Ch. Ct. 1844) (holding that child born in the United States U.S. to Irish national parents who were temporarily visiting was a citizen per governing *jus soli* rule). And *Wong Kim Ark* undoubtedly "establishes that at common law in England and the United States the rule with respect to nationality was that of the *jus soli*." *Weedin v. Chin Bow*, 274 U.S. 657, 660 (1927).

None of Defendants' arguments in support of their domicile theory can overcome *Wong Kim Ark*'s contrary interpretation of the meaning of "jurisdiction" in the Citizenship Clause. Defendants point to sources establishing that the United States has jurisdiction over foreigners domiciled in the United States and affords them greater protections than other foreigners (Br. 18–20, 25–26, 39–40), but this does not establish that the United States *lacks jurisdiction* over foreigners who are temporarily visiting—contrary to Chief Justice Marshall's seminal explanation of jurisdiction in *Schooner Exchange*. *See* 11 U.S. at 144. Nor do stray

statements by congressmen in speeches or letters (Defendants' Br. 21–22, 27–28) justify disregarding the *jus soli* rule.[8]  And although Justice Story had opined before *Wong Kim Ark* that birthright citizenship "*should* not apply to the children of parents" temporarily in the country, (Defendants' Br. 23 (quoting *Commentaries on the Conflict of Laws, Foreign and Domestic* § 48 (1834))) (emphasis added), this is not the only instance in which "Story's views are in considerable tension with English common law," *Burnham v. Superior Ct. of Calif., Cnty. of Marin*, 495 U.S. 604, 635 n.8 (1990) (Brennan, J., concurring).

Continuing a trend throughout their brief, Defendants rely on arguments and sources that were presented to the Court in *Wong Kim Ark*, but which failed to convince the majority to depart from the *jus soli* rule. *Compare, e.g.*, Br. 26–27 (citing Hall's *Treatise on International Law*) *with* 169 U.S. at 666 (majority citing same); Br. 28 (citing *Benny v. O'Brien*, 58 N.J.L. 36, 32 A. 696, 698 (1895)) *with* 169 U.S. at 693

---

[8] Defendants (Br. 27–28) misrepresent an exchange between Senators Fessenden and Wade.  When Senator Fessenden suggested that "a person … born here of parents from abroad temporarily residing in this country" may not be a citizen, Senator Wade responded: "The Senator says a person may be born here and not be a citizen. *I know that is so in one instance*, i*n the case of children of foreign ministers*." Cong. Globe, 39th Cong., 1st Sess., 2769 (emphasis added) (Plaintiffs' Add. 22).

(majority citing same); Br. 28 (citing Miller's *Lectures on the Constitution*) *with* 169 U.S. at 718–19 (dissent quoting same); Br. 30 (citing passport denials by Secretaries of State Frelinghuysen and Bayard) *with* 169 U.S. at 719 (dissent discussing same). None provides justification for departing from *Wong Kim Ark*.

Several of Defendants' sources (Br. 28–30) fail to support their domicile argument not only because they contradict *Wong Kim Ark*, but also because they describe an international law rule of expatriation rather than an American rule about birthright citizenship. In the Spanish Treaty Claims Commission report Defendants cite (Br. 30, 41), an assistant attorney opines that a child who is born in the United States to foreign travelers and who grows up abroad "has a right of election, and on attaining its majority," she may elect either U.S. citizenship or the citizenship of her parents. Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney-General* 125 (1910) (Plaintiffs' Add. 20).[9] The international law treatises of

---

[9] The assistant attorney who authored the portion of the *Final Report* Defendants rely on was of the opinion that *Wong Kim Ark* should be "limited to its own facts," and that the "good deal" it said regarding birthright citizenship passing to the children of "parents who are accidentally or

Taylor and Westlake that Defendants cite (Br. 28–29) discuss a similar rule. *See also Wong Kim Ark*, 169 U.S. at 722 (dissent discussing same and citing *Wharton's Digest*). Whatever the validity of such an international law principle, it speaks to whether a U.S.-born child, having lived abroad throughout childhood, *abandons* her U.S. citizenship by remaining abroad as an adult. *See, e.g.*, Hannis Taylor, *A Treatise on International Public Law* 220 (1901) (Plaintiffs' Add. 8) (a U.S.-born child "who goes during his minority to France, and there remains voluntarily after he attains his majority, will be held to have *abjured* his American nationality" (emphasis added)). But because something cannot be abandoned without first being possessed, this principle assumes a right to U.S. citizenship from birth. In any event, no "principle of international law … could defeat the operation of the established rule of citizenship by birth within the United States." *Wong Kim Ark*, 169 U.S. at 660.

---

temporarily in the United States" should be disregarded as "mere dictum." Spanish Treaty Claims Comm'n, *Final Report* at 121, 124 (Plaintiffs' Add. 16, 19). The author appears motivated to disregard *Wong Kim Ark* by the mistaken beliefs that dual citizenship is not cognizable, *but see Kawakita*, 343 U.S. at 723–24, and that any grant of citizenship that the United States recognized for its own citizens it must reciprocally recognize for other countries. *See* Spanish Treaty Claims Comm'n, *Final Report* at 121–25 (Plaintiffs' Add. 16–20).

Defendants' insistence that *Wong Kim Ark's* holding is limited to domiciliaries because the opinion mentions that Wong Kim Ark's parents were domiciled in San Francisco (Br. 37–39) improperly asks this Court to "ignore all but a handful of sentences from *Wong Kim Ark*," disregarding "the bulk of the majority's lengthy opinion." Defendants' Add. 21 (Op. 16). As the district court recognized, this "position reflects a serious misunderstanding at best—and a conscious flouting at worst—of the judicial process and the rule of law." *Id.* The references in *Wong Kim Ark* to the fact that the petitioner's parents were residing in San Francisco at the time of his birth are simply a natural way to describe their presence in the United States at the time. Their residency status did not factor in the Court's analysis, as is evident from the Court's explication of the broad *jus soli* principle, the expansiveness of U.S. jurisdiction over visiting foreigners, and the narrow exceptions thereto. *See supra*, pp. 4–9.

3. Finally, Defendants' "interpretive principles" (Br. 33–36) are ill-disguised policy arguments that fail to rehabilitate the Order's facial unconstitutionality. Defendants bemoan international conflicts that may arise from dual citizenship and complain that birthright citizenship incentivizes disfavored immigration and can result in citizenship extending

56

to the children of dangerous individuals present in the United States, "[b]ut the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008). While the political branches retain tools to deal with the concerns Defendants cite—for example, the executive can make tourist visas unavailable for anyone seeking to enter the United States to "obtain[] United States citizenship for a child," 85 Fed. Reg. 4219, 4223 (Jan. 24, 2020)—denying birthright citizenship to those constitutionally entitled to it is not among them. *See Nishikawa v. Dulles*, 356 U.S. 129, 138 (1958) (because the "Constitution has conferred" birthright citizenship, "neither the Congress, nor the Executive, nor the Judiciary, nor all three in concert, may strip [it] away"). That principle resolves this case.

Indeed, in *Wong Kim Ark* itself, the Court affirmed Wong Kim Ark's birthright citizenship against an odious legislative policy of "exclusion of persons of Chinese descent." 169 U.S. at 706, 725–26 (Fuller, C.J., dissenting); *see Fong Yue Ting*, 149 U.S. at 717 (explaining racist rationale for Chinese Exclusion Acts). Despite these alleged policy concerns, *Wong Kim Ark* affirmed the Chinese petitioner's birthright citizenship, declaring that "[w]hatever considerations" had led the political branches "to

decline to admit persons of the Chinese race to the status of citizens," none could overcome "the peremptory and explicit language of the fourteenth amendment." 169 U.S. at 694, 705.

This was the Citizenship Clause operating as designed. Indeed, having learned the painful lessons of *Dred Scott*, the Framers of the Fourteenth Amendment understood "our country should never again trust to judges or politicians the power to deprive from a class born on our soil the right of citizenship." *OLC Op.*, 1995 WL 1767990, *6. The President cannot change that tradition with the stroke of a pen, reinterpreting the Fourteenth Amendment for the first time in 127 years. The Order is unconstitutional.

### 2. The Order violates the INA.

As Defendants' brief makes clear, they disagree with *Wong Kim Ark*. But even if this Court could look past binding Supreme Court precedent and scrutinize the meaning of the Citizenship Clause's language on a clean slate, and even if it were to agree with Defendants that *Wong Kim Ark* erred in interpreting the Fourteenth Amendment to embody *jus soli*, the States still would prevail under 8 U.S.C. §1401(a). *See* Defendants' Add. 24 (Op. 19) (acknowledging same).

Although Defendants claim that Plaintiffs' "statutory claim … fails for the same reason" as their constitutional claim (Br. 43–44), they ignore their own concession that, for at least eight decades preceding the Order, the executive branch understood the Citizenship Clause consistently with *Wong Kim Ark*'s exposition. *See* JA119 (counsel for the Department of Justice conceding that "at least back to World War II, if not earlier," the Executive Branch recognized the citizenship of U.S.-born children, even if their parents are undocumented or have temporary legal status). And because statutes are interpreted consistent with the "public meaning of the statute's language at the time of the law's adoption," *Bostock v. Clayton Cnty.*, 590 U.S. 644, 659 (2020), the relevant time frame for interpreting 8 U.S.C. §1401(a) is 1940, when Congress codified the language of the Citizenship Clause, essentially unchanged, into the U.S. Code, *see* Nationality Act of 1940, ch. 876, § 201, 54 Stat. 1137, 1138.

By the mid-twentieth century—as Defendants concede, JA119—*Wong Kim Ark's* interpretation of the Citizenship Clause was both well-established and understood to guarantee citizenship to everyone born on United States soil, excluding only the children of tribal members, foreign diplomats, and hostile occupants. *See Lamar, Archer & Cofrin, LLP v.*

59

*Appling*, 584 U.S. 709, 721–22 (2018) (presuming the enacting Congress is "aware of the longstanding judicial interpretation of [a] phrase" that it codifies "and intend[s] for it to retain its established meaning"); *United States v. Place*, 693 F.3d 219, 229 (1st Cir. 2012). Indeed, when a member of Congress inquired whether the bill that became the 1940 Act could be amended to deny citizenship to persons living abroad "who happen to have been born here" to "alien parents" and departed the country "in early infancy" to be "brought up in the countries of their parents," all agreed that "it is not a matter we have any control over" because "no one proposed to change the Constitutional provisions." JA520–21. Their statute thus made no such change.

The INA codified Congress's understanding, informed by the longstanding *Wong Kim Ark* decision, that U.S. citizenship is the right of everyone born on United States soil, excluding only the children of foreign diplomats and hostile occupants (Congress having statutorily extended birthright citizenship to the children of tribal members sixteen years prior). The States thus succeed in showing that the Order violates 8 U.S.C. § 1401(a) as well.

**B.    The district court properly exercised its discretion in determining that the equities support relief.**

Beyond the fact that the Order patently violates the Citizenship Clause and 8 U.S.C. § 1401(a), the district court correctly determined that the remaining equitable factors—irreparable harm, balance of the equities, and public interest, *Winter*, 555 U.S. at 19–20—powerfully favor preliminary relief.  *See* Defendants' Add. 31–32 (Op. 26–27).

The district court correctly held that Defendants would not suffer any harm from a preliminary injunction in this case, because the Order "do[es] no more than maintain a status quo that has been in place for well over a century." *Id.* at 32 (Op. 27).  In contending otherwise (Br. 57–58), Defendants recycle arguments already rejected by this Court and devoid of record support.  They claim a court cannot properly enjoin implementation of a President's executive order, ignoring that the sole precedent on which they rely, *see INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Labor*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, J., in chambers), did not in fact question the ability of a court to restrain unconstitutional executive conduct if it has Article III jurisdiction over the case.  *See New Jersey*, 131 F.4th at 40–41 (at the stay pending appeal stage, rejecting Defendants' reliance on this case for that reason).

Defendants' remaining complaints are unavailing. Defendants say (Br. 58) that implementation of the Order is necessary to remove the promise of birthright citizenship as an "incentive[] to unlawful immigration" or to manage a "crisis at the southern border," but they continue to identify no evidence suggesting that birthright citizenship drives unlawful entry or is linked to any border crisis. Lacking any evidentiary support for these alleged rationales,[10] Defendants resort to citing *other* immigration-related orders which are not at issue here and make no mention of birthright citizenship. *See id.* This Court already found these arguments uncompelling, *see New Jersey*, 131 F.4th at 40–41, and Defendants provide no reason for this Court to depart from that conclusion now, *see Comcast of Me./N.H.*, 988 F.3d 607, 612 (1st Cir. 2021).

In sharp contrast, the record shows that allowing the Order to take effect would impose harms on Plaintiffs that would be both "significant" and "irreparable." Defendants' Add. 31 (Op. 26). Implementation of the

---

[10] Defendants cite amicus briefs hoping to fill those gaps. *See* Br. 58. But amici present no evidence that birthright citizenship has an impact on unauthorized immigration rates. And while some amici claim birthright citizenship enables "birth tourism" schemes, as the federal prosecutions they point to show, *id.* at 35, these schemes are already unlawful under existing federal law. *See* 22 C.F.R. § 41.31(b)(2)(i).

Order would dramatically alter the longstanding status quo—disrupting "settled law and practice spanning more than a dozen decades," *id.*—and would force Plaintiffs imminently to confront administrative challenges, incurring costs they could never recover. Plaintiffs would lose federal funding for providing critical services to children, *see supra,* pp. 14–19, would lose money from the moment of the child's birth given the foregone EAB dollars, *supra,* p. 17, and would incur costs even before a baby is born undertaking resource intensive alterations to their eligibility verification systems for these federal programs, *see supra,* pp. 18–19.

Finally, the impact on the public interest is stark and unrebutted, as the Order would render thousands of children deportable on birth and at risk of statelessness. *See* Defendants' Add. 31 (Op. 26). As this Court already held, "the public has a substantial interest in ensuring that those entitled to be recognized as U.S. citizens under the criteria on which officials at all levels of government have long relied are not unlawfully deprived of that recognition." *New Jersey*, 131 F.4th at 41.

In short, the equitable calculus here is entirely one-sided. The district court acted well within its discretion, *see eBay Inc. v. MercExchange,*

*LLC*, 547 U.S. 388, 391 (2006), in recognizing that the "scales tip decisively toward" granting preliminary relief.  Defendants' Add. 32 (Op. 27).

## III.  The district court did not abuse its discretion in granting preliminary relief, including on a nationwide basis.

This Court should reject Defendants' request (Br. 53–55) to hold that the district court abused its discretion in fashioning nationwide relief.  This Court reviews decisions regarding the scope of relief "for abuse of discretion." *DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 423 (1st Cir. 2024).  Here, the court acted well within its discretion in finding nationwide relief was justified to "provid[e] complete relief" to Plaintiffs.  Defendants' Add. 34 (Op. 29).

The record amply supports the district court's conclusion.  Below, Plaintiffs submitted multiple declarations—unrebutted by Defendants, and credited by the district court, *id.* at 30 (Op. 25)—that confirmed Plaintiffs would suffer continued pocketbook injury if children born outside of their borders were denied citizenship pursuant to the Order, *id.* at 34 (Op. 29).  Because such children may reside or later move into Plaintiffs' jurisdictions, Plaintiffs' agencies would all still have to redesign benefits eligibility verification systems to determine where each child enrolled in their benefits programs is born and whether they are eligible

citizens if born out-of-state. *See, e.g.*, JA248–50 (¶¶30–36); JA274–75 (¶¶23–25); *see also, e.g.*, 42 U.S.C. § 1320b–7(a) (requiring States who administer federally funded benefits to operate "eligibility verification system[s]"). And when Plaintiffs provide services to children who are ineligible for federally-funded benefits because their out-of-state birth was subject to the Order, they would not receive federal reimbursements to which they otherwise would be entitled. *See, e.g.*, JA247, 248 (¶¶26, 29); JA265–66 (¶¶21–24). A court order that applies only to children born in Plaintiffs' jurisdictions would thus fail to fully remedy their injuries; thus, the district court appropriately fashioned nationwide relief. Defendants' Add. 34 (Op. 29).

Defendants' argument that the district court abused its discretion because narrower, alternative injunctions are conceivable fails for two independent reasons.

*First*, Defendants forfeited the objection by failing to raise these alternatives below. Defendants now propose (Br. 54–55) that a baby's citizenship status could "turn on" when it enters Plaintiffs' jurisdictions—or at least "turn on" for purposes of the benefits Plaintiffs administer. But as this Court already held, Defendants forfeited that argument because

65

they never presented it to the district court, and thus the district court cannot have abused its discretion in failing to adopt their new proposals. *See New Jersey*, 131 F.4th at 42–43; *see also Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 680 (1st Cir. 1998) (holding defendants "forfeited the opportunity to obtain consideration of whether the preliminary injunction, as framed, is overbroad" where they never proposed narrower alternative below).  That determination "continue[s] to govern" at this "subsequent stage[] in the same case," where there has been no further factual development and the scope of relief question is the same, and it is therefore dispositive.  *Naser Jewelers, Inc. v. City of Concord*, 538 F.3d 17, 20 (1st Cir. 2008); *Comcast of Me./N.H., Inc.*, 988 F.3d at 612.

This forfeiture is not a mere technicality.  After all, district courts are "uniquely placed" to determine the relevant facts and "tailor injunctive relief" thereto.  *DraftKings*, 118 F.4th at 423.  By failing to present their proposed alternative injunctions to the district court, Defendants have deprived this Court of the benefit of a lower court's initial determination, based on adequate factual development and usual adversarial testing, as to whether these proposals are viable alternatives that would in fact avert the Plaintiffs' injuries while this litigation runs its course.

Indeed, Defendants' claims—which would require *American* citizenship to vary across state lines for the first time since the Civil War—surely requires at least some testing to assess workability.

*Second*, forfeiture aside, Defendants' proposed alternatives are not practically or legally workable on their face, and would instead impose additional harms on both the Plaintiffs and on third parties. See *Winter*, 555 U.S. at 20 (asking about harms both to the parties and to the public). The upshot of Defendants' alternatives is clear: an unprecedented situation in which a child's American citizenship would vary depending on the State in which she is present or the purpose for which her citizenship is assessed—raising serious questions of administrability and risking chaos on the ground. To illustrate, consider a Covered Child born in New Hampshire who moves to Massachusetts after birth. That child is born without lawful status and subject to deportation; she will not be assigned an SSN at birth; and if her parents seek to obtain Medicaid or other federally-funded social services for her in New Hampshire, they will be told the child lacks the citizenship or immigration status necessary to qualify.

That the child was so treated in New Hampshire results in numerous harms to Massachusetts when her family relocates there. Consider

67

that federal law requires, as a condition on a State's receipt of CHIP funds, that the State conduct targeted outreach to "families of children likely to be eligible for [CHIP]" and help them to enroll.  42 U.S.C. § 1397bb(c)(1); *see id.* § 1397bb(a)(3), (6); 42 U.S.C. § 1397ff(d)(1).  Under Defendants' proposed injunctions, this outreach will be especially difficult with respect to families of Covered Children born outside of the Plaintiffs' jurisdictions, who will have been told at birth they are not citizens and are ineligible for these benefits.

Further, setting aside the new obstacles Defendants' injunctions impose on Plaintiffs' outreach obligations, their proposals introduce administrative burdens into the benefits enrollment process.  Federal law requires States to administer Medicaid, TANF, and SNAP benefits and to operate eligibility verification systems for these programs.  42 U.S.C. § 1320b-7(a), (b)(1), (b)(2), (b)(4).  As part of their verification processes, States must "require … that each applicant for or recipient of benefits … furnish to the State his social security account number," which is used, among other things, to verify the applicants' submissions and prevent duplication of benefits.  *Id.* § 1320b-7(a)(1); *see* 7 U.S.C. 2025(e); 7 C.F.R. § 272.4(e)(1).  Yet under Defendants' proposals, children who otherwise

would have been assigned an SSN at birth through EAB will arrive in Plaintiffs' jurisdictions without SSNs. When they seek Medicaid, TANF, or SNAP benefits, the States will be unable to fully process those applications until their families procure SSNs for these children, and must expend resources assisting families in this procurement. *See, e.g.*, 42 C.F.R. § 435.910(e)(1).

Had Defendants raised their proposed alternatives below, the district court could have considered the factual and administrative complications they raise, and evaluated the proper scope of equitable relief, duly considering "what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017). The parties and the court would have been able to explore whether, under this proposal, a baby's citizenship would turn on when she crosses state lines—and thus whether (for instance) an ICE removal proceeding that had already begun would now have to stop at the state border. And the parties and court would have been able to explore whether, under this proposal, citizenship could turn back "off" when someone leaves the Plaintiffs States— meaning that ICE removal proceeding could start again. But because Defendants failed to do so, and thus provided no answers to any of the

69

above questions, they cannot complain to this Court that a narrower alternative was available but refused.  This Court should reject Defendants' argument that the district court abused its discretion in fashioning nationwide relief.

## CONCLUSION

The Court should affirm the preliminary injunction.

May 21, 2025

Respectfully submitted.

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*

Gerard J. Cedrone
  *Deputy State Solicitor*
Jared B. Cohen
  *Assistant Attorney General*
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Counsel for the Commonwealth
  of Massachusetts*


ROB BONTA
  *Attorney General of California*

Christopher D. Hu
  *Deputy Solicitor General*
Michael L. Newman
  *Senior Assistant Atty. Gen.*
Marissa Malouff
Irina Trasovan
  *Supervising Deputy Attys. Gen.*
Denise Levey
Lorraine López
Delbert Tran
Annabelle Wilmott
  *Deputy Attorneys General*
455 Golden Gate Ave., Ste. 11000
San Francisco, CA 94102
(415) 510-3917
christopher.hu@doj.ca.gov

*Counsel for the State of California*

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*

Jeremy M. Feigenbaum
  *Solicitor General*
Shankar Duraiswamy
  *Deputy Solicitor General*
Viviana M. Hanley
Elizabeth R. Walsh
Shefali Saxena
  *Deputy Attorneys General*
25 Market Street
Trenton, NJ 08625
(862) 350-5800
viviana.hanley@njoag.gov

*Counsel for the
  State of New Jersey*

71

PHIL WEISER
  *Attorney General of Colorado*

Shannon Stevenson
  *Solicitor General*
Office of the Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
shannon.stevenson@coag.gov

*Counsel for the State of Colorado*


KATHLEEN JENNINGS
  *Attorney General of Delaware*

Ian R. Liston
  *Director of Impact Litigation*
Vanessa L. Kassab
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

WILLIAM M. TONG
  *Attorney General of Connecticut*

Janelle Rose Medeiros
  *Assistant Attorney General*
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020
janelle.medeiros@ct.gov

*Counsel for the*
  *State of Connecticut*


BRIAN L. SCHWALB
  *Attorney General*
  *for the District of Columbia*

Caroline S. Van Zile
  *Solicitor General*
Jeremy R. Girton
  *Assistant Attorney General*
Office of the Attorney General
400 Sixth Street, N.W.
Washington, DC 20001
(202) 724-6609
caroline.vanzile@dc.gov

*Counsel for the*
  *District of Columbia*

ANNE E. LOPEZ
  *Attorney General of Hawai'i*

Kaliko'onālani D. Fernandes
  *Solicitor General*
Office of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawai'i*


ANTHONY G. BROWN
  *Attorney General of Maryland*

Julia Doyle
  *Solicitor General*
Adam D. Kirschner
  *Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
akirschner@oag.state.md.us
(410) 576-6424

*Counsel for the State of Maryland*

AARON M. FREY
  *Attorney General of Maine*

Thomas A. Knowlton
  *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
thomas.a.knowlton@maine.gov

*Counsel for the State of Maine*


DANA NESSEL
  *Attorney General of Michigan*

Toni L. Harris
Neil Giovanatti
Stephanie M. Service
  *Assistant Attorneys General*
Department of Attorney General
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
harrist19@michigan.gov

*Counsel for Attorney General Dana Nessel on behalf of the People of Michigan*

KEITH ELLISON
  *Attorney General of Minnesota*

John C. Keller
  *Chief Deputy Attorney General*
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
651-757-1355
john.keller@ag.state.mn.us

*Counsel for the State of Minnesota*

AARON D. FORD
  *Attorney General of Nevada*

Heidi Parry Stern
  *Solicitor General*
Office of the Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Counsel for the State of Nevada*

RAÚL TORREZ
  *Attorney General of New Mexico*

James W. Grayson
  *Chief Deputy Attorney General*
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 218-0850
jgrayson@nmdoj.gov

*Counsel for the*
  *State of New Mexico*

LETITIA JAMES
  *Attorney General of New York*

Ester Murdukhayeva
  *Deputy Solicitor General*
Matthew William Grieco
  *Senior Assistant Solicitor Gen.*
Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-6279
ester.murdukhayeva@ag.ny.gov

*Counsel for the*
  *State of New York*

JEFF JACKSON
  *Attorney General of North Carolina*

Daniel P. Mosteller
  *Associate Deputy Attorney General*
Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov

*Counsel for the*
  *State of North Carolina*

PETER F. NERONHA
  *Attorney General of Rhode Island*

Katherine Connolly Sadeck
  *Solicitor General*
Office of the Attorney General
150 South Main Street
Providence, RI  02903
(401) 274-4400, Ext. 2480
ksadeck@riag.ri.gov

*Counsel for the*
  *State of Rhode Island*

CHARITY R. CLARK
  *Attorney General of Vermont*

Jonathan T. Rose
  *Solicitor General*
109 State Street
Montpelier, VT 06509
(802) 793-1646
jonathan.rose@vermont.gov

*Counsel for the State of Vermont*


DAVID CHIU
  *City Attorney of San Francisco*

David S. Louk
  *Deputy City Attorney*
1390 Market Street, 6th Floor
City Attorney of San Francisco
San Francisco, CA 94102
(415) 505-0844
david.louk@sfcityatty.org

*Counsel for the City and
  County of San Francisco*

JOSHUA L. KAUL
  *Attorney General of Wisconsin*

Gabe Johnson-Karp
  *Assistant Attorney General*
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707
(608) 267-8904
johnsonkarpg@doj.state.wi.us

*Counsel for the State of Wisconsin*

## CERTIFICATE OF COMPLIANCE

On May 16, 2025, this Court granted Appellees' motion to file an oversized principal brief containing up to 15,000 words. This brief complies with that limitation because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 14,416 words.

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word in Century Schoolbook, a proportionally spaced typeface.

May 21, 2025

/s/ *Viviana Hanley*
Deputy Attorney General

# ADDENDUM

# CONTENTS OF ADDENDUM

**Historical Sources:**                                                      **Page**

Alexander P. Morse,
  *A Treatise on Citizenship* 248 (1881) ..................................... Add. 1

Emer de Vattel,
  *Law of Nations* § 212-14 (6th Am. ed. 1844).......................... Add. 3

Hannis Taylor,
  *Treatise on International Public Law* 220-21 (1901)............. Add. 6

Noah Webster,
  *An American Dictionary of the English Language* 35
  (George & Charles Merriam 1860) ........................................ Add. 9

Spanish Treaty Claims Comm'n,
  U.S. Dep't of Justice, *Final Report of William Wallace Brown,*
  *Assistant Attorney-General* 119-25 (1910) ........................... Add. 12

The Congressional Globe,
  *The Debates & Proceedings of the First Session of the 39th*
  *Congress* 2769 (F. & J. Rives 1866) ..................................... Add. 21

A

# TREATISE ON CITIZENSHIP,

## BY BIRTH AND BY NATURALIZATION,

WITH REFERENCE TO THE

## LAW OF NATIONS, ROMAN CIVIL LAW,

## LAW OF THE UNITED STATES OF AMERICA,

AND THE

## LAW OF FRANCE;

INCLUDING PROVISIONS IN THE FEDERAL CONSTITUTION, AND IN
THE SEVERAL STATE CONSTITUTIONS, IN RESPECT OF
CITIZENSHIP; TOGETHER WITH DECISIONS
THEREON OF THE FEDERAL AND
STATE COURTS.

BY

## ALEXANDER PORTER MORSE,

OF WASHINGTON, D.C.

BOSTON:
LITTLE, BROWN, AND COMPANY.
1881.

Generated on 2025-05-21 10:15 GMT / https://hdl.handle.net/2027/wu.89098880444
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Add. 001

Digitized by Google

Original from
UNIVERSITY OF WISCONSIN

248            A TREATISE ON CITIZENSHIP.

United States without being a citizen of any state.[1] Women
may be citizens.[2] This section does not confer citizenship
upon persons of foreign birth.[3] The words 'subject to the
jurisdiction thereof' exclude the children of foreigners tran-
siently within the United States, as ministers, consuls, or
subjects of a foreign nation.[4] This amendment does not in-
clude Indians and others not born in and subject to the juris-
diction of the United States;[5] but an Indian, if taxed, after
tribal relations have been abandoned, is a citizen.[6] Colored
persons, equally with whites, are citizens;[7] but an escaped
slave, resident in Canada, or his children, are not citizens.[8]
This section recognizes the difference between citizens of the
United States and citizens of the state.[9] The main purpose
of this section was to establish the citizenship of the negro.[10]
This clause applies only to citizens removing from one state
to another.[11] The purpose of this amendment was to secure
to the colored race in the South the benefit of the freedom
previously accorded to them.[12] Privileges and immunities of
citizens include such as are derived from, or recognized by,
the Constitution,[13] and are not identical with those referred
to in Sect. 2 of Art. 4.[14] This amendment adds nothing

[1] Slaughter House Cases, 16 Wall. 74; United States *v.* Cruikshank, 92
U. S. 543, 1 Woods, 308; Cully *v.* Baltimore, etc. R. R. Co., 1 Hughes, 536.

[2] Miner *v.* Happersett, 21 Wall. 162.

[3] Van Valkenburgh *v.* Brown, 43 Cal. 43.

[4] Slaughter House Cases, 16 Wall. 73.

[5] McKay *v.* Campbell, 2 Sawy. 129.

[6] United States *v.* Elm, 23 Int. Rev. Rec. 419.

[7] *In re* Turner, 1 Abb. U. S. 84.

[8] Hedgman *v.* Board, 26 Mich. 51.

[9] Frasher *v.* State, 3 Tex. Ct. App. 267.

[10] Slaughter House Cases, 16 Wall. 36; Frasher *v.* State, 3 Tex. Ct. App.
267.

[11] *Ex parte* Hobbs, 1 Woods, 542; Live Stock, etc. Asso. *v.* Crescent City,
1 Abb. U. S. 397.

[12] Slaughter House Cases, 16 Wall. 71.

[13] State *v.* McCann, 21 Ohio St. 198.

[14] Slaughter House Cases, 16 Wall. 75. The meaning of "privileges" in
art. 4, sect. 2 (1) is such as each state gave to its own citizens; while its

Generated on 2025-04-27 21:22 GMT / https://hdl.handle.net/2027/wu.89098800444
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google          Original from
                             UNIVERSITY OF WISCONSIN

# THE

# LAW OF NATIONS;

OR

## Principles of the Law of Nature,

APPLIED TO

## THE CONDUCT AND AFFAIRS

OF

# NATIONS AND SOVEREIGNS.

————◆————

FROM THE FRENCH

OF

## MONSIEUR DE VATTEL.

————◆————

Nihil est enim illi principi Deo, qui omnem hunc mundum regit, quod quidem in terris fiat, acceptius, quam concilia cœtusque hominum jure sociati, quæ civitates appellantur."— CICER. SOMN. SCIPION. REG. ED. t. IV. 422.

————————————

SIXTH AMERICAN EDITION,

FROM

## A New Edition,

BY

## JOSEPH CHITTY, Esq.

BARRISTER AT LAW.

————————————

PHILADELPHIA:
T. & J. W. JOHNSON, LAW BOOKSELLERS,
SUCCESSORS TO NICKLIN & JOHNSON,
NO. 5, MINOR STREET.

1844.

Add. 003

169    Document: 00118290433    Page: 95    Date Filed: 05/21/2025    Entry ID

cal laws, or treaties make no distinction between them, every thing said of the territory of a nation, must also extend to its colonies.

## CHAP. XIX.

### OF OUR NATIVE COUNTRY, AND SEVERAL THINGS THAT RELATE TO IT.

§ 211. What is our country.
§ 212. Citizens and natives.
§ 213. Inhabitants.
§ 214. Naturalization.
§ 215. Children of citizens born in a foreign country.
§ 216. Children born at sea.
§ 217. Children born in the armies of the state, or in the house of its minister at a foreign court.
§ 218. Settlement.
§ 219. Vagrants.
§ 220. Whether a person may quit his country.
§ 221. How a person may absent himself for a time.
§ 222. Variation of the political laws in this respect.

These must be obeyed.
§ 223. Cases in which a citizen has a right to quit his country.
§ 224. Emigrants.
§ 225. Sources of their right.
§ 226. If the sovereign infringes their right, he injures them.
§ 227. Supplicants.
§ 228. Exile and banishment.
§ 229. The exile and banished man have a right to live somewhere.
§ 230. Nature of this right.
§ 231. Duty of nations towards them.
§ 232. A nation cannot punish them for faults committed out of its territories.
§ 233. Except such as affect the common safety of mankind.

§ 211. THE whole of the countries possessed by a nation and subject to its laws, forms, as we have already said, its territory, and is the common country of all the individuals of the nation. We have been obliged to anticipate the definition of the term, *native country* (§ 122), because our subject led us to treat of the love of our country—a virtue so excellent and so necessary in a state. Supposing, then, this definition already known, it remains that we should explain several things that have a relation to this subject, and answer the questions that naturally arise from it.

§ 212. The citizens are the members of the civil society; bound to this society by certain duties, and subject to its authority, they equally participate in its advantages. The natives, or natural-born citizens, are those born in the country, of parents who are citizens. As the society cannot exist and perpetuate itself otherwise than by the children of the citizens, those children naturally follow the condition of their fathers, and succeed to all their rights. The society is supposed to desire this, in consequence of what it owes to its own preservation; and it is presumed, as matter of course, that each citizen, on entering into society, reserves to his children the right of becoming members of it. The country of the fathers is therefore that of the children; and these become true citizens merely by their tacit consent. We shall soon see whether, on their coming to the years of discretion, they may renounce their right, and what they owe to the society in which they were born. I say, that,

in order to be of the country, it is necessary that a person be born of a father who is a citizen; for, if he is born there of a foreigner, it will be only the place of his birth, and not his country.

§ 213. *The inhabitants, as distinguished from citizens, are foreigners, who are permitted to settle and stay in the country. Bound to the society by the residence, they are subject to the laws of the state while they reside in it; and they are obliged to defend it, because it grants them protection, though they do not participate in all the rights of citizens. They enjoy only the advantages which the law or custom gives them. The *perpetual inhabitants* are those who have received the right of perpetual residence. These are a kind of citizens of an inferior order, and are united to the society without participating in all its advantages. Their children follow the condition of their fathers; and, as the state has given to these the right of perpetual residence, their right passes to their posterity.

§ 214. A nation, or the sovereign who represents it, may grant to a foreigner the quality of citizen, by admitting him into the body of the political society. This is called *naturalization*(58). There are some states in which the sovereign cannot grant to a foreigner all the rights of citizens,—for example, that of holding public offices—and where, consequently, he has the power of granting only an imperfect naturalization. It is here a regulation of the fundamental law, which limits the power of the prince. In other states, as in England and Poland, the prince cannot naturalize a single person, without the concurrence of the nation represented by its deputies. Finally, there are states, as, for instance, England, where the single circumstance of being born in the country, naturalizes the children of a foreigner.

§ 215. It is asked whether the children born of citizens in a foreign country are citizens? The laws have decided this question in several countries, and their regulations must be followed(59). By the law of nature alone, children follow the condition of their fathers, and enter into all their rights (§ 212); the place of birth produces no change in this particular, and cannot, of itself, furnish any reason for taking from a child what nature has given him; I say " of itself," for, civil or political laws may, for particular reasons, ordain otherwise. But I suppose that the father has not entirely quitted his country in order to settle elsewhere. If he has fixed his abode in a foreign country, he is become a member of another society, at least as a perpetual inhabitant; and his children will be members of it also.

§ 216. As to children born at sea, if they are born in those parts of it that are possessed by their nation, they are born in the country: if it is on the open sea, there is no reason to make a distinction between them

---

(58) See fully in general, and of Naturalization in Great Britain in particular, 1 Chitty's Commercial Law, 123 to 131; 1 Bla. Com. 369, Bac. Ab. Aliens. A naturalization in a foreign country, without licence, will not discharge a natural-born subject from his allegiance, 2 Chalmer's Col. Opin. 363. But a natural-born subject of England, natu-

ralized in America, was holden to be entitled to trade as an American subject to the East Indies, 8 Term. Rep. 39, 43, 45; and see Reeves, 2nd ed. 328, 330, and 37 Geo. 3, c. 97.—C.

(59) See 1 Chitty's Commercial Law, 114, n. 1; 115, n. 1.

[*102]

# A  TREATISE

ON

# INTERNATIONAL  PUBLIC  LAW

BY

## HANNIS TAYLOR, LL. D.

LATE MINISTER PLENIPOTENTIARY OF THE UNITED STATES TO SPAIN;
AUTHOR OF "THE ORIGIN AND GROWTH OF THE ENGLISH CONSTI-
TUTION;" A MEMBER OF THE GENERAL ADVISORY COMMIT-
TEE OF THE AMERICAN ACADEMY OF POLIT-
ICAL AND SOCIAL SCIENCE.

———

CHICAGO
CALLAGHAN & COMPANY
1901

Add. 006

national character of a child depended primarily upon the national character of the parents, and not upon the place of birth. With the growth of feudalism, which brought about a far more intimate connection between the individual and the soil upon which he was born, the Roman theory was so far modified by the idea of locality that it became "the rule of Europe"[41] for states, within whose limits children were born to subjects of foreign powers, to consider such children as natives solely by virtue of the place of their birth. The reaction against that doctrine, which has finally established as a general rule the principle that children of aliens remain aliens by virtue of the status of their parents, dates from the establishment of the Code Napoleon providing that the nationality of a child shall follow that of its parents. The new doctrine thus announced has gradually worked its way into the codes of most civilized states, either in its entirety or with such modifications as protect children against the effects of the old rule by arming them with the power to choose their own nationality.[42] Austria-Hungary, Belgium, Costa Rica, Denmark, Germany, Greece, Norway, Roumania, Russia, Servia, Spain, Sweden, Switzerland and Salvador, which claim children of their subjects as subjects wherever born, admit the corresponding principle that the national character of a child depends upon that of his parents and not upon the place of his birth. The greater number of the South American states cling to the old rule, while England, France, the Netherlands, Portugal and the United States, which uphold to a greater or less extent its theory, avoid its effects by giving in various forms to children born of aliens the right to elect on attaining their majority either the nationality of their parents or that of the country in which they were born. So generally has that just principle been recognized by the more important states that it may now be regarded as the prevailing rule upon the subject.

§ 178. **The old rule in the U. S.**—Few states have done less to abrogate the old rule than the United States. The Fourteenth Amendment provides that "all persons born or naturalized in the United States, and *subject to the jurisdiction thereof,* are citizens of the United States and of the state

[41] Demolombe, *Cours de Code Napoléon,* liv. 1, tit. 1, ch. 1, No. 146. For the old law of France,

see Pothier, *Des Personnes et des Choses.* pt. 1, tit. 1i, sec. 1.

[42] Hall, pp. 234-238.

wherein they reside." By section 1992 of the Revised Statutes "all persons born in the United States *and not subject to any foreign power,* excluding Indians not taxed, are declared to be citizens of the United States." It is therefore clear that Indians not taxed and all persons who fall within the clauses italicized are not citizens within the terms either of the constitution or statute. It appears, therefore, that children born in the United States to foreigners here on transient residence are not citizens, because by the law of nations they were not at the time of their birth "subject to the jurisdiction." [43] When the question is asked as to the status of children born here to domiciled aliens, the only answer that can be made—in the absence of an affirmative statute giving them the right of election upon attaining their majority—is that they are provisionally citizens of the United States, until they voluntarily renounce that character after they have become of full age. It has been held by the department of state that minor children, born in this country to naturalized citizens, after visiting Germany temporarily, are entitled to passports to return to this country upon the eve of their majority;[44] and that a person born here, although he was immediately carried abroad by his parents, has the right to elect the nationality of the United States when he arrives at full age.[45] On the other hand it has been declared by the same authority that a child born here to French parents, who goes during his minority to France, and there remains voluntarily after he attains his majority, will be held to have abjured his American nationality,[46]—and that a child born here to a foreign father, when taken by him abroad, acquires his domicil and nationality.[47]

§ **179. Domicil of dependent persons.**—During the lifetime of the father his domicil remains that of his legitimate or legitimated minor child; after the father's death the domicil of such minor is that of the mother while he lives with her; after the death of both parents the domicil of such minor, or of an illegitimate minor after his mother's death, is probably that of the

[43] Cf. Wharton, Int. Law Dig. vol. II, § 183.

[44] Mr. Evarts, Sec. of State, to Mr. White, April 23, 1880, Mss. Inst. Germ.

[45] Mr. Evarts, Sec. of State, to Mr. Cramer, Nov. 12, 1880, Mss. Inst. Denmark; and the same to Mr. Hitt, Feb. 10, 1880, Mss. Inst. France.

[46] Mr. Evarts, Sec. of State, to Mr. Noyes, Dec. 31, 1878, Mss. Inst. France.

[47] Mr. Frelinghuysen, Sec. of State, to Mr. Cramer, June 4, 1883, Mss. Inst., Switz.

# AN
# AMERICAN DICTIONARY
### OF THE
# ENGLISH LANGUAGE;

CONTAINING

THE WHOLE VOCABULARY OF THE FIRST EDITION IN TWO VOLUMES QUARTO; THE ENTIRE CORRECTIONS
AND IMPROVEMENTS OF THE SECOND EDITION IN TWO VOLUMES ROYAL OCTAVO;

TO WHICH IS PREFIXED

## AN INTRODUCTORY DISSERTATION

ON THE ORIGIN, HISTORY, AND CONNECTION, OF THE LANGUAGES OF WESTERN ASIA AND EUROPE, WITH
AN EXPLANATION OF THE PRINCIPLES ON WHICH LANGUAGES ARE FORMED.

## BY NOAH WEBSTER, LL.D.,

*Member of the American Philosophical Society in Philadelphia; Fellow of the American Academy of Arts and Sciences in Massachusetts;
Member of the Connecticut Academy of Arts and Sciences; Fellow of the Royal Society of Northern Antiquaries in Copenhagen;
Member of the Connecticut Historical Society; Corresponding Member of the Historical Societies in Massachusetts,
New York, and Georgia; of the Academy of Medicine in Philadelphia, and of the Columbian Institute
in Washington; and Honorary Member of the Michigan Historical Society.*

### GENERAL SUBJECTS OF THIS WORK.

I.—ETYMOLOGIES OF ENGLISH WORDS, DEDUCED FROM AN EXAMINATION AND COMPARISON OF WORDS OF CORRESPONDING ELE-
MENTS IN TWENTY LANGUAGES OF ASIA AND EUROPE.
II.—THE TRUE ORTHOGRAPHY OF WORDS, AS CORRECTED BY THEIR ETYMOLOGIES.
III.—PRONUNCIATION EXHIBITED AND MADE OBVIOUS BY THE DIVISION OF WORDS INTO SYLLABLES, BY ACCENTUATION, BY
MARKING THE SOUNDS OF THE ACCENTED VOWELS, WHEN NECESSARY, OR BY GENERAL RULES.
IV.—ACCURATE AND DISCRIMINATING DEFINITIONS, ILLUSTRATED, WHEN DOUBTFUL OR OBSCURE, BY EXAMPLES OF THEIR USE
SELECTED FROM RESPECTABLE AUTHORS, OR BY FAMILIAR PHRASES OF UNDISPUTED AUTHORITY.

## REVISED AND ENLARGED,

### BY CHAUNCEY A. GOODRICH,

PROFESSOR IN YALE COLLEGE.

WITH PRONOUNCING VOCABULARIES OF SCRIPTURE, CLASSICAL, AND GEOGRAPHICAL NAMES.

TO WHICH ARE NOW ADDED

# PICTORIAL ILLUSTRATIONS,

TABLE OF SYNONYMS, PECULIAR USE OF WORDS AND TERMS IN THE BIBLE, APPENDIX OF NEW WORDS,
PRONOUNCING TABLE OF NAMES OF DISTINGUISHED PERSONS, ABBREVIATIONS, LATIN,
FRENCH, ITALIAN, AND SPANISH PHRASES, ETC.

## SPRINGFIELD, MASS.
### PUBLISHED BY GEORGE AND CHARLES MERRIAM,
CORNER OF MAIN AND STATE STREETS.

1860.

PE1625
.W3
1860

Entered according to Act of Congress, in the Year 1840.
By NOAH WEBSTER, LL. D.,
In the Clerk's Office of the District Court of the District of Connecticut.

Entered according to Act of Congress, in the Year 1847,
By GEORGE AND CHARLES MERRIAM,
In the Clerk's Office of the District Court of the District of Massachusetts.

Entered according to Act of Congress, in the Year 1856,
By EMILY W. ELLSWORTH, JULIA W. GOODRICH,
WILLIAM G. WEBSTER, ELIZA S. W. JONES,
and LOUISA WEBSTER,
In the Clerk's Office of the District Court of the District of Connecticut

Entered according to Act of Congress, in the Year 1859.
BY G. & C. MERRIAM,
In the Clerk's Office of the District Court of the District of Massachusetts.

STEREOTYPED AT THE
BOSTON TYPE AND STEREOTYPE FOUNDRY.

MANUFACTURED BY
CASE, LOCKWOOD & CO.,
HARTFORD, CONN.

Gift
Mrs. Truxtun Bea
Jan. 18, 1937

| ALL | ALL | ALL |

ALL-COM-PRE-HEN'SIVE, a. Comprehending all things. *Glanville.*

ALL-CON-CEAL'ING, a. Hiding or concealing all. *Spenser.*

ALL-CON'QUER-ING, (-konk'er-,) a. That subdues all. *Milton.*

ALL-CON'SCIOUS, a. Conscious of all; all-knowing.

ALL-CON-STRAIN'ING, a. Constraining all. *Drayton.*

ALL-CON-SUM'ING, a. That consumes or devours all. *Pope.*

ALL-CON-TROLL'ING, a. Controlling all. *Everett.*

ALL-DAR'ING, a. Daring to attempt every thing. *Jonson.*

ALL-DE-SIGN'ING, a. Designing all things.

ALL-DE-STROY'ING, a. Destroying every thing. *Fanshaw.*

ALL-DE-VAS-TA'TING, a. Wasting every thing.

ALL-DE-VOUR'ING, a. Eating or consuming all. *Pope.*

ALL-DIM'MING, a. Obscuring every thing. *Marston.*

ALL-DI-RECT'ING, a. Directing all; governing all things.

ALL-DIS-CERN'ING, a. Discerning every thing.

ALL-DIS-COV'ER-ING, a. Discovering or disclosing every thing. *More.*

ALL-DIS-GRA'CED, a. Completely disgraced. *Shak.*

ALL-DIS-PENS'ING, a. Dispensing all things; affording dispensation or permission. *Milton.*

ALL-DI-VINE', a. Supremely excellent. *Howell.*

ALL-DI-VIN'ING, a. Foretelling all things. *Fanshaw.*

ALL-DREAD'ED, a. Dreaded by all. *Shak.*

ALL-EF-FI-CA'CIOUS, a. Having all efficacy. *Everett.*

ALL-EF-FI"CIENT, a. Of perfect or unlimited efficiency or efficiency.

ALL-EL'O-QUENT, a. Eloquent in the highest degree. *Pope.*

ALL-EM-BRA'CING, a. Embracing all things.

ALL-END'ING, a. Putting an end to all things. *Shak.*

ALL-EN-LIGHT'EN-ING, a. Enlightening all things. *Cotton.*

ALL-EN-RA'GED, a. Highly enraged. *Hall.*

ALL-ES-SEN'TIAL, a. Wholly essential. *Everett.*

ALL-FLAM'ING, a. Flaming in all directions. *Beaumont.*

ALL-FOOLS'-DAY, n. The first of April.

ALL-FOR-GIV'ING, a. Forgiving or pardoning all. *Dryden.*

ALL-FOURS', n. [all and four.]
A game at cards, played by two or four persons; so called from the four chances of which it consists, viz. High, Low, Jack, and the Game.
*To go on all fours,* is to move or walk on four legs, or on the two legs and two arms.

ALL-GIV'ER, n. The giver of all things. *Milton.*

ALL-GLO'RI-OUS, a. Glorious to the full extent.

ALL-GOOD', a. Completely good. *Dryden.*

ALL-GOOD', n. The popular name of the plant Good-Henry, or English Mercury, *Chenopodium bonus Henricus.*

ALL-GRA'CIOUS, a. Perfectly gracious.

ALL-GUID'ING, a. Guiding or conducting all things.

ALL-HAIL', excl. [all and Sax. hæl, health.]
All health; a phrase of salutation, expressing a wish of all health, or safety, to the person addressed.

ALL-HAL'LOW, n. All-Saints-day, the first of November. [Obsolete.]

ALL-HAL'LOWS, } November; a feast dedicated to all the saints in general. [Colloquial.]

ALL-HAL'LOW-TIDE, n. [Tid, in Sax., is time.] The time near All-Saints, or November first.

ALL-HAP'PY, a. Completely happy.

ALL-HEAL', n. The popular name of several plants.

ALL-HEAL'ING, a. Healing all things. *Selden.*

ALL-HELP'ING, a. Assisting all. *Selden.*

ALL-HID'ING, a. Concealing all things. *Shak.*

ALL-HOL'LOW, adv. Entirely; completely; as, to beat any one *all-hollow.*

ALL-HO'LY, a. Completely, perfectly holy.

ALL-HON'OR-ED, (-on'ord,) a. Honored by all.

ALL-HURT'ING, a. Hurting all things. *Shak.*

ALL-I'DOL-IZ-ING, a. Worshiping every thing. *Crashaw.*

ALL-IL-LU'MIN-A-TING, a. Enlightening every thing.

ALL-IM'I-TA-TING, a. Imitating every thing. *More.*

ALL-IM-POR'TANT, a. Important above all things.

ALL-IM-PRES'SIVE, a. Impressive to the utmost extent. *Everett.*

ALL-IN-FORM'ING, a. Actuating all by vital power. *Sandys.*

ALL-IN-TER-EST'ING, a. Interesting in the highest degree.

ALL-IN-TER'PRET-ING, a. Explaining all things. *Milton.*

ALL-JUDG'ING, a. Judging all; possessing the sovereign right of judging. *Rowe.*

ALL-JUST', a. Perfectly just.

ALL-KIND', a. Perfectly kind or benevolent.

ALL-KNOW'ING, a. Having all knowledge; omniscient. *Atterbury.*

ALL-LI'CENS-ED, a. Licensed to every thing. *Shak.*

ALL-LOV'ING, a. Of infinite love. *More.*

ALL-MAK'ING, a. Making or creating all; omnific. *Dryden.*

ALL-MA-TUR'ING, a. Maturing all things. *Dryden.*

ALL-MER'CI-FUL, a. Of perfect mercy or compassion.

ALL-MUR'DER-ING, a. Killing or destroying every thing. *Fanshaw.*

ALL-O-BE'DI-ENT, a. Entirely obedient. *Crashaw.*

ALL-O-BEY'ING, a. [See OBEY.] Receiving obedience from all. *Shak.*

ALL-OB-LIV'I-OUS, a. Causing total oblivion. *Shak.*

ALL-OB-SCUR'ING, a. Obscuring every thing. *King.*

ALL-PA'TIENT, a. Enduring every thing without murmurs. *Milford.*

ALL-PEN'E-TRA-TING, a. Penetrating every thing. *Stafford.*

ALL-PER'FECT, a. Completely perfect; having all perfection.

ALL-PER'FECT-NESS, n. The perfection of the whole; entire perfection. *More.*

ALL-PER-VAD'ING, a. Pervading every place.

ALL-PIER'CING, a. Piercing every thing. *Marston.*

ALL-PO'TENT, a. Having all power. *Irving.*

ALL-POW'ER-FUL, a. Almighty; omnipotent. *Swift.*

ALL-PRAIS'ED, a. Praised by all. *Shak.*

ALL-PRES'ENT, a. Omnipresent.

ALL-PRO-TECT'ING, a. Furnishing complete protection.

ALL-RUL'ING, a. Governing all things. *Milton.*

ALL-SA-GA'CIOUS, a. Having all sagacity; of perfect discernment.

ALL-SAINTS'-DAY, n. The first day of November, called, also, *All-hallows;* a feast in honor of all the saints.

ALL-SANC'TI-FY-ING, a. Sanctifying the whole. *West.*

ALL-SAV'ING, a. Saving all. *Selden.*

ALL-SEARCH'ING, (-sèrch'ing,) a. Pervading and searching every thing. *Selden.*

ALL-SEE'ING, a. Seeing every thing. *Dryden.*

ALL-SEER', n. One that sees every thing. *Shak.*

ALL-SHAK'ING, a. Shaking all things. *Shak.*

ALL-SHROUD'ING, a. Shrouding; covering all things.

ALL-SHUN'NED, a. Shunned by all. *Shak.*

ALL-SOULS'-DAY, n. The second day of November; a feast of solemnity held by the Roman Catholic church, to supplicate for the souls of the faithful deceased.

ALL'SPICE, n. The berry of the pimento, a tree of the West Indies; a spice of a mildly pungent taste, and agreeably aromatic. It has been supposed to combine the flavor of cinnamon, nutmegs, and cloves; and hence the name.
*Encyc. of Dom. Econ.*

ALL-SUB-MIS'SIVE, a. Wholly submissive.

ALL-SUF-FI"CIEN-CY, n. Complete or infinite ability. *Hall.*

ALL-SUF-FI"CIENT, a. Sufficient to every thing; infinitely able. *Hooker.*

ALL-SUF-FI"CIENT, n. The all-sufficient Being; God. *Whitlock.*

ALL-SUR-ROUND'ING, a. Encompassing the whole.

ALL-SUR-VEY'ING, (-sur-va'ing,) a. [See SURVEY.] Surveying every thing. *Sandys.*

ALL-SUS-TAIN'ING, a. Upholding all things. *Beaumont.*

ALL-TELL'ING, a. Telling or divulging every thing. *Shak.*

ALL-TRI'UMPH-ING, a. Triumphant every where or over all. *Jonson.*

ALL-WATCH'ED, a. Watched throughout. *Shak.*

ALL-WISE', a. Possessed of infinite wisdom. *South.*

ALL-WIT'TED, a. Having all kinds of wit. *Jonson.*

ALL-WOR'SHIP-ED, (-wur'shipt,) a. Worshiped or adored by all. *Milton.*

ALL'-WOR'THY, a. Of infinite worth; of the highest worth.

ALL-LA-GITE, n. An impure, brownish variety of manganese spar. *Dana.*

AL'LAH, n. The Arabic name of the Supreme Being.

AL'LAN-ITE, n. An ore of the metals cerium and lanthanum, having a pitch-black or brownish color. It was first discovered, as a species, by Mr. Allan, of Edinburgh. *Dana.*

AL-LAN-TO'IC, a. Pertaining to or contained in the allantois.

AL-LAN-TO'IC AC'ID, n. An acid of animal origin, found in the liquor of the allantois of the fetal calf. [See ALLANTOIS.] This is the same acid which was formerly called *amniotic acid.*

AL-LAN-TOIS', } n. [Gr. αλλας, a sausage, and
AL-LAN-TOID', } ειδος, form.]
A thin membrane, situated between the chorion and amnion in quadrupeds, and forming one of the membranes which invest the fetus in those animals. *Ed. Encyc.*

AL'LA-TRATE, v. i. [L. *allatro.*] To bark, as a dog. [*Not used.*] *Stubbes.*

AL-LAY', v. t [Sax. *alecgan, alegan,* to lay, to set, to depress, *leegan,* to lay, to cast or strike down; Ic. *legen,* D. *leggen,* to lay; Gr. λεγω. The Fr. *alier,* to alloy, Sp. *ligar,* seems to be directly from the L. *ligo,* to bind; but this may be the same word differently applied, that is, to set, to fix, to make fast, to unite. *Alloy* and *alloy* were formerly used indifferently; but I have recognized an entire distinction between them, applying *alloy* to metals.]
1. To make quiet; to pacify or appease; as, to *allay* the tumult of the passions, or to *allay* civil commotions.
2. To abate, mitigate, subdue, or destroy; as, to *allay* grief or pain.
Females, who soften and allay the bitterness of adversity. *Smole.*
3. To obtund or repress, as acrimony; as, to *allay* the acrid qualities of a substance.
4. Formerly, to reduce the purity of; as, to *allay* metals. But in this sense *alloy* is now exclusively used. [See ALLOY.]

AL-LAY', n. Formerly, a baser metal mixed with a finer; but in this sense it is now written ALLOY, which see.
2. That which allays, or abates the predominant qualities; as, the *allay* of colors. *Newton.*
Also, abatement; diminution by means of some mixture; as, joy without *allay.* But *alloy* is now more generally used.

AL-LAY'ED, pp. Layed at rest; quieted; tranquillized; abated; [reduced by mixture. *Obs.*]

AL-LAY'ER, n. He or that which allays.

AL-LAY'ING, pp. Quieting; reducing to tranquillity; abating; reducing by mixture. [*Obs.*]

AL-LAY'MENT, n. The act of quieting, or a state of tranquillity; a state of rest after disturbance; that which allays; abatement; ease; as, the *allayment* of grief. *Shak.*

AL'LE, (al'ly,) n. The little auk, or black and white diver.

AL-LEC-TA'TION, n. Enticement; allurement. [*Not used.*] *Coles.*

AL-LECT'IVE, a. Alluring. [*Not used.*] *Chaucer.*

AL-LECT'IVE, n. Allurement. [*Not used.*] *Eliot.*

AL-LEDGE'. See ALLEGE. [This spelling, corresponding to *abridge,* was once the prevailing one, and would still be preferable.]

AL-LE-GA'NI-AN, a. Pertaining to the mountains called Alleganay, or Alleghenay.

AL'LE-GA-NY, n. The chief ridge of the great chains of mountains which run from N. East to S. West, through the Middle and Southern States of North America; but, *more appropriately,* the main or unbroken ridge, which casts all the waters on one side to the east, and on the other side to the west. This ridge runs from Pennsylvania to Georgia, and chains extend through the United States.
This name is given also to the River Ohio, above its confluence with the Mononjahela; but improperly, as the Indian name of the river to its source is Ohio.

AL-LE-GA'TION, n. Affirmation; positive assertion or declaration.
2. That which is affirmed or asserted; that which is offered as a plea, excuse, or justification.
3. In *ecclesiastical courts,* a formal complaint, or declaration of charge.

AL-LEGE', v. t. [L. *allego, ad* and *lego,* to send; Fr. *alleguer;* Sp. *alegar;* Port. *allegar;* It. *allegare.* This is only a modified application of the Eng. *lay;* L. *loco,* to set, or throw. See Class L.g.]
1. To declare; to affirm; to assert; to pronounce with positiveness; as, to *allege* a fact.
2. To produce, as an argument, plea, or excuse; to cite or quote; as, to *allege* the authority of a judge.

AL-LEGE'A-BLE, a. That may be alleged or affirmed. *Brown.*

AL-LEG'ED, pp. or a. Affirmed; asserted, whether as a charge or a plea.

AL-LEGE'MENT, n. Allegation. [*Not in use.*]

AL-LEG'ER, n. One who affirms or declares.

AL-LE'GI-ANCE, n. † [old Fr., from L. *alligo, ad* and *ligo,* to bind. See LIEGE and LEAGUE.]
The tie or obligation of a subject to his prince or government; the duty of fidelity to a king, government, or state. Every native or citizen owes *allegiance* to the government under which he is born. This is called *natural* or *implied* allegiance, which arises from the connection of a person with the society in which he is born, and his duty to be a faithful subject, independent of any express promise. *Express* allegiance, is that obligation which proceeds from an express promise or oath of fidelity.

TONE, BULL, UNITE.— AN"GER, VI"CIOUS.— C as K; G as J; S as Z; CH as SH; TH as в THIS.

* See Pictorial Illustrations.     † See Table of Synonyms.     35

Add. 011

DEPARTMENT OF JUSTICE

U. S. SPANISH TREATY CLAIMS COMMISSION

# FINAL REPORT OF

# WILLIAM WALLACE BROWN

### ASSISTANT ATTORNEY-GENERAL

BEING A CONDENSED STATEMENT OF THE WORK DONE,
THE QUESTIONS CONSIDERED, AND THE MOST IMPOR-
TANT DECISIONS RENDERED, WITH A SCHEDULE OF
THE CLAIMS FILED, THE DISPOSITION OF THE SAME,
AND THE AWARDS MADE, BY THE SPANISH TREATY
CLAIMS COMMISSION FROM APRIL 10, 1907, THE DATE
OF THE SPECIAL REPORT OF HON. WM. E. FULLER,
ASSISTANT ATTORNEY-GENERAL, TO MAY 2, 1910, WHEN
THE COMMISSION EXPIRES BY OPERATION OF LAW



WASHINGTON
GOVERNMENT PRINTING OFFICE
1910

Add. 012

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated on 2025-05-06 16:13 GMT / https://hdl.handle.net/2027/mdp.35112104550621
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

# APPENDIX D.

## BRIEF ON THE LAW OF CITIZENSHIP.

By E. S. Huston, *Assistant Attorney*.

### SYNOPSIS.

Page.
I. Citizenship, generally.................................................... 115–118
II. Citizenship, state and national........................................ 118
III. Citizenship, in international sense.................................... 119
    (a) Citizenship, by birth............................................. 119–124
    (b) Citizenship, by naturalization.................................. 125
    (c) Courts of naturalization......................................... 126
    (d) Court no clerk, no jurisdiction................................. 126
    (e) Court no seal, no jurisdiction................................... 127
    Corporation; Is a State created, citizen of United States....... 116–118
IV. Naturalization, granting and effect of................................. 128
    (a) Naturalization a judicial proceeding........................... 128
    (b) Naturalization, judgment of, how shown....................... 130
    (c) Naturalization, certificates of.................................. 129
V. Naturalization, how questioned........................................ 129–140
    (a) Collateral attack on ............................................. 129
    (b) Judgment of, binding on parties and privies.................. 130
    (c) United States neither party nor privy......................... 130
    (d) Direct attack on ................................................. 130
    (e) How regarded by international tribunals....................... 131
    May be disregarded by, for fraud................................. 131–140
VI. Married women.......................................................... 140–145
    (a) Status as to citizenship......................................... 140–142
    (b) Status under international laws................................. 142–144
    (c) Status under municipal law...................................... 144–145
VII. Children, citizenship of................................................ 145–150
    (a) How far controlled by that of parents......................... 145
    (b) Right of electing citizenship.................................... 150–154
    (c) Stepchildren, citizenship of.................................... 147–150
VIII. Citizenship, how lost.................................................. 155
    (a) By expatriation................................................... 155–157
    (b) Declaration of intention, only.................................. 157–158
1–(c) Lost by abandonment............................................. 158–162
2–(d) Abandonment, what is............................................ 158–165
    (e) Presumptions...................................................... 162
    (f) Abandonment recognized by treaties, etc ...................... 162
      1. By treaties...................................................... 162
      2. By adjudged cases............................................... 163
IX. Evidence................................................................. 164
    (a) Of citizenship, should be by record............................ 164
    (b) Passports not..................................................... 165

### CITATIONS.

Am. & Eng. Ency. 2d. ed., vol. 6, p. 15............................... 115
Alexander *v.* U. S. No. 45 (B. & A. Com., 1871)................... 123
Am. & Eng. Ency. 2d. ed., vol. 17, p. 849........................... 130
Angarica No. 17 *v.* Spain (U. S. & Sp. Com., 1871)............... 136
Bank *v.* Deveaux, 5 Cranch, 61....................................... 116
Bank *v.* Slocum, 14 Pet., 61.......................................... 116
Blake *v.* McClung, 172 U. S., 239.................................... 116
Bayard, Secretary.  *See* Letters.
Blaine, Secretary.  *See* Letters.

Add. 013

## III.

### CITIZENSHIP IN THE INTERNATIONAL SENSE.

There are but three ways in which citizenship of the United States may be obtained:

(1) By birth in the United States or to a citizen father; (2) by naturalization; and (3) by treaty. The latter will receive no consideration in this brief.

1. *By birth.*—It is generally stated that all persons born in the United States are citizens of the United States, but this is not a correct statement. The clause of the fourteenth amendment on this subject reads thus:

All persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the State in which they reside.

The precise meaning of the phrase ''and subject to the jurisdiction thereof'' has not been fully determined, though it has been the subject of consideration on different occasions. The Constitution has not defined its meaning, and it must be interpreted ''in the light of the common law, the principles and history of which were familiarly known to the framers of the Constitution.'' (United States *v.* Wong Kim Ark, 169 U. S., 649, 654.)

In the same case, on page 676, the court says:

As appears upon the face of the amendment, as well as from the history of the times, this was not intended to impose any new restrictions upon citizenship, or to prevent any persons from becoming citizens by the fact of birth within the United States who would thereby have become citizens according to the law existing before its adoption. It is declaratory in form, and enabling and extending in effect. Its main purpose was doubtless, as has been often recognized by this court, to establish the citizenship of free negroes, which had been denied in the opinion delivered by Chief Justice Taney in Dred Scott *v.* Sandford (19 How., 393), and to put it beyond doubt that all blacks, as well as whites, born or naturalized within the jurisdiction of the United States, are citizens of the United States.

And, again, on page 678:

Mr. Justice Miller indeed, while discussing the cause which led to the adoption of the fourteenth amendment, made this remark: ''The phrase 'subject to its jurisdiction.' was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign States born within the United States.'' This was wholly aside from the question in judgment and from the course of reasoning bearing upon that question. It was unsupported by any argument or by reference to authorities, and that it was not formulated with the same care and exactness as if the case before the court had called for an exact definition of the phrase, is apparent from its classing foreign ministers and consuls together, whereas it was then well-settled law, as has since been recognized in a judgment of this court, in which Mr. Justice Miller concurred, that consuls as such, and unless expressly invested with a diplomatic character, in addition to their ordinary powers, are not considered as intrusted with authority to represent their sovereign in its intercourse with foreign States, or to vindicate his prerogatives, or entitled by the law of nations to the privileges and immunities of ambassadors or public ministers, but are subject to the jurisdiction, civil and criminal, of the courts of the country in which they reside.

And yet again, on page 679:

That neither Mr. Justice Miller nor any of the justices who took part in the decision of the Slaughterhouse cases, understood the court to be committed to the view that all children born in the United States of citizens or subjects of foreign States were excluded from the operation of the first sentence of the fourteenth amendment, is manifest from a unanimous judgment of the court delivered about two years later, while all those judges, but Chief Justice Chase, were still on the bench, in which Chief

Generated on 2025-05-06 16:18 GMT / https://hdl.handle.net/2027/mdp.35112104550621
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google    Original from    UNIVERSITY OF MICHIGAN

Justice Waite said: "Allegiance and protection are, in this connection (that is, in relation to citizenship), reciprocal obligations; the one is compensation for the other; allegiance for protection, and protection for allegiance."

At common law, with the nomenclature of which the framers of the Constitution were familiar, it was never doubted that all children born in a country of parents who were its citizens, became themselves, upon their birth, citizens also; that is, were natives, or natural-born citizens, as distinguished from aliens or foreigners. Some authorities go further and include as citizens children born within the jurisdiction without reference to the citizenship of their parents. As to this class there have been doubts, but never as to the first. For the purpose of this case it is not necessary to solve these doubts. It is sufficient for everything we have now to consider that all children born of citizen parents, within the jurisdiction, are themselves citizens.

In Elk v. Wilkins (112 U. S., 94), the court says, on page 102, referring to the phrase "and subject to the jurisdiction thereof,"

The evident meaning of these last words is not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct and immediate allegiance; and the words relate to the matter of birth, in the one case, as they do to the matter of naturalization, in the other. Persons not thus subject to the jurisdiction of the United States at the time of birth can not become so afterwards except by being naturalized individually, as by proceedings under the naturalization acts, or qualify, as by force of a treaty by which foreign territory is acquired.

Indians born within the territorial limits of the United States, members of and owing immediate allegiance to one of the Indian tribes (an alien though dependent power), although in a geographical sense born in the United States, are not more "born in the United States and subject to the jurisdiction thereof" within the meaning of the first section of the fourteenth amendment than the children of the subjects of any foreign government born within the domain of that government, or the children born within the United States of ambassadors or other public ministers of foreign nations.

Referring to that decision, the court says, in United States v. Wong Kim Ark, supra:

The decision in Elk v. Wilkins concerned only members of the Indian tribes within the United States and had no tendency to deny citizenship to children born in the United States of foreign parents of Caucasian, African, or Mongolian descent not in the diplomatic service of a foreign country.

And the court then sums up its conclusions on that point as follows:

The amendment in clear words, and in manifest intent, includes the children born within the territory of the United States, of whatever race or color, domiciled within the United States. Every citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States. His allegiance to the United States is direct and immediate and although but local and temporary, continuing only so long as he remains within our territory, is yet, in the words of Lord Coke, in Calvin's case, 7 Rep., 6a: "Strong enough to make a natural subject, for if he hath issue here, that issue is a natural-born subject."

On page 704 the court considers whether Wong Kim Ark had lost his citizenship, thus acquired by birth, and says:

Whether any act of himself or of his parents, during his minority, could have the same effect is at least doubtful, but it would be out of place to pursue that inquiry, inasmuch as it is expressly agreed that his residence has always been in the United States, and not elsewhere; that each of his temporary visits to China, the one for some months when he was 17 years old, and the other for something like a year, about the time of his coming of age, were made with the evident intention of returning, and were followed by his actual return to the United States; and "that said Wong Kim Ark has not, either by himself or his parents acting for him, ever renounced his allegiance to the United States, and that he has never done or committed any act or thing to exclude him therefrom."

The evident intention and the necessary effect of the submission of this case to the decision of the court, upon the facts agreed to by the parties, were to present for determination the single question stated at the beginning of this opinion, namely, whether a child born in the United States of parents of Chinese descent, who, at the time of his

Generated on 2025-05-06 16:20 GMT / https://hdl.handle.net/2027/mdp.35112104550621
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google    Original from    UNIVERSITY OF MICHIGAN

birth, are subjects of the Empire of China, but have a permanent domicile and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity under the Empire of China, becomes, at the time of his birth, a citizen of the United States. For the reasons above stated this court is of the opinion that the question must be answered in the affirmative.

This case, when limited to its own facts and the law pronounced thereon, and limited in the same way under the rule laid down by Chief Justice Marshall in Cohens v. Virginia (6 Wheat., 264), to wit:

It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated. (Cohens v. Virginia (1821), 6 Wheat., 264, 399.)

goes no further than to determine that the child born to parents who are foreigners. but domiciled in the United States and there engaged in business, is a citizen of the United States.

The dissenting opinion in the Wong Kim Ark case shows that Mr. Justice Marshall observed in his lectures on Constitutional Law that:

If a stranger or traveler passing through or temporarily residing in this country, who has not himself been naturalized, and who claims to owe no allegiance to our Government, has a child born here which goes out of the country with its father, such child is not a citizen of the United States because it was not subject to its jurisdiction.

So Mr. Story, in his Conflict of Laws, section 488:

Persons who are born in a country are not generally deemed to be citizens of that country, and reasonable qualification of the rule would seem to be that it should not apply to children of parents who were in itinere in the country or who were abiding there for temporary purposes, as for health, or curiosity, or occasional visits. It would be difficult, however, to assert that in the present state of public law such a qualification is universally established.

This question has been under consideration by the political department of the Government, and we cite the following:

In 1871 Mr. Fish, Secretary of State, wrote to Mr. Marsh as follows:

* * * The qualification "and subject to the jurisdiction thereof" was probably intended to exclude the children of foreign ministers and all other persons who may be within our territory with rights of extraterritoriality. It is indeed possible to read the language as meaning while or when they are subject to the jurisdiction of the United States, but this would denationalize all citizens native or naturalized the moment they entered the foreign jurisdiction.

In 1871 Mr. Seward, Acting Secretary of State, wrote to Mr. Fish:

* * * In Speck's case, while it is true that the boy by virtue of his nativity may claim citizenship of the United States, yet his father continuing to remain a Swiss citizen, having removed the boy Joseph while a minor without the jurisdiction of the United States, his status, as well as domicile, according to well-understood principles of international and municipal law, follows that of the father until the boy attains his majority. Should he, after reaching the age of 21 years, voluntarily return to the United States and make it his permanent home, asserting the right of citizenship by virtue of his nativity, his political status would then be determined according to the law and the circumstances of the case.

In 1880 Mr. Evarts, Secretary of State, wrote to Mr. Noyes:

A child born in the United States to French parents goes in his minority to France, and there remains voluntarily after he has become of full age, may be held to have abjured his American nationality.

Digitized by Google    Original from UNIVERSITY OF MICHIGAN

Generated on 2025-05-06 16:20 GMT  /  https://hdl.handle.net/2027/mdp.35112104530621
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

In 1880 Mr. Evarts, Secretary of State, wrote to Mr. Cramer:

A person born in the United States has a right, though he has intermediately been carried abroad by his parents, to elect the United States as his nationality when he arrives at full age.

In 1881 Mr. Blaine, Secretary of State, wrote to Mr. O'Neill:

The child born to an alien in the United States loses his citizenship on leaving the United States and returning to his parent's allegiance.

In 1882 Mr. Frelinghuysen, Secretary of State, wrote to Mr. O'Neill:

A child born in this country to a German subject is subject, if he puts himself in German jurisdiction, to German laws.

In 1883 he wrote to Mr. Cramer as follows:

A child born in this country to a foreign father when taken by his father abroad acquires the father's domicile and nationality.

Mr. Bayard, Secretary of State, wrote to Mr. Liebmann in 1886:

It has been settled by frequent rulings in this department that when a child who was born in the United States to a father temporarily here residing returns with his father to the latter's country of native allegiance such child can not, during his minority and his residence in such country, call on this department to intervene in his behalf against such country.

NOTE.—But how can this be if he was born a citizen of the United States, and who had authority to surrender his rights in this particular while a minor? This is contrary to the opinion of the Attorneys-General, as hereinafter shown.

In reference to the case of de Bourry, Mr. Bayard, Secretary of State, wrote to Mr. Lee in 1886. It should be stated before quoting that de Bourry was born in the United States in 1862, where he remained with his parents until he was 5 years old, when he and his mother went to Europe. His father went there also in 1869, and they resided in Vienna until 1880, when the father died, and the mother and son continued to reside in Austria. The Secretary says:

Under these circumstances it is necessary for me to consider the question whether de Bourry was at the time of his birth a citizen of the United States under the naturalization statutes and the fourteenth amendment to the Constitution of the United States. It is enough to say that he has exhibited no such proof of an election on arriving at full age of United States citizenship as now entitles him to a passport. An election in case of dual or doubtful allegiance, which is the utmost which can be claimed in the present case, must be made on attaining majority or shortly afterwards, and must be signified by acts plainly expressive of intention, such as immediate preparations to return to the elected country.

This question of citizenship by birth has also been under consideration by international commissions. Thus, under the convention of 1868 with Mexico, in case No. 716, Suarez v. Mexico, the umpire, Thornton, said:

Nor would the mere fact of his having been born at New York be sufficient evidence of citizenship. It is clear that his parents were both aliens at the time of his birth, and it is not shown that they were naturalized or that they or the child remained in the United States. The inference is to the contrary, and the umpire believes that the child in question, even if that child was really the claimant, though born in the United States, was subject to a foreign power, and can not, without further proof, be considered to be a citizen of the United States.

The same umpire in No. 748, Barco v. Mexico, says:

With regard to Manuel de Barco, he does not consider that the mere fact of his birth within the United States is sufficient of itself to give him citizenship of the United States. It appears that his parents were both foreigners, and that he was certainly not of age, and was still under the tutelage of his parents when he left the United States, nor has he since that time taken any steps to acquire United States citizenship.

Generated on 2025-05-06 16:20 GMT / https://hdl.handle.net/2027/mdp.35112104550621
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

In case No. 958, of Gauthier v. Mexico, the claimant was born in Texas of French parents, and when 19 years of age he removed to Mexico with his mother, then a widow, and they established a commercial house. He at one time presented a claim against Mexico as a French subject, and received an award of $1,000. The commissioners held that—

As it did not appear that the parent of the claimant was naturalized during their residence in Texas, it was to be presumed that they retain their French nationality; that the claimant, who left the United States before arriving at the age of 21 years, was entitled, according to the French code, to retain the nationality transmitted by his parent; that the laws of Mexico did not forbid such election; but that he was not entitled to renounce his French nationality and elect that of the United States after he had abandoned the latter country to establish himself in another, and after he had made a valid act of adoption of French nationality.

In the case of Lavigne, No. 11, and Bister, No. 20, under the United States and Spanish convention of 1871, the arbitrators say:

The act of Congress of February 10, 1855, which provides that "persons heretofore born, or hereafter to be born, out of the limits and jurisdiction of the United States, whose fathers were, or shall be, at the time of their birth citizens of the United States, shall be deemed and considered and are hereby declared to be citizens of the United States," can not operate so as to interfere with the allegiance which such children may owe to the country of their birth while they continue within its territory.

In Hall's International Law, page 237, it is said:

In the United States it would seem that the children of foreigners in transient residence are not citizens, but that children of foreigners who are in more prolonged residence fall provisionally within the category of American citizens, though they lose their American character if they leave the United States during their minority.

In the case of Joseph Fry Mogridge v. The United States, No. 345, before the American and British Claims Commission of 1871, the memorial alleged the claimant to have been born in Pennsylvania of native parents, British subjects, never domiciled within the United States, but on a visit there at the time of his birth, and who returned to England within a few weeks thereafter, where the claimant remained during his minority. He was domiciled in the United States at the time of the alleged injuries. His claim was dismissed, apparently on the ground that he was a citizen of the United States.

In the case of Alexander v. The United States, No. 45, before the same commission, it appears the claimant was born in Kentucky. Commissioner Frazer in his opinion says:

The testator was by British law a British subject, but he was also, by the law of the United States, an American citizen by reason of his birth in Kentucky; and he was not capable of divesting himself of his American nationality by mere volition and residence from time to time in Scotland and holding office there.

Being then a subject of both governments, was he a British subject within the meaning of the treaty? The practice of nations in such cases is believed to be by their sovereign to leave the person who has embarrassed himself by assuming a double allegiance to the protection which he may find provided for him by the municipal laws of that other sovereign to whom he thus also owes allegiance.

The British minister, Mr. Gurney, dissented in this case. With reference to the point above suggested, of divesting American nationality of a child by residence elsewhere, it is said (15 Ops. Att'y Gen., p. 15) that—

Though a father, once a foreigner, but naturalized in the United States, returns to his native country and resumes his nationality, his child, born in the United States,

Generated on 2025-05-06 16:20 GMT / https://hdl.handle.net/2027/mdp.35112104580621
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

and who returns with his father to his native land, does not lose his American nationality, but that on attaining his majority he has a right of election.

And with reference to that part of Mr. Frazer's opinion, as to the claimant being a subject of both Governments and the consequences, it is said (13 Ops. Att'y Gen., 89):

On general principles such conflicting citizenship is decided according to the laws of the one of the two countries claiming allegiance, within whose jurisdiction the individual happens to be.

It will be observed, therefore, that our statutes which declare (1) that all persons born in the United States and subject to the jurisdiction thereof, and (2) all persons born out of the United States of parents who are citizens, are citizens of the United States, reach out into the domain of other countries, for if they should also declare to the same effect, we would have many conflicts and many cases of double allegiance. While, therefore, our statutes may be given full force and effect in our internal affairs and administration, yet, when it comes to dealing with other nations, these broad claims must yield to the principles of international law. The last two cases referred to above are illustrations of this conflict and of the method of disposing of the same.

The Spanish Treaty Claims Commission seems to have taken the position that under the fourteenth amendment to the Constitution, as expounded in the Wong Kim Ark case, supra, there is no longer any room to question that every person born in the United States is an American citizen, as its rulings have been along that line; but that doctrine in its absolutism is one which the government of the United States does not and can not take and maintain.

The United States has upon its statute books a counter proposition which reads as follows:

SEC. 1993. All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States.

Here we assert a right which by the fourteenth amendment, as construed, we deny to other Governments, and it needs no argument to show that we can not maintain both propositions. If we claim that children born abroad to American citizen parents are American citizens (we do so claim and maintain, and this is the more important of the two), then we must concede the same right to other nations, and we must abandon so much of the fourteenth amendment as by construction may be held to undertake to make an American citizen out of children born to foreign parents on American soil, and in actual practice the government of the United States so admits.

The truth is that it has never been held, and it is very doubtful whether it will ever be held, that the mere act of birth of a child on American soil, to parents who are accidentally or temporarily in the United States, operates to invest such child with all the rights of American citizenship. It was not so held in the Wong Kim Ark case. No such question was involved or decided, and whatever is said on that subject in that case (and there is a good deal), is mere dictum. The summary of the case on its facts, set forth in the last two pages of the opinion of the court, shows exactly what was the issue, and that such a broad question was not in any sense involved in the case. The Chinese child in that case, born in the United States, showed

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated on 2025-05-06 16:21 GMT / https://hdl.handle.net/2027/mdp.35112104550621
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

FINAL REPORT OF ASSISTANT ATTORNEY-GENERAL.     **125**

that both he and his parents had resided in the United States continuously from his birth until after his majority, except that he had made two temporary visits to China, which it was conceded were temporary and with the intention of returning to the United States as his permanent residence. At the time of his birth his parents were not temporary sojourners in the United States, but were domiciled and engaged permanently in business there.

It follows therefore that the question of what is meant by the clause in the fourteenth amendment reading "and subject to the jurisdiction thereof" is yet open, and as already said, it is exceedingly doubtful, to say the least, whether the courts will ever hold that the accidental birth within the territory of the United States instantly invests the child with all the rights of an American citizen, regardless of its future movements and those of its parents. If such a child should be possessed of a very considerable estate, and should be at once taken by its parents to their own country, we think the United States would have a very difficult time collecting an income tax or enforcing any other rights as against this child or its estate.

We avoid this, to our minds, untenable position by taking the ground that such a child has a right of election, and on attaining its majority it may elect the nationality of either government, which election the child may make by remaining permanently in the one country, or removing to the other on attaining majority and there abiding and performing the duties of citizenship.

This seems a very simple solution, but it leads to many complications not regulated by law, and for the determination of which there is no satisfactory guide. Among these are: (1) What acts are sufficient to amount to an election; (2) when and how must that election be made; (3) within what period, after attaining majority, must it be done; (4) in case a child desires to elect the nationality of the government other than the one within whose jurisdiction he is residing, is it possible for him to make such an election without bodily removal to such elected country; and (5) should any such election be permitted unless made under oath, and by having the same entered upon the records of some proper court, competent to naturalize aliens? The situation is such as to call for prompt and careful legislative action.

Finally, on this point, it would seem that when the courts are compelled to construe this clause, " and subject to the jurisdiction thereof," it is to be hoped that they will take the very simple and reasonable position that it does not mean that jurisdiction to which the bodily form of the child is subject from the moment of its birth, such as the right to live, to be protected from harm, and the like, but that larger jurisdiction, which, though difficult to define, is well known and understood, the difference between the jurisdiction which is exercised over a visitor and that over one domiciled, which difference may be seen at a glance. The former was certainly not in the legislative mind when dealing with such grave and important rights.

2. *By naturalization.*—(b) Naturalization is the act by which the Government formally admits into its community persons formerly owing allegiance to another country, investing them with all the rights and privileges and imposing upon them all the duties and obligations of full membership therein.

Generated on 2025-05-06 16:21 GMT / https://hdl.handle.net/2027/mdp.35112104550621
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google     Original from UNIVERSITY OF MICHIGAN

# THE CONGRESSIONAL GLOBE:

CONTAINING

# THE DEBATES AND PROCEEDINGS

OF

## THE FIRST SESSION

OF

## THE THIRTY-NINTH CONGRESS.

BY F. & J. RIVES.

CITY OF WASHINGTON:
PRINTED AT THE CONGRESSIONAL GLOBE OFFICE.
1866.

Generated on 2025-01-04 00:32 GMT / https://hdl.handle.net/2027/osu.32437011560394
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
THE OHIO STATE UNIVERSITY

Add. 021

there may be danger that when party spirit runs high, it may receive a very different construction from that which we would now put upon it. I find that gentlemen doubt upon that subject, and I think it is very easy now to solve that doubt and put the question beyond all cavil for the present and for the future.

In the first clause of the amendment which I have submitted, I strike out the word " citizens," and require the States to give equal rights and protection of person and property to all persons born in the United States or naturalized under the laws thereof. That seems to me to put the question beyond all doubt.

The Senator from Maine suggests to me, in an undertone, that persons may be born in the United States and yet not be citizens of the United States. Most assuredly they would be citizens of the United States unless they went to another country and expatriated themselves, if they could do so by being adopted in that other country by some process of naturalization that I know nothing about; for I believe the countries of Europe—certainly it is so in England—have always held that a person born within the realm cannot expatriate himself and become a citizen of any other country or owe allegiance to any other country. I think, then, the first section of my amendment covers the whole ground.

Mr. FESSENDEN. Suppose a person is born here of parents from abroad temporarily in this country.

Mr. WADE. The Senator says a person may be born here and not be a citizen. I know that is so in one instance, in the case of the children of foreign ministers who reside "near" the United States, in the diplomatic language. By a fiction of law such persons are not supposed to be residing here, and under that fiction of law their children would not be citizens of the United States, although born in Washington. I agree to that, but my answer to the suggestion is that that is a simple matter, for it could hardly be applicable to more than two or three or four persons; and it would be best not to alter the law for that case. I will let it come under that well-known maxim of the law, *de minimis lex non curat.* It would make no difference in the result. I think it better to put this question beyond all doubt and all cavil by a very simple process, such as is the language of the first section of the amendment I have offered. I do not know that the corresponding section reported by the committee would leave the matter very doubtful; but that which I have proposed is beyond all doubt and all cavil now and hereafter, and it is as easy to adopt it as it is the other. I regard it as an improvement, and therefore I think it ought to be adopted.

The second section is in regard to the apportionment of representation; and here I like the provision I have proposed better than the corresponding one of the committee. There is no doubt or cavil about it; and it contains some elements which I think make it entirely preferable to the other proposition. There are some reasons, and many believe there are good reasons, for restricting universal suffrage, and upon such principles as not to justify the inflicting of a punishment or penalty upon a State which adopts restricted suffrage. It is already done in some of the New England States—in Massachusetts, for instance. I believe the constitution of that State restricts the right of suffrage to persons who can read the Constitution of the United States and write their names. I am not prepared to say that that is not a wise restriction. At all events, a State has the right to try that experiment; but if she tries it, under the report of the committee she must lose, in the proportion that she has such persons among her inhabitants, her representation in Congress. I do not think that ought to be so. I think we should leave the subject open to the States to act as they see fit about it. I think my amendment in this respect is plainer and more practicable than the proposition of the committee. The entire population is taken, in the first instance, as a basis. The census always discriminates between the black

and the white population, and it makes several other discriminations; and therefore it is, and will be at all times, perfectly easy and practicable to ascertain exactly how much of the population of a State shall be counted in the basis of representation under my amendment. Under the other proposition, it seems to me, you must have a census commission all the time in operation in order to keep pace with the variations that will take place from time to time.

Under this amendment you ascertain the classes of the population, and when any discrimination shall be made upon any of these subjects the whole of that particular class will be excluded. There is only one question to be determined. If the exclusion is because of race or color, the question is what amount of colored population is there in the State, and in exactly that proportion she is to lose representation. If any class is deprived of the privilege of voting there should certainly be some restriction on the representation of the State which excludes them. The particular I think my amendment is a great improvement on the provision reported by the committee. My amendment is such that a calculation can very easily be made of what the restriction of representation is under it. I have not myself calculated it; but we know that some of the States would lose more than half their representation; South Carolina would, and I think Mississippi would, and some other of the States would lose largely if they excluded their colored population from voting; and I think they ought to be restricted in the proportion that the excluded portion bear to the whole.

In the next place, my amendment prohibits and renders null and void all obligations incurred in rebellion and insurrection against the United States or for the purpose of aiding rebellion or insurrection; and in that particular it is precisely the same as the corresponding section of the original proposition which was so eloquently defended and enforced by the Senator from Michigan. I agree with all that he said on that subject, and the proposition reported by his committee and the one I have submitted are the same in that respect; but then my amendment goes to another branch of this business almost as essential as that. It puts the debt incurred in the civil war on our part under the guardianship of the Constitution of the United States, so that a Congress cannot repudiate it. I believe that to do this will give great confidence to capitalists and will be of incalculable pecuniary benefit to the United States, for I have no doubt that every man who has property in the public funds will feel safer when he sees that the national debt is withdrawn from the power of a Congress to repudiate it and placed under the guardianship of the Constitution than he would feel if it were left at loose ends and subject to the varying majorities which may arise in Congress. I consider that a very beneficial provision, which is not in the original proposition.

This section of my amendment goes further, and secures the pensioners of the country. We ought to do something to protect those wounded patriots who have been stricken down in the cause of their country, and to put the security of their pensions and their means of support beyond the power of wavering majorities in Congress, who may at some time, perhaps, be hostile to the soldier. In the condition of things around us we have no great guarantee now that rebels will not ere long be in these Halls, deadly hostile to everything that shall benefit the soldier who was used as an instrument in their downfall and their conquest. Let the policy which I understand to be that now prevailing at the other end of the avenue be adopted, and we have no security and no guarantee that the widow of your dead soldier, who died in the cause of his country, will not be deprived of the pittance that we give her as a support. I am anxious to put the pensions of our soldiers and their widows and children under the guardianship of the Constitution of

the United States. They ought to be there, along with your public debt. I think no gentleman will deny that it is very essential that the debt incurred in this war should be placed under the protection of the Constitution of the United States, especially when we are now prosecuting a doubtful war with your Executive as to whether open and hostile rebels shall not have seats in Congress. If they are admitted here to act with their sympathizers at the North, who have constantly opposed every policy that looked to the remuneration of those engaged in the war on our part, who have been opposed to every war measure, who voted against paying your Army in the field, or doing anything to defend the country, what will be the result? Under the dictation of such a policy, should it prevail, who can guaranty that the debts of the Government will be paid, or that your soldiers and the widows of your soldiers will not lose their pensions? I hope that whether my amendment be adopted or not, any amendment to the Constitution which shall finally prevail will contain a clause like this.

Mr. President, I have stated nearly all the differences between my amendment and the proposition of the committee. I have left out the provision, because as the Senator from Michigan has said it does not seem to me to amount to much. Practically I do not believe it would have any effect. I am for excluding those who took any leading part in the rebellion from exercising any political power here or elsewhere now and forever; but as that clause does not seem to effect that purpose, and will probably effect nothing at all, I do not think it is of any consequence that it should have a place in the measure. I hope another clause I shall be very glad to see that adopted either as an amendment to my proposition, if it should prevail, or, if not, as an amendment to the original proposition.

I have seen other suggested amendments which I should like to have prevail. The Senator from Nevada [Mr. STEWART] has submitted a proposition which in my judgment is of the most important and essential character. Could my voice and my vote prevail to give efficacy to his proposition, he should not fail to have it. I am for suffrage to our friends in this rebellion, the men who have stood by us in this rebellion, the men who have hazarded their lives and all that they hold dear to defend our country. I think our friends, the colored people of the South, should not be excluded from the right of voting, and they shall not be if my vote and the votes of a sufficient number who agree with me in Congress shall be able to carry it. I do not agree in this particular with the Senator from Michigan. He yields to the provision in the committee's resolution on the subject reluctantly, because he does not believe three fourths of the States can be got to ratify that proposition which is right and just in itself. My own opinion is that if you go down to the very foundation of justice, so far from weakening yourself with the people, you will strengthen yourself immensely by it; but I know that it is not the opinion of many here, and I suppose we must accommodate ourselves to the will of majorities, and if we cannot do all we would, do all we can. I propose for myself to contend for all I can get in the right direction, and finally to go with those who will give us anything that is beneficial. That is my doctrine. I wish and I hope that on due reflection the Senate will adopt the amendment of the Senator from Nevada, at least as an alternative to some of these propositions, leaving the States to take his proposition if they will in lieu of the one we give to them. I should like to see even that, for I believe they would take his in preference to the one we shall probably give them.

But, sir, notwithstanding I say all this, I am not finding fault with the doings of the com-

Add. 022

