# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

**No. 25-1169**

_____

O. DOE; BRAZILIAN WORKER CENTER; LA COLABORATIVA,
Plaintiffs - Appellees,

v.

DONALD J. TRUMP, in their official capacity as President of the United States;
US DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of
State; US SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in their official
capacity as Acting Commissioner of Social Security,
Defendants - Appellants.

_____

On Appeal from the United States District Court
for the District of Massachusetts

## BRIEF OF APPELLEES O. DOE, BRAZILIAN WORKER CENTER, AND
## LA COLABORATIVA

Oren M. Sellstrom (CA1 #1172527)
Ivan E. Espinoza-Madrigal (CA1 #1171237)
Jacob M. Love (CA1 #1203905)
Mirian Albert (CA1 #1204131)
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(857) 264-0416
jlove@lawyersforcivilrights.org

*Counsel for Plaintiffs-Appellees*

Dated: May 21, 2025

— *Additional caption on the next page* —

**No. 25-1170**

_____

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS;
STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT;
STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII;
STATE OF MAINE; STATE OF MARYLAND; DANA NESSEL, Attorney General for the
People of the State of Michigan; STATE OF MINNESOTA; STATE OF NEVADA;
STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA;
STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN;
CITY AND COUNTY OF SAN FRANCISCO,
Plaintiffs - Appellees,

v.

DONALD J. TRUMP, in their official capacity as President of the United States;
US DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of
State; US DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official
capacity as Secretary of Homeland Security; US DEPARTMENT OF HEALTH AND HUMAN
SERVICES; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of Health and
Human Services; US SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in their
official capacity as Acting Commissioner of Social Security; UNITED STATES,
Defendants - Appellants.

**PLAINTIFF-APPELLEE BRAZILIAN WORKER CENTER, INC.'S
CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned, as attorneys for Plaintiffs-Appellees, certify that Plaintiff Brazilian Worker Center, Inc. has no parent corporations and that there is no publicly held corporation owning 10% or more of its stock.

**PLAINTIFF-APPELLEE LA COLABORATIVA'S
CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned, as attorneys for Plaintiffs-Appellees, certify that Plaintiff La Colaborativa has no parent corporations and that there is no publicly held corporation owning 10% or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS .......................................................i

TABLES OF AUTHORITIES ....................................................................v

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD......................... xii

STATEMENT OF THE CASE...................................................................1

    I.     INTRODUCTION ................................................................1

    II.    BACKGROUND ..................................................................6

         A.    The United States Has a Long History of Broad Territorial Birthright Citizenship, Dating Back to the Colonial Period. ..............................................................6

         B.    The Trump Administration Issues the EO, Radically Redefining Birthright Citizenship.................................9

         C.    Facing Immediate and Irreparable Harm, the Doe Plaintiffs Sue to Enjoin Enforcement of the Patently Unlawful EO. ..........................................................10

         D.    The District Court Enjoined the EO. .........................11

SUMMARY OF THE ARGUMENT .......................................................13

STANDARD OF REVIEW ....................................................................16

ARGUMENT .....................................................................................16

    I.     THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS HAVE DEMONSTRATED A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS THAT THE EXECUTIVE ORDER IS UNLAWFUL.......16

         A.    The Executive Order is Unconstitutional under Binding Precedent from the Supreme Court..........................16

B. Supreme Court and First Circuit Precedent Have Routinely Affirmed Birthright Citizenship for All But the Few Narrow and Well-Defined Exceptions. ............................21

C. The Government's Arguments Concerning the "Original Meaning" of the Citizenship Clause have Already Been Considered and Rejected by the Supreme Court. ....................24

  a. The *Wong Kim Ark* Court Rejected the Government's Argument that a Child Must Have "Primary Allegiance" to the United States and No Other Foreign Power to be a Citizen. ............................24

  b. The *Wong Kim Ark* Court Considered, and Rejected, the Government's Argument that Parental Domicile is Required under the Citizenship Clause. .........................................27

  c. The Government's Attempt to Downplay the Instructiveness of English Common Law Runs Counter to *Wong Kim Ark*. .............................................29

D. The Government's Effort to Cabin *Wong Kim Ark* Must Fail. ............................................................................30

E. The Government's Recitation of Historical Context is Incomplete and Unavailing. ......................................32

F. The *Doe* Plaintiffs Established that They are Likely to Succeed on the Merits of Their Claim that the EO is Unlawful Because it Conflicts with 8 U.S.C. Section 1401. ..........................................................................36

II. AS THE GOVERNMENT TACITLY CONCEDES, PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF ENFORCEMENT OF THE EXECUTIVE ORDER IS NOT ENJOINED. ............................40

III. THE REMAINING PRELIMINARY INJUNCTION FACTORS SIMILARLY SUPPORT THE DISTRICT COURT'S INJUNCTION. ..................................................43

IV.    THE *DOE* PLAINTIFFS HAVE CLEAR ARTICLE III
         STANDING TO PURSUE THEIR CLAIMS......................................46

CONCLUSION ........................................................................................48

CERTIFICATE OF COMPLIANCE.......................................................50

CERTIFICATE OF SERVICE ................................................................51

# TABLES OF AUTHORITIES

C<small>ASES</small>:

*Abrego Garcia v. Noem*,
    2025 WL 1135112 (4th Cir. Apr. 17, 2025).................................36

*Afroyim v. Rusk*,
    387 U.S. 253 (1967)..............................................................2, 31

*Ah How v. United States*,
    193 U.S. 65 (1904)...................................................................22

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020)................................................................40

*Bruesewitz v. Wyeth LLC*,
    562 U.S. 223 (2011)................................................................35

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006)................................................................47

*Dos Reis ex rel. Camara v. Nicolls*,
    161 F.2d 860 (1st Cir. 1947)....................................................22

*DraftKings Inc. v. Hermalyn*,
    118 F.4th 416 (1st Cir. 2024) ..................................................16

*Dred Scott v. Sandford*,
    60 U.S. 393 (1857)................................................................1, 7

*Elk v. Wilkins*,
    112 U.S. 94 (1884)..............................................19, 24, 32, 33

*Ex Parte Lopez*,
    6 F. Supp. 342 (S.D. Tex. 1934)..............................................38

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024)................................................................48

v

*Fedorenko v. United States*,
    449 U.S. 490 (1981)....................................................................5, 44

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004)....................................................................21, 23

*Hasan v. Holder*,
    673 F.3d 26 (1st Cir. 2012)........................................................22, 23

*Hirabayashi v. United States*,
    320 U.S. 81 (1943).....................................................................22, 26

*Hunt v. Wash. State Apple Advertising*,
    432 U.S. 333 (1977)....................................................................47

*Inglis v. Sailors' Snug Harbor*,
    28 U.S. 99 (1830).......................................................................25

*INS v. Errico*,
    385 U.S. 214 (1966)....................................................................23

*INS v. Pangilinan*,
    486 U.S. 875 (1988)....................................................................36

*INS v. Rios-Pineda*,
    471 U.S. 444 (1985)....................................................................23

*Int'l Jr. Coll. of Bus. & Tech., Inc. v. Duncan*,
    802 F.3d 99 (1st Cir. 2015).........................................................35

*Int'l Union v. Brock*,
    477 U.S. 274 (1986)....................................................................47

*Johnson v. Johnson*,
    23 F.4th 136 (1st Cir. 2022) .......................................................39, 48

*Kawakita v. United States*,
    343 U.S. 717 (1952)....................................................................22, 26

*Lawless v. Steward Health Care System*,
    894 F.3d 9 (1st Cir. 2018)................................................................40

*Lynch v. Clarke*,
    1 Sand. Ch. 583 (N.Y. Ch. Ct. Jan. 1, 1844) ....................................28, 33, 35

*Mariko v. Holder*,
    632 F.3d 1 (1st Cir. 2011)................................................................22, 23

*New Jersey v. Trump*,
    131 F.4th 27 (1st Cir. 2025) ............................................................15, 45, 46

*New Prime, Inc. v. Oliveira*,
    586 U.S. 105 (2019)......................................................................40

*Nishikawa v. Dulles*,
    356 U.S. 129 (1958)......................................................................21-22

*Nken v. Holder*,
    556 U.S. 418 (2009)......................................................................43

*Obergefell v. Hodges*,
    576 U.S. 644 (2015)......................................................................5

*Perez v. Brownell*,
    356 U.S. 44 (1958)........................................................................44

*Perkins v. Elg*,
    99 F.2d 408 (D.C. Cir. 1938)..........................................................38

*Perkins v. Elg*,
    307 U.S. 325 (1939)......................................................................22, 31, 38

*Playboy Enter., Inc. v. Public Serv. Com'n of P.R.*,
    906 F.2d 25 (1st Cir. 1990)............................................................47

*Plyler v. Doe*,
    457 U.S. 202 (1982)......................................................................23

*Regan v. King*,
  49 F. Supp. 222 (N.D. Cal. 1942) ), *aff'd*, 134 F.2d 413 (9th Cir.),
  *cert. denied,* 319 U.S. 753 (1943)...................................................................38

*Schneiderman v. United States*,
  320 U.S. 118 (1943)......................................................................................44

*Schooner Exch. v. McFadden*,
  11 U.S. (7 Cranch) 137 (1803) ............................................................17, 18, 19

*Shelley v. Kraemer*,
  334 U.S. 1 (1948)............................................................................................8

*Slaughter-House Cases*,
  83 U.S. 36 (1872).....................................................................................2, 6, 7

*Students for Fair Admissions, Inc. v. Harvard*,
  600 U.S. 181 (2023).......................................................................................48

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009).......................................................................................47

*Telecomm. Regul. Bd. of P.R. v. CTIA-Wireless Ass'n*,
  752 F.3d 60 (1st Cir. 2014)...........................................................................48

*Town of Chester v. Laroe Estates, Inc.*,
  581 U.S. 433 (2017).......................................................................................47

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021).......................................................................................47

*Trop v. Dulles*,
  356 U.S. 86 (1958)..................................................................................5, 41, 44

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
  517 U.S. 544 (1996).......................................................................................48

*United Nurses & Allied Prof'ls v. NLRB*,
  975 F.3d 34 (1st Cir. 2020)............................................................................31

*United States v. Manzi*,
   276 U.S. 463 (1928)........................................................................36

*United States v. Rice*,
   17 U.S. 246 (1819)..........................................................................19

*United States v. Santana*,
   6 F.3d 1 (1st Cir. 1993)...................................................................31

*United States v. Wong Kim Ark*,
   169 U.S. 649 (1898)..............................................................*passim*

*United States ex rel. Hintopoulous v. Shaughnessy*,
   353 U.S. 72 (1957)..................................................................... 23-24

*Warth v. Seldin*,
   422 U.S. 490 (1975).........................................................................47

*Weedin v. Chin Bow*,
   274 U.S. 657 (1927)...................................................................21, 31

*Wong v. Dulles*,
   236 F.2d 622 (9th Cir. 1956) ........................................................30

## CONSTITUTIONAL PROVISIONS:

U.S. Const. amend. XIV ................................................................*passim*

## STATUTES:

8 U.S.C. Section 1401 ....................................................................*passim*

## RULES:

1st Cir. R. 34.0 .................................................................................xiv

Fed. R. App. P. 34............................................................................xiv

OTHER AUTHORITIES:

86 Cong. Rec. 11944 (1940) ........................................................38

*Citizenship by Birth*, 41 Harv. L. Rev. 643 (1928) ................................38

*Civil Rights Act of 1866*, ch. 31, § 1, 14 Stat. at 27 ..................................7

Cong. Globe, 39th Cong., 1st Sess. 2891 (1866) ........................................34

Joseph W. Dellapenna, *Constitutional Citizenship Under Attack*,
    61 Vill. L. Rev. 477 (2016) ...............................................7

Jonathan C. Drimmer, *The Nephews of Uncle Sam: The History, Evolution,
    and Application of Birthright Citizenship in the United States*,
    9 Geo. Immigr. L.J. 667 (1999) .........................................6

Garrett Epps, *The Citizenship Clause: A "Legislative History"*,
    60 AM. U. L. REV. 331 (2010) ...............................................8, 34

Immigration and Nationality Act of 1952, ch. 477, tit. III, ch. 1, § 301, 66
    Stat. 235 (1952) .........................................................37

Vinineath Nuon Gopal, *From Judicial to Administrative Denaturalization:
    For Better or For Worse?*, 72 U. COLO. L. REV. 779 (2001) ...................43

James C. Ho, *Birthright Citizenship, The Fourteenth Amendment, and State
    Authority*, 42 U. RICH. L. REV. 969 (2008) .................................34

James C. Ho, *Defining "American": Birthright Citizenship and the Original
    Understanding of the 14th Amendment*, 9 Green Bag 2d 367 (2006) ............6

Bernadette Meyler, Note, *The Gestation of Birthright Citizenship, 1868-
    1898: States' Rights, the Law of Nations, and Mutual Consent*,
    15 Geo. Immigr. L.J. 519 (2001) ..........................................6

Nationality Act of 1940, ch. 876, § 201, 54 Stat. 1137, 1138 ............................9, 37

Gerald L. Neuman, *Justifying U.S. Naturalization Policies*,
    35 Va. J. Int'l L. 237 (1994) ...........................................2

Jessica Pullman-Pozen & Olatunde C.A. Johnson, *Federalism and Equal Citizenship: The Constitutional Case for D.C. Statehood*, 110 Geo. L.J. 1269 (2022)................................................................2

Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L. J. 405 (2020)..........................................................7, 33

William Rawle, A View of the Constitution of the United States of America, 80 (2d Ed. 1829)..................................................................34

S. Rep. No. 82-1137 (1952) ......................................................37

Joseph Story, *Commentaries on the Conflict of Laws* § 48 (1834) ........................35

*To Revise and Codify the Nationality Laws of the United States into a Comprehensive Nationality Code: Hearings on H.R. 6127 Superseded by H.R. 9980 Before the Committee on Immigration and Naturalization*, 76th Cong. 28 (1948) ..........................................38

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

This appeal involves a preliminary injunction enjoining a presidential executive order that seeks to strip the constitutional right of citizenship from scores of individuals. Pursuant to Fed. R. App. P. 34(a)(1) and 1st Cir. R. 34.0(a), the *Doe* Plaintiffs respectfully request this Court hear oral argument given the nature and importance of the issues at stake.

# STATEMENT OF THE CASE

## I.    INTRODUCTION

Defendants-Appellants[1] begin their brief by reciting the settled principle that "the Citizenship Clause of the Fourteenth Amendment … repudiated the Supreme Court's shameful decision in *Dred Scott v. Sandford*."[2]  However, in the pages that follow, they articulate a theory of birthright citizenship straight out of *Dred Scott*'s playbook.  The *Dred Scott* majority infamously barred Black people from citizenship as a matter of ancestry.  *See Dred Scott v. Sandford*, 60 U.S. 393, 404-427 (1857).  The Court held that the term "citizens" as used in the Constitution referred only to the descendants of those "recognized" as citizens at the time of the founding; and excluded Black Americans whose ancestors, the Court said, were viewed at that time as "a subordinate and inferior class."  *Id.* at 404-405, 406.

This explicitly racist and hereditary conception of birthright citizenship is precisely what we as a country renounced when we enshrined the Citizenship Clause into the Constitution in the wake of the Civil War.[3]  *See* JA16-17.  As legal scholars

---

[1] The Defendants-Appellants in this case are Donald J. Trump, in his official capacity as President of the United States; U.S. Department of State; Marco Rubio, in his official capacity as Secretary of State; U.S. Social Security Administration; and Michelle King, in her official capacity as Acting Commissioner of Social Security (collectively, the "Government").

[2] Appellants' Br. 1.

[3] The Supreme Court has repeatedly said that the primary purposes of the Citizenship Clause were to overrule the doctrine of *Dred Scott* and forever preserve

have explained, the Clause "decoupled citizenship from race and notions of caste"[4] and "guarantee[d] full citizenship rights to the native-born in order to prevent the reemergence of a hereditary caste of subordinated denizens."[5]  And yet the Executive Order ("EO") at issue here seeks to once again impose a hereditary test for birthright citizenship.  It dictates that the citizenship of each child born on U.S. soil will now depend on the immigration status of that child's parents.  Mirroring the doctrine of *Dred Scott*, the EO denies citizenship and its benefits to those born to members of a group disfavored by its proponents—immigrants without permanent status.

Plaintiffs are among the many thousands who would be immediately and irreparably harmed by the EO.  As the district court correctly found, plaintiffs more than surpass the four-part standard for issuance of a preliminary injunction.  On the merits, the EO violates the well-established meaning of the Citizenship Clause and its parallel federal statute, 8 U.S.C. § 1401.  The Citizenship Clause states that "[a]ll

---

the citizenship of Black Americans.  *See Afroyim v. Rusk*, 387 U.S. 253, 262 (1967) (stating that the "chief interest of the people in giving permanence and security to citizenship in the Fourteenth Amendment was the desire to protect Negroes"); *Slaughter-House Cases,* 83 U.S. 36, 73 (1872) (noting that the Citizenship Clause "overturns the *Dred Scott* decision by making *all persons* born within the United States and subject to its jurisdiction citizens of the United States") (emphasis in original).

[4] Jessica Pullman-Pozen & Olatunde C.A. Johnson, *Federalism and Equal Citizenship: The Constitutional Case for D.C. Statehood*, 110 GEO. L.J. 1269, 1289 (2022).

[5] Gerald L. Neuman, *Justifying U.S. Naturalization Policies*, 35 Va. J. Int'l L. 237, 248 (1994).

2

persons born … in the United States, and subject to the jurisdiction thereof, are citizens of the United States ….”  U.S. Const. amend. XIV, § 1.  This plain text imposes no hereditary or racial prerequisite for citizenship.  Instead, it limits the citizenship of people born in the United States only by saying that they must be “subject to the jurisdiction thereof.”  *Id.*  And, despite the Government’s attempts to obfuscate, the Supreme Court has squarely held that the term “jurisdiction” refers to the nation’s sovereign lawmaking power—a power to which U.S.-born children of immigrants and citizens alike are fully “subject.”

The Supreme Court’s landmark ruling in *United States v. Wong Kim Ark* permits no other interpretation.  That decision explained in exhaustive detail, with reference to text, history, and precedent, that the Citizenship Clause “affirm[ed] the ancient and fundamental rule of citizenship by birth within the territory…” otherwise known as *jus soli*.  *United States v. Wong Kim Ark*, 169 U.S. 649, 667, 693 (1898).  Under *jus soli* as applied at common law, “all children, born within the dominion of the United States” including “of foreign parents holding no diplomatic office” were “citizens at the time of their birth” with only a few rare and circumscribed exceptions.  *Id.* at 664.

Indeed, the Court made clear that the common thread running through the four narrow American exceptions to *jus soli*—the children of “sovereigns or their ministers,” those “born on foreign public ships,” those “born of enemies … during

a hostile occupation", and "the children of members of the Indian tribes", *id.* at 693—was that each had some degree of immunity from U.S. law. *See id.* at 655, 658, 680-685. The Court elucidated that it had previously used the term "jurisdiction" as shorthand for the "full and absolute" lawmaking power of the nation within its territory; and that Congress would have "understood and intended" that term "in the same sense" as part of the Citizenship Clause. *Id.* at 684, 687 (cleaned up). Ultimately, the Court determined that the jurisdiction qualifier "was not intended to impose any new restrictions upon citizenship," *id.* at 676, but, rather, to "exclude, by the fewest and fittest words" those classes excepted at common law. *Id.* at 682.

The upshot is simple. By limiting the Citizenship Clause's scope to those subject to U.S. "jurisdiction"—a term understood as the "full" lawmaking power of the nation—Congress simply and intentionally enshrined the list of recognized exceptions to *jus soli* in America. Because the EO strips citizenship from an enormous swath of native-born people who are fully subject to U.S. law and fall outside the scope of those exceptions, it is flagrantly illegal.

The district court also correctly found that the harm Plaintiffs will suffer if the EO is not enjoined is both irreparable and massive. The act of stripping someone of their citizenship is so grave that the Supreme Court has called it "a form of punishment more primitive than torture" that amounts to "the total destruction of the

individual's status in organized society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). De-naturalization is highly stigmatizing and forces those subjected to it to live with the uncertainty and fear that come with the threat of banishment from their native country. *See, e.g.*, *Fedorenko v. United States*, 449 U.S. 490, 525 n.14 (1981) (all citizens are lawfully entitled "to enjoy the benefits of citizenship in confidence and without fear"); *see also Obergefell v. Hodges*, 576 U.S. 644, 663 (2015) (affirming the centrality of "individual dignity and autonomy"). The record is replete with evidence of these cascading harms to Plaintiffs and others like them, from becoming deportable, to being rendered stateless, to loss of healthcare access and more.

Finally, the district court correctly found that the balance of harms and the public interest tip sharply in Plaintiffs' favor. If the EO were allowed to take effect, even if it were later enjoined, it would distort and contort American society with a conception of citizenship that has been outlawed by the Constitution, prohibited by Supreme Court precedent, and rejected by Congress. It would also cause grievous harm to Plaintiffs and thousands of others like them.

The district court's grant of a preliminary injunction should be affirmed.

## II.    BACKGROUND

### A.    The United States Has a Long History of Broad Territorial Birthright Citizenship, Dating Back to the Colonial Period.

Prior to the Fourteenth Amendment's ratification in 1868, the U.S. Constitution repeatedly used the term "citizen" without defining it.[6]  Early American courts relied on English common law conventions to clarify the ambiguities this created and, in doing so, broadly embraced the common law idea of *jus soli*, outlined above.[7]  As the Supreme Court has explained, "[t]he fundamental principle of the common law with regard to English nationality was birth within the allegiance— also called 'ligealty,' 'obedience,' 'faith,' or 'power'—of the king."  *Wong Kim Ark*, 169 U.S. at 655.  "Allegiance" was not subjective.  It did not require an "oath," but rather attached automatically to anyone, including "aliens in amity, *so long as they were within the kingdom*."  *Id.*  (emphasis added).  "Children, born in England, of such aliens, were therefore natural-born subjects" with limited exceptions for those, like the children of ambassadors, who were "not born within the allegiance, the

---

[6] *See Slaughter-House Cases*, 83 U.S. at 72; Bernadette Meyler, Note, *The Gestation of Birthright Citizenship, 1868-1898: States' Rights, the Law of Nations, and Mutual Consent*, 15 GEO. IMMIGR. L.J. 519, 526 (2001).

[7] *See Wong Kim Ark*, 169 U.S. at 649-664 (citing cases); Jonathan C. Drimmer, *The Nephews of Uncle Sam: The History, Evolution, and Application of Birthright Citizenship in the United States*, 9 GEO. IMMIGR. L.J. 667, 683-685 (1999) (citing cases); James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 GREEN BAG 2d 367, 369, 369 n.12 (2006) (citing cases).

obedience or, *as would be said at this day*, within the *jurisdiction*, of the king." *Id.* (emphasis added).

The same rule was "in force" during the American colonial period and "continued to prevail under the constitution as originally established" in the early United States. *Id.* at 658. However, in 1858, the *Dred Scott* Court adopted a racist and hereditary departure from the traditional English rule of *jus soli*. 60 U.S. at 404-405, 406. The ruling helped spark the Civil War[8] and was harshly criticized even contemporaneously.[9] Following the Union's victory over the Confederacy, Congress quickly acted to overturn the *Dred Scott* decision. Initially, it did so via statute, passing the Civil Rights Act of 1866, which provided that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States[.]" *Civil Rights Act of 1866*, ch. 31, § 1, 14 Stat. at 27. But understanding "it unwise, and perhaps unsafe, to leave so important a declaration of rights to depend upon an ordinary act of legislation, which might be repealed by any subsequent congress," Congress and the

---

[8] *See* Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L. J. 405, 417 (2020) (noting that *Dred Scott* was a "flashpoint" in the country's conflict over slavery); Joseph W. Dellapenna, *Constitutional Citizenship Under Attack*, 61 Vill. L. Rev. 477, 485 (2016) (explaining that the "decision fed into the heated debate that led to the Civil War just a few years later").

[9] *See* Ramsey*, supra* note 8 at 417 (noting that the dissenters "ridiculed" the majority's holding and that some politicians "renounced" it).

states codified the Citizenship Clause in the Fourteenth Amendment to the Constitution, completing its ratification in 1868.[10]  *Wong Kim Ark*, 169 U.S. at 675.

Although there is no doubt that the Citizenship Clause's "main purpose" was to establish the citizenship of freed slaves, the Supreme Court has explicitly highlighted that "the opening words, 'All persons born,' are general, not to say universal, restricted only by place and jurisdiction, and not by color or race …." *Id.* at 676.  Consistent with the principles of equality and fairness embedded in the Fourteenth Amendment,[11] the Supreme Court has held that Congress intended this "broad and clear" grant of birthright citizenship to apply to *all* Americans born on U.S. soil, "whether the children of citizens or of foreigners," so long as they do not fall into one of the rare exceptions to birthright citizenship recognized at American common law.  *Id.* at 675, 693, 704.

---

[10] The Government repeatedly conflates the Citizenship Clause with the Civil Rights Act in its brief, *see*, *e.g.*, Appellants' Br. 11, 20-21, but they are not one and the same.  A thorough review of historical context shows that the Clause's "meaning must stand on its own."  Garrett Epps, *The Citizenship Clause: A "Legislative History"*, 60 AM. U. L. REV. 331, 352 (2010) (explaining this is so because the Clause "has different wording; it emerged from a different political situation; it was adopted under different procedures and had different authors, and it was approved by different voting bodies").

[11] *See*, *e.g.*, *Shelley v. Kraemer*, 334 U.S. 1, 23 (1948) (stating that "the matter of primary concern [for the Fourteenth Amendment] was the establishment of equality in the enjoyment of basic civil and political rights …").

In 1940, Congress codified the same language from the Citizenship Clause into federal statute. *See* Nationality Act of 1940, ch. 876, § 201, 54 Stat. 1137, 1138. In 1952, Congress did so again in the Immigration and Nationality Act ("INA"). Section 301(a) of the INA, codified at 8 U.S.C. § 1401(a), provides that any "person born in the United States, and subject to the jurisdiction thereof" is a "citizen[] of the United States at birth." 8 U.S.C. § 1401(a) (1952).

### B. The Trump Administration Issues the EO, Radically Redefining Birthright Citizenship.

Fast forward to January 2025. The text of the Citizenship Clause and its analogue statute are long unchanged. Likewise, the principles stated in *Wong Kim Ark*—including that the Citizenship Clause did not "impose any new restrictions on citizenship"—remain intact. 169 U.S. at 676. Yet, on the first day of his presidency, Defendant Donald J. Trump issued the EO, which the Government admits "identifies two *additional* categories" of people excluded from the Citizenship Clause's reach. Appellants' Br. at 13 (emphasis added).

Entitled "Protecting the Meaning and Value of American Citizenship", the EO declares that a person born in the United States falls outside the scope of the Citizenship Clause if born to: (i) a mother who is "unlawfully present" or whose presence is "lawful but temporary"; and (ii) a father who is neither a citizen nor a lawful permanent resident. JA485. It expressly prohibits federal agencies and

9

departments from issuing or accepting documents recognizing the citizenship of children within the targeted group.  JA485-86.

### C. Facing Immediate and Irreparable Harm, the Doe Plaintiffs Sue to Enjoin Enforcement of the Patently Unlawful EO.

Plaintiffs O. Doe, Brazilian Worker Center, and La Colaborativa (the "*Doe Plaintiffs*") brought suit challenging the legality of the EO within hours of its issuance, and filed a motion for a preliminary injunction shortly thereafter.  JA10-32.  As the declarations supporting the motion demonstrated, each of the *Doe* Plaintiffs will be immediately and irreparably harmed by implementation and enforcement of the EO—a point so convincingly made by the *Doe* Plaintiffs below that the Government does not even contest it (and has therefore forfeited any argument to the contrary) on appeal.

The supporting declarations, unrebutted by the Government in the district court, set forth the following basic facts.  Plaintiff O. Doe, an expectant mother, resides in the United States through Temporary Protected Status (TPS) from Haiti.  JA33.  Under the EO, her unborn child would not be recognized as a U.S. citizen due to her immigration status and that of her husband.  JA13.  Doe's Co-Plaintiffs are both membership organizations based in Eastern Massachusetts that provide immigration-related assistance; and have members who fall into the class targeted by the EO and are either pregnant or planning to grow their families.  JA13-14.

D.     **The District Court Enjoined the EO.**

The district court considered the *Doe* Plaintiffs' preliminary injunction motion alongside a parallel motion filed by a coalition of States and, in a comprehensive and well-reasoned decision, enjoined the EO.[12]  In doing so, the district court held that "the plaintiffs are exceedingly likely to prevail on the merits of their constitutional and statutory claims."  (Add. 29).

The court also determined that the irreparable-harm factor "favors the plaintiffs strongly" because "what is at stake [for *Doe Plaintiffs*] is a bedrock constitutional guarantee and all of the attendant privileges" the deprivation of which "*even if temporary*, and later restored at the conclusion of litigation – has cascading effects that would cut across a young child's life (and the life of that child's family), very likely leaving permanent scars."  (Add. 30 (emphasis added)).

The district court found that the Doe Plaintiffs demonstrated that leaving newborn children stateless or without legal status would subject them to immediate and concrete harms—including "barriers [in] accessing critical healthcare, among other services, along with the threat of removal to countries they have never lived in and possible family separation."  *Id.*;  *see also* JA50 (Danaher Decl. ¶5 ("Income-

---

[12] In the *Doe* case, the Court enjoined the Defendants from "implementing and applying the EO against Doe or any member of either plaintiff organization…." (Add. 33).  In the companion *New Jersey* case, the Court entered "universal or nationwide relief…." (*Id.* at 34).

eligible children whose immigration status bars eligibility for public health insurance programs are uninsured at more than seven times the rate of comparable children with U.S. citizenship.")); JA37 (Vega Decl. ¶12 (individuals "who are undocumented may delay or avoid seeking medical care altogether due to confusion, fear of deportation, or stigma, putting their children at heightened risk for untreated conditions and developmental delays.")).

These harms are not hypothetical. As the court observed, a child born into the Doe family would grow up in a home where her U.S. citizen sibling enjoys full legal rights and protections, while she—an infant—would be treated as a second-class citizen, denied critical benefits, and placed at risk of removal. (Add. 30). That is the very definition of irreparable harm. Crucially, the Government did not dispute—let alone rebut—any of the factual evidence submitted in the Doe Plaintiffs' declarations. (Add. 30). And for good reason: the record is unambiguous, and the consequences for these children and thousands like them would be both immediate and profound.

The court also determined that the balance-of-the-harms and public-interest factors strongly favored issuance of the injunction. (Add. 31-32). Finally, the court confirmed that the *Doe* Plaintiffs have standing. (Add. 13). The court noted that the Government did not challenge the standing of any of the *Doe* Plaintiffs, "nor could [it]" because the *Doe* Plaintiffs "plainly established injury … that is concrete,

imminent, traceable to the EO, and redressable by the relief" sought in the lawsuit. (Add. 16).

The Government appealed.

## SUMMARY OF THE ARGUMENT

The EO is blatantly unlawful. It cannot be squared with the text of the Citizenship Clause, longstanding Supreme Court and First Circuit precedent, or a federal statute set in stone for more than 85 years.

At the outset, the key question here is whether the class of people the EO targets for denial of citizenship rights—children born on U.S. soil to parents with temporary immigration status—fall within the meaning of "subject to the jurisdiction thereof" as written in the Citizenship Clause. *Wong Kim Ark* provides a resounding answer in the affirmative. That case stands for two key principles: (1) that "jurisdiction" refers to the "full" lawmaking power of the United States; and (2) that the Citizenship Clause codified only the limited exceptions to *jus soli* established at common law. Taken together, these principles dictate that any native-born person who is fully subject to U.S. law, i.e., lacking some kind of recognized immunity from it, is a birthright citizen. Because the EO purports to strip citizenship from countless people who meet that definition, it is, therefore, unconstitutional. The immigration status of one's parents simply does not matter under the Citizenship Clause.

Since *Wong Kim Ark*, the Supreme Court and this Court have repeatedly reaffirmed these principles.  Even if this more recent precedent could be sidestepped (and it cannot be), the Government's arguments still must be rejected.  The Government recycles a host of arguments already considered and rebuffed by the Supreme Court in *Wong Kim Ark*.  Among those are its attempts to write domicile and "primary allegiance" requirements into the Citizenship Clause. Moreover, its presentation of historical sources—including cherry-picked quotes from legislative debates and other non-precedential sources—is incomplete and unavailing.

Separate from their constitutional claim, the *Doe* Plaintiffs have established a strong likelihood of success on the merits of their statutory claim under 8 U.S.C. § 1401.  When that statute was codified—borrowing language directly from the Citizenship Clause—*Wong Kim Ark*'s broad interpretation of the Clause was well-settled. This time-of-enactment meaning controls and, even if it did not, the Government has waived the counterarguments they raise for the first time on appeal.

The *Doe* Plaintiffs have also fully demonstrated the irreparable harms they, or their members, would suffer should the EO be implemented, including the destabilizing threat of deportation, likelihood of family separation, barriers to accessing healthcare and other necessities of life.  The district court's conclusion on

14

this element was supported by a robust evidentiary record and the Government does not attempt to challenge it on appeal.

Similarly, the balance of equities and public interest favor injunctive relief. This Court has already considered and rejected the generic and unsupported assertions of harm that the Government argues it will suffer if the injunction is left intact. *See New Jersey v. Trump*, 131 F.4th 27, 41 (1st Cir. 2025). It should reject these arguments once again.

Finally, in a last-ditch effort to avoid the injunction, the Government debuts a new argument on appeal: an unpreserved scope-of-injunction argument that the Government attempts to cloak in the garb of "Article III standing" to avoid forfeiture. But the Government has forfeited this argument. And, even if this Court deems it preserved, the Government's argument is meritless. The Government admits, as it must, that Plaintiff O. Doe has Article III standing and that "the organizations each satisfied [the standing] burden for one or two identified members' claims by providing a declaration explaining that member's standing." That resolves Article III standing, as confirmed by the very cases that the Government cites. The remainder of the Government's mislabeled argument

concerns the scope of the injunction entered by the district court, a challenge the Government forfeited by not raising it below.

The district court's issuance of the preliminary injunction should be affirmed in its entirety.

## STANDARD OF REVIEW

A district court's grant of a preliminary injunction is reviewed for abuse of discretion.  *See DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 419, 423 (1st Cir. 2024). The scope of the preliminary injunction is similarly reviewed by this Court for abuse of discretion.  *Id.*  On abuse-of-discretion review, the Court defers to the district court unless it made "an obvious mistake of judgment."  *Id.* at 419.  Questions of law are reviewed *de novo* and findings of fact for clear error.  *Id.*

## ARGUMENT

**I.    THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS HAVE DEMONSTRATED A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS THAT THE EXECUTIVE ORDER IS UNLAWFUL.**

### A.    The Executive Order is Unconstitutional under Binding Precedent from the Supreme Court.

In *Wong Kim Ark*, the Supreme Court took pains to explain—in a myriad of ways—that a person is "subject" to United States "jurisdiction" under the Citizenship Clause if they are fully subject to U.S. law.  It made this point explicitly

as well as by reference to case law and other sources. And it endorsed a list of narrow exceptions to birthright citizenship—exceptions that prove the rule.

As a starting point, the Court directly stated that "[i]t can hardly be denied that an alien is completely subject to the political jurisdiction of the country in which he resides, seeing that … [as] repeated by this court: for so long a time as he continues within the dominions of a foreign government, [he] owes obedience to the laws of that government." *Wong Kim Ark*, 169 U.S. at 693-694. This is so, the Court explained, "independently of" factors such as "residence with intention to continue such residence", "domiciliation", and "the taking of any oath of allegiance, or of renouncing any former allegiance." *Id.* at 693 (cleaned up). These words leave no room for ambiguity—a non-citizen comes within a country's "jurisdiction" if they have a duty to obey the country's laws.

The Court also cited with approval the concept of "jurisdiction" articulated in *Schooner Exchange v. McFadden*. *See id.* at 683-686. The *Wong Kim Ark* Court described as "incontrovertible principles" *Schooner*'s points that: "the jurisdiction of every nation within its own territory is … full and absolute"; and that all exceptions to that jurisdiction "must be traced up to [the nation's] own consent." *Id.* at 686. Among other references to *Schooner*, the Court also quoted that case for its explanation of why "aliens" are not "exempt" from a country's jurisdiction while in that country: "[w]hen private individuals of one nation spread themselves through

17

another as business or caprice may direct … it would … subject the laws to continual infraction … if such individuals … did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country." *Wong Kim Ark*, 169 U.S. at 685-86 (quoting *Schooner Exch. v. McFadden*, 11 U.S. (7 Cranch) 137, 144 (1803)).

Viewed together, these points make clear that the *Schooner* Court used the word "jurisdiction" to refer to a nation's "full and absolute" lawmaking authority over its territory—a power that indisputably applies to foreign individuals present even temporarily. And, critically, *Wong Kim Ark* explicitly held that Congress intended to enshrine *Schooner*'s concept of jurisdiction into the Citizenship Clause. The Court stated that "Congress" as well as "the legislatures which [ratified]" the Citizenship Clause "must be presumed to have … understood and intended" the Clause's words "in the same sense" as "the like words" used in *Schooner*. *Id.* at 687. The phrase "subject to the jurisdiction thereof, therefore, means: subject to the full lawmaking authority of the United States.

What is more, the *Wong Kim Ark* Court found that Congress embedded four— and only four—*jus soli* exceptions into the Citizenship Clause, all of which concerned individuals widely understood to have some degree of immunity from U.S. law. The Court declared that "[t]he fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory … including all children here born of resident aliens, with the exceptions" of children born: to

foreign sovereigns and diplomats; on foreign public ships; enemies in hostile occupation; and of "members of the Indian tribes owing direct allegiance to their several tribes." *Id.* at 693. Based on the "face of the amendment" and "the history of the times," the Court concluded that the Citizenship Clause was "not intended to impose any new restrictions upon citizenship." *Id.* at 676. The Clause, therefore, only codified these common law exceptions and the principles underlying them. *Id.*

The Court's discussion of the exceptions—and the cases it relies on—demonstrate how each exception was founded on some recognized exemption from U.S. law. *See generally Wong Kim Ark*, 169 U.S. at 680-687; *see also Elk v. Wilkins*, 112 U.S. 94, 99-100, 102 (1884) (discussing exception for Native Americans and noting that, historically, that group could not be taxed by state or federal governments, that "General acts of Congress did not apply to them", and that they were "no more ... subject to [U.S.] jurisdiction" than the "children of … ambassadors"); *United States v. Rice*, 17 U.S. 246, 254 (1819) (explaining that during British "conquest and military occupation" of a Maine town "the laws of the United States could no[] longer be rightfully enforced there"); *Schooner Exch.*, 11 U.S. (7 Cranch) at 138, 147 (discussing "the immunity which all civilized nations allow to foreign ministers" and the "implied promise" that "[foreign] armed ships" are "exempt from the jurisdiction of the country" while in its "territory").

19

All these pieces come together to form an unmistakable picture. At the time of the Fourteenth Amendment's passage, Congress understood jurisdiction to mean the "full" lawmaking power of the nation. It also sought to constitutionalize the broad sweep of *jus soli*, as well as its rare exceptions for groups not fully subject to U.S. law. The simplest solution, therefore, was to narrowly exclude those groups by limiting the Citizenship Clause's reach to the universe of people wholly covered by U.S. law, that is, within the country's "jurisdiction." And, as *Wong Kim Ark* says, that is precisely what Congress did by the "fewest and fittest words." *Wong Kim Ark*, 169 U.S. at 469.

The Government contends that "jurisdiction" cannot merely mean "the power to regulate" because that definition would not exclude the common law exceptions. *See* Appellants' Br. at 14-18. However, this argument relies on a misstatement of Plaintiffs' position, which defines "jurisdiction" as the "full and absolute" lawmaking power of the United States, not some portion of it. Even assuming, *arguendo*, the Government has some authority over the excepted groups, that would not change the outcome here. What matters is that, at the time of the Fourteenth Amendment's adoption, these groups had longstanding and recognized exemptions from U.S. law, which enshrined them as exceptions within the Citizenship Clause.

Fundamentally, the EO purports to deny citizenship to a huge group of native-born people who—like the Plaintiffs and their members—fall into none of the four

*jus soli* exceptions and are fully bound by U.S. law.  That group is entitled to citizenship under the Citizenship Clause and the EO's attempt to negate that guarantee is nothing short of an unconstitutional abuse of power.  Just like the *Dred Scott* doctrine on which it is founded, the EO cannot be allowed to stand.

### B.    Supreme Court and First Circuit Precedent Have Routinely Affirmed Birthright Citizenship for All But the Few Narrow and Well-Defined Exceptions.

The district court correctly held that birthright citizenship under the Citizenship Clause depends on only two factors: (1) "the location of the [child's] birth", and (2) "the inapplicability of the narrow exceptions to birthright citizenship that had been identified by the [*Wong Kim Ark*] Court."  (Add. 21).  Contrary to the Government's arguments, birthright-citizenship analysis has never considered things like "[t]he duration of the parents' residency in the United States … [or the] laws preventing the parents from seeking naturalization."  *Id.*

The Supreme Court has repeatedly reaffirmed this principle.  *See, e.g., Weedin v. Chin Bow*, 274 U.S. 657, 670 (1927) (reaffirming the principle that "one born in the United States, although of a race and of a parentage denied naturalization under the law, [is] nevertheless, under the language of the Fourteenth Amendment, a citizen of the United States by virtue of the jus soli embodied in the amendment").[13]

---

[13] *See also, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 510 (2004) (treating the petitioner as a U.S. citizen based on his birth in Louisiana without discussing his parents' status, who were lawfully but temporarily present); *Nishikawa v. Dulles*,

In essence, excluding situations concerning the few well-defined exceptions explicitly recognized in *Wong Kim Ark*, a child born within the United States is entitled to citizenship by birth, regardless of the parents' status or the circumstances of their entry into, or duration living in, the country.

Following this binding Supreme Court precedent, this Court has also repeatedly recognized that any child born in the United States (outside the limited exceptions) is a citizen. *See, e.g., Hasan v. Holder*, 673 F.3d 26, 28 n.1 (1st Cir. 2012) (recognizing that a child of noncitizens who overstayed their nonimmigrant visas in the United States was still a U.S. citizen by virtue of "having been born in the United States"); *Mariko v. Holder*, 632 F.3d 1, 3, 8 n.4 (1st Cir. 2011) (deeming a child "born in the United States" to be a "United States citizen" despite the concession that the parents "were here illegally" and thus removable); *Dos Reis ex rel. Camara v. Nicolls*, 161 F.2d 860, 861-62 (1st Cir. 1947) (asserting that person

---

356 U.S. 129, 131 (1958) (explaining that petitioner born in California to Japanese-citizen parents was a U.S. citizen); *Kawakita v. United States*, 343 U.S. 717, 720 (1952) (explaining that a person born in the United States "of Japanese parents who were citizens of Japan" was nonetheless "a citizen of the United States by birth."); *Hirabayashi v. United States*, 320 U.S. 81, 96-97 (1943) (noting that thousands of "persons of Japanese descent" living on Pacific coast "are citizens because [they were] born in the United States," even though they were "under many circumstances deemed, by Japanese law, to be citizens of Japan."); *Perkins v. Elg*, 307 U.S. 325, 329 (1939) (explaining that "at birth [plaintiff] became a citizen of the Unites States" notwithstanding parents' Swedish nationality); *Ah How v. United States*, 193 U.S. 65, 65 (1904) (accepting without question that a petitioner was "therefore" a citizen due simply to the evidence he offered that he had been born in the United States).

22

born in Massachusetts became "an American citizen, not by gift of Congress, but by force of the Constitution," irrespective of his parents' status as foreign nationals who had "never naturalized in the United States.").

The requirement the Government seeks to impose—that a child's parents must have been *lawfully* and *permanently* present in the United States for the Citizenship Clause to apply—finds no support in the precedent of the Supreme Court or the First Circuit. A child born in the United States whose parents were not domiciled in the United States is a citizen.[14] A child born in the United States whose parents' presence is "unlawful" at the child's birth is also a citizen.[15] In *INS v. Rios-Pineda*, the Supreme Court unanimously acknowledged that a child "born in the United States[] was a citizen of this country" despite the fact that both parents were Mexican citizens and that they had "paid a professional smuggler … to transport them" across the border. 471 U.S. 444, 446 (1985). Similarly, in *United States ex rel. Hintopoulous v. Shaughnessy*, the Supreme Court accepted that a child born to

---

[14] *See, e.g., Hamdi*, 542 U.S. at 510; *Hasan*, 673 F.3d at 28 n.1.

[15] *See INS v. Errico*, 385 U.S. 214, 215-16 (1966) (noting that two different children "acquired United States citizenship at birth" although their parents gained admission to this country by misrepresenting their status for the purpose of evading statutory quota restrictions on lawful immigration); *see also Plyler v. Doe*, 457 U.S. 202, 211 n.10 (1982) ("[N]o plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful."); *Mariko*, 632 F.3d at 3, 8 n.4.

parents in the United States who entered the country legally but overstayed their legal status was "of course, an American citizen by birth," despite the parents' "illegal presence[.]" 353 U.S. 72, 73 (1957).

In sum, in *Wong Kim Ark* and its progeny, both the Supreme Court and this Court have rejected the Government's view that Constitutional birthright citizenship turns on parental immigration status. This Court need look no further to affirm the district court's holding that the *Doe* Plaintiffs are likely to succeed on the merits.

### C. The Government's Arguments Concerning the "Original Meaning" of the Citizenship Clause have Already Been Considered and Rejected by the Supreme Court.

a. <u>The *Wong Kim Ark* Court Rejected the Government's Argument that a Child Must Have "Primary Allegiance" to the United States and No Other Foreign Power to be a Citizen.</u>

Relying primarily on *Elk v. Wilkins*, the Government argues that birthright citizenship extends only to those who owe primary allegiance to the United States and to no other foreign power. (Appellants' Br. 14-23). That argument, too, has been considered and rejected by the Supreme Court.

The *dissent* in *Wong Kim Ark* took the same position.[16] But the majority rebuffed it, instead explaining that "allegiance" in the citizenship-by-birth context,

---

[16] *See Wong Kim Ark*, 169 U.S. at 725 (Fuller, J., dissenting) (relying on *Elk* and arguing that "[t]o be 'completely subject' to the political jurisdiction of the United States is to be in no respect or degree subject to the political jurisdiction of any other government").

pursuant to common law tradition, is conferred automatically by birth within the sovereign's territory, subject to only limited exceptions. This conception of "allegiance" is synonymous with a duty of obedience to the territorial sovereign. As the *Wong Kim Ark Court* explained, drawing on an earlier case, "'Allegiance *is nothing more than the tie or duty of obedience of a subject to the sovereign under whose protection he is*; and allegiance by birth is that which arises from being born within the dominions and under the protection of a particular sovereign.'" *Wong Kim Ark*, 169 U.S. at 659 (quoting *Inglis v. Sailors' Snug Harbor*, 28 U.S. 99, 155 (1830) (Story, J.) (emphasis added)). The district court therefore correctly concluded that "allegiance in the United States arises from the fact of birth. It does not depend on the status of a child's parents, nor must it be exclusive[.]". (Add. 8).

Similarly, the *Wong Kim Ark* Court has already rejected the Government's argument that the "not subject to any foreign power" language from the Civil Rights Act of 1866 must be read into the Citizenship Clause. (Appellants' Br. 11). First, the Court determined that "[i]n light of the law as previously established, and of the history of the times, it can hardly be doubted that the words of that act, 'not subject to any foreign power,' were not intended to exclude any children born in this country for the citizenship which would theretofore have been their birthright[.]" *Wong Kim Ark*, 169 U.S. at 688. Moreover, the Court reasoned, *even if* that language from the Civil Rights Act was inconsistent with *jus soli* principles, "any possible doubt in this

regard was removed when the negative words of the civil rights act, 'not subject to any foreign power,' gave way, in the fourteenth amendment of the constitution, to the affirmative words, 'subject to the jurisdiction of the United States.'" *Id.* The Government cannot in good faith argue that its interpretation of the "subject to the jurisdiction thereof" survives *Wong Kim Ark*.

Indeed, as the district court correctly recognized, if the Government were correct that the Citizenship Clause reaches only those who owe allegiance to the United States, and to no other foreign power, then *Wong Kim Ark* would have come out the other way. (Add. 26 ("The defendants veer off course, however, by suggesting allegiance must be exclusive, and that it derives from the status of a child's parents. … This principle would also rule out the petitioner in Wong Kim Ark, whose parents resided for years in the United States but remained 'subjects of the emperor of China' (and, indeed, returned to China when their U.S.- born son was a teenager).")). Nor can the Government's argument be squared with the multiple Supreme Court cases recognizing that a child born in the United States is a U.S. citizen even where the child is also a dual citizen of another country. *See, e.g.*, *Kawakita v. United States*, 343 U.S. 717, 720 (1952) ("Petitioner was born in this country in 1921 of Japanese parents who were citizens of Japan. He was thus a citizen of the United States by birth, Amendment XIV, s 1 and, by reason of Japanese law, a national of Japan."); *Hirabayashi v. United States*, 320 U.S. 81, 96-97 (1943)

26

(noting that thousands of "persons of Japanese descent" living on Pacific coast "are citizens because [they were] born in the United States," even though they were "under many circumstances deemed, by Japanese law, to be citizens of Japan.").

As the Government's "primary allegiance" argument has already been considered and rejected by the Supreme Court, it must also fail here.

### b.  The *Wong Kim Ark* Court Considered, and Rejected, the Government's Argument that Parental Domicile is Required under the Citizenship Clause.

The Government argues that parental domicile is required under the Citizenship Clause. (*See* Appellants' Br. 24-33, 37-43). But the district court below correctly concluded that "the text [of the Citizenship Clause] includes no domicile requirement at all." (Add. 8). Indeed, the argument that the Citizenship Clause requires domicile was considered and rejected by the Court in *Wong Kim Ark.*

Once again, the dissent in *Wong Kim Ark* put forth the same argument as the Government on this point,[17] only to have it rejected by the majority. First, the Court explicitly stated that to be "subject to the jurisdiction thereof" did not depend on domicile or intent to remain but rather existed "independently of any domiciliation[.]" 169 U.S. at 693. Second, the Court chronicled the *jus soli*

---

[17] *See, e.g.,* 169 U.S. at 715 (Fuller, J., dissenting) ("it is unreasonable to conclude that 'naturalborn citizen' applied to everybody born within the geographical tract known as the United States, irrespective of circumstances; and that the children of foreigners, happening to be born to them while passing through the country were eligible [for citizenship]").

principles of English common law, under which "every person born within the dominions of the crown, no matter whether of English or of foreign parents, and in the latter case, whether the parents were settled, *or merely temporarily sojourning, in the country*, was an English subject." *Id.* at 657 (emphasis added). This was part of "the fundamental principle of citizenship by birth within the territory" that the Court held "[t]he fourteenth amendment affirms." *Id.* at 693.

Third, and along similar lines, the Court explained that, in this country as in England, the principle "[t]hat all children, born within the dominion of the United States, of foreign parents holding no diplomatic office, became citizens at the time of their birth, does not appear to have been contested or doubted until more than 50 years after the adoption of the constitution[.]" *Id.* at 664 (citing *Lynch v. Clarke*, 1 Sand. Ch. 583, 663 (N.Y. Ch. Ct. Jan. 1, 1844)). The child in *Lynch* was born in the United States to non-citizen Irish parents who were on a "temporary sojourn" to the United States at the time of the child's birth. *Lynch v. Clarke*, 1 Sand. Ch. at 638. And, as *Wong Kim Ark* pointed out, the *Lynch* Court rejected the novel contention that this fact somehow undermined the child's status as a citizen, "decid[ing] … in favor of [the child's] citizenship." *Wong Kim Ark*, 169 U.S. at 664.

As discussed thoroughly above, the *Wong Kim Ark* Court held that the Fourteenth Amendment broadly provided birthright citizenship for those born in the United States and enshrined only the narrow common law exceptions to birthright

citizenship. *Id.* at 676, 693. And, to put it plainly, neither English nor American common law recognized the domicile-based exception to *jus soli* the Government advances here. Thus, the Supreme Court has already rejected the idea that domiciliation matters for purposes of the Citizenship Clause. This Court should similarly reject that proposition in this appeal.

      c.    <u>The Government's Attempt to Downplay the Instructiveness of English Common Law Runs Counter to *Wong Kim Ark*.</u>

The Government argues that English common law is "not particularly instructive" as to birthright citizenship under the Citizenship Clause. (Appellants' Br. 42-43). But that argument blatantly disregards the English origins of American common law, and the fact that the *Wong Kim Ark* Court relied heavily on English common law. As that Court put it, citing to an earlier case, "[t]here is no common law of the United States, in the sense of a national customary law, distinct from the common law of England." *Wong Kim Ark*, 169 U.S. at 655 (cleaned up). Thus, "the interpretation of the constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, *and are to be read in the light of its history*." *Id.* (emphasis added). With that in mind, not only should this Court look to English common law in resolving the issues here, *Wong Kim Ark* established that doing so is necessary.

### D.    The Government's Effort to Cabin *Wong Kim Ark* Must Fail.

The Government argued below that "all but a handful of sentences from *Wong Kim Ark*" could be ignored as dicta, an argument that the district court correctly rejected as "brazen[ ]" and "reflect[ing] a serious misunderstanding at best – and a conscious flouting at worst – of the judicial process and the rule of law." (Add. 21). Although the Government carefully avoids using the word "dicta" in its brief on appeal, it nonetheless makes the argument—identical in substance if not form—that *Wong Kim Ark* must be limited solely to the "narrow question presented" and the few statements that were, in the Government's view, strictly necessary to resolve that question. (*See* Appellants' Br. 37-39, 41). This argument should be dispensed with under the same reasoning the district court applied to the dicta framing.

The passages from the *Wong Kim Ark* opinion upon which the *Doe* Plaintiffs rely were necessary to the decision and are not dicta. *See, e.g.*, *Wong v. Dulles*, 236 F.2d 622, 625 (9th Cir. 1956) (rejecting the argument that language from *Wong Kim Ark* was dictum, noting that "[t]he question before the court" required it "to distinguish between citizenship by birth and citizenship by naturalization" and concluding that the quoted language was "pertinent to the inquiry and a part of the rationale of the decision."). Moreover, even if those statements could be construed as dicta, which they cannot, they are at least "considered dicta," which this Court

has held is also binding. *United Nurses & Allied Prof'ls v. NLRB*, 975 F.3d 34, 40 (1st Cir. 2020) (courts "are bound by the Supreme Court's 'considered dicta'").

Where the dicta "bears the earmarks of deliberative thought purposefully expressed ... [it] must be accorded great weight and should be treated as authoritative." *United States v. Santana*, 6 F.3d 1, 9 (1st Cir. 1993). And several courts have recognized that the comprehensive *Wong Kim Ark* opinion bears several hallmarks of deliberative and careful reasoning and analysis. *See, e.g.*, *Afroyim v. Rusk*, 387 U.S. 253, 266 n.22 (1967) ("Some have referred to this part of the [*Wong Kim Ark*] decision as a holding, while others have referred to it as obiter dictum. Whichever it was, the statement was evidently the result of serious consideration and is entitled to great weight." (cleaned up)); *Weedin*, 274 U.S. at 660 (referring to "learned and useful opinion" in *Wong Kim Ark*).

Ultimately, what matters is that the passages *Doe* Plaintiffs rely on are binding. The litany of cases (*see supra* Argument, § II(A)(2)) from the Supreme Court and the First Circuit applying the birthright citizenship principle stated in *Wong Kim Ark* demonstrate as much, as does the Supreme Court's own view about the value of *Wong Kim Ark*'s discussion. *See*, *e.g.*, *Perkins*, 307 U.S. at 329 (citing *Wong Kim Ark* majority's "comprehensive review" supporting its "decision . . . that a child born here of alien parentage becomes a citizen of the United States"). Accordingly, *Wong Kim Ark* and all of its pronouncements are binding on this Court.

### E.    The Government's Recitation of Historical Context is Incomplete and Unavailing.

In light of *Wong Kim Ark* and its progeny, this Court need not consider the Government's remaining arguments concerning the purported "original meaning" of the Citizenship Clause.  However, even if the Court were to undertake a *de novo* review of the relevant history, the Government presents an incomplete and ultimately incorrect view of the Fourteenth Amendment's history.

*First,* notwithstanding its rejection by *Wong Kim Ark* (*see supra* Argument, § II(A)(3)(a)), the Government's claim that the "original meaning" of the Citizenship Clause encompassed "primary allegiance" and parental "domicile" (Appellants' Br. 14, 18) finds no support in other precedent.  Plaintiffs are not aware of, and the Government does not cite, a single post-*Wong Kim Ark* case supporting this position.  Instead, the Government relies primarily on three pre-*Wong Kim Ark* cases—the *Slaughterhouse Cases*, *Elk v. Wilkins,* and *Benny v. O'Brien* (*see* Appellants' Br. 15–18, 28).  The *Wong Kim Ark* Court expressly repudiated the sentence from the *Slaughterhouse Cases* that the Government relies on here, stating that it "was wholly aside from the question in judgment, and from the course of reasoning bearing upon that question" and also "unsupported by any argument, or by any reference to authorities[.]"  *Wong Kim Ark*, 169 U.S. at 678-79.  And the *Wong Kim Ark* Court similarly cabined the "primary allegiance" passage from *Elk*, cited by the Government, to apply only to Native Americans.  *See id.* at 682 ("The

decision in *Elk v. Wilkins* concerned only members of the Indian tribes within the United States, and had no tendency to deny citizenship to children born in the United States of foreign parents … not in the diplomatic service of a foreign country.").

The Government's reliance on *Benny* (Appellants' Br. 28) is also misplaced. *Wong Kim Ark* cited *Benny* only for *Benny*'s holding that a child born in the United States to non-citizen parents who were domiciled in the United States is a U.S. citizen. *Wong Kim Ark*, 169 U.S. at 692-93. *Wong Kim Ark* did not cite *Benny* for the dictum assertion that a child born in the United States to noncitizen parents who were in the United States only temporarily is not a U.S. citizen. Indeed, no case has ever cited *Benny* for this proposition. The only pre-*Wong Kim Ark* case to squarely address the question of whether a child born in the United States to noncitizen parents who were in the United States temporarily concluded there was "no doubt but that [the child] was a citizen." *Lynch*, 1 Sand. Ch. at 683; *see also Wong Kim Ark*, 169 U.S. at 664 (discussing *Lynch*).

*Second,* the Government's reliance on selected snippets from the legislative history of the Civil Rights Act of 1866 and the Citizenship Clause are incomplete and unavailing. Even putting aside the fact that the Government's reliance on the "not subject to any foreign power" language of the Civil Rights Act is foreclosed by *Wong Kim Ark* and its progeny (*see supra* Argument, § II(A)(3)(a)), the relevant legislative history does not support the government's interpretation. *See* Ramsey,

109 GEO. L.J. at 447-54 (extensively examining these debates and explaining why statements of the type relied upon by Defendants "are at best ambiguous" and are "insufficient to overcome the Clause's apparent textual meaning"); Epps, 60 AM. U. L. REV. at 355-62 (surveying debates and concluding that "the evidence more readily supports the broad reading of the [Citizenship] Clause than the restrictive one"); James C. Ho, *Birthright Citizenship, The Fourteenth Amendment, and State Authority,* 42 U. RICH. L. REV. 969, 972 (2008) (analyzing exchanges during congressional debates where legislators clarified that the term "subject to the jurisdiction" was intended to exclude children of foreign diplomats and ministers but included children born to immigrants, regardless of their legal status). Contrary to the select debate snippets cited by the Government, there is ample evidence that legislators understood that each would guarantee citizenship to all children born in the United States, except for those few narrow and well-defined exceptions. *Id.*[18]

---

[18] *See also* Cong. Globe, 39th Cong., 1st Sess. 2891 (1866) (remarks of Senator Conness); 2893 (Sen. Johnson); 2897 (Proponents defending the language and leading both sides to agree that the Clause would broadly confer citizenship upon children born on U.S. soil); 1117 (Rep. Wilson quoting constitutional law treatise that "Every person born within the United States, its Territories or districts, whether parents are citizens or aliens, is a natural-born citizen in the sense of the Constitution, and entitled to all the rights and privileges appertaining to that capacity." (quoting William Rawle, A View of the Constitution of the United States of America, 80 (2d Ed. 1829)).

*Third,* the Government's citation to patchwork statements from legal commentaries[19] and a bill from 1874 that never passed[20] do nothing to undercut that the Citizenship Clause applies to all children born in the United States regardless of the length or legality of their presence. That conclusion follows necessarily from *Wong Kim Ark*, and the Government can point to no case that has abrogated or even limited that decision. In fact, the historical records cited by the Government support the conclusion that *Wong Kim Ark* correctly stated the intended meaning of the phrase "subject to the jurisdiction thereof" in the Citizenship Clause.

---

[19] The Government relies on a snippet of Justice Story's Commentaries for its argument that birthright citizenship does not extend to children of noncitizen parents who were in the country temporarily (*see* Appellants' Br. 23) without disclosing that the very next sentence of that treatise acknowledges that the proposition Justice Story was offering was not well settled or accepted: "It would be difficult, however, to assert that in the present state of public law such a qualification is universally established." Joseph Story, *Commentaries on the Conflict of Laws* § 48, at 48 (1834); *compare Lynch*, 1 Sand. Ch. at 683 ("no doubt but that [the child born in the United States to noncitizen parents in this country on a temporary sojourn] was a citizen[.]").

[20] The Government's argument that, because Congress proposed (but did not pass) a bill six years after the ratification of the Citizenship Clause that would have limited birthright citizenship only to the children of noncitizens who reside in the United States, it was understood that the "parental domicile requirement" was part of the Citizenship Clause (Appellants' Br. 29) defies logic. *See Int'l Jr. Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 108 n.15 (1st Cir. 2015) ("[P]ostenactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation ... [because it] by definition could have had no effect on the congressional vote." (quoting *Bruesewitz v. Wyeth LLC,* 562 U.S. 223, 242 (2011))).

*Finally*, the Government grasps at straws when it invokes the principle that "when doubts exist concerning a grant of [citizenship], generally at least, they should be resolved in favor of the United States and against the claimant." (Appellants' Br. 36 (quoting *United States v. Manzi*, 276 U.S. 463, 467 (1928))). That principle applies in the context of *naturalization* proceedings, where the claimant bears the burden "to show his eligibility for citizenship in every respect." *INS v. Pangilinan*, 486 U.S. 875, 886 (1988) (cleaned up). This case concerns not a question of proof in an individual naturalization proceeding, but a question of the meaning of the text of our Constitution. The Government's position boils down to this: as long as it can conjure doubts about the scope of the Citizenship Clause, those unsupported doubts must redound to the Government's benefit, and constitutional rights must consequently be denied to those otherwise entitled to them. "This should be shocking not only to judges, but to the intuitive sense of liberty that Americans far removed from courthouses still hold dear." *Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at *1 (4th Cir. Apr. 17, 2025).

### F. The *Doe* Plaintiffs Established that They are Likely to Succeed on the Merits of Their Claim that the EO is Unlawful Because it Conflicts with 8 U.S.C. Section 1401.

The district court appropriately recognized that the *Doe* Plaintiffs' claim that the EO violates Section 1401 is a "distinct" (Add. 25) and "independent avenue to prevailing here" (Add. 24). Section 1401 identifies those who are "citizens of the

United States at birth," including "(a) a person born in the United States, and subject to the jurisdiction thereof." The statute was enacted in 1940 and re-codified in 1952 as part of the INA.[21] The district court correctly determined that "the fundamental rule conveyed by the Citizenship Clause was clear by the time § 1401 was enacted, and the legislators who chose to include the same phrase the Supreme Court already had examined presumably intended the same words would be accorded the same meaning in both contexts." (Add. 25). That conclusion is well supported by the host of numerous pre-1952 and pre-1940 cases cited above (*see supra* Argument,

---

[21] *See* Nationality Act of 1940, ch. 876, § 201(a), 54 Stat. 1137, 1138; Immigration and Nationality Act of 1952, ch. 477, tit. III, ch. 1, § 301, 66 Stat. 235 (1952); s*ee also* S. Rep. No. 82-1137, at 38 (1952).

§ II(A)(2)), as well as several other cases,[22] the legislative history of the Nationality Act of 1940,[23] and other authorities.[24]

_____

[22] *See, e.g., Regan v. King*, 49 F. Supp. 222, 223 (N.D. Cal. 1942), *aff'd*, 134 F.2d 413, 413 (9th Cir.) (en banc), *cert. denied,* 319 U.S. 753 (1943) (dismissing, without any consideration or discussion of whether the parents were domiciled in the United States, a lawsuit that claimed that more than 2,600 Japanese individuals born in the United States to non-citizen parents were not U.S. citizens; court found that the question "has been definit[iv]ely decided by the United States Supreme Court" in *Wong Kim Ark* and its progeny, which required dismissal of the lawsuit); *Perkins v. Elg*, 99 F.2d 408, 411 (D.C. Cir. 1938) ("It may now be stated as an established rule that every person born within the United States (except in the case of children of ambassadors, etc.), whether born of parents who are themselves citizens of the United States or of foreign parents, is a citizen of the United States."); *Perkins*, 307 U.S. at 328 ("On her birth in New York, the plaintiff became a citizen of the United States."); *Ex Parte Lopez*, 6 F. Supp. 342, 343-44 (S.D. Tex. 1934) (holding that petitioner was a U.S. citizen by birth even though it was unknown when his parents came to the United States and there was no discussion about whether they were domiciled in the United States at the time of petitioner's birth, stating, "That persons born in the United States (as was petitioner) are citizens of the United States need not be discussed.").

[23] *To Revise and Codify the Nationality Laws of the United States into a Comprehensive Nationality Code: Hearings on H.R. 6127 Superseded by H.R. 9980 Before the Committee on Immigration and Naturalization*, 76th Cong. 28, 37 (1948) ("Hearings on H.R. 6127") (reflecting Congress's understanding that any children who "happen to have been born" in the United States "acquire citizenship under the Citizenship Clause" and the Chairman of the House of Representative's Subcommittee on Immigration and Naturalization asserting that "no one wants to change that of course."); 86 Cong. Rec. 11944 (1940) (Congressman Dickstein, House sponsor of the Nationality Act of 1940, stating, "There are others who, through accident of birth and circumstances have been born in the United States of alien parents, yet can claim citizenship.").

[24] *See, e.g.,* Note, *Citizenship by Birth*, 41 Harv. L. Rev. 643, 644-45 (1928) ("it seems safe to say that the same rule [from *Wong Kim Ark*] would be applied to children born to aliens temporarily within the country, no matter how short their stay ... Similarly, where the child is born to parents who have entered the country

The Government briefly (and ineffectually) attempts to rebut this argument on appeal.  (Appellants' Br. 43-44).  But it cannot do so.  The Government "advance[d] no separate challenge to the plaintiffs' statutory claim" and "opt[ed] not to address the statute" below.  (Add. 25 n.18).  It cannot now raise this argument for the first time on appeal.  *See Johnson v. Johnson*, 23 F.4th 136, 143 (1st Cir. 2022) ("The Federal Reporter is brimming with opinions from us saying things like: arguments not seasonably advanced below cannot be raised for the first time on appeal.") (cleaned up).

It is therefore established that, at the time that Section 1401 was enacted and recodified, it was well understood that this language extended birthright citizenship to those categories of individuals from whom the EO seeks to strip citizenship.  This, in turn, means that Plaintiffs' statutory argument is indeed a distinct and independent ground upon which the EO must be enjoined, as the district court concluded.  (Add. 24-25).  That is because, even if this Court or the Supreme Court were to accept the Government's view concerning the original meaning of the Citizenship Clause (notwithstanding *Wong Kim Ark* and its progeny), Section 1401 must be interpreted in accordance with the meaning of this phrase as it was understood in 1940 and 1952.

---

illegally, citizenship should not be refused. The spirit of the constitutional provision can be achieved only by a rule which accepts as citizens all persons born within the territorial limits of the United States, provided they do not come within an exception recognized by the common law.").

*See New Prime, Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (cleaned up) ("It's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute."); *see Bostock v. Clayton Cnty.,* 590 U.S. 644, 654 (2020) (explaining that a court "normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment" because "only the words on the page constitute the law adopted by Congress and approved by the President.").

## II.    AS THE GOVERNMENT TACITLY CONCEDES, PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF ENFORCEMENT OF THE EXECUTIVE ORDER IS NOT ENJOINED.

The district court correctly determined that the irreparable-harm factor "favors the plaintiffs strongly" because the Plaintiffs "have shown they are likely to suffer substantial and irreparable harm in the absence of a preliminary injunction." (Add. 29-31). On appeal, the Government makes no argument whatsoever refuting the irreparable harm that would be suffered by the *Doe* Plaintiffs if the EO were not enjoined. The Government has therefore forfeited any such argument. *See, e.g., Lawless v. Steward Health Care System*, 894 F.3d 9, 25 (1st Cir. 2018) (holding appellant's argument was "defaulted" or waived by its "failure to raise it in its opening brief"). Accordingly, it is now conclusively established in this appeal that the *Doe* Plaintiffs satisfied their burden to show that it is likely that they will suffer irreparable harm if the EO is not enjoined. Moreover, in addition to the clear

irreparable harm identified by the district court, *see supra* Background, § D, other record evidence demonstrates that the *Doe* Plaintiffs have made an overwhelmingly strong showing of irreparable harm.

Plaintiffs' robust evidentiary submissions in support of their motion for preliminary injunction establish numerous additional harms that plainly qualify as irreparable. Plaintiffs are living with intense, constant fear, anxiety, and uncertainty that accompanies marginalization and risk of deportation. *See Trop v. Dulles*, 356 U.S. 86, 102 (1958) (punishing someone by stripping their citizenship is unacceptable because it "subjects the individual to a fate of ever-increasing fear and distress" where they don't know "what proscriptions may be directed against [them], and when and for what cause [their] existence in [their] native land may be terminated."); JA41 (Reason Decl. ¶10). The intense fear and anxiety are impacting entire families. *Id.* ("[M]any of our members … undocumented women who are pregnant or planning to grow their families in the future, have approached us with confusion and panic. They are uncertain about how the Executive Order will be enforced, who it affects, and whether their future children will be able to obtain a passport or other federal documents recognizing their child's citizenship.").

Plaintiffs are experiencing social isolation within their communities due to the EO. JA41-43 (Reason Decl. ¶ 15); *see also* JA38 (Vega Decl. ¶¶13-14). Plaintiffs do not even feel safe to utilize the limited resources that are available to them

because of fear that it will expose them to deportation. JA41-42 (Reason Decl. ¶¶8, 13). Plaintiffs have withdrawn from their communities for fear of attracting unwanted scrutiny and jeopardizing familial separation. *See* JA27-38 (Vega Decl. ¶¶13-14).

If the preliminary injunction is not affirmed, Plaintiffs will experience delayed access to critical documentation and essential services due to vague implementation of the EO. *See* JA35 (Vega Decl. ¶2). The Government admitted at the motion hearing that there is currently no plan in place for how the EO would be implemented and the Government has not even begun thinking about how it may be implemented. *See* JA137-38. Without a clear implementation plan, the irreparable harm of delayed access to critical documentation and essential services due to inconsistent implementation is certain to occur.

Plaintiffs have already experienced and will continue to experience stigmatization, reputational injury, and impairment of personal dignity. *See* JA35-36 (Vega Decl. ¶3-4); JA40-41 (Reason Decl. ¶2-3). There is particular concern "about the long-term consequences for children of immigrant parents, who may grow up in an environment where their legal status and rights are constantly questioned and challenged." JA43 (Reason Decl. ¶14). "[T]he emotional toll this policy [will have on the] children, [] may [cause them to] grow up feeling stigmatized, excluded, and alienated in the only country they know as home." JA37-

38 (Vega Decl. ¶13). "The prospect of raising children deemed "stateless" or lacking full citizenship rights would cause immense stress and anxiety, undermining the mental health and stability of entire families." JA38 (Vega Decl. ¶14). Plaintiffs' children will be stripped of rights and privileges exclusive to citizens, such as the right to vote in federal elections, the right to run for and be appointed to certain high elective offices, and the right to serve on federal and state juries. *See* Vinineath Nuon Gopal, *From Judicial to Administrative Denaturalization: For Better or For Worse?*, 72 U. COLO. L. REV. 779, 782 (2001) (listing these and other benefits available to citizens of the United States, but not noncitizens).

In sum, the evidentiary record developed by the *Doe* Plaintiffs overwhelmingly demonstrates irreparable harm on several independent bases, which the Government has not refuted. Consequently, this factor weighs heavily in the *Doe* Plaintiffs' favor.

## III. THE REMAINING PRELIMINARY INJUNCTION FACTORS SIMILARLY SUPPORT THE DISTRICT COURT'S INJUNCTION.

All agree that the final two preliminary-injunction factors—the balance of the equities and whether an injunction is in the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The district court correctly determined that those merged factors also "decisively" support the *Doe* Plaintiffs. (Add. 31-32). As the district court aptly stated: "[i]t is difficult to imagine a government or public interest that could outweigh the harms

43

established by the plaintiffs here.  Perhaps that is why the defendants have identified none."  (Add. 31).

On the one hand, children targeted by the EO are at risk of being stripped of the fundamental right of birthright citizenship.  *See, e.g.*, *Schneiderman v. United States*, 320 U.S. 118, 122 (1943) (stating that U.S. citizenship carries with it such "priceless benefits" that "it would be difficult to exaggerate its value and importance."); *Trop*, 356 U.S. at 101 (concluding that depriving someone of their citizenship amounts to "the total destruction of the individual's status in organized society" and "is a form of punishment more primitive than torture" and holding that stripping someone of their citizenship as a criminal penalty would be cruel and unusual in violation of the Eighth Amendment); *id.* at 101-02 (equating citizenship with "the right to have rights"); *Perez v. Brownell*, 356 U.S. 44, 64 (1958) (Warren, C.J., dissenting) ("Citizenship is man's basic right for it is nothing less than the right to have rights.  Remove this priceless possession and there remains a stateless person, disgraced and degraded in the eyes of his countrymen."); *Fedorenko v. United States*, 449 U.S. 490, 525 n.14 (1981) (Blackmun, J., concurring) (all citizens are lawfully entitled to "enjoy the benefits of citizenship in confidence and without fear.").

On the other hand, the EO represents a wholly novel and fundamentally incorrect interpretation of the Citizenship Clause that breaks with a Supreme Court

interpretation that is more than 125 years old and has been consistently applied since it was announced.  There is no harm to the Government in maintaining the *status quo* while the ultimate merits of the Government's novel position are litigated to completion.  As this Court concluded in denying the Government's motion to stay the nationwide injunction issued in the companion *New Jersey* case, the interests of the public would be adversely affected by "premature enforcement" of the EO.  *See New Jersey v. Trump*, 131 F.4th 27, 41 (1st Cir. 2025) ("The risks that this determination [concerning citizenship made in the EO] may later be deemed wrong are high, given that the Government does not argue to us that the Executive Order likely complies with either federal constitutional or federal statutory law. And, understandably, the Government does not dispute that the public has a substantial interest in ensuring that those entitled to be recognized as U.S. citizens under the criteria on which officials at all levels of government have long relied are not unlawfully deprived of that recognition.").

Instead, the Government argues that the injunction "prevents the President from carrying out his broad authority and constitutional responsibility" and "the challenged Executive Order is an integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border." (Appellants' Br. 57-58).  These harms should be rejected now for the same reasons that this Court rejected them in denying the Government's

motion to stay: (1) the precedent upon which the Government relies does not support this argument; and, in any event, (2) the Plaintiffs' strong showing of likelihood of success on the merits forecloses this argument from carrying the day. *See New Jersey*, 131 F.4th at 40-41.

## IV.   THE *DOE* PLAINTIFFS HAVE CLEAR ARTICLE III STANDING TO PURSUE THEIR CLAIMS.

Finally, the *Doe* Plaintiffs clearly have Article III standing to pursue their claims. The Government's brand-new argument to the contrary is a mislabeled and forfeited argument that the scope of the relief is overbroad. That scope-of-relief argument was not raised below and is therefore forfeited. The Government's "standing" argument was similarly not raised below, but nonetheless is meritless. (Add. 16 ("the defendants have not challenged the standing of Doe or her co-plaintiffs to sue – nor could they.")).

Each of the *Doe* Plaintiffs has demonstrated unrefuted irreparable harm. *See supra* Argument, § II. That is injury-in-fact for the purposes of standing. Nothing else is required. Moreover, the Government concedes, as it must, that all of the *Doe* Plaintiffs have standing. The Government concedes that "the organizations each satisfied that burden for one or two identified members' claims by providing a declaration explaining that member's standing." (Appellants' Br. 56). And that is where the analysis of the Government's "standing" argument must end; the *Doe* organizational plaintiffs need only establish standing for at least one of their

members to receive the requested relief. *See Int'l Union v. Brock*, 477 U.S. 274, 281 (1986) (holding that labor union had standing to bring claims after demonstrating less than all members had standing even where the relief may not be applicable to all); *Playboy Enter., Inc. v. Public Serv. Com'n of P.R.*, 906 F.2d 25, 34 (1st Cir. 1990) (rejecting argument that the prospective standing of a single member cannot support standing for entire association because "the Supreme Court has never required that *every* member of an association have standing before it can sue on behalf of its members."). None of the other cases cited by the Government support its unpreserved argument that the fact that the injunction may give relief to other members of the organizational plaintiffs raises an Article III standing problem.[25]

---

[25] Several of the Government's cases do not even address organizational standing or involve organizational plaintiffs. *See TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) (determining class action standing, which is distinguished from organizational standing by *Int'l Union*); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) (holding that a group of municipal taxpayers, neither an organization nor a class, lacked standing because the challenge involved a state tax issue); *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433 (2017) (establishing standing requirements for an intervenor). Further, the cases cited by the Government that do involve an organization or association are either irrelevant to the Government's arguments or actually undercut the Government's argument. *See Int'l Union*, 477 U.S. at 290 (holding that union had standing to bring suit on behalf of its members); *Hunt v. Wash. State Apple Advertising Cm'n*, 432 U.S. 333, 343-44 (1977) (finding that association had standing to bring suit on behalf of its members); *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (holding that to establish associational standing, at least one member must suffer immediate or threatened injury as a result of the challenged action, and finding that no associational standing existed where no member had an injury); *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) (finding no organizational standing where issue of injury to one of the members had already

The Government's remaining "standing" arguments are scope-of-relief arguments, which were not timely raised and therefore cannot make their debut on appeal. *See Johnson*, 23 F.4th at 143; *Telecomm. Regul. Bd. of P.R. v. CTIA-Wireless Ass'n*, 752 F.3d 60, 63 n.2 (1st Cir. 2014) (finding that appellants waived potential claims regarding scope of injunction by failing to raise them below or on appeal). Even if these arguments were properly raised, they must be rejected. In cases where organizational plaintiffs have prevailed, courts have not limited relief to individual, identified members.[26]

## CONCLUSION

The Plaintiffs are exceedingly likely to succeed on the merits of their claims that the EO violates the Constitution and 8 U.S.C. § 1401. The Plaintiffs have demonstrated unrefuted irreparable harm. The Government has not and cannot demonstrate that its alleged harm or the public interest outweigh the unrefuted

---

been settled in lower court and members attempted to revive the issue, and no other concrete injury was established).

[26] *See*, *e.g.*, *Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181, 201, 230 (2023); *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc*., 517 U.S. 544, 546 (1996) ("individual participation is not normally necessary when an association seeks prospective or injunctive relief for its members.") (cleaned up); *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring) ("If a single member of an association has suffered an injury, our doctrine permits that association to seek relief for its entire membership ....").

irreparable harms of the Plaintiffs.  Consequently, the preliminary injunction must be affirmed.

Respectfully submitted,

**LAWYERS FOR CIVIL RIGHTS**

*/s/ Jacob M. Love*
Oren M. Sellstrom (CA1 #1172527)
Ivan E. Espinoza-Madrigal (CA1 #1171237)
Jacob M. Love (CA1 #1203905)
Mirian Albert (CA1 #1204131)
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(857) 264-0416
jlove@lawyersforcivilrights.org

*Counsel for Plaintiffs-Appellees*

Dated: May 21, 2025

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,289 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

*/s/ Jacob M. Love*
Oren M. Sellstrom (CA1 #1172527)
Ivan E. Espinoza-Madrigal (CA1 #1171237)
Jacob M. Love (CA1 #1203905)
Mirian Albert (CA1 #1204131)
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(857) 264-0416
jlove@lawyersforcivilrights.org

*Counsel for Plaintiffs-Appellees*

Dated: May 21, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2025, I electronically filed the foregoing document with the Clerk for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Jacob M. Love*
Oren M. Sellstrom (CA1 #1172527)
Ivan E. Espinoza-Madrigal (CA1 #1171237)
Jacob M. Love (CA1 #1203905)
Mirian Albert (CA1 #1204131)
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(857) 264-0416
jlove@lawyersforcivilrights.org

*Counsel for Plaintiffs-Appellees*