Nos. 25-1169, 25-1170

_____

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

_____

O. DOE; BRAZILIAN WORKER CENTER; LA COLABORATIVA,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in their official capacity as Acting Commissioner of Social Security,

*Defendants-Appellants.*

_____

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF MAINE; STATE OF MARYLAND; DANA NESSEL, Attorney General for the People of the State of Michigan; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN; CITY AND COUNTY OF SAN FRANCISCO

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of Health and Human Services; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in her official capacity as Acting Commissioner of Social Security; UNITED STATES OF AMERICA,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Massachusetts

**BRIEF OF AMICI CURIAE FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY, ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND, CENTER FOR CIVIL RIGHTS AND CRITICAL JUSTICE, AND 84 ADDITIONAL NONPROFIT AND GRASSROOTS ORGANIZATIONS AND RACE AND LAW CENTERS IN SUPPORT OF PLAINTIFFS-APPELLEES**

Robert S. Chang
Susan McMahon
FRED T. KOREMATSU CENTER
  FOR LAW AND EQUALITY
UC Irvine School of Law
401 E. Peltason Dr., Suite 1000
Irvine, CA 92697
(949) 824-3034

Bethany Li
Niji Jain
Razeen Zaman
ASIAN AMERICAN LEGAL DEFENSE
  AND EDUCATION FUND
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932

Jonathan D. Hacker
*Counsel of Record*
Arjun A. Shenoy
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
jhacker@omm.com

Anthony S. Wang
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
(949) 823-6900

Jessica Levin
Melissa R. Lee
CENTER FOR CIVIL RIGHTS
  AND CRITICAL JUSTICE
Ronald A. Peterson Law Clinic
Seattle University School of Law
1112 East Columbia St.
Seattle, WA 98122
(206) 398-4167

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), amici curiae state that no amicus has a parent corporation and that no publicly held corporation owns 10% or more of the stock of any amicus.

# TABLE OF CONTENTS

**Page**

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ................1

INTRODUCTION ........................................................................................3

ARGUMENT ..............................................................................................6

I.     If This Court Upholds the Citizenship Stripping Order, It Will Invite
       Attempts to Retroactively Revoke the Citizenship of Countless
       Americans. ......................................................................................6

II.    The Government's Prior Denaturalization and Involuntary
       Expatriation Efforts Offer a Cautionary Tale. .............................7

       A.     In the Wake of the Supreme Court's 1923 Decision in *United
              States v. Thind*, the Government Initiated a Denaturalization
              Campaign Against South Asian American Citizens. ..............7

       B.     The Expatriation Act of 1907 Stripped Citizenship from
              American Women—Including Birthright Citizens—Who
              Married Non-Citizens. ...................................................12

III.   The Citizenship Stripping Order Risks Destroying the Settled
       Expectations of Presumed Birthright Citizens and Would Create a
       Permanent Underclass of Americans. ......................................16

CONCLUSION ..........................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Dred Scott v. Sandford*,
   60 U.S. 393 (1857).................................................................................3

*Ex Parte (Ng) Fung Sing*,
   6 F.2d 670 (W.D. Wash. 1925)..........................................................15

*Mackenzie v. Hare*,
   239 U.S. 299 (1915)...........................................................................13

*Ozawa v. United States*,
   260 U.S. 178 (1922)..............................................................................7

*Perez v. Brownell*,
   356 U.S. 44 (1958)..............................................................................24

*United States v. Pandit*,
   15 F.2d 285 (9th Cir. 1926)..................................................................9

*United States v. Thind*,
   261 U.S. 204 (1923)..............................................................................8

*United States v. Wong Kim Ark*,
   169 U.S. 649 (1889)........................................................................3, 14

## Statutes

Cable Act of 1922, ch. 411, 42 Stat. 1021 (1922) ...................................15

Chinese Exclusion Repeal Act of 1943, ch. 344, 57 Stat. 600 (1943) ...................16

Expatriation Act of 1907, ch. 2534, 34 Stat. 1228 (1907)......................... 12, 13, 14

Immigration and Nationality Act of 1952, ch. 477, 66 Stat. 163 (1952)...............16

Luce-Celler Act of 1946, ch. 534, 60 Stat. 416 (1946) ..........................................16

Naturalization Act of 1790, ch. 3, 1 Stat. 103 (1790)...............................................7

Naturalization Act of 1870, ch. 254, 16 Stat. 254 (1870)..........................................8

## Other Authorities

*A Portrait of Unauthorized Immigrants in the United States*, Pew Rsch. Ctr.
   (Apr. 24, 2009), http://pewrsr.ch/X0KT6J..........................................20

Anna Youtz, *Undocumented Adoptees and the Fight to be Recognized as
   Americans*, Mochi Magazine (Sept. 9, 2024),
   https://www.mochimag.com/activism/undocumented-adoptees/ .......................16

ii

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

Biblia S. Cha, Laura E. Enriquez & Annie Ro, *Beyond Access: Psychosocial Barriers to Undocumented Students' Use of Mental Health Services*, 233 Soc. Sci. & Med. 193 (2019) ...............................................................19

Candice Lewis Bredbenner, *A Nationality of Her Own: Women, Marriage, and the Law of Citizenship* (1998) .......................................................12

Doug Coulson, *Race, Nation, and Refuge: The Rhetoric of Race in Asian American Citizenship Cases* (2017).........................................................9

Erika Lee, *The Making of Asian America: A History* (2015) ...................................10

Erika Lee, *United States of America vs. Vaishno Das Bagai*, South Asian American Digital Archive, https://www.saada.org/tides/article/united-states-of-america-vs-vaishno-das-bagai....................................... 10, 11

Felice Batlan, *"She Was Surprised and Furious": Expatriation, Suffrage, Immigration, and the Fragility of Women's Citizenship, 1907-1940*, 15 Stan. J. C.R. & C.L. 315 (2020)...........................................................13

Jamie Richards & Laura M. Bohoruez, United We Dream Network, *National Institutions Coming Out Day Toolkit* (2015) .......................................20

Janna E. Haider, *The Afterlives of Thind: Denaturalizations and the Changing Legal Definitions of Whiteness*, 46 Ethnic Studies Rev. 35 (2023) .......................................................................... 10, 12

Joy Kanwar, *Stories from the Negative Spaces: United States v. Thind and the Narrative of (Non)Whiteness*, 74 Mercer L. Rev. 801 (2023) ..................9, 10

Kritika Agarwal, *Living in a Gilded Cage*, South Asian American Digital Archive, https://www.saada.org/tides/article/living-in-a-gilded-cage................11

Leti Volpp, *Divesting Citizenship: On Asian American History and the Loss of Citizenship Through Marriage*, 53 UCLA L. Rev. 405 (2005)............... 14, 15

*Protecting the Meaning and Value of American Citizenship*, The White House (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-meaning-and-value-of-american-citizenship/ ...............................................................................6

Sherally Munshi, *"You Will See My Family Became So American": Toward a Minor Comparativism*, 63 Am. J. Comparative L. 655 (2015) .........................9

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Should I Consider U.S. Citizenship*, U.S. Citizenship and Immigration
    Servs., https://www.uscis.gov/citizenship/learn-about-citizenship/should-
    i-consider-us-citizenship ...........................................................................7

Theresa Vargas, *A doctor tried to renew his passport. Now he's no longer a
    citizen*, Wash. Post (Nov. 25, 2023), https://www.washingtonpost.com/dc-
    md-va/2023/11/25/virginia-doctor-passport-citizenship-nightmare/..................17

## STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE[1]

The Fred T. Korematsu Center for Law and Equality ("Korematsu Center") is a non-profit organization based at the UC Irvine School of Law.  The Korematsu Center works to advance justice through research, advocacy, and education. Inspired by the legacy of Fred Korematsu, who defied military orders during World War II that ultimately led to the unlawful incarceration of 120,000 Japanese Americans, the Korematsu Center works to advance social justice for all.  The Korematsu Center has a special interest in addressing governmental overreach that harms vulnerable communities and individuals, especially when accomplished through Executive Orders.  The Korematsu Center is joined by the following race and law centers that share this concern: the Aoki Center for Critical Race and Nation Studies at UC Davis School of Law; the Center for Law, Equity and Race at Northeastern University School of Law; the Center for Racial and Economic Justice at UC Law San Francisco; the Center on Race, Inequality, and the Law at NYU School of Law; the Center on Law, Race & Policy at Duke University School of Law; and the Gibson-Banks Center for Race and the Law at the

---

[1] Amici certify that no party's counsel authored this brief in whole or in part, nor did any party or party's counsel contribute money intended to fund the preparation or submission of this brief; and no person other than amici curiae and their counsel contributed money intended to fund the preparation or submission of this brief.  The parties have consented to the filing of this brief.

University of Maryland Francis King Carey School of Law.[2]  None of these centers, in this brief or otherwise, represent the official views of their respective law schools.

The Asian American Legal Defense and Education Fund ("AALDEF"), founded in 1974, is a New York City-based national organization that promotes the civil rights of Asian Americans.  Through litigation, advocacy, and education, AALDEF focuses on critical issues affecting Asian Americans, including protecting immigrants' rights and eliminating anti-Asian violence.  Throughout its history, AALDEF has represented individuals affected by the government's immigration policies, advocated for immigrants' rights, and led impact litigation around immigration and deportation.  AALDEF has a special interest in this litigation because of its work on behalf of individuals and community organizations whose members will be directly impacted by the Citizenship Stripping Order.

In this filing, AALDEF is joined by 78 non-profit and grassroots organizations[3] who have been disproportionately harmed by the government's efforts to restrict citizenship on racial lines and denaturalize certain citizens.

---

[2] This amicus brief is submitted on behalf of the Gibson-Banks Center for Race and the Law and not on behalf of Maryland Carey Law, the University of Maryland, Baltimore, the University System of Maryland, or the State of Maryland.

[3] The names of additional amici are set forth in Appendix A.

Amici believe that the Citizenship Stripping Order, which historically stems from the Asian exclusion movement in the late 19th century, has no place in a democracy founded on the notion that all people are created equal and that we all have a right to belong here.

The Center for Civil Rights and Critical Justice ("CCRCJ") is based at Seattle University School of Law and works to achieve a legal system where both historical and present-day racism, oppression, and marginalization no longer control outcomes or otherwise contribute to inequality. CCRCJ educates future lawyers to be agents for social change and racial equality in all areas of the law, advocates for advancement of the law to achieve equal justice, and produces research to drive effective reform by revealing systems of oppression and exclusion. CCRCJ has a special interest in ensuring that political agendas do not undermine guarantees enshrined in the Constitution. CCRCJ does not, in this brief or otherwise, represent the official views of Seattle University.

## INTRODUCTION

Citizenship, whether by birth, statute, or naturalization, is the cornerstone of American democracy. Birthright citizenship, enshrined in the Fourteenth Amendment, corrected the grave error committed by the Supreme Court in *Dred Scott v. Sandford*, 60 U.S. 393 (1857). This bedrock principle of citizenship by birth on U.S. soil was recognized in *United States v. Wong Kim Ark*, 169 U.S. 649

3

(1889), as applying even to children born of parents the political branches deemed racially ineligible to naturalize. Birth on U.S. soil, with very limited exceptions, affords full membership in the American community regardless of one's race or parents' status.

Amici are deeply familiar with the importance of citizenship. Their families and communities have personally experienced the hardships inflicted when pathways to citizenship are denied; the agonizing doubts and insecurities imposed when the foundations of citizenship—thought secure—are undermined; and ultimately the fundamental difference that citizenship makes in determining whether one flourishes or is condemned to a lifetime of exclusion and marginalization. After the Supreme Court in 1923 deemed South Asians to be racially ineligible for citizenship, the government instituted denaturalization proceedings against many South Asian Americans, resulting in more than 50 individuals losing their U.S. citizenship. After the Expatriation Act of 1907, U.S.-citizen women—birthright citizens—lost their citizenship because they married noncitizen men. Even when Congress repealed certain aspects of the Act in 1922, many Asian American women could not regain their citizenship because they were racially ineligible to naturalize. Amici can attest that the pain of these events endures to the present day.

The Administration's Citizenship Stripping Order ("Order") unlawfully and cruelly invokes that unjust era in U.S. history. It is styled as prospective only, but it threatens much deeper harms. To uphold the Order, this Court would need to conclude that birth on U.S. soil does not constitutionally guarantee U.S. citizenship. And once that threshold constitutional foundation of birthright citizenship is eliminated, it is all too easy to imagine the government taking the next step and trying to strip citizenship *retroactively* from those who were born on U.S. soil before February 19, 2025, and have lived their entire lives—from their first breaths—as U.S. citizens. Such retroactive citizenship-stripping may present a distinct constitutional problem, but there is no basis even to invite the risk that government will impose such measures or that courts will uphold them. The threshold problem for *all* such laws—whether prospective or retrospective—is that the Fourteenth Amendment conclusively secures birthright citizenship. As the experience of Amici's community demonstrates, casting *any* doubt on that foundational premise can impose generational harms and a permanent stain on America's legacy.

We urge this Court to reject the Administration's dangerous and incorrect interpretation of the Fourteenth Amendment.

**ARGUMENT**

**I.     If This Court Upholds the Citizenship Stripping Order, It Will Invite Attempts to Retroactively Revoke the Citizenship of Countless Americans.**

The Citizenship Stripping Order states that birthright citizenship does not automatically extend to a child born in the United States (1) when the mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of the child's birth, or (2) when the mother was lawfully but only temporarily present in the United States and the father was not a United States citizen or lawful permanent resident at the time of the child's birth. *Protecting the Meaning and Value of American Citizenship*, The White House (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-meaning-and-value-of-american-citizenship/. The only way for the Order to be upheld is if the "subject to the jurisdiction of" language in the Citizenship Clause of the Fourteenth Amendment does *not* include children born in either category. If this Court interprets the Citizenship Clause accordingly, it will surely invite proposals for even broader citizenship-stripping, including efforts to apply the Order to those born on U.S. soil *before* its effective date, nullifying the citizenship of *all* individuals who fall in either category, regardless of birth date. In that scenario, without further intervention from Congress, the affected individuals would become undocumented, with many or

most becoming stateless. Indeed, because those individuals never naturalized—due to their presumption of birthright citizenship—their presence in the United States might be deemed unlawful. At minimum, they would lose the right to vote in federal elections, safeguards against family separation, and access to certain federal and state employment opportunities and benefits, among other things. *See Should I Consider U.S. Citizenship*, U.S. Citizenship and Immigration Servs., https://www.uscis.gov/citizenship/learn-about-citizenship/should-i-consider-us-citizenship.

The Court should take this prospect seriously. As explained below, it would not be the first time the government has leveraged a change in the law to retroactively strip U.S. citizens of their status. And historically, those efforts have either outright targeted or otherwise had an outsized impact on Asian Americans.

## II.    The Government's Prior Denaturalization and Involuntary Expatriation Efforts Offer a Cautionary Tale.

### A.    In the Wake of the Supreme Court's 1923 Decision in *United States v. Thind*, the Government Initiated a Denaturalization Campaign Against South Asian American Citizens.

Congress first established the rules governing naturalization in the Naturalization Act of 1790, which limited the process to "free white person[s]." Naturalization Act of 1790, ch. 3, § 1, 1 Stat. 103, 103 (1790). Following the Civil War and the passage of the Reconstruction Amendments, Congress amended the

Act to allow "aliens of African nativity" and "persons of African descent" to become citizens. Naturalization Act of 1870, ch. 254, § 7, 16 Stat. 254, 256 (1870). In *Ozawa v. United States*, 260 U.S. 178 (1922), the Supreme Court interpreted the term "white person" to mean "Caucasian" and held that Takao Ozawa, a Japanese American who had lived in the U.S. for 20 years, was therefore racially "ineligible for citizenship." *Id.* at 198.

In *United States v. Thind*, 261 U.S. 204 (1923), the Supreme Court addressed whether Bhagat Singh Thind, a sergeant in the U.S. Army during World War I and characterized as "a high-caste Hindu, of full Indian blood," qualified as a "white person" within the meaning of the Naturalization Act. *Id.* at 206. Cognizant of the reasoning in *Ozawa*, Thind pointed to various "scientific authorities" to support his argument that he was "Caucasian" and thus eligible for citizenship. *Id.* at 210–11. Embracing a "common speech" view of what constituted a "white person," the Court disagreed, stating that "[i]t is a matter of familiar observation and knowledge that the physical group characteristics of the Hindus renders them readily distinguishable from the various groups of persons in this country commonly recognized as white." *Id.* at 214–15. Thind, who had already been naturalized, had his citizenship revoked.

At the time, some thought it "unthinkable" that the government could use the *Thind* decision to denaturalize other South Asians who had become U.S. citizens in

8

the years preceding the case.  Sherally Munshi, *"You Will See My Family Became So American": Toward a Minor Comparativism*, 63 Am. J. Comparative L. 655, 659 (2015).  Yet that is exactly what happened.

In the weeks following the decision, the Bureau of Naturalization—then the equivalent of the U.S. Citizenship and Immigration Services—initiated denaturalization proceedings against over fifty U.S. citizens of Indian origin. Joy Kanwar, *Stories from the Negative Spaces: United States v. Thind and the Narrative of (Non)Whiteness*, 74 Mercer L. Rev. 801, 841 (2023).  The decision to strip these citizens of their status was not without controversy—one Bureau official called it "unfair, undemocratic, and contrary to every American principle of fair play."  Doug Coulson, *Race, Nation, and Refuge: The Rhetoric of Race in Asian American Citizenship Cases* 76 (2017).  The Bureau nevertheless began enlisting U.S. Attorneys' offices around the country to aid in the effort.  Despite the government's original intent to limit denaturalization to those of "bad moral character," *id.*, proceedings quickly ensnared upstanding citizens, including the lawyer who argued Thind's case before the Supreme Court, *see United States v. Pandit*, 15 F.2d 285 (9th Cir. 1926).

Most of the targeted individuals had been citizens for over five years at the time, some as long as sixteen years.  Coulson, *supra*, at 75.  Many if not all had become outcasts in India because of their decision to obtain U.S. citizenship.  *Id.* at

78.  Some owned land or founded businesses in the United States.  *See* Janna E.

Haider, *The Afterlives of Thind: Denaturalizations and the Changing Legal

Definitions of Whiteness*, 46 Ethnic Studies Rev. 35, 45 (2023); Coulson, *supra*, at

77–78; Munshi, *supra*, at 660.  Others were married and had children they planned

to raise as American.  Erika Lee, *The Making of Asian America: A History*, at

198–99 (2015); Coulson, *supra*, at 77–78; Munshi, *supra*, at 660.  These U.S.

citizens relied upon their status to "make a life for themselves in this country," but

denaturalization left them unmoored.  Kanwar, *supra*, at 821.

Vaishno Das Bagai had spent nearly a decade in the United States when the

U.S. government asked a court to strip his citizenship.  An immigrant from

Peshawar (then a part of British India), Bagai arrived in San Francisco with his

wife and three children in 1915, obtaining his citizenship in 1921.  Lee, *supra*, at

198–201.  Described as having "relished his new life in America," he owned a

home and opened a general store called Bagai's Bazaar.  Erika Lee, *United States

of America vs. Vaishno Das Bagai*, South Asian American Digital Archive,

https://www.saada.org/tides/article/united-states-of-america-vs-vaishno-das-bagai.

Bagai made a conscious effort to assimilate—he "wore American suits, spoke

English fluently, and adopted Western manners."  *Id.*  In his words, he and his

family had "all made ourselves as much Americanized as possible."  *Id.*

10

But one year after *Thind*, the government filed a denaturalization case against Bagai, alleging that he had illegally obtained his citizenship by claiming a status ("white person") that he never actually held. Although no court decision survives, in May 1925, the Bureau of Naturalization "confirmed that Vaishno Das Bagai was a U.S. citizen no more." *Id.*

As a result of his denaturalization, Bagai was stripped of his property, including Bagai's Bazaar, in accordance with California law prohibiting "aliens ineligible for citizenship" from owning property. *Id.* The government refused to give him a U.S. passport when he tried to visit relatives in India; he was told to apply for a British passport instead. Bagai, an Indian nationalist, declined. Lee, *supra*, at 222. Three years after he lost his citizenship, Bagai rented a room, turned on the gas, and ended his life. Kritika Agarwal, *Living in a Gilded Cage*, South Asian American Digital Archive, https://www.saada.org/tides/article/living-in-a-gilded-cage. He left a note emphasizing how the loss of his citizenship impacted him:

> I came to America thinking, dreaming and hoping to make this land my home. . . . But now they come to me and say, I am no longer an American citizen. . . . Now what am I? What have I made of myself and my children? We cannot exercise our rights. . . . Obstacles this way, blockades that way, and the bridges burnt behind.

*Id.* Bagai's story ended on a particularly tragic note, but the harms he suffered as a result of his denaturalization—loss of a homeland, loss of property, loss of ability

to travel beyond U.S. borders, and loss of the right to vote—were certainly not unique to him.[4]  At the time, the government's post-*Thind* denaturalization campaign effectively undermined *all* South Asian Americans' assumption of permanence and replaced the security attending citizenship with a persistent fear of discrimination.

> **B.     The Expatriation Act of 1907 Stripped Citizenship from American Women—Including Birthright Citizens—Who Married Non-Citizens.**

The *Thind* decision and its aftermath were not aberrations.  To the contrary, they were but one chapter in the government's long history of revoking the citizenship of racial minorities and women.  While *Thind* countenanced stripping naturalized citizens of their status, sixteen years earlier, the government revoked the citizenship of American women who married foreign nationals.  Expatriation Act of 1907, ch. 2534, §3, 34 Stat. 1228, 1229 (1907).  Notably, the Expatriation Act covered birthright citizens and was, in practice, applied retroactively.  Candice Lewis Bredbenner, *A Nationality of Her Own: Women, Marriage, and the Law of Citizenship* 66 n.52 (1998).  While the government eventually walked back the

---

[4] For example, the U.S. Attorney's Office successfully filed denaturalization proceedings against four men who lived and worked in the greater Los Angeles area.  One of them, Deir Chand, had—like Thind himself—served in World War I and been honorably discharged.  As a citizen, Chand had taken advantage of the Veterans' Farm and Home Purchase Act to buy a tract of land to cultivate as a farm.  But after his denaturalization, he became ineligible to own land under California's Alien Land Law.  *See* Haider, *supra*, at 46.

policy, the harm to women—particularly Asian Americans—was far reaching and multi-faceted.

Congress enacted the Expatriation Act in response to the State Department's concerns that the country needed more uniform rules regarding who was entitled to a U.S. passport and consular protection while abroad.  *See* Felice Batlan, *"She Was Surprised and Furious": Expatriation, Suffrage, Immigration, and the Fragility of Women's Citizenship, 1907-1940*, 15 Stan. J. C.R. & C.L. 315, 320 (2020).  The State Department also warned that if an American woman married a foreign national, her loyalty to the United States would give way to her allegiance to her husband.  *Id.*  To guard against this perceived conflict of interest, Section 3 of the Act provided "[t]hat any American woman who marries a foreigner shall take the nationality of her husband."  Expatriation Act § 3, 34 Stat. at 1228.[5]  The Act reflected gendered notions of dependency,[6] with women subordinate to men in all respects,[7] and thus assigned the nationality of the husband to the wife.  For some

---

[5] Section 3 further provided that if her marriage terminated, a woman could resume citizenship by satisfying certain conditions.  *Id.* § 3, 34 Stat. at 1228–29.

[6] *See, e.g.*, *Mackenzie v. Hare*, 239 U.S. 299, 311–12 (1915) (consistent with coverture, upholding California's refusal to allow Mackenzie to register to vote, as she had lost citizenship by marrying a British man, and Congress had not violated the Fourteenth Amendment when it, "urged by conditions of national moment," stripped citizenship from women who married foreigners).

[7] *See Mackenzie*, 239 U.S. at 311 (noting that this ancient jurisprudential doctrine "has greater purpose, and, it may be, necessity, in international policy").

women, unless their husband's country had a law granting derivative citizenship to a married woman, the Expatriation Act rendered them stateless.  Leti Volpp, *Divesting Citizenship: On Asian American History and the Loss of Citizenship Through Marriage*, 53 UCLA L. Rev. 405, 425 (2005).

Just as with the South Asian Americans targeted after *Thind*, losing U.S. citizenship left these women vulnerable to deportation and barred them from many forms of employment, traveling freely, and, for some, holding interests in real property.  It also impacted their ability to vote, as they were unable to benefit from the passage of the Nineteenth Amendment in 1920.  *Id.* at 426–28.

The effects of the Expatriation Act of 1907 fell much more harshly on Asian American women than on their white counterparts.  "[W]hile not made explicit in the text of the Act, U.S. citizen women could only resume their citizenship [after termination of their marriage] if they were racially eligible to naturalize."  *Id.* at 430; *see* Expatriation Act § 3, 34 Stat. at 1228–29 (providing for pathways to reestablish citizenship, which would only be feasible for those eligible under the naturalization criteria).  Thus, as a practical matter, once an Asian American woman lost her citizenship under the Act, she could not regain it.

Ng Fung Sing's story is just one example.  Born in Port Ludlow, Washington, in October 1898 to Chinese parents, Sing was considered a U.S. citizen as a result of the Supreme Court's decision earlier that year in *Wong Kim*

14

*Ark.* Volpp, *supra*, at 407.  There, the Court held that, under the Citizenship Clause, a child born in the United States to noncitizen parents not present in the country in any diplomatic or official capacity "becomes at the time of his birth a citizen of the United States."  169 U.S. at 705.  Sing's parents brought her back to China when she was five years old.  Volpp, *supra*, at 407.  At the age of twenty-two, she married a Chinese citizen.  After her husband's death in 1925, Sing returned to the United States but was denied entry.  *Ex Parte (Ng) Fung Sing*, 6 F.2d 670, 670 (W.D. Wash. 1925).  Her marriage meant that the Expatriation Act had stripped her of her birthright citizenship, and the Chinese exclusion laws in place at the time rendered her ineligible to naturalize.  *Id.* at 670–71.  Had Sing been white, she could have regained her U.S. citizenship as a widow.  While it is presumed that she returned to China, "the rest of her life is lost to history."  Volpp, *supra*, at 408.

The Cable Act of 1922 partially repealed the Expatriation Act, but women who married Asian men continued to lose their citizenship.  Although the Cable Act did not explicitly target individuals of Asian origin, it did codify the policy that "any woman citizen who marries an alien ineligible to citizenship shall cease to be a citizen of the United States," and Asians remained ineligible to naturalize. Cable Act, ch. 411, § 3, 42 Stat. 1021, 1022 (1922).  The general prohibition on Asian naturalization also meant that—just as under the Expatriation Act regime—

15

any Asian American woman who lost her citizenship via marriage could not regain it. *Id.* §§ 2, 7, 42 Stat. at 1022.  The federal government finally removed the bar to naturalization for Chinese immigrants in 1943; South Asians and Filipinos in 1946; and for all other ineligible Asians in 1952.  *See* Chinese Exclusion Repeal Act of 1943, ch. 344, 57 Stat. 600 (1943); Luce-Celler Act of 1946, ch. 534, 60 Stat. 416 (1946); Immigration and Nationality Act of 1952, ch. 477, 66 Stat. 163 (1952).

## III.   The Citizenship Stripping Order Risks Destroying the Settled Expectations of Presumed Birthright Citizens and Would Create a Permanent Underclass of Americans.

Although our country's immigration history provides a useful guide, the Court need not turn to the past to assess the effects of any retroactive revocation of citizenship that may result from upholding the Citizenship Stripping Order.  The present-day stories of individuals and families who have experienced first-hand the disparities in rights, privileges, and opportunities based on citizenship status are equally instructive.

Emily Warnecke, one of an estimated 45,000 adult former-adoptees without citizenship, considers herself "a woman with no country."  Anna Youtz, *Undocumented Adoptees and the Fight to be Recognized as Americans*, Mochi Magazine (Sept. 9, 2024), https://www.mochimag.com/activism/undocumented-adoptees/.  Her adoptive parents, who brought her to the U.S. from South Korea when she was three months old, neglected to take steps to naturalize her.  *Id.*

16

Unaware of her status, Warnecke lived as a U.S. citizen for 31 years until 1995, when the government initiated removal proceedings against her after she was caught unknowingly driving a woman carrying drugs. *Id.* As a 61-year-old dealing with spinal disabilities, the government has denied her access to Social Security and disability funds. *Id.* To support herself, she likely will have to work past retirement age, and she has no control over whether or when her work permit will be renewed, uncertainties that have resulted in her losing jobs. *Id.*

Similarly, Siavash Sobhani, a doctor in Northern Virginia, became stateless as an adult. Dr. Sobhani was born in Walter Reed Army Medical Center in November 1961. Theresa Vargas, *A doctor tried to renew his passport. Now he's no longer a citizen*, Wash. Post (Nov. 25, 2023), https://www.washingtonpost.com/dc-md-va/2023/11/25/virginia-doctor-passport-citizenship-nightmare/. In July 2023, when he tried to renew his passport before a family trip, the State Department informed him that he had not acquired U.S. citizenship at birth, because his father was a diplomat with the Embassy of Iran at that time. *Id.* After a lifetime of paying taxes, voting in presidential elections, and serving his community as a physician—including as a front-line responder during the COVID-19 pandemic—Dr. Sobhani's entire future is now in doubt. *Id.* He does not know whether he can still practice medicine, whether his past earnings count toward his Social Security benefits, or even whether he can attend his son's wedding in

Portugal.  *Id.*  He was not able to visit a friend in London who suffered a stroke or his seriously ill father-in-law in Lebanon.  *Id.*  Prior to receiving notice from the State Department, Dr. Sobhani had contemplated retirement.  *Id.*  Now, due to circumstances entirely outside his control, he has been forced to spend $40,000 in legal fees to fight for the citizenship he assumed he had acquired at birth.  *Id.*

The Citizenship Stripping Order would create a new permanent underclass of potentially stateless individuals who would be undocumented from birth despite not having broken any U.S. immigration laws.  They would endure life-long discrimination and remain ineligible to access any benefits and privileges that come with citizenship.  They would be disenfranchised—left without a political voice or representation in likely the only country they will ever know—and denied access to employment, higher education, and freedom of movement.

We need not speculate about the nature and scope of the harm faced by this class of U.S.-born children.  Their lived experiences would resemble those of undocumented individuals who came to the U.S. as children.  Many such individuals grew up in mixed-status families, with U.S.-citizen siblings; their stories in particular help isolate and illuminate the effects directly attributable to citizenship.  In mixed-status families, undocumented and U.S.-citizen siblings may experience some of the same struggles due to growing up in the same household, but U.S. citizens—by virtue of their status—have far greater access to

18

opportunities that allow someone to overcome challenging circumstances.  The following stories are sourced from interviews conducted in March 2025.

Tereza Lee, a formerly undocumented immigrant of Korean descent who was the inspiration behind the DREAM Act, arrived in the U.S. when she was two years old.  Within months, her parents' status expired, leaving the entire family undocumented.  As a result, Tereza's parents struggled to obtain employment and the family lived in extreme poverty in Chicago, where her younger brother was born one year after they arrived.  Although DREAMers are often characterized as high achievers, Tereza was a C student for most of her life.  She attended poorly funded schools and assumed that she would not be able to attend college because of her immigration status and ineligibility for financial aid.  By contrast, Tereza's U.S.-citizen younger brother, Nate, grew up being told by his parents that he would face no barriers with education or work and therefore was the family's only hope.  Perhaps internalizing that pressure, Nate was a straight A student throughout his life.

Children in the United States without immigration status grow up vulnerable to shame, judgement, and condemnation.  The constant stress, anxiety, and fear of deportation that pervade their daily lives increase their chances of developing mental health issues.  *See* Biblia S. Cha, Laura E. Enriquez & Annie Ro, *Beyond Access: Psychosocial Barriers to Undocumented Students' Use of Mental Health*

*Services*, 233 Soc. Sci. & Med. 193 (2019).  Indeed, it is no surprise that undocumented immigrants suffer from higher rates of major depressive disorders compared to the general population.  *Id.*  Growing up in her family's Chicago basement apartment that often had no heat or hot water, flooded when it rained, and was infested with bugs and mice, Tereza recalls food being so scarce that she was only fifty pounds in sixth grade.  She became suicidal by the time she was a teenager:  "My family and I were at rock bottom.  The trauma of realizing what it meant to be undocumented caused me to fall into severe depression.  I thought there was no way out.  I contemplated suicide a few times but with no health insurance, I couldn't see a mental health professional."

Undocumented students must also overcome significant hurdles to access higher education.  Consequently, only 47 percent of undocumented immigrants between the ages of 25 and 65 hold a high school diploma, compared to 92 percent of their U.S.-born peers.  *A Portrait of Unauthorized Immigrants in the United States*, Pew Rsch. Ctr. (Apr. 24, 2009), http://pewrsr.ch/X0KT6J.  Of those undocumented students who do finish high school, only 5 to 10 percent go on to pursue a college education.  Jamie Richards & Laura M. Bohoruez, United We Dream Network, *National Institutions Coming Out Day Toolkit* 7 (2015).  Due to the dedicated efforts of teachers and mentors who believed in her potential, Tereza joined the small minority of undocumented students who attended and graduated

from college, even though she was rejected by all but one school because she lacked a Social Security number.

Unlike his sister, Nate faced no obstacles paying for higher education because, as a citizen, he received financial aid and could access paid internships throughout college, the latter of which also made it easier to find a job right after graduating. Nate has worked at a major fintech software company for over a decade; as a technology lead, he currently supervises a team of twelve people.

Having witnessed first-hand the struggles of his undocumented family members, Nate did not take for granted the privileges that U.S. citizenship afforded him. He explained that he would feel inferior if his right to vote were suddenly stripped away and that disenfranchisement would pave the way for the revocation of other rights. Contemplating a scenario in which he would no longer lawfully be able to work, Nate expressed concern for his wife and three children. He wondered where he would be deported and noted: "My kids would suffer psychological trauma if they were suddenly ripped away from their friends and family here. The people we'd leave behind here would also suffer a huge loss if we were ripped away from them."

As a result of growing up in poverty, undocumented young people are often expected to contribute to household finances by working instead of pursuing higher

21

education.  Ruthie,[8] a 34-year-old implementation manager at a health-tech startup in New York, immigrated to the United States with her mother from Fujian, China, when she was 8 years old.  They incurred $80,000 in debt to reunite with Ruthie's father in the United States, who had entered with a visa four years earlier.  Due to her family's debt, at age twelve, Ruthie began assisting her parents, who were working in Chinese restaurants.  Although Ruthie enjoyed school, she left high school to work full-time to help support her family when her father became ill.  Ruthie's academic drive nevertheless led her to obtain a General Equivalency Diploma at age 17, but unlike her peers, she could not start college right away because she was ineligible for financial aid and had to work to support her family.  For several years, Ruthie worked in Chinese restaurants, a job that required her to be on her feet for 72 hours a week.  Despite her demanding schedule, Ruthie eventually enrolled in community college, taking one class per semester.  She calculated that at that rate, she would have graduated with a degree in 10 years.

In contrast, Ruthie's U.S.-born siblings had and continue to have access to more opportunities for personal growth and advancement.  Her younger sister, Rachel, was able to attend international school trips and even study abroad.  Rachel was eligible for financial aid, enabling her to attend Parsons School of Design

---

[8] To ensure this individual's safety and privacy, we use pseudonyms to refer to her and her family members.

instead of working a restaurant job with her parents.  Imagining a future where her U.S. citizenship was stripped, Rachel emphasized how pointless her life would feel if she could not work lawfully, travel abroad, or exercise her right to protest without fear of reprisal.  She describes how important voting in the 2024 presidential election was for her, knowing the dangers her undocumented family members faced.  If she were to lose her own right to vote, Rachel laments:  "It would feel so unfair. . . . Without the right to vote, we wouldn't even have a voice to express the injustice of our experience."  Ruthie and Rachel's 16-year-old U.S.-born brother, Robert, a junior at the competitive Bronx High School of Science, will apply to college this fall.  He is an ambitious student, but noted that if his citizenship were stripped, he would no longer be eligible for financial aid for college and would "probably stay at home all day and hide."

Melanie,[9] an undocumented community organizer from California who first arrived in the U.S. from the Philippines when she was five years old, recalls that her guidance counselor misinformed her in 2017 that undocumented students could not go to college.  Melanie's older brother, who came to the United States at age nine, received similar advice.  Although he enrolled in community college, he struggled to cover the costs without financial aid.  When he learned that his status prevented him from obtaining a nursing license, he became demoralized and

---

[9] To ensure this individual's safety and privacy, we use a pseudonym.

dropped out. He currently works in restaurants making minimum wage. After the government detained Melanie's father, who was also undocumented, she recalls the distress that she, her mother, and her brother suffered as a result of being unable to visit him in the detention center, where he was held for one year before he was deported. Melanie's younger sister, who was born in the United States, was the only family member who was able to regularly visit their father without risk.

As these stories illustrate, citizenship retroactively revoked or prospectively denied strips individuals of their sense of identity and belonging, as well as their access to basic rights and opportunities. The Citizenship Stripping Order seeks to lawlessly impose those harms on countless individuals, and the stakes could not be higher. As Chief Justice Earl Warren aptly put it: "Citizenship is man's basic right, for it is nothing less than the right to have rights." *Perez v. Brownell*, 356 U.S. 44, 64 (1958) (Warren, C.J., dissenting).

The Fourteenth Amendment's guarantee of birthright citizenship enabled this nation to move past an era tainted with nativism and racism. This Court now plays a pivotal role in determining whether we will roll back that progress or reaffirm America's promise of liberty, justice, equality, and opportunity for all.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's grant of provisional relief to Plaintiffs.

Dated:  May 28, 2025

Robert S. Chang
Susan McMahon
FRED T. KOREMATSU CENTER
  FOR LAW AND EQUALITY
401 E. Peltason Dr., Suite 1000
(949) 824-3034
rchang@law.uci.edu

*Counsel for Amici Curiae*

Bethany Li
Niji Jain
Razeen Zaman
ASIAN AMERICAN LEGAL DEFENSE
  AND EDUCATION FUND
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932

*Counsel for Amici Curiae*

Jessica Levin
Melissa R. Lee
CENTER FOR CIVIL RIGHTS
  AND CRITICAL JUSTICE
Ronald A. Peterson Law Clinic
Seattle University School of Law
1112 East Columbia St.
Seattle, WA 98122
(206) 398-4167

*Counsel for Amici Curiae*

Respectfully submitted,

*/s/ Jonathan D. Hacker*
Jonathan D. Hacker
*Counsel of Record*
Arjun A. Shenoy
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
jhacker@omm.com

Anthony S. Wang
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
(949) 823-6900

*Counsel for Amici Curiae*

# APPENDIX A

## Names of Additional Amici Curiae

AAPI Equity Alliance
Adhikaar for Human Rights and Social Justice
Alliance of Filipinos for Immigrant Rights and Empowerment
Aoki Center for Critical Race & Nation Studies
APA Justice Task Force
APEX Express
Apex for Youth
API Equality-LA
Asian American Federation
Asian American Organizing Project
Asian American Resource Workshop
Asian Americans & Pacific Islanders for Justice (SA, TX)
Asian Americans Advancing Justice | Chicago
Asian Americans Advancing Justice Southern California
Asian Americans Advancing Justice-Atlanta
Asian Americans and Pacific Islanders of New Jersey
Asian Americans for Equality
Asian Americans United
Asian and Pacific Islander American Vote
Asian Community Development Corporation
Asian Community Fund at the Boston Foundation
Asian Law Alliance
Asian Pacific Islanders Civic Action Network, Massachusetts
Aurora Commons LLC
Boston Chinatown Neighborhood Center (BCNC)
CAAAV: Organizing Asian Communities
Cambodian Mutual Assistance Association of Greater Lowell, Inc.
Center for the Integration and Advancement of New Americans, Inc.
Chinese for Affirmative Action
Coalition for Asian American Children + Families
CORE: Community Organizing for Radical Empathy
Dalit Solidarity Forum USA
Dignidad/The Right To Immigration Institute
DRUM - Desis Rising Up & Moving
Formerly Incarcerated Group Healing Together
Hamkae Center

HANA Center
Hindus for Human Rights
Hmong Innovating Politics
Jakara Movement
Japanese American Citizens League Philadelphia Chapter
Korean American Civic Empowerment for Community
Karen Organization of San Diego
Khmer Anti-deportation Advocacy Group
Laal NYC
League Of Asian Americans of New York
Mekong NYC
Metropolitan Asian Deaf Association
MinKwon Center for Community Action
Montgomery County Progressive Asian American Network
National Korean American Service & Education Consortium
New Mexico Asian Family Center
OCA-Greater Houston
OPAWL - Building AAPI Feminist Leadership
Orange County Asian American Bar Association (OCAABA)
Project New Yorker
Providence Youth Student Movement
Raksha, Inc
Revolutionizing Asian American Immigrant Stories on the East Coast
Sahiyo
Sakura Foundation
Southeast Asian Mutual Assistance Association Coalition
Sikh American Legal Defense and Education Fund
South Asian American Justice Collaborative
South Asian Bar Association of North America
South Asian Bar Association of North America Foundation
South Asian Network
South Asian SOAR
Southeast Asian Freedom Network
Stop AAPI Hate
The Asian American Foundation
The Minoru Yasui Legacy Project
The Sikh Coalition
Tsuru for Solidarity
VietLead
Vietnamese American Community Center of the East Bay

Vincent Chin Institute
Woori Center

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,080 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Jonathan D. Hacker*
Jonathan D. Hacker

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on May 28, 2025.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Jonathan D. Hacker*
Jonathan D. Hacker