**Nos. 25-1169, 25-1170**

———————————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————————

No. 25-1169

O. DOE; BRAZILIAN WORKER CENTER; LA COLABORATIVA,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in their official capacity as President of the United States; US DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State; US SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in their official capacity as Acting Commissioner of Social Security,

*Defendants-Appellants*.

———————————————

No. 25-1170

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; DANA NESSEL, Attorney General for the People of the State of Michigan; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN; CITY AND COUNTY OF SAN FRANCISCO,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in their official capacity as President of the United States; US DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State; US DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of Homeland Security; US DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of Health and Human Services; US SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in their official capacity as Acting Commissioner of Social Security; UNITED STATES,

*Defendants-Appellants*.

_____

On Appeal from the United States District Court
for the District of Massachusetts

_____

**CORRECTED BRIEF OF SERVICE EMPLOYEES INTERNATIONAL UNION, AMERICAN FEDERATION OF TEACHERS, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COMMUNICATIONS WORKERS OF AMERICA, NATIONAL EDUCATION ASSOCIATION, UNITED FARM WORKERS OF AMERICA, AND UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Steven K. Ury*
Elena Medina
Deborah L. Smith
Mac McMechan
Service Employees International
  Union
1800 Massachusetts Avenue, N.W.
Washington, D.C. 20036
(202) 730-7466
* Attorney of Record

*Attorneys for Amicus Curiae SEIU*

Daniel McNeil
American Federation of Teachers
555 New Jersey Avenue, N.W.
Washington, D.C. 20001

*Attorney for Amicus Curiae AFT*

Teague Paterson
American Federation of State, County
  & Municipal Employees, AFL-CIO
1625 L Street, N.W.
Washington, D.C. 20036

*Attorney for Amicus Curiae AFSCME*

Matthew Holder
Communications Workers of America
501 3rd Street, N.W.
Washington, D.C. 20001

*Attorney for Amicus Curiae CWA*

Alice O'Brien
National Education Association
1201 16th Street, N.W.
Washington, D.C. 20036

*Attorney for Amicus Curiae NEA*

Mario Martinez
United Farm Workers of America
29700 Woodford-Tehachapi Road
Keene, CA 93531

*Attorney for Amicus Curiae UFWA*

Lisa Pedersen
United Food and Commercial
  Workers International Union
1775 K Street, N.W.
Washington, D.C. 20006

*Attorney for Amicus Curiae UFCW*

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* Service Employees International Union, American Federation of Teachers, American Federation of State, County and Municipal Employees, AFL-CIO, Communications Workers of America, National Education Association, United Farm Workers of America, and United Food and Commercial Workers International Union  have no parent corporations. They have no stock, and, therefore, no publicly held company owns 10% or more of their stock.

Dated: June 17, 2025                    Respectfully submitted,


                                        /s/ Steven K. Ury
                                        Steven K. Ury

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF *AMICI CURIAE* ............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................5

ARGUMENT ...................................................................................6

I. The Importance of Birthright Citizenship .......................................6

II. The Irreparable Harm to Union Members and Their Families of the Denial of Birthright Citizenship ................................................10

    A. Drs. G. and E.: Fearing the life their newborn child will face if birthright citizenship were terminated .................................10

    B. A.M.L.: 21-year-old daughter of a home health aide with dreams of public service.......................................................12

    C. F.M.: Harvard-educated public school counselor helps low-income students access higher education .............................14

    D. S.: Homecare worker and grandmother whose U.S. citizen grandchildren "are my life".................................................16

    E. J.M: Dynamic professor contributes to her students and the community......................................................................17

    F. P.V.: Public school health aide's daily life illustrates the importance of her U.S. citizenship .......................................19

    G. Y.: Ph.D. researcher born in the United States and dedicated to helping low-wage healthcare workers.................................21

    H. F.: Teacher and family childcare provider whose education and career were possible because of her U.S. citizenship .........23

    I. M.: Outstanding high school student who hopes to become a lawyer and represent her community .................................25

J.      J.: Dedicated surgeon who fears his U.S. citizen daughter will
be stateless if her birthright citizenship were denied ..........................27

CONCLUSION ........................................................................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ng Fung Ho v. White*,
    259 U.S. 276 (1922)..................................................................8

*United States v. Wong Kim Ark*,
    169 U.S. 649 (1898)..................................................................6

**Statutes**

8 U.S.C. § 1401(a) ........................................................................6

20 U.S.C. § 1091(a)(5)...................................................................8

*Executive Order 11935 on the Competitive Civil Service,
Appropriations Act Restrictions,* USA Jobs .......................................7

**Other Authorities**

Ciro Avitabile et al., *Citizenship, Fertility, and Parental Investments*,
    6 Am. Econ. J.: Applied Econ. 35 (2014)...............................9

Drishti Pillai & Samantha Artiga, *Employment Among Immigrants
and Implications for Health and Health Care*, Kaiser Fam. Found.
(Jun. 12, 2023) .......................................................................7

Jens Hainmueller et al., *The Effect of Citizenship on the Long-Term
Earnings of Marginalized Immigrants: Quasi-Experimental
Evidence from Switzerland*, Sci. Advances (Dec. 4, 2019)..................7

Kipling D. Williams & Andrew Hales, *Statelessness as Social
Ostracism: A Psychologist's Perspective*, in Inst. On Statelessness
& Inclusion, The World's Stateless: Deprivation of Nationality
(2020)....................................................................................9

Martin Weinmann, *Modernisation of German Citizenship:
Completing the Paradigm Shift of 2000*, Glob. Citizenship
Observatory (Feb. 6, 2024).......................................................9

Michael Fix, *Repealing Birthright Citizenship: The Unintended Consequences*, Migration Pol'y Inst. (Aug. 2015) ................................................9

Robert J. Taormina & Jennifer H. Gao, *Maslow and the Motivation Hierarchy: Measuring Satisfaction of the Needs*, 126 Am. J. of Psych. 155 (2013) ................................................9

*The Belonging Barometer*, Am. Immigr. Council (2024) ........................................9

Thomas Liebig & Friederike Von Haaren, *Citizenship and the Socio-economic Integration of Immigrants and their Children: An Overview Across European Union and OECD Countries*, in Org. for Econ. Coop. & Dev., 23 (2011) ....................................7

*Tuition & Financial Aid Equity for Undocumented Students*, Higher Educ. Immigr. Portal .................................................8

U.S. Const. amend. XIV, § 1 .................................................6

Wendy Cervantes, *Birthright Citizenship: A Fundamental Right for America's Children*, Center for the Children of Immigrants (Sept. 2015) .................................................8

# INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are labor organizations whose members and their families would be impacted by this case. The **Service Employees International Union ("SEIU")**, a labor organization of approximately two million working people, has members in the United States and Canada. SEIU's members include foreign-born U.S. citizens, lawful permanent residents, and immigrants authorized to work in the United States. Many of SEIU's members have mixed-status families.

The **American Federation of Teachers ("AFT")**, an affiliate of the AFL-CIO, represents approximately 1.8 million members who are employed across the nation in K-12 and higher education, public employment, and healthcare. The AFT has a longstanding history of supporting and advocating for the civil rights of our members and the communities they serve. The AFT has members throughout the country that were born in the United States to undocumented parents. AFT members also teach American students who were born to undocumented parents. These individuals are dedicated and integral members of U.S. society who actively participate and contribute to the well-being of their communities.

---

[1] No party opposes the filing of this brief. No counsel of any party to this proceeding authored any part of this brief. No party or party's counsel, or person other than *amici* and their members, contributed money to the preparation or submission of this brief.

The **American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME")**, is a union of 1.4 million public service workers throughout the United States, Puerto Rico, and the District of Columbia. AFSCME members share a commitment to public service and advocate for fairness and security in their workplaces and communities. AFSCME is participating in this case to advance its mission of helping all working people achieve the American dream, regardless of their or their parent's national origin, and to uphold the Fourteenth Amendment's explicit guarantee of citizenship to all persons born in the United States. AFSCME members, which include immigrants and the children of immigrants, contribute to our localities, states, and country every day, and they deserve the opportunities, security, and rights provided under the U.S. Constitution.

**Communications Workers of America ("CWA")** is the largest communications and media labor union in the United States. Its membership consists of workers in the communications and information industries, as well as the news media, the airlines, broadcast and cable television, public service, higher education, healthcare, manufacturing, video games, and high tech. CWA takes an active role advocating for its members on workplace issues, which includes participating in litigation as a party or amicus.

The **National Education Association ("NEA")** is the nation's largest professional association and union, representing approximately three million members – the vast majority of whom serve as educators, counselors, and education support professionals in our nation's public schools and higher education institutions.

The **United Food and Commercial Workers International Union ("UFCW")**, a labor organization which represents over a million members, includes the children of immigrants born in the United States. UFCW's members work in a range of industries, with the majority working in retail food, poultry and meatpacking, food processing and manufacturing, and non-food retail. UFCW's objective is the elevation of its members and their families through improved wages, hours, benefits, and working conditions.

UFCW and its predecessor unions have represented immigrants from around the world, and their children, since the beginning of the last century. These immigrant workers are a vital part of the American workforce and have played a crucial role in feeding American families. Many UFCW members were born in the United States to parents who came here as immigrants.

The **United Farm Workers of America ("UFW")**, a labor organization that represents thousands of migrant and seasonal farm workers in various agricultural occupations throughout the country, has members of diverse racial, ethnic, and

immigration backgrounds throughout the United States. UFW seeks to improve the lives, wages, and working conditions of agricultural workers and their families through collective bargaining, worker education, state and federal legislation, litigation, and through public campaigns. Since its founding in 1962 by Cesar Chavez and Dolores Huerta, UFW has been dedicated to the cause of eliminating discrimination against farmworkers, Latinos, and against any other groups that have been the target of unfair or unlawful treatment. UFW's members include foreign-born U.S. citizens, lawful permanent residents, immigrants authorized to work in the United States, and undocumented immigrants. Many of UFW's members have mixed-status families, with members born both in the United States and outside of the country.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Fourteenth Amendment ensures that regardless of the status of the parents, a child's birth in the United States confers the privilege of U.S. citizenship. It assures that every child born on U.S. soil has the opportunity to participate in all aspects of life and make valuable contributions to their communities as doctors, teachers, home healthcare workers, family childcare providers, health aides, and as other essential workers.

On January 20, 2025, President Trump issued Executive Order No. 14160, Protecting the Meaning and Value of American Citizenship ("Order"), declaring that children born in the United States are not U.S. citizens if, at the time of birth, their mother is either "unlawfully present in the United States" or their "mother's presence in the United States was lawful but temporary," and their father was not a U.S. citizen or lawful permanent resident. The Order seeks to nullify the Constitution's Fourteenth Amendment, Supreme Court precedent, and federal statutes granting citizenship to all children born on U.S. soil.

*Amici* submit this brief containing detailed examples from union members and their families of the devastating consequences that denying birthright citizenship would have on children born in the United States and their immigrant parents. These stories illustrate the real-life impact of this unconstitutional Order on children, their families, their communities, their workplaces, and the nation.

**<u>ARGUMENT</u>**

President Trump's Order rescinding the Fourteenth Amendment's birthright citizenship mandate violates the U.S. Constitution, the laws of the United States and Supreme Court precedent. It would create massive structural disruption and funding loss to the 50 States, and trigger devastating harms to children for generations to come. The Fourteenth Amendment's language is clear: "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States." U.S. Const. amend. XIV, § 1. The Amendment's directive that children born on U.S. soil are U.S. citizens, regardless of the immigration status or citizenship of their parents, was recognized by the U.S. Supreme Court[2] and affirmed by Congress.[3]

## I.    The Importance of Birthright Citizenship

If the Order were allowed to go into effect, children and parents will suffer the denial of fundamental rights inherent in U.S. citizenship, including the right to vote in federal elections, to run for and be appointed to certain high elective offices, and the right to serve on federal and state juries. Equally important, the Order will subject children and their parents to life-long economic loss.

---

[2] *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898).
[3] 8 U.S.C. § 1401(a).

Citizenship is associated with better employment, higher earnings, and advanced occupational positions.[4] The lack of citizenship and the attendant identity documents such as a social security card and driver's license denies access to the formal labor market, thus decreasing job opportunities, especially in high-paying careers.[5] Without U.S. citizenship and the right to a U.S. passport, travel outside the United States is impossible, as is employment requiring travel for international conferences and meetings. Most federal jobs require U.S. citizenship, and Congress prohibits the use of appropriated funds to employ non-citizens within the United States.[6]

---

[4] *See generally* Thomas Liebig & Friederike Von Haaren, *Citizenship and the Socio-economic Integration of Immigrants and their Children: An Overview Across European Union and OECD Countries*, in Org. for Econ. Coop. & Dev., 23 (2011) (available at https://www.oecd.org/en/publications/naturalisation-a-passport-for-the-better-integration-of-immigrants_9789264099104-en.html); Jens Hainmueller et al., *The Effect of Citizenship on the Long-Term Earnings of Marginalized Immigrants: Quasi-Experimental Evidence from Switzerland*, Sci. Advances (Dec. 4, 2019), https://www.science.org/doi/10.1126/sciadv.aay1610.

[5] *See* Drishti Pillai & Samantha Artiga, *Employment Among Immigrants and Implications for Health and Health Care*, Kaiser Fam. Found. (Jun. 12, 2023), https://www.kff.org/racial-equity-and-health-policy/issue-brief/employment-among-immigrants-and-implications-for-health-and-health-care/ (reporting that roughly one in three noncitizen workers was low-income compared with 15% of U.S.-born workers).

[6] *Executive Order 11935 on the Competitive Civil Service, Appropriations Act Restrictions*, USA Jobs, https://help.usajobs.gov/working-in-government/non-citizens (last visited Apr. 4, 2025).

Stripping U.S. citizenship from children born in the United States will dramatically limit these children's access to higher education, a professional career, and increased income. Eligibility to receive federal student financial aid, including grants, loans, or work assistance, is generally limited to U.S. citizens.[7] In-state tuition at public colleges is available only in 24 states and D.C. regardless of immigration status. In contrast, several states prohibit students from enrolling in all or some public colleges based on immigration status.[8]

The denial of citizenship is a deprivation of "property and life and all that makes life worth living."[9] As a consequence of the Order, many children will be rendered undocumented and subject to removal from the United States. Others will become effectively stateless and forced to live at "constant risk of exploitation or deportation to a country they have never known."[10]

---

[7] 20 U.S.C. § 1091(a)(5).

[8] *See Tuition & Financial Aid Equity for Undocumented Students*, Higher Educ. Immigr. Portal, https://www.higheredimmigrationportal.org/states/tuition-financial-aid-equity-for-undocumented-students/ (last visited Apr. 4, 2025).

[9] *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922).

[10] Wendy Cervantes, *Birthright Citizenship: A Fundamental Right for America's Children*, Center for the Children of Immigrants (Sept. 2015), https://firstfocus.org/wp-content/uploads/2015/08/Birthright-Citizenship-A-Fundamental-Right-for-Americas-Children.pdf.

Children deprived of nationality lose a sense of belonging and face trauma and other negative psychological effects.[11] The need to belong is one of the most fundamental of human drives, the loss of which results in negative health outcomes.[12]

The Order's implementation will lead to the creation of a permanent class of unauthorized and potentially stateless individuals – perpetuating disadvantages across generations.[13] Germany's experience denying citizenship based on parental status to generations of persons born on German soil caused it to recognize the destructive impact of such a legal regime.[14] Denying citizenship to any child born

---

[11] *See* Kipling D. Williams & Andrew Hales, *Statelessness as Social Ostracism: A Psychologist's Perspective*, in Inst. On Statelessness & Inclusion, The World's Stateless: Deprivation of Nationality (2020), https://files.institutesi.org/WSR20_Williams_Hales.pdf.

[12] *See generally The Belonging Barometer*, Am. Immigr. Council (2024), available at https://www.americanimmigrationcouncil.org/research/the-belonging-barometer; Robert J. Taormina & Jennifer H. Gao, *Maslow and the Motivation Hierarchy: Measuring Satisfaction of the Needs*, 126 Am. J. of Psych. 155 (2013), available at https://doi.org/10.5406/amerjpsyc.126.2.0155.

[13] *See generally* Michael Fix, *Repealing Birthright Citizenship: The Unintended Consequences*, Migration Pol'y Inst. (Aug. 2015), https://www.migrationpolicy.org/news/repealing-birthright-citizenship-unintended-consequences.

[14] *See* Ciro Avitabile et al., *Citizenship, Fertility, and Parental Investments*, 6 Am. Econ. J.: Applied Econ. 35 (2014), available at http://dx.doi.org/10.1257/app.6.4.35; Martin Weinmann, *Modernisation of German Citizenship: Completing the Paradigm Shift of 2000*, Glob. Citizenship Observatory (Feb. 6, 2024), https://globalcit.eu/modernisation-of-german-citizenship-completing-the-paradigm-shift-of-2000/.

on U.S. soil would create an underclass of citizens contrary to American values and the Constitution.

## II. The Irreparable Harm to Union Members and Their Families of the Denial of Birthright Citizenship

*Amici*'s members and their families would be irreparably harmed if the Order denying birthright citizenship to children born in the United States were allowed to go into effect. The experiences of some union members and their families illustrating the impacts are detailed below.[15]

### A. Drs. G. and E.: Fearing the life their newborn child will face if birthright citizenship were terminated

Drs. G. and E. are a married couple whose first child was born in April 2025. They reside in the United States on temporary visas, H-4 and H-1B visas respectively. Both are highly trained and specialized surgeons. Dr. E. is a member of SEIU's Committee of Interns and Residents (CIR).

The couple met at the University of Illinois at Chicago (UIC) while working in the same department as research fellows in transplantation surgery. They fell in love and married. Their hope is to establish meaningful careers, raise a family, and contribute to the United States.

---

[15] The individuals whose stories are told here all consented to having their experiences re-counted in this brief. Participants chose to maintain a measure of anonymity by using initials only.

Dr. G. pursued a post-graduate medical education at UIC after receiving her medical degree and completing a general surgery residency at universities in Italy. In her residency, she trained in abdominal transplant surgery. During her research fellowship at UIC, Dr. G. conducted several studies and clinical trials in Chicago. Now Dr. G. awaits the commencement of her fellowship in transplantation surgery while caring for her newborn child.

Dr. E. undertook post-graduate training in the United States at UIC's abdominal organ transplantation division. He is a citizen of Russia who trained as a pediatric urology fellow and as a clinical resident in pediatric surgery at universities in Russia. He now works as a resident surgeon at a world-class hospital in New York where he provides specialized medical care to indigent and low-income patients.

Drs. G. and E. hope to live and work in the United States because, in the words of Dr. G, "the United States is the world's leading country in the field of medical innovation and research." They are committed to careers as outstanding transplantation surgeons, serving their patients and their community, and making their permanent home in the United States with their child.

Under President Trump's Order, Drs. G. and E.'s child would not be a U.S. citizen. Their child would be denied the educational and career opportunities that are only available to U.S. citizens through federal student loans and grants.

Because their child would be unable to obtain a social security card, passport, or other forms of U.S. identification, Drs. G. and E. worry that their child would have difficulty registering for school, obtaining medical insurance, and eventually pursuing a career. Drs. G. and E. also believe their child would suffer the loss of self-esteem and a sense of belonging, as well as other psychological traumas. They are concerned about their family's ability to travel internationally and live securely in the United States if their child is denied birthright citizenship.

Drs. G. and E. are devoted to this country, their family, and their profession. Their child will be raised in the United States, and they believe that their child should be able to enjoy the benefits, privileges, and responsibilities of living in the United States as a U.S. citizen.

### B.    A.M.L.: 21-year-old daughter of a home health aide with dreams of public service

A.M.L. is a 21-year-old U.S. Citizen from Brooklyn, New York, whose mother, an AFSCME District Council 37 member, works as an in-home health aide to the elderly. A.M.L.'s mother is originally from Mexico, and although she is lawfully authorized to work, she is not a permanent resident. A.M.L. and her 15-year-old younger brother were born in the United States and have never known life anywhere else. If President Trump's Order had been in effect when A.M.L. was born, neither she nor her brother would be U.S. citizens.

12

A.M.L.'s mother works six days a week caring for two elderly individuals who rely on her for the tasks of daily life – she gives them sponge baths; she accompanies patients to their doctor's appointments and translates for those who have limited English proficiency; she ensures that they take their medications; and she prepares meals for them. When asked what her mother's patients would do without her, A.M.L. says that "not a lot of people want to do these jobs," and "if they didn't have my mom there, how would they get places, how would they know when to take their pills, and once they run out [of medication], what would happen then?"

A.M.L. is a college student at New York City College of Technology majoring in human services. She is set to graduate with a bachelor's degree in June 2025 and hopes to eventually work at a government agency or organization that helps people who are in need. A.M.L. notes that her own experience growing up inspires her to help others, recounting the language barriers and racism she and her mom encountered when navigating the requirements of the social service system.

A.M.L. balances her academic responsibilities with work as a temporary clerical associate at the World Trade Center, where she assists with the collection and review of documents for new employee onboarding. She plans to take an examination this summer for a permanent position.

Encouraged by her mother, A.M.L. often contributes to her community by volunteering through her church and helping at local food pantries. She also plans to tutor young children about to start school.

A.M.L. thinks her life would "definitely turn completely upside down" if she were not a U.S. citizen, were subject to deportation, and forced to leave the United States. Being forced to leave the country she knows and loves "would put me back to zero – I have a higher education here, but would I be able to use my degree there? Probably not." A.M.L. describes a distressing state of limbo when reflecting on the prospect of a life without her U.S. citizenship – "It would emotionally hurt [to leave] because I'm [of] Mexican [descent], but I wasn't born there, I would be without my family, friends and colleagues who want me … being forced to leave would place me in the middle of nowhere."

### C.    F.M.: Harvard-educated public school counselor helps low-income students access higher education

F.M., a public school counselor in Boston, MA, and AFT member, comes from a mixed-status family: her parents are undocumented, while she and her three siblings are U.S. citizens.

As a child in Los Angeles, F.M. grew up with her single mother and three siblings. Her mother cared for the children, one of whom struggles with mental illness, by herself, with no extended family nearby. Together, F.M. and her family

14

dealt with various hardships, including multiple experiences of homelessness. She remembers squeezing into the back of her mother's car with her siblings at night.

F.M.'s mother always stressed the importance of education. She believed it was the only viable way for her children to escape poverty and instability. During her senior year of high school, while dealing with a significant decline in her health and the trauma of homelessness, F.M. was determined to attend college, as her mother had wanted. F.M. secured several scholarships, both private and public. She attended the University of California, Los Angeles (UCLA), and then Harvard University for her master's degree in education. F.M. received partial funding from federal student aid to attend both programs, which she would not have qualified for had she been undocumented like her mother.

In college, F.M. realized her commitment to supporting low-income families grappling with homelessness or mental health issues – challenges she and her family had faced. Now a public school counselor, she helps low-income students manage the balance between their academic demands and mental health needs.

Education has been a path to freedom for F.M. allowing her to follow her passion for helping children from low-income and immigrant communities. F.M. is acutely aware that had she not been born in the United States, and thus a U.S. citizen, she would not be able to work assisting students. Had she not been a U.S

citizen, she would have faced barriers to accessing higher education, financial aid, the ability to pursue her dream and, in turn, help others.

**D.    S.: Homecare worker and grandmother whose U.S. citizen grandchildren "are my life"**

S. is a 57-year-old home care worker with two grandchildren who were born in the United States. She is a permanent resident of the United States, a member of SEIU Local 2015, and works providing direct personal care to patient clients in their homes, a job she has performed for the past fifteen years.

S. fled her home in Mexico with her two children to escape domestic violence. In California, her daughter gave birth to a son, S.'s first grandchild, fourteen years ago, and gave birth to a second son six years ago. If the Order had been in effect when S.'s youngest grandson was born, he would not be a U.S. citizen. S. lives directly next door to her grandchildren and cares for them daily, with meals, clothing, and transportation to and from school.

S. loves her work. She assists patient clients who live with a variety of conditions including physical disability, mental illness, and chronic alcoholism. Depending on the individual's needs, she may bathe the client, cook for and feed them, clean house, launder clothing, and/or administer medications. She speaks warmly of one patient she has assisted for fifteen years, who suffers from schizophrenia and calls her "mother."

16

As much as S. loves her work, her grandchildren are "the ultimate" to her. She worries when her 14-year-old grandchild repeatedly asks her, "What will I do if they take us away? If we are deported, what will we do?"

S. adds that, if the Order had been in effect when her youngest grandson was born and thus denied his birthright citizenship, it would have changed the lives of her entire family. She fears for families like hers, who would struggle with the instability and uncertainty of living in the United States without citizenship. S. is concerned about the possibility that the Order would limit her grandson's academic and employment opportunities and expose him to deportation. She could not imagine life in the United States if her grandson had to live in Mexico: "They are my life."

### E.    J.M: Dynamic professor contributes to her students and the community

J.M. is a 50-year-old NEA member and English Professor in Florida. Her parents moved from Peru to New York in the early 1970s when her father was on a student visa. When J.M. was born in New Jersey, her father was still on the student visa, and her mother was not a U.S. citizen or legal permanent resident. If President Trump's Order had been in effect when J.M. was born, she would not have been an American citizen. Today, J.M. and her two sons are U.S. citizens, and her parents also eventually obtained citizenship in the 1990s.

J.M. became a first-generation college graduate and the first in her extended family to earn a doctoral degree, earning scholarships and fellowships. Because she was a U.S. citizen, she was able to pay in-state tuition at Florida public universities. If she had been charged out-of-state tuition, J.M. may not have been able to afford to continue her education and obtain the required credentials for her chosen field.

J.M. is very involved in her school community. She teaches five or six classes per semester, serves on faculty committees, sponsors student clubs, and helps to develop a literature curriculum for aspiring educators. This is important public service work, training the next generation of community members and leaders. J.M. explains that this is particularly crucial at community colleges, where students who have taken nontraditional paths can develop. J.M.'s school is very integrated into the community, regularly partnering with local businesses and other community organizations. J.M. is also very involved in her union at the local and state level, even serving as chapter president and government relations chair.

Over the decades, J.M. has had a positive impact on countless students. As a citizen, she deeply understands the crucial importance of civic participation and voting in all elections, from the national to the local level. She encourages her students to learn about their community and the issues that affect them and to take action according to their individual beliefs.

Travel is an important part of both J.M.'s job and her family life. If she were not a U.S. citizen and able to travel freely and return to the United States, she would be unable to attend professional conferences, an integral part of her professional career. On a personal level, she would be unable to maintain close connections in Peru, where most of her family still lives and where she travels nearly every year.

Yet, J.M.'s Spanish is not fluent enough for her to have made a life in Peru had she been deported. Had her life been uprooted, she predicts that she would have struggled to adapt to a completely different school and university system and may well have had difficulty finding a job. This likely would have meant a completely different life for her and her two sisters – who are also U.S. citizens and educators. If President Trump's Order had been in effect when J.M. was born, J.M. would never have become the dynamic professor that she is today and the United States would have been deprived of her many contributions.

### F.    P.V.: Public school health aide's daily life illustrates the importance of her U.S. citizenship

P.V. is a 33-year-old public school paraprofessional health aide and an AFT member. Her best friend is her sister. P.V. was born in New York to undocumented parents, while her sister was born in Mexico. P.V.'s sister was brought to the United States at the age of two without legal authorization. Despite living in the United States for nearly her entire life, she remains undocumented.

From a young age, P.V. and her sister began to experience very different realities living in the United States based on their status. P.V. got a Social Security number at birth. Her sister did not. P.V. could get a driver's license and work legally. Her sister could not.

These differences became even more apparent when both sisters decided to leave high school and enter the workforce to support their family. P.V.'s sister relied on her for transportation to work because she could not obtain a driver's license. One employer exploited her sister's lack of legal status, knowing she would not challenge unfair treatment for fear of being reported to immigration authorities.

Desperate to step out of the shadows and build a life openly in the United States, P.V.'s family explored various paths to obtain legal status. However, each effort ended in disappointment. They were victimized twice, losing over $10,000, to scams that promised assistance with work visas.

While P.V. was able to obtain her GED and build a career, pursuing her passion for supporting children, and live openly, her sister lived cautiously. P.V.'s parents now reside in Mexico, but her sister cannot visit them. Despite having lived in the United States nearly her entire life, P.V.'s sister still lives under constant threat of detention and deportation.

Her sister is currently battling cancer and is unable to work, making health insurance a significant concern. At one point, she nearly gave up treatment, saying she would prefer to live with cancer than watch her family take on extra jobs to afford her healthcare.

For P.V., the emotional burden of living a life so different from her sister's has been immense. The sisters were raised in the same home, attended the same schools, and shared a similar upbringing; yet, their lives are vastly different. P.V. understands in a deeply personal way that if she had been born when President Trump's plan was in effect, she would not have been a U.S. citizen, and she would have suffered the same deprivations that she witnessed her sister suffering.

### G. Y.: Ph.D. researcher born in the United States and dedicated to helping low-wage healthcare workers

Y. is a forty-year-old U.S. citizen and staff member at SEIU United Healthcare Workers. Both of Y.'s parents are from South Korea. Y. was born in the United States and became a U.S. citizen at birth when her father was legally present on a student visa and her mother was on a spousal student visa. If born under the Trump administration's Order, Y. would not have been an American citizen. Y. notes that "I have seen so many times firsthand how U.S. citizenship can make a difference in people's lives, including my own."

Y.'s family moved to South Korea from the United States when she was ten years old. Y. remembers the move being extremely hard for her and constantly

asking to be sent back to the United States. Y. returned to the United States for college, which was only possible because, as a citizen, she was eligible for various grants and loans. Y. completed her undergraduate degree as well as a master's degree and eventually a Ph.D. in urban planning and public policy. Now Y. returns to South Korea every few years to visit her family. Most recently she was able to fly out last minute for services after her grandfather passed on New Year's Day. Without her U.S. citizenship her last-minute trip would have been impossible.

Y. is an avid and regular voter ever since her return to the United States at age nineteen. Before Y. began her job at the union, she worked at a think tank that advanced voting rights and election law reform. Y. believes voting is important because "it is absolutely vital for me to have my voice heard, to hold our elected officials accountable, and also to advance policies through ballot initiative process."

As a graduate student, Y. was heavily involved in her graduate student union, where she befriended many international students. Y. observes that many of her international student friends were severely restricted in their choices because of the increased cost of their "non-resident" tuition as well as their need to maintain their foreign-student immigration status which was dependent on advisors continued funding and sponsorship.

Y. performs research and analysis to support union efforts to ensure that workers, especially low wage healthcare workers – predominately women, immigrants, and people of color – have a voice in their jobs. Y. also works on policies that increase access to quality healthcare and jobs for all workers. Y. has found that this work is a compelling way of improving the lives of those most disenfranchised in this country.

Y. believes that if she had not been able to return to the United States, her life would have been completely different. Y. thinks that the sexism in South Korea would have made it extremely hard for her to thrive in the same way she has been able to in the United States. Due to her U.S. citizenship, Y. has been able to pursue further education, vote, and have her voice heard in the electoral process, meet her husband, visit her family in South Korea and her friends from school around the world, and build a fulfilling career helping others.

**H.    F.: Teacher and family childcare provider whose education and career were possible because of her U.S. citizenship**

F. is a 48-year-old family childcare provider and SEIU Local 99 member who lives near Edwards Air Force Base in California. Both of her parents came to the United States from Mexico without authorization and neither had immigration status when F. was born in Los Angeles. If the Order had been in effect then, F. would not have been born an American citizen. Today, F. and her three children are U.S. citizens, and her mother is deceased. Two of F.'s children continue to live

with her, and F. provides financial and emotional support for her 70-year-old father.

F.'s first education-related job was as a preschool teacher providing specialized education for developmentally disabled children. In 2003, she established a family childcare in her home, after attending college and training in childhood development. Currently, she serves several families each day, regularly caring for twelve infants and toddlers with her staff by feeding them, changing diapers, reading to them, playing with them, coordinating activities, supervising staff, providing first aid as necessary, and other needed tasks while their parents are at work.

F. is dedicated to her clients, many of whom are single mothers working multiple jobs to make ends meet. She takes pride in preparing the small children for school by providing a stable, social environment where they can learn foundational skills. Moreover, she expresses care and concern for the parents who depend on her, knowing that some parents would lose their jobs or housing and be forced to rely on public benefits if they could not access the services F. provides.

Given those experiences and others, F. is particularly aware of how profoundly different her life would have been had she not been born a U.S. citizen. She would have been unable to obtain the education and training necessary to become a qualified preschool teacher. Without her U.S. citizenship she would have

been unable to get her first job, would have experienced the insecurity and trauma of possible removal from the United States, and the inability to support her children or elderly father. "It would be heartbreaking."

## I.    M.: Outstanding high school student who hopes to become a lawyer and represent her community

M. is a native-born U.S. citizen, a high school student at the highly ranked School Without Walls in Washington, D.C., and the daughter of a janitor who is a long-time SEIU 32BJ member. Together M. and her mother, a Temporary Protected Status (TPS) recipient from El Salvador, reside in Washington, D.C., where M. has lived her entire life. Under President Trump's Order, M. would not be a U.S. citizen because at the time of her birth her mother had TPS status and her father was neither a U.S. citizen nor legal resident.

M., an exceptional student who was accepted at School Without Walls after a rigorous interview and enrollment process, plans to attend an ivy league or other premier university to achieve her goal of becoming an attorney. In preparation for this goal, M. has visited and toured Harvard. "I intend to become a lawyer and to help and represent the people in my community. I don't think that it's enough to just enjoy the great educational benefits that I receive at my school. I think it's my responsibility to give back, including giving back to my mother, who has done so much for me." M. hopes to earn enough money in the future to buy a house for her mother.

M. understands that her U.S. citizenship provides her with opportunities that she would never have had if President Trump's Order were in effect when she was born. During a visit to El Salvador several years ago with her uncle, she witnessed first-hand the appalling conditions and the lack of educational supplies in Salvadoran schools. "I brought paper and pencils to schools in El Salvador because without those donations, the students would have had nothing." She also observed that the people she met in El Salvador worked selling food on street corners. M. concludes that her educational and career aspirations could only be achieved because she is a U.S. citizen living in the United States.

M. is active in her Catholic church, participating in a church group that helps fundraise for members of the community that need assistance. As part of this church group, M. traveled to Portugal two years ago for an audience with the Pope. "I am so grateful that because I am a U.S. citizen I was able to travel freely to have an amazing experience meeting the Pope and that I also had the ability to see my mother's country, El Salvador."

M. is looking forward to her 18th birthday not only because she will be graduating high school and getting ready to go to college, but also because she will be able to vote. "I want to participate in choosing our country's leaders. I think voting is important and it will mean a lot to me when I'm 18 and I can have a voice

26

in picking who will lead our country." M. appreciates that it is only because she is a U.S. citizen that she can vote and make her voice heard.

### J.    J.: Dedicated surgeon who fears his U.S. citizen daughter will be stateless if her birthright citizenship were denied

J. is a 36-year-old surgeon and an active member of SEIU's CIR who lives in New York. He and his wife were born in Mexico, and both came to the United States five years ago, pursuant to a J-1 visa for medical training. J.'s employer, a leading academic medical center, later sponsored him for an O-1 visa due to his extraordinary ability and achievements in clinical practice and research.

Two years ago, J.'s daughter was born in New York and is a U.S. citizen. If the Order had been in effect, then J.'s daughter would not be a U.S. citizen. J. and his wife want to have another child but the prospect of subjecting their U.S.-born children to the trauma of living in the United States as virtually stateless people is inconceivable to J.

Returning to Mexico would endanger the entire family. To return to Mexico as a highly paid professional after training in the United States is very dangerous. Criminal organizations threaten those perceived as wealthy with kidnapping, torture, and murder and frequently carry out these warnings.

J. is also concerned about the effects the Order would have on the client population he serves, who are among society's most vulnerable and who are grappling with life-threatening conditions. The people J. treats often don't speak

27

English, and many come from different countries as first- or second-generation immigrants. J. is able to understand the nuances and complexities of the symptoms and situations his Hispanic patients describe. Without the type of specialized service J. provides, care can be delayed, surgeries postponed, and diagnoses can be missed because surgeons and interpreters don't communicate as clearly as he can.

Additionally, J. worries that if his children did not have U.S. citizenship due to the Order he would be prevented from traveling for his work. International travel is fundamental to J.'s profession, to update his medical knowledge and "to learn from people who are the best of the best in the field." In addition to his clinical and surgical practice, J. has been involved in research to enhance quality of services and screening programs for early cancer detection.

J. says that "[o]ur intention is to stay here. I have more of an opportunity to contribute to the field, and to particular patients, here, because the resources in Mexico are much more limited. My bigger picture impact would be much more limited too, because there's no funding to do the research, or the infrastructure to collaborate with other experts." Similarly, J. believes that the Order could "scare away a lot of people with unique sets of skills from coming to the U.S."

These experiences demonstrate the devastating consequences and irreparable harm that denying birthright citizenship would have on children born in the United States, their families, their communities, their workplaces, and the nation.

28

## <u>CONCLUSION</u>

The district court's orders granting a preliminary injunction should be affirmed.

Dated: June 17, 2025                      Respectfully submitted,


                                         <u>/s/ Steven K. Ury</u>
                                         Steven K. Ury
                                         Elena Medina
                                         Deborah L. Smith
                                         Mac McMechan
                                         Service Employees International Union
                                         1800 Massachusetts Avenue, N.W.
                                         Washington, D.C. 20036
                                         (202) 730-7466

                                         *Attorneys for Amicus Curiae SEIU*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,410 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

Dated: June 17, 2025                               Respectfully submitted,


/s/ Deborah Smith
Deborah Smith

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 17, 2025, I electronically filed this brief with

the Clerk of the Court for the U.S. Court of Appeals for the First Circuit by using

the appellate CM/ECF system. I certify that all participants are registered CM/ECF

users, and that service will be accomplished by the appellate CM/ECF system.


/s/ Steven K. Ury
Steven K. Ury